UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,

                Plaintiff,

v.

MARIA VULLO, in her official capacity as Superintendent Financial Services of the New York State Department of Financial Services,

                Defendant.

17 Civ. _____

---

## COMPLAINT FOR DECLARATORY RELIEF, TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

---

Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Robert A. Long, Jr. (*pro hac vice* pending)
Henry B. Liu (*pro hac vice* pending)
Jonathan Y. Mincer (*pro hac vice* pending)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

*Attorneys for Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") brings this Complaint for declaratory, injunctive, and all other appropriate relief against Defendant Maria Vullo, in her official capacity as Superintendent Financial Services (the "Superintendent") of the New York State Department of Financial Services ("DFS"). In support of the requested relief, Plaintiff alleges as follows:

## INTRODUCTION

1. This action seeks to prevent the Superintendent of DFS from enforcing an order that clearly violates federal law and that would require BTMU to violate the terms of its recently issued federal licenses. Without the requested relief, BTMU will be placed in the untenable position of being subject to an order that requires it to violate federal law and of being subject of competing demands from different banking regulators.

2. On October 30, 2017, BTMU submitted applications to the federal Office of the Comptroller of the Currency ("OCC") to convert its then-state-licensed branch and agency offices into federally-licensed branch and agency offices. BTMU sought this conversion as part of a larger effort to consolidate its U.S. banking operations and streamline its supervisory and regulatory requirements. Before the conversion, four different state regulators—in California, Illinois, New York, and Texas—supervised BTMU's state-licensed branches and agencies, and the OCC supervised its national bank subsidiary in California. Now that the conversion has occurred, the OCC supervises each of BTMU's banking operations in the United States.

3. On November 7, 2017, the OCC approved BTMU's application and issued federal licenses to BTMU's branch and agency offices. As of that date, all of BTMU's branches and agencies, in addition to its national bank subsidiary in the U.S., became subject to supervision and regulation by the same federal banking agency—the OCC. Accordingly, BTMU's U.S. banking operations are now governed by a consistent set of federal standards and supervisory

-1-

expectations, which in turn will allow BTMU to share resources, operate more efficiently, and serve customers more effectively. A copy of the OCC Decision Letter is attached as Exhibit A to this Complaint, and copies of the federal licenses issued by the OCC are attached as Exhibit B to this Complaint.

4. Even though federal law duly authorizes the OCC to approve conversions and exercise exclusive supervisory authority over federal branches and agencies of foreign banks, *see* 12 U.S.C. § 3102(f), the Superintendent of DFS has taken action that seeks to upend the OCC's authority, in clear contravention of federal law. Shortly after BTMU received its federal licenses from the OCC and BTMU informed the DFS's examiners of that fact, the Superintendent took the extraordinary step of issuing an order requiring BTMU, among other things, to continue to submit to the supervisory activity of the DFS. A copy of the Superintendent's Order Pursuant to New York Banking Law and Financial Services Law is attached as Exhibit C to this Complaint.

5. Well-established federal law bars the Superintendent's extraordinary action. The Superintendent's order is preempted by federal law because it is an attempted exercise of supervisory powers over federally-licensed branch and agency offices that are now within the exclusive province of the OCC.

6. Under the International Banking Act and the National Bank Act, the OCC exercises exclusive "visitorial powers" over the activities of federally-licensed branches and agencies of foreign banks, subject only to very limited exceptions not applicable here. *See* 12 U.S.C. §§ 484(a), 3102(b); 12 C.F.R. § 28.13(a); OCC Decision Letter at 6 ("[T]he Federal licenses for the Federally-licensed [BTMU] Branches and Agencies supersede and replace the state licenses of the [BTMU] Branches and Agencies previously operated at such locations, and the Federally-licensed BTMU/MUTB Branches and Agencies shall not be subject to the

visitorial powers of the state authority by which each of their predecessors was licensed prior to the conversions."). Visitorial powers include (i) "[e]xamination of a bank," (ii) "[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law," and (iii) "[e]nforcing compliance with any applicable Federal or state laws concerning those activities." 12 C.F.R. § 7.4000. Once a branch is federally-licensed, as BTMU is now, a state regulatory agency such as DFS may not "prevent or . . . significantly impair the exercise of authority" by the OCC over that branch's activities. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007).

7. The Superintendent's order is facially invalid and puts BTMU in an impossible position. The order would require BTMU to violate the terms of its recently issued federal licenses. Without judicial relief, BTMU will be placed in the untenable position of being subject to a DFS order that requires it to violate both federal law and the directives of the OCC and of being subject of competing demands from state and federal banking regulators.

## THE PARTIES

8. Plaintiff BTMU is Japan's largest bank and one of the world's largest, with offices throughout Japan and in 40 other countries. BTMU is one of the two primary banking institutions owned by Mitsubishi UFJ Financial Group, Inc. ("MUFG"), a diversified bank holding company incorporated as a joint stock company under the Companies Act of Japan. In the United States, BTMU has two branches in New York, additional branches in California and Illinois, and agency offices in Texas. As a result of the recent conversions and the OCC's issuance of federal licenses, BTMU's branches and agencies in the United States, including its branches in New York, are now federal branches and agencies established in accordance with the International Banking Act, 12 U.S.C. § 3101 *et seq.*

9. BTMU has provided banking services in New York since 1880. BTMU's New York branch provides a full range of commercial- and investment-banking services in the Americas to its corporate-banking clients in the United States, Canada, Latin America, and Asia. Today, BTMU's New York branch is the second-largest branch of a foreign bank in the United States by assets.

10. Defendant Maria Vullo is the Superintendent Financial Services of the New York State Department of Financial Services. As such, she is the state official charged by state law with enforcing compliance with the New York Banking Law, including over foreign-bank branches and agencies licensed by the Superintendent to conduct banking business in New York. *See* N.Y. Banking Law §§ 10–45, 94–140-a, 200–209, 221-a–221-k.

## JURISDICTION AND VENUE

11. BTMU seeks declaratory and injunctive relief from this Court to declare that the Superintendent has no authority to issue the order she issued on November 8, 2017 and enjoining her and her agents from taking any action under the order. This order, and any actions under it, are barred by federal law and the U.S. Constitution and threaten immediate and irreparable harm to BTMU.

12. This action arises under the International Banking Act, the National Bank Act, and the Supremacy Clause of the United States Constitution.

13. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202.

14. Venue in this District is proper under 28 U.S.C. § 1391(b)(1) because the Superintendent resides in this District and under § 1391(b)(2) because the events and omissions giving rise to this case occurred in this District.

## THE INTERNATIONAL BANKING ACT, THE NATIONAL BANK ACT, AND OCC REGULATIONS

15. The International Banking Act grants BTMU a federal right to seek conversion of BTMU's state-licensed foreign branches and agency offices to federally-licensed foreign branches and agency offices. *See* 12 U.S.C. § 3102(f). Now that BTMU has exercised that right and obtained federal licenses, regulation of BTMU's U.S. business is consolidated in a single regulatory body, the OCC, and unified federal standards apply across all of BTMU's U.S. branches and offices, including unified regulation regarding examinations, inspection and production of books and records, and prosecution of enforcement actions.

16. Under the International Banking Act, foreign banks' federally-licensed branches and agencies are entitled to "the same rights and privileges as a national bank" and are "subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank." 12 U.S.C. § 3102(b); *see also* 12 C.F.R. § 28.13(a) (federal branches of foreign banks are afforded "the same rights and privileges" as a "national bank"); OCC Decision Letter at 6 (same); OCC Interp. Letter No. 280 (Dec. 1, 1983) (federal branches of foreign banks "are treated as national banks" under National Bank Act and subject to OCC's exclusive regulatory authority); *cf.* 12 U.S.C. § 25b(a)(1) (defining "national bank" to include "any Federal branch established in accordance with the International Banking Act" for purposes of state-law preemption standards for national banks).

17. The National Bank Act affords the OCC exclusive regulatory, supervisory, examination, and enforcement authority over national banks—and thus over federally-licensed branches and agencies of foreign banks—subject only to very limited exceptions not applicable here. *See* 12 U.S.C. § 484(a); 12 C.F.R. § 7.4000. Section 484 of the National Bank Act provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by

Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized." Section 484(b) provides only a limited exemption to this exclusive federal visitorial power over national banks "solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with such laws." 12 U.S.C. § 484(b).

18. Interpreting Section 484, OCC regulations likewise provide that "[o]nly the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks." 12 C.F.R. § 7.4000(a)(1). "State officials may not exercise visitorial powers with respect to national banks . . . ." *Id.* Visitorial powers are defined broadly to include "[e]xamination of a bank," "[i]nspection of a bank's books and records," "[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law," and "[e]nforcing compliance with any applicable Federal or state laws concerning those activities." *Id.* §§ 7.4000(a)(1)-(a)(2). State regulators may not exercise such powers over national banks or federal branches or agencies of foreign banks. 12 U.S.C. § 3102(b); *see also* 12 C.F.R. § 28.13(a). Accordingly, BTMU's conversion of its state licenses has resulted in uniform, exclusive oversight by the OCC of all of BTMU's branches, agencies, and offices in the United States.

19. Consistent with these statutory and regulatory provisions, the Supreme Court has affirmed that the OCC exercises generally exclusive "visitorial power" over the "content and conduct" of national banks' activities. In *Watters*, the Supreme Court reiterated its century-old precedent that "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent." 550 U.S. at 13–14.

As the Supreme Court explained, visitation "'is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce[s] an observance of its laws and regulations.'" *Id.* at 14 (quoting *Guthrie v. Harkness*, 199 U.S. 148, 158 (1905)). "Recognizing the burdens and undue duplication state controls could produce," the Supreme Court emphasized that "Congress included in the NBA an express command: 'No national bank shall be subject to any visitorial powers except as authorized by Federal law . . . .'" *Id.* (quoting 12 U.S.C. § 484(a)). The Supreme Court thus concluded that a state "cannot confer on its commissioner examination and enforcement authority over mortgage lending, or any other banking business done by national banks." *Id.* at 14–15.

20. Indeed, the Supreme Court in *Watters* found it "[b]eyond genuine dispute" that "state law . . . may not curtail or hinder a national bank's efficient exercise of any . . . power, incidental or enumerated under the NBA." *Id.* at 13. The Court further reiterated that it has "'interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law.'" *Id.* at 12 (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996)).

## FACTS COMMON TO ALL COUNTS

### A. BTMU's U.S. Operations

21. Plaintiff BTMU is a major commercial-banking organization and one of two primary banking institutions owned by MUFG, a diversified bank-holding company incorporated as a joint-stock company under the Companies Act of Japan. In the United States, BTMU operates branches in New York, California, and Illinois, as well as agency offices in Texas.

22. In New York, BTMU technically has two branches because it has personnel working in two separate office buildings, but these branches operate as a single branch. BTMU's key business lines in New York are (i) U.S. Corporate Banking, which provides

-7-

commercial- and investment-banking products and services, as well as capital-market services, to large investment-grade, U.S.-based corporations that issue short-term debt in the public capital markets; (ii) Asian Corporate Banking (East), which provides similar products and services to Japanese and Asian corporate clients in the U.S.; and (iii) the Global Markets Division for the Americas, which engages in sales and trading of financial instruments and funds the assets and liabilities of BTMU's businesses in the Americas. As of March 31, 2017, BTMU's New York branch had total assets of $135.3 billion.

23. BTMU operates branches and agency offices in three other states: BTMU has branches in Los Angeles, California and Chicago, Illinois, as well as agency offices in Dallas, Texas and Houston, Texas. In its Los Angeles and Chicago branches, BTMU offers corporate and commercial-lending services, as well as marketing of financial products and services to be provided by other BTMU U.S. offices and MUFG entities. In its Dallas and Houston agency offices, BTMU actively solicits business to be provided by BTMU's New York branch and other MUFG entities.

24. BTMU also operates in the United States through a subsidiary, MUFG Union Bank N.A. ("Union Bank"), formerly known as Union Bank, N.A. Union Bank is a leading regional bank in California, ranked by the Federal Deposit Insurance Corporation ("FDIC") as the 22nd largest bank in the United States measured by total deposits as of December 2016. Union Bank provides a wide range of financial services to consumers, small businesses, middle-market companies, and major corporations, primarily in California, Oregon, Washington, and Texas.

25.     In recent years, MUFG has moved to integrate the management, strategy, and controls of its U.S. operations, including Union Bank and BTMU's various branches and agencies.

26.     Before November 2017, BTMU's U.S. operations were subject to multiple supervisory and regulatory schemes. Four different state regulators (in California, Illinois, New York, and Texas) and the Federal Reserve System supervised the state-licensed branches and agency offices of BTMU, and the OCC supervised Union Bank—MUFG's largest U.S. banking operation. This patchwork of supervisory and regulatory schemes created great inefficiencies and imposed additional costs on BTMU's operations in the United States.

### B.    BTMU's Application for Conversion to Federally-Licensed Branches

27.     On October 30, 2017, BTMU submitted to the OCC applications to convert its state-licensed branches in New York, Illinois, and California to federally-licensed branches, as well as to convert its state-licensed agencies in Texas to federally-licensed agencies.

28.     BTMU sought conversion to enhance the efficiency of the supervisory and regulatory framework applicable to its U.S. operations. As a result of the conversion, federal regulators now are able to oversee the entirety of BTMU's operations in a more effective, orderly, and expeditious manner than if coordination were required with four different states' banking regulators. All of the BTMU's U.S. operations are now subject to primary supervision and regulation by a single federal banking agency—the OCC—and to a consistent and well-defined body of federal standards and requirements.

29.     Federal banking agencies increasingly have favored policies that call for the centralization of foreign banks' U.S. operations—for example, by requiring the formation of intermediate holding companies to hold the U.S. subsidiaries and non-branch assets of large foreign banks, by imposing certain centralized risk-management standards on the combined U.S.

operations of foreign banks, and by issuing other informal guidance and supervisory expectations to foreign banks. Consolidating the supervision and regulation of BTMU's national bank, branches, and agencies in the United States within a single primary banking agency—the OCC—is consistent with these policies.

30. In addition, since the applications have been granted, BTMU is now able to operate its U.S. offices and Union Bank more efficiently. Many of the personnel operating BTMU's U.S. branches and agencies are already technically employees of Union Bank and have "dual-hatted" roles with respect to both BTMU and Union Bank, meaning that they support both entities and, depending on seniority, have authority to act on behalf of both entities. These employees are now able to manage the operations of BTMU's U.S. branches and agencies and the operations of Union Bank in a more coordinated manner. As a result of a multi-year process for streamlining the organization, BTMU's governance structure also now includes dedicated senior executive officers responsible for managing all of its U.S. operations, including its branches, agencies, and Union Bank. The conversion of BTMU's state branches and agencies into federal branches and agencies has facilitated further coordination of BTMU's U.S. operations. For instance, Compliance and Legal personnel of Union Bank have substantial experience complying with the legal and regulatory regime that applies to BTMU following conversion because the federal legal and regulatory regime is very similar to the regime that applied to Union Bank even before BTMU filed its application. Moreover, business managers across BTMU's U.S. operations are now subject to a consistent set of standards and supervisory expectations with respect to risk management, third-party vendor oversight, and cybersecurity. This allows legal entities and offices to share resources, operate more efficiently, and serve customers more effectively.

31.     Section 4 of the International Banking Act (12 U.S.C. § 3102(f)) and Section 28.12 of OCC regulations (12 C.F.R. § 28.12) expressly authorize the conversions of state-licensed branches or agencies of foreign banks to federally-licensed branches or agencies. Federal law also provides that "[i]n establishing and operating a Federal branch or agency, a foreign bank shall be subject to such rules, regulations, and orders as the Comptroller considers appropriate . . . ." 12 U.S.C. § 3102(b). In determining whether to approve a conversion application, the OCC generally considers the following six factors:

> (1) The financial and managerial resources and future prospects of the applicant foreign bank and the Federal branch or agency; (2) Whether the foreign bank has furnished to the OCC the information the OCC requires to assess the application adequately, and provided the OCC with adequate assurances that information will be made available to the OCC on the operations or activities of the foreign bank or any of its affiliates that the OCC deems necessary to determine and enforce compliance with the IBA and other applicable Federal banking statutes; (3) Whether the foreign bank and its United States affiliates are in compliance with applicable United States law; (4) The convenience and needs of the community to be served and the effects of the proposal on competition in the domestic and foreign commerce of the United States; (5) With respect to an application to establish a Federal branch or agency outside of the foreign bank's home state, whether the foreign bank is subject to comprehensive supervision or regulation on a consolidated basis by its home country supervisor . . . ; and (6) Whether the home country supervisor has consented to the proposed establishment of the Federal branch or agency.

12 C.F.R. § 28.12(b).

32.     In addition, the OCC has issued guidance stating that it typically considers whether the applicant's financial condition poses any supervisory concerns, whether there are any safety or soundness concerns, whether conversion is inconsistent with applicable laws or regulations, and whether the applicant is trying to escape supervisory action by its current regulator. *See* OCC, *Comptroller's Licensing Manual: Federal Branches and Agencies* 47 (Oct.

-11-

2017), *available at* https://www.occ.treas.gov/publications/publications-by-type/licensing-manuals/lm-fba2.pdf.

### C. The OCC's Approval of BTMU's Application

33. On November 7, 2017, the OCC determined that BTMU satisfied the foregoing standards for conversion and issued federal licenses to BTMU's branches and agencies. As of that date, BTMU's branches in New York, California, and Illinois became federally-licensed branches, and its agencies in Texas became federally-licensed agencies—all supervised by the OCC and Federal Reserve System.

34. Before the conversions, BTMU had entered into consent decrees in 2013 and 2014 with the DFS arising out of BTMU's provision of U.S. dollar clearing services to certain entities in Iran, Sudan, and Myanmar. In approving the conversion applications, the OCC imposed certain express conditions on BTMU to "ensure the converted branch continues to be subject to the substantive requirements that were in the" prior DFS orders. OCC Decision Letter at 3 Specifically, the OCC required BTMU's primary New York branch, five business days after converting, to enter a consent order with the OCC containing substantive requirements based on the DFS orders. *Id.*

35. Now that conversion has occurred, the OCC is vested with full and exclusive supervisory authority over BTMU's branches and agencies. The OCC's letter approving the applications states: "[T]he Federal licenses for the Federally-licensed [BTMU] Branches and Agencies supersede and replace the state licenses of the [BTMU] Branches and Agencies previously operated at such locations, and the Federally-licensed [BTMU] Branches and Agencies shall not be subject to the visitorial powers of the state authority by which each of their predecessors was licensed prior to the conversions." OCC Decision Letter at 6. The OCC is

amply qualified to supervise BTMU's branches and agencies with respect to the subject matter of the 2013 and 2014 consent orders.

### D. The Superintendent Seeks to Undo BTMU's Conversion

36. Although federal law expressly and exclusively authorizes the OCC to approve conversion applications and supervise federally-licensed branches and agencies of foreign banks, *see* 12 U.S.C. § 3102(f), the Superintendent has taken action that threatens to upend the OCC's authority.

37. On October 31, 2017, representatives of BTMU notified the DFS of BTMU's conversion application. The DFS informed BTMU that it planned to consider the matter internally and then would contact BTMU to discuss the conversion applications further. On November 7, 2017, the OCC approved BTMU's application and issued federal licenses to BTMU's branch and agency offices. BTMU then informed the DFS of the OCC's issuance of these federal licenses.

38. On November 8, 2017, the DFS issued an order (signed Shirin Emami, Executive Deputy Superintendent – Banking) asserting uninterrupted and unimpeded supervisory authority over BTMU. The order states that, effective immediately:

- "All supervision of the [DFS] shall continue uninterrupted and unimpeded, including, but not limited to, the ongoing examination of the New York Branch currently being conducted by the [DFS] . . . ."

- "The Bank and the New York Branch shall comply with all New York laws, regulations, orders and agreements . . . ."

- "The Bank and the New York Branch remain subject to all supervisory and enforcement activity . . . ."

- "The Bank and the New York Branch shall preserve all documents and information in their possession, custody or control . . . ."

39. On information and belief, the Superintendent issued its order solely in an effort to obstruct BTMU's conversion of its state licenses to federal licenses, and not for any other reason. There is no apparent reason for the Superintendent's order at this point other than to punish BTMU for its application to the OCC and to challenge the OCC's supervisory authority and licenses under federal law.

40. The Superintendent's order constitutes the purported exercise of visitorial powers over BTMU. Federal law preempts this action because BTMU's New York branches are now federally-licensed and thus no longer subject to the visitorial powers of the Superintendent.

## The Need for Immediate Judicial Relief

41. BTMU will suffer immediate and irreparable harm absent judicial intervention. Unless the Court declares that the order is preempted by federal law, BTMU is subject to an order from a state banking regulator that requires it to violate the terms of both its license from the OCC and federal law.

42. The Superintendent's order causes BTMU to suffer injury-in-fact sufficient to establish standing. An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Here, the issuance of the order alone causes irreparable harm to BTMU because it orders BTMU to violate the terms of its recently issued license from the OCC and to violate federal banking law.

43. The balance of hardships clearly favors issuance of a temporary restraining order and a preliminary injunction that will permit BTMU to continue to operate under its recently issued federal license. If the Superintendent is not enjoined from attempting to exercise continued supervisory authority over BTMU, BTMU will suffer immediate and irreparable harm.

In contrast, BTMU's New York customers, whom DFS is charged with protecting, will not be harmed at all by such judicial relief because BTMU's New York branches now are fully regulated by the OCC, which has a comprehensive, effective regulatory program. In addition, the OCC has imposed conditions on BTMU ensuring that the substantive requirements of the prior DFS consent orders continue to apply with full force to BTMU's New York branches. Finally, a state does not have a hardship to weigh when it is seeking to enforce a preempted state order. *See Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990).

44. The public interest also favors a temporary restraining order and a preliminary injunction. Under the recently issued federal licenses, the OCC exercises, and will continue to exercise, regulatory authority over all of BTMU's operations in the United States, including in New York. There is a strong public interest in avoiding "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking." *Watters*, 550 U.S. at 13–14. And the public interest is not served when a state agency flouts federal law and violates the Supremacy Clause. *See, e.g., Gattau*, 190 F.3d at 848 (holding that "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law").

### COUNT I – DECLARATORY AND INJUNCTIVE RELIEF
### (Federal Preemption of the Superintendent's Visitorial Authority By 12 U.S.C. §§ 24(Seventh), 484, 3102(b), and 12 C.F.R. § 7.4000)

45. Plaintiff incorporates and realleges each and every allegation contained in paragraphs 1 – 44 of this Complaint as though fully set forth herein.

46. The International Banking Act, the National Bank Act, and OCC regulations preempt the Superintendent's order because BTMU's New York branches are now federally-licensed branches.

-15-

47.     The National Bank Act and related regulations vest in the OCC exclusive visitorial authority over national banks, subject only to very limited exceptions not applicable here. *See* 12 U.S.C. §§ 24(Seventh), 484(a), 1818(b); 12 C.F.R. § 7.4000. Under the International Banking Act, this exclusive visitorial authority applies equally to federally-licensed branches of foreign banks. *See* 12 U.S.C. § 3102(b); 12 C.F.R. § 28.13(a).

48.     Through her actions, the Superintendent seeks to continue to regulate and supervise the banking activities of the federally-licensed branches of BTMU. Because the OCC now has exclusive visitorial authority over those branches, the Superintendent's actions are preempted under Article VI of the United States Constitution; by the International Banking Act, 12 U.S.C. § 3102; the National Bank Act, 12 U.S.C. §§ 24(Seventh) and 484; as well as by 12 C.F.R. § 7.4000.

49.     In addition, the Superintendent's actions are preempted because they prevent or significantly interfere with BTMU's exercise of federally-protected banking powers under the International Banking Act, 12 U.S.C. § 3102, and the National Bank Act, 12 U.S.C. §§ 24(Seventh) and 484. *See Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996) (state laws are preempted if they "prevent or significantly interfere with" the exercise of federal banking powers).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd. demands judgment against Defendant Maria Vullo, in her official capacity as Superintendent Financial Services of the New York State Department of Financial Services for the following relief:

A.     A judgment declaring that Defendant has no authority to issue the order issued on November 8, 2017, or exercise any other authority over Plaintiff's banking operations, purportedly under the New York Banking Law because such action is preempted under Article

VI of the United States Constitution, the International Banking Act, the National Bank Act, and implementing OCC regulations; and because that order violates the International Banking Act, the National Bank Act, and implementing OCC regulations;

B.   A temporary restraining order, pending a hearing on a motion for a preliminary injunction in this action, that enjoins Defendant and her agents from taking any action under the order or otherwise taking any action to prevent or interfere with, either directly and indirectly, Plaintiff's banking operations in New York, and from otherwise exercising visitorial powers over Plaintiff and/or its officers, employees, or agents because Plaintiff has no adequate remedy at law and will suffer irreparable injury as a result of Defendant's above-described threatened enforcement of the New York Banking Law against Plaintiff and/or its officers, employees, or agents;

C.   A preliminary injunction, pending final resolution of this action, that enjoins Defendant and her agents from taking any action under the order or otherwise taking any action to prevent or interfere with, either directly and indirectly, Plaintiff's banking operations in New York, and from otherwise exercising visitorial powers over Plaintiff and/or its officers, employees, or agents because Plaintiff has no adequate remedy at law and will suffer irreparable injury as a result of Defendant's above-described threatened enforcement of the New York Banking Law against Plaintiff and/or its officers, employees, or agents;

D.   A permanent injunction that enjoins Defendant and her agents from taking any action under the order or otherwise taking any action to prevent or interfere with, either directly and indirectly, Plaintiff's banking operations in New York, and from otherwise exercising visitorial powers over Plaintiff and/or its officers, employees, or agents because Plaintiff has no adequate remedy at law and will suffer irreparable injury as a result of Defendant's above-

described threatened enforcement of the New York Banking Law against Plaintiff and/or its officers, employees, or agents; and

    E.    The grant to Plaintiff of such other and further relief, including costs, as the Court may deem just and proper.

DATED: New York, New York
November 8, 2017

Respectfully submitted,

By: /s/ Richard C. Pepperman II
Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000
peppermanr@sullcrom.com
newtonb@sullcrom.com

Robert A. Long, Jr. (*pro hac vice* pending)
Henry B. Liu (*pro hac vice* pending)
Jonathan Y. Mincer (*pro hac vice* pending)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
rlong@cov.com
hliu@cov.com
jmincer@cov.com

*Attorneys for Plaintiff*