UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF TOKYO-MITSUBISHI UFJ,
LTD.,

                       Plaintiff,

                v.

MARIA VULLO, in her official capacity as
Superintendent of Financial Services of the New
York State Department of Financial Services,

                    Defendant.

1:17-cv-08691-SHS

---

## AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Robert A. Long, Jr. (*pro hac vice*)
Henry B. Liu (*pro hac vice*)
Jonathan Y. Mincer (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000

*Attorneys for Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") brings this Amended Complaint for declaratory and injunctive relief against Defendant Maria Vullo in her official capacity as Superintendent of Financial Services of the New York State Department of Financial Services.  The Superintendent and her agents are collectively referred to herein as the "DFS."  In support of the requested relief, Plaintiff alleges as follows:

## INTRODUCTION

1.       This action seeks a declaratory judgment that (i) BTMU's federal licenses issued by the United States Office of the Comptroller of the Currency ("OCC") on November 7, 2017 are valid and effective, (ii) federal law preempts BTMU's former New York regulator, the DFS, from bringing an enforcement action against or exercising any other visitorial powers over BTMU now that BTMU is federally licensed, and (iii) federal law preempts the *Order Pursuant to New York Banking Law and Financial Services Law* (the "DFS Order") issued by the DFS on November 8, 2017 after BTMU received its federal licenses.  In addition to declaratory relief, BTMU seeks an injunction preventing the DFS from pursuing any enforcement action or exercising any other form of visitorial powers that violates federal law and from enforcing the DFS Order.

2.       Since the OCC issued federal licenses to BTMU, the DFS has publicly— and repeatedly—challenged the validity and effectiveness of those licenses.  In a November 13, 2017 letter to the OCC that almost immediately appeared in the media and received widespread attention, the DFS claimed that "[t]he OCC should not have approved the BTMU [license] conversion applications."  The DFS similarly stated in open court in this action on November 9 that "we want to reserve all rights that we have to challenge [BTMU's] conversion and license before the Court or another court."  And the DFS Order issued on November 8 asserts that the

conversion of BTMU's licenses must be carried out "in a manner that is in full compliance with the Banking Law . . . and all other applicable laws of the State of New York."

3.      With its former state regulator publicly challenging the validity of the licenses that permit BTMU to engage in banking activities in New York, BTMU is being forced to operate under a cloud of uncertainty.  Under its federal licenses, BTMU is entitled—indeed, obligated—to adhere to OCC, not DFS, supervision and regulatory requirements.  With each day that passes, however, BTMU's adherence to a federal (instead of a New York) regulatory framework puts it at risk:  if the DFS later were somehow able to invalidate the licenses issued by the OCC, the DFS then could seek to penalize BTMU for an alleged breach of its duties under state law while the federal licenses were in place.  Rather than being forced to endure such uncertainty and risk—as well as the reputational damage caused by the DFS's claims and its extraordinary release of confidential supervisory information concerning the bank—BTMU is entitled to a judicial declaration confirming the validity and effectiveness of its federal licenses. BTMU should not be required simply to wait for the DFS to follow through on its threat to sue for invalidation of BTMU's licenses.

4.      BTMU also remains under active threat of unlawful enforcement activity by its former state regulator.  The DFS's position that it retains enforcement authority over BTMU, combined with its public allegations of misconduct by BTMU, subjects BMTU to a significant continuing risk of a DFS enforcement action.  Federal preemption principles, however, prohibit *any* attempted exercise by the DFS of visitorial powers over BTMU's New York branches.  Unless the Court grants the requested relief, BTMU will be forced to operate under the looming threat that the DFS will pursue enforcement activities against BTMU.  BTMU also will remain subject to the DFS's claim that the DFS Order is valid and enforceable,

notwithstanding that the DFS Order violates federal law and interferes with BTMU's exercise of federally-protected banking powers.  The DFS's disregard of well-settled federal preemption principles puts BTMU in an untenable position by creating uncertainty, inflicting reputational injury and leaving BTMU exposed to unlawful state enforcement activities.

5.      On October 30, 2017, as expressly permitted by federal statute, BTMU submitted applications to the OCC to convert its state-licensed branches in California, Illinois and New York, and its state-licensed agencies in Texas, to federally-licensed branches and agencies.  BTMU sought this conversion as part of a larger effort to streamline the supervisory and regulatory system under which it operates in the United States and to consolidate its United States banking operations.  The Board of Governors of the Federal Reserve System (the "Federal Reserve") has encouraged foreign banks to simplify the structure of their United States operations and establish unified governance and risk-management systems.

6.      Before the conversion of its licenses, four different state regulators—in each of the aforementioned states—supervised BTMU's state-licensed branches and agencies, and the OCC supervised BTMU's national bank subsidiary, which operates in California, Georgia, Illinois, New York, Oregon, Texas and Washington.  In addition to the four state regulators, the Federal Reserve also regulated BTMU's branches and agencies, as well as both Mitsubishi UFJ Financial Group, Inc. ("MUFG") and BTMU as bank holding companies and MUFG Americas Holdings Corp. as an "intermediate holding company" under Federal Reserve Regulation YY, 12 C.F.R. § 252.153.  The DFS was the state regulator responsible for BTMU's branches in New York (collectively, "BTMU NY").

7.      On November 7, 2017, the OCC approved BTMU's conversion applications and issued federal licenses to BTMU's branches and agencies.  As of that date, all of

BTMU's branches and agencies in the United States, in addition to its national bank subsidiary, became subject to the exclusive visitorial powers of the same federal banking agency—the OCC.[1]  Visitorial powers include examination, regulation, supervision and enforcement.  *See* 12 C.F.R. § 7.4000.  As a result, BTMU's banking operations in the United States are now governed by a consistent set of federal standards and supervisory expectations, which in turn allows BTMU to share resources better, operate more efficiently and serve customers more effectively.[2]

        8.     Even though federal law authorized the OCC to approve the conversion of BTMU's licenses and, after the conversion, vested the OCC with exclusive visitorial powers over BTMU's branches and agencies, *see* 12 U.S.C. §§ 484(a), 3102(b), the DFS has taken and continues to take actions that challenge the validity of BTMU NY's licenses.  On November 7, 2017, shortly after receiving its federal licenses, BTMU informed the DFS examiners assigned to BTMU NY of the OCC's issuance of those licenses.  By operation of federal law, the OCC's issuance of the licenses divested the DFS of any and all continuing visitorial powers over BTMU's New York branches.  Nevertheless on November 8, 2017, *after* being advised of BTMU's federal licenses, the DFS took the extraordinary step of issuing the DFS Order, requiring, effective immediately, that:

---

[1] The Federal Reserve continues to maintain supervisory oversight over MUFG and its combined operations in the United States.

[2] Attached as Exhibit A to this Amended Complaint is a copy of the November 7, 2017 letter from Stephen A. Lybarger, Deputy Comptroller for Licensing of the OCC, to Michael F. Coyne, General Counsel and senior legal officer for the Americas of MUFG, conditionally approving BTMU's license application (the "OCC Decision Letter").  Attached as Exhibit B to this Amended Complaint is a copy of the November 7, 2017 letter from Mr. Lybarger to Stephen Cummings, CEO for the Americas of MUFG, memorializing the OCC's final approval of the conversion.  Attached as Exhibit C to this Amended Complaint are copies of the federal licenses received by BTMU's New York branches.

1.  All supervision activity of the Department shall continue uninterrupted and unimpeded, including, but not limited to, the ongoing examination of the New York Branch currently being conducted by the Department, unless and until any such conversion to an OCC license becomes legally effective (should that event occur).

2.  The Bank and the New York Branch shall comply with all New York laws, regulations, orders and agreements, including, but not limited to, all reporting and record keeping requirements.

3.  The Bank and the New York Branch remain subject to all supervisory and enforcement activities, including the investigation and prosecution of any violations of the Banking Law or the Financial Services Law, for any conduct occurring during the time period of its license from the Department.

4.  The Bank and the New York Branch shall preserve all documents and information in their possession, custody or control that pertain, directly or indirectly, to:

    (a)  the affairs, operations or business of the New York Branch;

    (b)  compliance, or lack of compliance, with New York laws or regulations including, but not limited to, compliance (or lack of compliance) with laws and regulations pertaining to BSA/AML and OFAC matters;

    (c)  all documents relating to matters raised or discussed in any report (written or oral) prepared by the BTMU Consultant [*i.e.*, a consultant retained by BTMU under a consent order with the DFS];

    (d)  information collected by or provided to the BTMU Consultant, including but not limited to, any information or documents relating to (ii) [sic] additional concerns or issues identified by the BTMU Consultant that relate to the Bank's BSA/AML and OFAC sanctions compliance programs and (ii) compliance with the 2013 and 2014 Consent Orders;

    (e)  information self-reported by the Bank and the New York Branch to the BTMU Consultant or the Department about compliance with applicable laws and regulations, including the Bank's BSA/AML and OFAC sanctions compliance programs; and

    (f)  all communications with the Department relating to the 2013 Consent Order and the 2014 Consent Order.

5.  Unless and until any conversion of the license issued by the Department to the Bank to a Federal branch shall become legally effective, and only in the event that such conversion becomes legally effective, the Bank and the New York Branch shall then carry out such conversion in a manner that is in full compliance with

the Banking Law, including, but not limited to, Section 605 of the Banking Law, and all other applicable laws of the State of New York.[3]

9.      The DFS Order asserts that BTMU NY remains subject to DFS "enforcement activities, including the investigation and prosecution of any violations of the Banking Law or the Financial Services Law, for any conduct occurring during the time period of its license from the [DFS]."  DFS Order ¶ 3.  The DFS Order also contends—without any support—that the conversion of BTMU NY's licenses must be carried out "in a manner that is in full compliance with [New York] Banking Law . . . and all other applicable laws of the State of New York."  *Id.* ¶ 5.  Consistent with that contention, the DFS advised this Court at the conference on November 9, 2017 that "we want to reserve all rights that we have to challenge that conversion and license before the Court or another court."  Tr. at 7:24–25.

10.      On November 13, 2017, the DFS expressly challenged the validity of BTMU NY's OCC licenses, citing federal-law theories.  In a November 13, 2017 letter to the OCC (the "November 13 DFS Letter"), the DFS argued that BTMU NY's license conversion violated the National Bank Act, *see* 12 U.S.C. § 35; the International Banking Act, *see* 12 U.S.C. § 3102(b); the Dodd-Frank Wall Street Reform and Consumer Protection Act; the OCC's Licensing Manual for Federal Branches and Agencies (the "Licensing Manual"); and a policy statement published by the Federal Financial Institutions Examination Council ("FFIEC"), of which the OCC is a member.[4]

11.      Despite containing confidential supervisory information regarding BTMU, the November 13 DFS Letter was published in its entirety after the DFS took the extraordinary

---

[3] Attached as <u>Exhibit D</u> to this Amended Complaint is a copy of the DFS Order.

[4] Attached as <u>Exhibit E</u> to this Amended Complaint is a copy of the November 13 DFS Letter.

step of waiving the privilege that protects such information from disclosure.  The day after the letter was sent to the OCC, a link to the letter was available on *The Wall Street Journal*'s website, and the letter received substantial press coverage on November 14 and 15.

12.     The DFS lacks any legal basis to cast doubt on the validity and effectiveness of BTMU NY's federal licenses.  Contrary to the DFS's contentions, the conversion of BTMU's licenses fully complied with all applicable laws, rules and regulations, and the resulting licenses clearly are valid and effective as a matter of federal law.  The DFS's response to BTMU's federal licenses also is contrary to well-established principles of federal law that protect our federal form of government.  Federal law preempts both the threatened DFS enforcement activities and the DFS Order as an improper attempt by the DFS to continue exercising visitorial powers over federally-licensed branches that—as BTMU informed the DFS before the DFS issued the Order—are now within the exclusive province of the OCC.

13.     Under the International Banking Act and the National Bank Act, the OCC exercises exclusive "visitorial powers" over the banking activities of foreign banks' federally-licensed branches and agencies, subject only to a very limited exception not applicable here.  *See* 12 U.S.C. §§ 484(a), 3102(b); 12 C.F.R. § 28.13(a).  As the OCC stated in issuing BTMU's federal licenses, "the Federal licenses for the Federally-licensed [BTMU] Branches and Agencies supersede and replace the state licenses of the [BTMU] Branches and Agencies previously operated at such locations, and the Federally-licensed [BTMU] Branches and Agencies shall not be subject to the visitorial powers of the state authority by which each of their predecessors was licensed prior to the conversions."  OCC Decision Letter at 5.  Visitorial powers include (i) "[e]xamination of a bank," (ii) "[i]nspection of a bank's books and records," (iii) "[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law," and

(iv) "[e]nforcing compliance with any applicable Federal or state laws concerning those activities." 12 C.F.R. § 7.4000(a)(2).  Additionally, once a branch is federally-licensed, as BTMU NY is now, a state regulatory agency such as the DFS may not "prevent or . . . significantly impair the exercise of authority" by the OCC over that branch's activities.  *Watters* v. *Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007).

14.     The DFS's public challenge to the validity and effectiveness of BTMU NY's federal licenses—in the DFS Order, its reservation of rights at the November 9 conference before this Court and the publicly available November 13 DFS Letter—is causing actual and imminent harm to BTMU.  The DFS's denial of the validity of BTMU's federal licenses has created uncertainty regarding BTMU NY's authority to conduct banking business in New York under the federal licenses issued by the OCC.  To remedy the operational problems and reputational harm caused by this uncertainty and to address the risk that BTMU's New York branches are failing to comply with an applicable regulatory scheme, BTMU requires a judicial declaration that the conversion of BTMU NY's licenses did not violate applicable law and that BTMU NY's federal licenses are valid and effective.

15.     The DFS Order also is facially invalid under federal law.  Although the DFS agreed in response to BTMU's emergency motion for a temporary restraining order "to not exercise any supervisory authority over the bank *while the OCC license is in effect*," Tr. at 7:22-24 (emphasis added), the DFS has never rescinded the DFS Order and is maintaining that the OCC's licenses are not validly in effect.  Notwithstanding that BTMU is no longer licensed by the DFS, the DFS Order states, among other things, that BTMU (i) must continue to "comply with all New York laws, regulations, orders and agreements, including, but not limited to, all reporting and record keeping requirements," (ii) "remain[s] subject to all . . . enforcement

activities, including the investigation and prosecution of any violations of the Banking Law or the Financial Services Law, for any conduct occurring during the time period of its license from the [DFS]," and (iii) must "preserve all documents and information in [its] possession, custody or control that pertain, directly or indirectly," to six different topics.  DFS Order ¶¶ 3-4.  The DFS's attempt under the guise of state law to impose such requirements and its threat of enforcement activities cannot be reconciled with the OCC's exclusive visitorial powers under federal law.

### THE PARTIES

16.     Plaintiff BTMU is Japan's largest bank and one of the world's largest, with offices throughout Japan and in more than 50 other countries.  BTMU is one of the two primary banking institutions owned by MUFG, a diversified bank holding company incorporated as a joint stock company under the Companies Act of Japan.  In the United States, BTMU has two branches in New York, additional branches in California and Illinois and agencies in Texas.  As a result of the recent conversion and the OCC's issuance of federal licenses, BTMU's branches and agencies in the United States, including its New York branches, are now federal branches and agencies established in accordance with the International Banking Act.

17.     BTMU has provided banking services in New York since 1880 and, as of September 30, 2017, employed approximately 2,200 people in its New York branches.  BTMU provides a full range of commercial- and investment-banking services in the Americas to its corporate-banking clients in the United States, Canada, Latin America and Asia.  Today, BTMU NY is the second-largest branch of a foreign bank in the United States by assets.

18.     Defendant Maria Vullo is the Superintendent of the DFS.  As such, she is the state official charged by state law with enforcing compliance with the New York Banking

Law, including over foreign-bank branches and agencies licensed by the DFS to conduct banking business in New York.  *See* N.Y. Banking Law §§ 10–45, 94–140-a, 200–209, 221-a–221-k.

## JURISDICTION AND VENUE

19.     BTMU seeks a declaratory judgment that (i) BTMU NY's federal licenses are valid and effective, (ii) federal law preempts any attempt by the DFS to bring an enforcement action against or exercise any other form of visitorial powers over BTMU now that BTMU NY is federally licensed, and (iii) federal law preempts the DFS Order now that BTMU NY is federally licensed.  In addition, BTMU seeks injunctive relief prohibiting the DFS from exercising any visitorial powers over BTMU, including commencing an enforcement action against BTMU, and from taking any action under the DFS Order.  In the absence of a judicial declaration that its federal licenses are valid and effective, BTMU will be required to operate under the cloud of a public challenge by its former New York regulator to the authority of BTMU NY to conduct business in New York and the threat of state-law sanctions for adhering to federal law.  Now that BTMU NY is federally licensed, federal law bars any exercise of visitorial powers by the DFS over BTMU NY, including the commencement of an enforcement action or the taking of any other action under the DFS Order.

20.     This action arises under the International Banking Act, the National Bank Act, the OCC's implementing regulations and the Supremacy Clause of the United States Constitution.

21.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States.  This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202.

22.     Venue in this District is proper under 28 U.S.C. § 1391(b)(1) because the Superintendent resides in this District and under 28 U.S.C. § 1391(b)(2) because the events giving rise to this case occurred in this District.

## THE INTERNATIONAL BANKING ACT, THE NATIONAL BANK ACT AND THE OCC'S IMPLEMENTING REGULATIONS

23.     The International Banking Act provides foreign banks with the option of seeking federal licenses for their branches and agencies in the United States.  That statute also grants foreign banks such as BTMU, which previously could have established only state-licensed branches, a federal right to seek conversion of their state-licensed branches and agencies to federally-licensed branches and agencies.  *See* 12 U.S.C. § 3102(f).  The International Banking Act does not require that a foreign bank seeking to convert the license of its branch or agency obtain the approval of any state banking agency.  Nor does the International Banking Act impose such a requirement for state approval on the OCC.  *See id.* ("Any branch or agency operated by a foreign bank in a State pursuant to State law . . . may be converted into a Federal branch or agency with the approval of the Comptroller.").

24.     Now that BTMU has exercised its right under federal law to convert its licenses and has obtained federal licenses from the OCC, regulation of BTMU's banking activities in the United States is consolidated in a single regulatory body—the OCC—and unified federal standards apply across all of BTMU's branches and agencies in the United States.  This includes unified regulation regarding examinations, inspection and production of books and records and prosecution of enforcement actions.

25.     Under the International Banking Act, operations of foreign banks' federally-licensed branches and agencies "shall be conducted with the same rights and privileges as a national bank" and are "subject to all the same duties, restrictions, penalties, liabilities,

conditions, and limitations that would apply under the National Bank Act to a national bank." 12 U.S.C. § 3102(b); *see also* 12 C.F.R. § 28.13(a) (operations of federal branches of foreign banks to be conducted with the "same rights and privileges" as a "national bank"); OCC Decision Letter at 5 (same); OCC Interp. Letter No. 280, Fed. Banking L. Rep. at 85,444 (Dec. 1, 1983) (federal branches of foreign banks are subject to the OCC's exclusive regulatory authority); *cf.* 12 U.S.C. § 25b(a)(1) (defining "national bank" to include "any Federal branch established in accordance with the International Banking Act" for purposes of state-law preemption standards for national banks).

26.     The National Bank Act affords the OCC exclusive visitorial powers over national banks—and thus also over federally-licensed branches and agencies of foreign banks— subject only to a very limited exception not applicable here.  *See* 12 U.S.C. § 484(a); 12 C.F.R. § 7.4000.  Section 484 of the National Bank Act provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized."  Section 484(b) provides only a limited exemption to this exclusive federal visitorial power over national banks "solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with such laws."  12 U.S.C. § 484(b).

27.     Interpreting Section 484 of the National Bank Act, OCC regulations likewise provide that "[o]nly the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks."  12 C.F.R. § 7.4000(a)(1).  "State officials may not exercise visitorial powers with respect to national banks . . . ."  *Id.*  Visitorial powers are

defined broadly to include (i) "[e]xamination of a bank," (ii) "[i]nspection of a bank's books and records," (iii) "[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law," and (iv) "[e]nforcing compliance with any applicable Federal or state laws concerning those activities." *Id.* § 7.4000(a)(2).  State regulators may not exercise such powers over either national banks or federal branches or agencies of foreign banks. *See* 12 U.S.C. § 3102(b); 12 C.F.R. § 28.13(a).  As a result, BTMU's conversion of its state licenses has resulted in uniform, exclusive oversight by the OCC of all of BTMU's branches and agencies in the United States and has foreclosed any exercise of visitorial powers by its former state banking regulators, including the DFS.

> 28.     Consistent with these statutory and regulatory provisions, the Supreme Court has affirmed that the OCC exercises generally exclusive "visitorial power" over the "content and conduct" of national banks' activities.  In *Watters*, the Supreme Court reiterated its century-old precedent that "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent." 550 U.S. at 13–14.  As the Supreme Court explained, visitation "'is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce[s] an observance of its laws and regulations.'" *Id.* at 14 (quoting *Guthrie* v. *Harkness*, 199 U.S. 148, 158 (1905)).  "Recognizing the burdens and undue duplication state controls could produce," the Supreme Court emphasized that "Congress included in the NBA an express command:  'No national bank shall be subject to any visitorial powers except as authorized by Federal law . . . .'" *Id.* (quoting 12 U.S.C. § 484(a)).  The Supreme Court thus has held that a state "cannot confer on its commissioner examination and enforcement authority over . . . any . . . banking business done by national banks." *Id.* at 14–15; *see also Cuomo* v. *Clearing*

*House Ass'n, L.L.C.*, 557 U.S. 519, 536 (2009) (holding that federal law preempted the New

York Attorney General's attempt to issue administrative subpoenas to national banks "on his

own authority under New York Executive Law" because the issuance of such subpoenas

constituted a visitorial act rather than permissible state law enforcement).

29.     The Supreme Court found it "[b]eyond genuine dispute" that "state law

. . . may not curtail or hinder a national bank's efficient exercise of any . . . power, incidental or

enumerated under the NBA." *Watters*, 550 U.S. at 13.  The Court further reiterated that it has

"'interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of

authority not normally limited by, but rather ordinarily pre-empting, contrary state law.'" *Id.* at

12 (quoting *Barnett Bank of Marion Cnty., N.A.* v. *Nelson*, 517 U.S. 25, 32 (1996)) (alteration in

original).

## FACTUAL BACKGROUND

**A.      BTMU's United States Operations**

30.     BTMU is a major commercial-banking organization and one of two

primary banking institutions owned by MUFG.  In the United States, BTMU operates branches

in New York, California and Illinois and agencies in Texas.

31.     In New York, BTMU has two branches because its personnel work in two

separate office buildings, but those branches effectively operate as a single branch.  BTMU's key

business lines in New York are (i) U.S. Corporate Banking, which provides commercial- and

investment-banking products and services to large investment-grade, United States-based

corporations that issue short-term debt in the public capital markets, (ii) Asian Corporate

Banking (East), which provides similar products and services to Japanese and Asian corporate

clients in the United States, and (iii) the Global Markets Division for the Americas, which

engages in sales and trading of financial instruments and funds the assets and liabilities of

BTMU's businesses in the Americas.  As of March 31, 2017, BTMU's New York branches had

total assets of $135.3 billion.  Combined, BTMU's New York branches are by far BTMU's

largest offices in the United States, Canada and Latin America, acting as BTMU's regional hub

in the Americas through which most U.S. dollar loans are booked and through which billions of

dollars of wire transactions and U.S. dollar clearing transactions from BTMU's worldwide

affiliates flow on a daily basis.

      32.     BTMU also operates branches and agencies in three other states:  BTMU

has branches in Los Angeles, California and Chicago, Illinois and agencies in Dallas, Texas and

Houston, Texas.  In its Los Angeles and Chicago branches, BTMU offers corporate and

commercial-lending services, as well as marketing of financial products and services provided by

other BTMU United States offices and MUFG entities.  In its Dallas and Houston agencies,

BTMU actively solicits business to be provided by BTMU's New York branches and other

MUFG entities.

      33.     BTMU also operates in the United States through a subsidiary, MUFG

Union Bank N.A. ("Union Bank"), formerly known as Union Bank, N.A.  Union Bank is a

leading regional bank with its main office in California and operations in California, Georgia,

Illinois, New York, Oregon, Texas and Washington.  The Federal Deposit Insurance Corporation

("FDIC") ranked Union Bank as the 22nd largest bank in the United States measured by total

deposits as of December 2016.  Union Bank provides a wide range of financial services to

consumers, small businesses, middle-market companies and major corporations.

      34.     In recent years, MUFG has moved to integrate the management, strategy

and controls of its United States operations, including Union Bank and BTMU's various

branches and agencies. Those efforts have been consistent with regulations promulgated and policy guidance issued by federal banking regulators aimed at promoting the simplification of the structure of foreign banks' United States operations and the establishment of unified governance and risk-management systems.[5]

35.     Before the conversion of its licenses, BTMU's United States operations were subject to multiple supervisory and regulatory schemes. Four different state regulators (in California, Illinois, New York and Texas) and the Federal Reserve supervised BTMU's state-licensed branches and agencies, and the OCC supervised Union Bank—BTMU's large bank subsidiary in the United States. This patchwork of supervisory and regulatory schemes created inefficiencies and imposed significant costs on BTMU's operations in the United States.

**B.     BTMU's Conversion Applications**

36.     On October 30, 2017, BTMU submitted applications to the OCC to convert its state-licensed branches in New York, Illinois and California to federally-licensed

_____

[5] *See, e.g.*, 12 C.F.R. § 252.153 (requiring with limited exceptions that any foreign banking organization with non-branch assets of $50 billion or more in the United States such as MUFG establish an intermediate holding company in the United States to hold the bank's "entire ownership interest in any U.S. subsidiary" and providing that such intermediate holding company, among other things, must comply with specified capital, risk management, liquidity and stress-test requirements); 12 C.F.R. § 252.155(b) (requiring any foreign banking organization with combined U.S. assets of $50 billion or more to appoint a chief risk officer responsible for overseeing risk identification, assessment and management for all of the organization's U.S. operations); Board of Governors of the Federal Reserve System, Consolidated Supervision of Bank Holding Companies and the Combined U.S. Operations of Foreign Banking Organizations, SR 08-9/CA 08-12 (Oct. 16, 2008) ("Regardless of where they are located, senior FBO [Foreign Banking Organization] management with responsibility for the governance functions for the FBO's U.S. operations is expected to maintain an ongoing understanding of key inherent risks, associated trends, and primary control functions . . . . Primary expectations for these senior FBO officers include . . . [e]stablishing, communicating, and monitoring institutional risk tolerances and a culture across U.S. operations . . . ."); *id.* (explaining that Federal Reserve "supervises and assesses the combined U.S. operations of each FBO and assigns [each FBO] a U.S. combined operations rating").

branches and to convert its state-licensed agencies in Texas to federally-licensed agencies. The OCC previously had granted similar conversion applications under Section 4 of the International Banking Act by other foreign banks, including (i) the 2017 conversion of UBS AG's state-licensed branches in Connecticut and Illinois to federally-licensed branches, and (ii) the 2015 conversion of The Toronto-Dominion Bank's state-licensed branch in New York to a federally-licensed branch.

37.     BTMU sought to convert its state licenses in an effort to enhance the efficiency of the supervisory and regulatory framework applicable to its operations in the United States. As a result of the conversion of its licenses, federal regulators—the OCC and the Federal Reserve—now oversee the entirety of BTMU's operations in a more effective, orderly and expeditious manner than if coordination were required with four different states' banking regulators. All of BTMU's banking operations in the United States are now subject to primary supervision and regulation by a single federal banking agency—the OCC—and to a consistent and well-defined body of federal standards and requirements.

38.     Federal banking agencies increasingly have favored policies that call for the simplification of the structure of foreign banks' United States operations and the unification of their governance and risk-management systems—for example, by requiring the formation of intermediate holding companies to hold the United States subsidiaries and non-branch assets of large foreign banks, by imposing certain centralized risk-management standards on the entirety of foreign banks' combined United States operations, and by issuing other informal guidance and supervisory expectations to foreign banks. Consolidating the supervision and regulation of BTMU's national bank, branches and agencies in the United States with a single primary federal banking agency—the OCC—is consistent with those regulatory policies.

39.     Now that its conversion applications have been approved, BTMU is able to operate its United States branches and agencies and Union Bank more efficiently.  The conversion of BTMU's licenses was part of a years-long effort by BTMU to streamline its United States operations.  As a result of this multi-year process, BTMU's governance structure now includes dedicated senior executive officers responsible for managing all of its operations in the United States, including its branches, agencies and Union Bank.  The conversion of BTMU's licenses has facilitated further coordination of BTMU's operations.  For instance, Compliance and Legal personnel of Union Bank already have substantial experience complying with the legal and regulatory regime that now applies to BTMU's branches and agencies following conversion.  Moreover, business managers across BTMU's United States operations are now subject to a consistent set of standards and supervisory expectations concerning such areas as risk management, third-party vendor oversight and cybersecurity.  This allows legal entities and offices to share resources better, operate more efficiently and serve customers more effectively.

**C.     The OCC's Approval of BTMU's Applications**

40.     Section 4 of the International Banking Act (12 U.S.C. § 3102(f)) and Section 28.12 of the OCC's regulations (12 C.F.R. § 28.12) expressly authorize the OCC to approve the conversion of foreign banks' state-licensed branches or agencies to federally-licensed branches or agencies.  In determining whether to approve a conversion application, the OCC generally considers the following six factors:

(1) The financial and managerial resources and future prospects of the applicant foreign bank and the Federal branch or agency; (2) Whether the foreign bank has furnished to the OCC the information the OCC requires to assess the application adequately, and provided the OCC with adequate assurances that information will be made available to the OCC on the operations or activities of the foreign bank or any of its affiliates that the OCC deems necessary to determine and enforce compliance with the IBA and other applicable Federal banking statutes; (3) Whether the foreign bank and its United States affiliates are in compliance with

-18-

applicable United States law; (4) The convenience and needs of the community to be served and the effects of the proposal on competition in the domestic and foreign commerce of the United States; (5) With respect to an application to establish a Federal branch or agency outside of the foreign bank's home state, whether the foreign bank is subject to comprehensive supervision or regulation on a consolidated basis by its home country supervisor . . . ; and (6) Whether the home country supervisor has consented to the proposed establishment of the Federal branch or agency.

12 C.F.R. § 28.12(b).

41.     In addition, the OCC has issued guidance stating that it typically also considers whether (i) the applicant's financial condition poses any supervisory concerns, (ii) there are any safety or soundness concerns, (iii) conversion is inconsistent with applicable laws or regulations, and (iv) the applicant is trying to escape supervisory action by its current regulator.[6]

42.     On November 7, 2017, the OCC determined that BTMU satisfied the standards for conversion and issued federal licenses to BTMU's branches and agencies.  As of that date, BTMU's branches in New York, California and Illinois became federally-licensed branches, and its agencies in Texas became federally-licensed agencies—all supervised exclusively by the OCC.

43.     Before the conversion, BTMU had entered into consent orders in 2013 and 2014 with the DFS arising out of U.S. dollar clearing transactions implicating certain entities in Iran, Sudan and Myanmar (the "DFS Consent Orders").  The DFS Consent Orders followed a 2012 settlement between BTMU and the Treasury Department's Office of Foreign Assets Control arising out of the same conduct.  In approving BTMU's conversion applications, the

---

[6] *See* OCC, *Comptroller's Licensing Manual:  Federal Branches and Agencies* at 47 (Oct. 2017), *available at* https://www.occ.treas.gov/publications/publications-by-type/licensing-manuals/lm-fba2.pdf.

OCC imposed certain express conditions on BTMU to "ensure the converted branch continues to be subject to the substantive requirements that were in the" DFS Consent Orders.  OCC Decision Letter at 3.  Specifically, the OCC required BTMU's primary New York branch, within five business days of converting, to enter into a superseding consent order with the OCC containing nearly identical substantive requirements as the DFS Consent Orders.  *Id.*  In satisfaction of that requirement, BTMU's primary New York branch and the OCC entered into such a consent order on November 9, 2017.[7]  The OCC's inclusion of this requirement as an express condition of its approval—and BTMU's prompt acceptance of that condition—demonstrates that the OCC, consistent with its licensing guidance, ensured that BTMU was not "trying to escape supervisory action by its current regulator."  OCC, *Comptroller's Licensing Manual:  Federal Branches and Agencies* at 47.

44.     The superseding OCC Consent Order contains "remedial provisions that are substantively the same as those in the 2013 Consent Order and 2014 Consent Order."  OCC Consent Order at 3.  The OCC Consent Order requires, among other things, that BTMU NY submit (i) "all plans to improve and enhance the New York Branch's BSA/AML related Sanctions Compliance Programs adopted by the Bank and the New York Branch pursuant to the 2013 Consent Order and 2014 Consent Order," (ii) plans to "address any and all findings of BSA/AML and OFAC deficiencies, including those contained in any final independent consultant's report(s)," and (iii) plans "for enhanced internal controls and updates and/or revisions to policies, procedures, and processes of the New York Branch to ensure full compliance with . . . the requirements of the 2013 Consent Order and 2014 Consent Order."  *Id.*

---

[7] Attached as <u>Exhibit F</u> to this Amended Complaint is a copy of the OCC's superseding Consent Order.

at 4.  Furthermore, the OCC Consent Order provides that, effective November 7, 2017, the DFS

Consent Orders "are not effective with respect to the Bank and the New York Branch."  *Id.* at 3.

45.    Now that the conversion of BTMU's licenses has occurred, the OCC is

vested with exclusive visitorial powers over BTMU's branches and agencies.  The OCC's letter

approving the conversion applications states:  "[T]he Federal licenses for the Federally-licensed

[BTMU] Branches and Agencies supersede and replace the state licenses of the [BTMU]

Branches and Agencies previously operated at such locations, and the Federally-licensed

[BTMU] Branches and Agencies shall not be subject to the visitorial powers of the state

authority by which each of their predecessors was licensed prior to the conversions."  OCC

Decision Letter at 5.  As an experienced banking regulator—and the primary federal regulator of

the four largest international banks based in the United States—the OCC is amply qualified to

supervise BTMU NY concerning the subject matter of the DFS Consent Orders.[8]

**D.    The DFS Order**

46.    Although federal law expressly and exclusively authorizes the OCC to

approve conversion applications and supervise foreign banks' federally-licensed branches and

---

[8] *See*, *e.g.*, Agreement By and Between Bank of China New York, New York and the Comptroller of the Currency, 2015 WL 13501322 (Dec. 16, 2015) (agreement between OCC and federally-licensed branch of the Bank of China to remediate BSA/AML deficiencies identified by the OCC with respect to the branch's internal controls and to implement an enhanced written institution-wide, ongoing OFAC Risk assessment program); Consent Order Among JPMorgan Chase Bank, N.A., JPMorgan Bank and Trust Company, N.A., Chase Bank USA, N.A. and the Comptroller of the Currency, 2013 WL 12249744 (Jan. 14, 2013) (agreement among OCC and federally-chartered national banks to remediate BSA/AML deficiencies, maintain a compliance committee with a majority of independent members and submit to OCC a comprehensive written BSA/AML action plan designed to achieve full compliance with the terms of the Consent Order); Consent Order Between HSBC Bank USA, N.A. and the Comptroller of the Currency, 2012 WL 6764495 (Dec. 11, 2012) (agreement between OCC and HSBC's federally-chartered national bank to remediate BSA/AML deficiencies, maintain a compliance committee with at least two independent members and implement a written institution-wide, ongoing compliance program).

agencies, *see* 12 U.S.C. § 3102(f), the DFS has taken actions that challenge (i) the approval of BTMU's conversion applications, (ii) the issuance of federal licenses to BTMU, and (iii) the OCC's exclusive authority over BTMU's New York branches.[9]

47.     On October 31, 2017, BTMU representatives notified all of its state regulators, including the DFS, of BTMU's conversion applications.  In response, the DFS informed BTMU that it planned to consider the matter internally and that it then would contact BTMU to discuss the conversion applications further.  During the ensuing week, however, no such contact occurred.

48.     As described above, on November 7, 2017, the OCC approved BTMU's applications and issued federal licenses to BTMU's branches and agencies.  That same day, the OCC sent the DFS a copy of the letter conditionally approving BTMU's applications but, according to the DFS, did not send a copy of a second letter issuing the federal licenses to BTMU.  Regardless of whether the OCC provided the DFS with a copy of that second letter, BTMU promptly informed the DFS of the OCC's issuance of the federal licenses.  In an email sent on November 7, 2017 to the three DFS examiners assigned to BTMU, a BTMU representative explained that:

> the OCC has granted our applications to convert the licenses for BTMU and MUTB's U.S. Branches and Agencies, and we have now received those federal licenses.  Accordingly, our prior state licenses are superseded, including the licenses from the NY Department of Financial Services.  The OCC is now the regulator for our U.S. banking operations, which as you know includes the NY

---

[9] The DFS has not challenged the OCC's approval of the application of BTMU's affiliate, Mitsubishi UFJ Trust and Banking Corporation ("MUTB"), to convert its New York-licensed branch to a federally-licensed branch.  Nor has the DFS contested the validity of the federal license issued to MUTB's New York branch.  In addition, none of BTMU's other former state banking regulators has challenged the validity of BTMU's federal licenses.

Branches of BTMU.  Therefore, the NY DFS no longer has jurisdiction over BTMU.[10]

49.     On the morning of November 8, 2017—after receiving the above-quoted notification from BTMU that the OCC had issued BTMU federal licenses—the three DFS examiners previously assigned to BTMU nonetheless sought to enter BTMU NY's building and to continue their examination.  When BTMU personnel explained that BTMU NY is now federally licensed and thus no longer regulated by the DFS, the DFS examiners asked to enter BTMU NY's premises for the ostensible purpose of retrieving their personal belongings.  Once on the premises, however, two of the three DFS examiners insisted on remaining in the building until late in the afternoon that day.  The examiners requested the email address of Stephen Cummings, BTMU's CEO for the Americas, which BTMU NY employees provided to them.

50.     In the afternoon of November 8, 2017—after BTMU had reiterated to the DFS examiners when they arrived in the morning that BTMU NY's license conversion was complete—the DFS issued the DFS Order (signed by Shirin Emami, the DFS's Executive Deputy Superintendent—Banking).  The DFS emailed the DFS Order to Mr. Cummings at the email address that BTMU NY employees had just provided to the DFS examiners.  The DFS Order states, "effective immediately," that:

1.     All supervision activity of the Department shall continue uninterrupted and unimpeded, including, but not limited to, the ongoing examination of the New York Branch currently being conducted by the Department, unless and until any such conversion to an OCC license becomes legally effective (should that event occur).

2.     The Bank and the New York Branch shall comply with all New York laws, regulations, orders and agreements, including, but not limited to, all reporting and record keeping requirements.

---

[10] Attached as Exhibit G to this Amended Complaint is a copy of this communication.

3.    The Bank and the New York Branch remain subject to all supervisory and enforcement activities, including the investigation and prosecution of any violations of the Banking Law or the Financial Services Law, for any conduct occurring during the time period of its license from the Department.

4.    The Bank and the New York Branch shall preserve all documents and information in their possession, custody or control that pertain, directly or indirectly, to:

    (a)    the affairs, operations or business of the New York Branch;

    (b)    compliance, or lack of compliance, with New York laws or regulations including, but not limited to, compliance (or lack of compliance) with laws and regulations pertaining to BSA/AML and OFAC matters;

    (c)    all documents relating to matters raised or discussed in any report (written or oral) prepared by the BTMU Consultant;

    (d)    information collected by or provided to the BTMU Consultant, including but not limited to, any information or documents relating to (ii) [sic] additional concerns or issues identified by the BTMU Consultant that relate to the Bank's BSA/AML and OFAC sanctions compliance programs and (ii) compliance with the 2013 and 2014 Consent Orders;

    (e)    information self-reported by the Bank and the New York Branch to the BTMU Consultant or the Department about compliance with applicable laws and regulations, including the Bank's BSA/AML and OFAC sanctions compliance programs; and

    (f)    all communications with the Department relating to the 2013 Consent Order and the 2014 Consent Order.

5.    Unless and until any conversion of the license issued by the Department to the Bank to a Federal branch shall become legally effective, and only in the event that such conversion becomes legally effective, the Bank and the New York Branch shall then carry out such conversion in a manner that is in full compliance with the Banking Law, including, but not limited to, Section 605 of the Banking Law, and all other applicable laws of the State of New York.

51.    On information and belief, the DFS issued the DFS Order in an effort to challenge BTMU NY's conversion of its state licenses to federal licenses and to assert the DFS's continuing authority over BTMU's branches in New York, including its authority to pursue "the investigation and prosecution of any violations of the Banking Law or the Financial Services Law, for any conduct occurring during the time period of its license from the [DFS]."  DFS

Order ¶ 3.  Given that the OCC already had approved BTMU's applications to convert

BTMU NY to federal licenses and actually had issued those licenses—as BTMU had informed

the DFS before the DFS issued the DFS Order—there was no apparent reason to issue the DFS

Order other than to challenge the OCC's licenses and to assert the DFS's continuing authority to

pursue enforcement activities and other forms of visitorial powers.

52.     Since issuing the DFS Order on November 8, the DFS has refused to

rescind the Order.  All five numbered paragraphs of the DFS Order are improper attempts by the

DFS to continue exercising visitorial powers over BTMU NY.  Federal law preempts

Paragraphs 1, 2 and 4 of the DFS Order because BTMU NY is now federally-licensed and thus

no longer subject to the DFS's visitorial powers.  Paragraph 1 provides that "[a]ll supervision

activity of the [DFS] shall continue uninterrupted and unimpeded . . . unless and until any such

conversion to an OCC license becomes legally effective (should that event occur)."  Paragraph 2

similarly states that "[t]he Bank and the New York Branch shall comply with all New York laws,

regulations, orders and agreements, including, but not limited to, all reporting and record keeping

requirements."  Following the conversion, however, BTMU and BTMU NY are subject to

federal banking laws, and not to any New York banking laws that prevent or significantly

interfere with BTMU NY's exercise of its federally-protected banking powers.  Likewise,

Paragraph 4's attempt to impose recordkeeping requirements on BTMU NY is a prohibited

exercise of visitorial powers over BTMU's federally-regulated branch.

53.     Federal law also preempts Paragraph 3 of the DFS Order.  Because the

OCC has issued federal licenses to BTMU NY, it no longer "remain[s] subject to all . . .

enforcement activities [of the DFS], including the investigation and prosecution of any violations

of the Banking Law or the Financial Services Law," for conduct occurring before the conversion

of BTMU NY's licenses.  Federal preemption principles apply to *any* attempted exercise of

visitorial powers by the DFS, including any attempt by the DFS to investigate BTMU NY's

conduct and to prosecute BTMU NY for alleged violations of New York banking law

irrespective of the time of the alleged violations.  *See Capital One Bank (USA), N.A.* v. *McGraw*,

563 F. Supp. 2d 613, 622 (S.D. W. Va. 2008) (holding that state regulator "cannot exercise

visitorial powers over a national bank regardless of when the activities sought to be investigated

occurred," even if the activities occurred and the investigation began pre-conversion).  As the

court explained in *McGraw*, there is no basis to "fashion a special rule that states, in essence, that

. . . a state official may exercise visitorial powers over a national bank so long as (1) the state

seeks to investigate activities that the bank engaged in before achieving national bank status, and

(2) the state's investigation began before the bank converted to a national bank."  *Id.*  The same

fundamental principle applies to federally-licensed branches of foreign banks.

54.     The DFS Order also challenges the validity of BTMU NY's federal

licenses.  Paragraph 5 states:

> Unless and until any conversion of the license issued by the Department to the
> Bank to a Federal branch shall become legally effective, and only in the event that
> such conversion becomes legally effective, the Bank and the New York Branch
> shall then carry out such conversion in a manner that is in full compliance with
> the Banking Law, including, but not limited to, Section 605 of the Banking Law,
> and all other applicable laws of the State of New York.

55.     When the DFS issued the DFS Order, BTMU's license conversion already

had become "legally effective."  Contrary to Paragraph 5's assertion, federal law does not require

that the license conversion proceed in a manner that complies with New York Banking Law or

any other New York law.  Tellingly, the only provision of New York Banking Law cited by the

DFS—Section 605—is irrelevant to conversion applications.  Section 605 of the Banking Law

instead governs "Voluntary liquidation; sale of assets" and "forfeiture of charter by non-user."  It has no application to a license conversion.

56.     In the evening of November 8, 2017, in response to the DFS Order and the DFS examiners' insistence on entering and remaining in BTMU NY's premises earlier that day, the OCC reiterated to the DFS that the conversion of BTMU NY's licenses became effective on November 7, thus divesting the DFS of any continuing authority over BTMU NY.  In a November 8 letter to the DFS (the "November 8 OCC Letter"), the OCC advised the DFS that BTMU NY's "conversion[s] from state to federal license[s] legally became effective on November 7, 2017."[11]  The OCC further informed the DFS that "[b]ecause the conversion has been completed, the [DFS] is no longer the supervisor for the Branches and may no longer assert visitorial authority with respect to their operations."  As the OCC explained, as of November 7, 2017, the DFS lacked any continuing visitorial authority over BTMU NY.

E.     This Lawsuit

57.     On November 8, 2017, shortly after the DFS issued the DFS Order, BTMU filed this action.  Relying on federal preemption principles, BTMU sought (i) a temporary restraining order and preliminary and permanent injunctions prohibiting the DFS from attempting to exercise any visitorial powers over BTMU, and (ii) a judgment declaring that the DFS Order violates federal law and that the DFS cannot exercise any other authority over BTMU's banking operations under New York Banking Law.

58.     On November 9, 2017, the Court held an initial conference in this action to address BTMU's emergency motion for a temporary restraining order.  At that hearing, the

---

[11] Attached as Exhibit H to this Amended Complaint is a copy of the November 8 OCC Letter.

DFS did not rescind the DFS Order.  Rather, the DFS carefully limited its representation to the Court, stating only that it would "not exercise any supervisory authority over the bank *while the OCC license is in effect*."  Tr. at 7:22-24 (emphasis added).  The DFS also expressly reserved its right to challenge the validity and effectiveness of BTMU's recently issued federal licenses: "[W]e want to reserve all rights that we have to challenge that conversion and license before the Court or another court."  *Id*. at 7:24–25.

59.    The DFS's carefully constructed statement to the Court may have mooted BTMU's immediate need for a temporary restraining order at that time.  When that statement is considered in conjunction with the DFS's subsequent statements and actions, however, it is clear that BTMU faces actual and imminent harm.  Indeed, BTMU is presented with the risk that if the DFS continues to challenge the validity of its federal licenses—and somehow were able to invalidate those licenses—then the DFS would take supervisory action against BTMU for failure to comply with New York's regulatory scheme even during the period when the federal licenses were in place.

**F.     The November 13 DFS Letter**

**1.     The DFS's Challenge to BTMU's Federal Licenses**

60.    Since the initial conference in this action, the DFS has continued to attack the validity and effectiveness of BTMU's federal licenses.  In the November 13 DFS Letter sent to the OCC, which was published in full by *The Wall Street Journal* (but not provided to BTMU), the DFS asserted that the OCC "should not have approved the BTMU conversion applications without DFS's input or no objection."  November 13 DFS Letter at 3.  The November 13 DFS Letter does not repeat the state-law theory asserted in Paragraph 5 of the DFS Order.  Instead, it refers to federal law, arguing that BTMU NY's conversions violated the

National Bank Act, the International Banking Act, the Dodd-Frank Act and OCC policy statements.

61.     In particular, the November 13 DFS Letter asserts that "sections 35 and 3102(b) of Title 12 of the United States Code, and Section 612(d)(2) of the Dodd-Frank Act required that DFS not object to the conversion in order for it to proceed," and that the DFS never provided a "no-objection" to the conversion.  November 13 DFS Letter at 6.  The November 13 DFS Letter further contends that the OCC's approval of BTMU NY's conversion applications departed from two informal guidance documents:  the OCC's Licensing Manual and the FFIEC's July 1, 2009 Statement on Regulatory Conversions (the "FFIEC Statement").  According to the DFS's letter, the OCC acted inconsistently with the Licensing Manual's statements that: (i) "[g]enerally, the OCC will not consider a conversion application submitted while a material enforcement action is pending," and (ii) the OCC "consults with" and "draws heavily on information received from [an applicant]'s current U.S. supervisor" in evaluating conversion applications.  *Id.* at 5.  The November 13 DFS Letter also argues that the conversion of BTMU NY's licenses was inconsistent with the policy expressed in the FFIEC Statement that "[c]onversion requests submitted while serious or material enforcement actions are pending with the current chartering authority or primary federal regulator should not be entertained."  *Id.* at 6.

62.     The DFS's assertions in the November 13 DFS Letter regarding the validity of BTMU's federal licenses are incorrect as a matter of law.  The statutory provisions on which the DFS relies apply only to conversions of state banks to national banks; they have no application to conversions of foreign banks' state-licensed branches to federally-licensed branches.  *See* 12 U.S.C. § 35 (providing that "*[a]ny bank* incorporated by special law of any State or of the United States or organized under the general laws of any State or of the United

States" may, with approval of the OCC, "be converted into *a* national banking association," provided that "said conversion shall not be in contravention of the State law") (emphasis added); *id.* (Dodd-Frank Act amendments prohibiting conversion of "*a State bank*" if the bank "is subject to a cease and desist order (or other formal enforcement order) issued by, or a memorandum of understanding entered into with, a State bank supervisor or the appropriate Federal banking agency with respect to a significant supervisory matter or a final enforcement action by a State Attorney General") (emphasis added); Dodd-Frank Act, Pub. L. No. 111-203, § 612(d), 124 Stat. 1376, 1612–13 (2010) (permitting *state bank* conversions otherwise prohibited under amendments to 12 U.S.C. § 35 if the pre-conversion regulator that instituted the relevant enforcement action "does not object to the conversion . . . within 30 days of receipt of the written notice").  By contrast, for conversions of foreign banks' state-licensed branches or agencies to federally-licensed branches or agencies, the International Banking Act provides only that "[a]ny branch or agency operated by a foreign bank in a State pursuant to State law . . . may be converted into a Federal branch or agency with the approval of the Comptroller."  12 U.S.C. § 3102(f).  The International Banking Act contains *none* of the limitations cited by the DFS.

63.     Moreover, the DFS's contention that the requirements of 12 U.S.C. § 35 apply to conversions of state-licensed branches by virtue of 12 U.S.C. § 3102(b) is incorrect. Section 3102(b) provides:  "Except as otherwise specifically provided in this chapter or in rules, regulations, or orders adopted by the Comptroller under this section, *operations* of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank doing business at the same location."  12 U.S.C. § 3102(b) (emphasis added).  By its terms,

Section 3102(b) is limited to the "operations" of a federally-licensed branch of a foreign bank.[12] It does not apply to a foreign bank's state-licensed branches before they convert their licenses or to the OCC's determination whether to approve a foreign bank's application to convert its state-licensed branches to federally-licensed branches.

      64.    Congress's express statutory distinction between state banks and state-licensed branches or agencies of foreign banks not only is determinative of the question, but also is longstanding and reasonable.  Whereas state-chartered banks and savings associations, as well as national banks and federal savings associations, all receive federal "safety net" protections as federally-insured depository institutions, almost no branches or agencies of foreign banks are federally insured, and no more can become insured.  *See* Testimony of Governor Daniel K. Tarullo Before the Committee on Financial Services, U.S. House of Representatives (Oct. 29, 2009) (Dodd-Frank Act would address the possibility that "*insured depository institutions*"— which generally exclude foreign bank branches or agencies—would seek "charter conversions . . . that are motivated by hopes of escaping current or prospective supervisory actions") (emphasis added).  Consistent with this statutory distinction, BTMU's branches and agencies in the United States are not federally insured.

      65.    Nor can the DFS successfully challenge BTMU's conversion of its licenses under the policy statements cited in the November 13 DFS Letter.  Those guidance documents—the Licensing Manual and the FFIEC Statement—do not have the force of law, do

---

[12] *See Samsun Logix Corp* v. *Bank of China*, 740 F. Supp. 2d 484, 490 (S.D.N.Y. 2010) ("To read 'operations of a foreign bank' as equating to a 'foreign bank' renders the term 'operations' surplusage.  If Congress had intended to treat federally chartered branches of foreign banks exactly as national banks, then it could have done so by removing the word 'operations' and stating that a foreign bank at a Federal branch shall be treated with the same rights and privileges as a national bank at the same location.") (internal citations omitted).

not bind the OCC and are not subject to judicial review.  Even if those policy statements were subject to judicial review, the OCC did not depart from the policies articulated in either document.

### 2.      The Threat of a DFS Enforcement Action

66.      The November 13 DFS Letter also asserts that the DFS was undertaking an ongoing "enforcement investigation" of BTMU NY and that BTMU had engaged in "misconduct" and had "significant compliance deficiencies," thus reinforcing the DFS's intent to pursue an enforcement action against the bank.  November 13 DFS Letter at 2, 4.

67.      Much of the information selectively disclosed by the DFS in the November 13 DFS Letter constitutes confidential supervisory information about the bank, which New York law protects from disclosure absent a waiver by the DFS under Section 36(10) of New York Banking Law.  Under that provision, such a waiver is not within the general discretion of the DFS, but rather requires an affirmative determination by the Superintendent that disclosure of confidential supervisory information serves both "the ends of justice and the public advantage." Presumably in anticipation of making broad disclosure of the incomplete confidential supervisory information in the letter, the November 13 DFS Letter invokes Section 36(10) and contains a waiver of the confidentiality requirements otherwise applicable to the confidential supervisory information, but that waiver is not expressly limited to disclosure to the recipient of the letter—the OCC.  On information and belief, the DFS's normal process for disclosing confidential supervisory information to another banking regulator is to expressly limit the waiver to that regulator.  The DFS's disclosure of confidential supervisory information about BTMU in the form of the November 13 DFS Letter is unprecedented and extraordinary.

68.     The November 13 DFS Letter publicly charges BTMU with a laundry list of misconduct and deficiencies relating to its sanctions-compliance program.  Exacerbating the selective and incomplete disclosure of confidential supervisory information, the DFS's allegations are riddled with false and misleading statements, and the letter is also unfair because it fails to acknowledge that BTMU has invested, and continues to invest, enormous resources to transform and strengthen its worldwide financial-crimes compliance program.  Such public allegations by the DFS, coupled with the DFS Order's statement in Paragraph 3 that BTMU "remains subject to all enforcement activities, including the investigation and prosecution of any violations . . . for any conduct occurring during the time period of its license from the [DFS]," establish a significant risk of a DFS enforcement action against BTMU.  Federal law preempts such an action, and BTMU is entitled to judicial intervention so that it is not forced to operate under this threat.

69.     The November 13 DFS Letter makes a number of incendiary assertions. For example, the letter asserts that (i) "BTMU failed to identify thousands of Sudan-owned accounts in Tokyo until the Independent Consultant urged BTMU to investigate the accounts," (ii) BTMU's Independent Consultant identified "continuing compliance failures in Hong Kong" relating to United States sanctions against North Korea, and (iii) BTMU was "acting to prevent the Independent Consultant from identifying for the DFS the most recently discovered bank misconduct."  November 13 DFS Letter at 4.

70.     Beyond the fundamental principle of federal law that all of these accusations are now subject to the OCC's exclusive visitorial powers and the superseding OCC Consent Order, the DFS's allegations are false and misleading.  The DFS's claim that BTMU has "thousands of Sudan-owned accounts in Tokyo" is untrue.  Neither the DFS nor the Independent

Consultant ever made such an assertion previously or suggested that the bank investigate any such accounts.  Likewise, BTMU is unaware of any "compliance failures in Hong Kong" relating to United States sanctions against North Korea.  For transactions involving relevant Chinese cities that border North Korea, BTMU's Hong Kong branch manually reviews documentation about the transaction and the counterparties to ensure that the transaction does not involve North Korea.  The DFS's allegation misstates a limited exception to this policy—rescinded more than a year ago—that was applied where compliance staff already had approved a corporate customer's similar transaction with the same counterparty.  The DFS also does not acknowledge that after a review of past transactions approved under that former policy, BTMU found *no* transaction that involved North Korea or violated United States sanctions.  And neither the DFS nor any other regulator has ever contended that BTMU's Hong Kong branch processed transactions that involved North Korea or violated such sanctions.  Indeed, the DFS nowhere asserts that *any* BTMU office in any location processed a single transaction after 2007 that violated United States sanctions laws.

71.     It is also untrue that BTMU has acted "to prevent the Independent Consultant from identifying for the DFS the most recently discovered bank misconduct."  BTMU is not aware of any "recently discovered bank misconduct," and BTMU did nothing to prevent the Independent Consultant from providing information to the DFS before the conversion of BTMU's licenses.  This assertion may refer instead to BTMU's entirely proper request *after* the issuance of its federal licenses that the Independent Consultant discontinue sharing BTMU's confidential information with the DFS because the DFS was no longer BTMU's supervisor.

72.     The DFS's letter also omits significant information regarding BTMU's compliance-program developments.  For instance, to position itself as a market leader in this

area, BTMU has launched a Global Financial Crimes Division—covering sanctions, anti-money laundering and anti-bribery and corruption—headquartered in New York that has authority over BTMU's operations worldwide.  To lead this new division, BTMU has recruited experienced subject-matter experts who have held top positions at the Treasury Department's Office of Foreign Assets Control and Financial Crimes Enforcement Network, other government agencies and state and federal prosecutors' offices.  The DFS letter further fails to mention BTMU's overhaul over the last year of its global sanctions policies, procedures, testing and training functions, as well as its expansion of worldwide staff devoted to financial crimes compliance.

73.    All of the DFS's allegations have been placed in the public record.  On November 14, 2017, *The Wall Street Journal* published an article about the conversion of BTMU's licenses that both described and quoted at length from the November 13 DFS Letter (which BTMU had not received from the DFS).  On its website, *The Wall Street Journal* provided a link to the November 13 DFS Letter.[13]  The next day, the November 13 DFS Letter also was the subject of articles in *The New York Times* and *Financial Times*.[14]

74.    The DFS's drumbeat against BTMU continued on November 21, 2017, when the DFS's Executive Deputy Superintendent for Enforcement gratuitously referenced the DFS's allegations against BTMU (and disparaged the OCC) during a court hearing in an unrelated litigation between the DFS and the OCC.  He asserted:

> [BTMU] had a number of problems.  This has been in the press recently.  They have had a number of problems, and they wanted to get out [of the DFS's

---

[13] *See* Ryan Tracy, *Switching U.S. Regulators Upends Probe Into Japan's Biggest Bank*, WALL ST. J. (Nov. 14, 2017, *updated* Nov. 15, 2017).

[14] *See* Ben Protess & Jessica Silver-Greenberg, *Under Trump, Banking Watch Dog Trades Its Bite for a Tamer Stance*, N.Y. TIMES (Nov. 15, 2017); Ben McLannahan, *MUFG makes bid for freedom from New York regulator*, FIN. TIMES (Nov. 15, 2017).

jurisdiction] because they didn't want to solve those problems.  The OCC didn't care about those problems.  They put some stuff in their conversion papers to recognize they had problems but, in actuality, they really don't care; they are not known for their vigorous enforcement.[15]

**G.    The OCC's November 17 Response**

75.    In a letter dated November 17, 2017 (the "November 17 OCC Response"), the OCC responded to the DFS's contentions.[16]  The OCC's response explained that the OCC approved BTMU's conversion applications "based on a record that supported favorable findings under the applicable legal standards."  November 17 OCC Response at 2.  Among other things, the OCC considered (i) "information provided by BTMU in connection with the pre-filing discussions, consistent with the pre-filing process contemplated by [OCC] regulations," (ii) "[t]he OCC's ongoing supervisory activities" over Union Bank, which "afforded the OCC extensive knowledge about and familiarity with BTMU," (iii) information contained in "[t]he formal application from BTMU," and (iv) information obtained from BTMU's home-country regulator, the Japan Financial Services Agency.  *Id*.  Based on that information, the OCC determined that the statutory "standards were satisfied, and approval of the applications was fully in accordance with Federal law."  *Id*.

76.    The OCC's response also addressed the DFS's legal challenges to the validity of BTMU's federal licenses.  First, the OCC explained that none of the authorities cited by the DFS—Section 612 of the Dodd-Frank Act, the Licensing Manual and the FFIEC Statement—"grants a state regulator a 'veto' over a proposed branch conversion."  *Id*. at 3.  Second, the OCC stated that the DFS "had no 'pending' enforcement actions against [BTMU's]

---

[15] Tr. at 21:11-17, *Vullo* v. *OCC*, No. 17 Civ. 3574 (S.D.N.Y. Nov. 21, 2017).

[16] Attached as Exhibit I to this Amended Complaint is a copy of the November 17 OCC Response.

Branches as that term is defined in OCC policies." *Id.* Finally, the OCC rejected the DFS's

contention that the OCC could not act on BTMU's conversion applications while the DFS "had

ongoing examination or supervisory work in progress." *Id.* As the OCC explained, "Federal law

does not impose any such restriction with respect to state branches converting to Federal

licenses," and the DFS's suggestion to the contrary "would be inconsistent with the dual

licensing system established under Federal Law." *Id.* Moreover, "[b]y operation of law, [a]

state's examination and supervisory authority over [a] branch terminates upon the issuance of a

Federal license." *Id.*

      77.    Finally, the OCC stressed that it "has required execution of consent orders

by BTMU and the Branches that are substantively the same as the outstanding New York

consent orders." *Id.* The OCC added that it "also conditioned its approval on BTMU and its NY

Federal Branches consent to any additional conditions at the OCC's discretion . . . based upon

information that the OCC may receive post-conversion." *Id.* The OCC thus emphasized that

"[t]he conduct covered by the New York orders will be remediated under the supervision of the

OCC" and that "BTMU cannot evade further supervisory or enforcement action." *Id.*

## H.    BTMU's Efforts To Resolve This Dispute

      78.    In an effort to eliminate the uncertainty created by the DFS's public

challenges to BTMU NY's conversion of its licenses and to identify the legal issues on which the

parties disagree, BTMU proposed to the DFS a stipulation that would (i) recognize the validity of

BTMU's federal licenses, (ii) preclude the DFS's future exercise of visitorial powers over

BTMU, including the commencement of an enforcement action, and (iii) rescind the DFS

Order.[17]  Although the DFS did not foreclose the possibility of future discussion of these issues, the DFS did not agree to BTMU's proposed stipulation.  As a result, there are three principal areas of legal disagreement between the parties that require judicial resolution.

79.    First, the DFS continues to dispute the validity of BTMU's federal licenses.  Contrary to the DFS's contentions, however, BTMU's federal licenses are not subject to challenge under either state law (as described in Paragraph 5 of the DFS Order) or federal law (as described in the November 13 DFS Letter).  The implications of the DFS's challenge to BTMU's federal licenses are far-reaching.  For example, if, as the DFS incorrectly maintains, the conversion of BTMU's New York licenses was not effective, then BTMU NY arguably remains subject to New York's regulatory scheme and is exposed to the risk of an enforcement action by the DFS to the extent that BTMU NY has not been in compliance with that scheme.  Since the OCC approved the conversion of its licenses on November 7, 2017, BTMU NY has been complying with the regulatory requirements imposed by the OCC.  In view of the DFS's challenge to the validity of BTMU NY's federal licenses, however, BTMU is forced to assume the risk that it is complying with the wrong regulatory scheme.  What is more, the DFS has created operational uncertainty for BTMU in its long-term efforts to create processes that comply with the OCC's regulatory requirements, and the DFS has not given BTMU permission to share confidential supervisory information with the OCC, creating additional difficulties for BTMU in complying with the demands of its new regulator.  BTMU NY also continues to have more than $135 million of assets encumbered by the DFS as a result of BTMU NY's previous New York licenses.

_____

[17] Attached as <u>Exhibit J</u> to this Amended Complaint is a copy of BTMU's proposed stipulation.

80.     Second, as reflected in Paragraph 3 of the DFS Order, the DFS continues to insist that it has authority to bring an enforcement action against BTMU.  Now that federal licenses have been issued, however, federal law preempts the DFS from taking any enforcement action, or exercising any other form of visitorial powers, based on its purported authority over BTMU NY, "regardless of when the activities sought to be investigated [or prosecuted] occurred" or when the investigation commenced.  *McGraw*, 563 F. Supp. 2d at 622.  Because BTMU's New York branches now are federally licensed, the DFS may not bring any enforcement action against BTMU NY—in either an administrative or a judicial forum—that it could not bring against a national bank.  *See* 12 U.S.C. § 3102(b).

81.     Third, the DFS Order is invalid under federal law.  Federal law preempts the DFS Order because BTMU NY is now federally licensed and thus no longer subject to the DFS's visitorial powers.  The DFS nevertheless has refused to rescind the DFS Order.

## I.     The Need for Judicial Relief

82.     To resolve these critical areas of continued disagreement between the parties based on the DFS's insistence on the right to exercise visitorial powers over BTMU, BTMU has no choice but to seek the Court's intervention.

83.     BTMU has standing to assert claims for declaratory and injunctive relief.  At the time BTMU filed its original complaint, the DFS clearly was attempting to exercise visitorial powers over the bank, despite the OCC's exclusive role as supervisor of BTMU NY.  *See, e.g.*, *Etuk* v. *Slattery*, 936 F.2d 1433, 1441 (2d Cir. 1991) ("standing focuses on the status of the parties when an action is commenced").  Only after BTMU filed this lawsuit did the DFS agree that it would "not exercise any supervisory authority over the bank," but even that statement was carefully limited to apply only "while the OCC license is in effect."  Tr. at

-39-

7:22-24.  The DFS's professed voluntary, and highly conditional and temporary, cessation of part

of its unlawful conduct in no way moots this case.  *See Friends of the Earth, Inc.* v. *Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (explaining that party asserting mootness has

a "heavy burden of persua[ding]" the court that "the challenged conduct cannot reasonably be

expected to start up again") (internal quotation marks omitted).  The DFS has made clear that it

intends to start the challenge again at a time and a place more to its liking.

        84.    The DFS's repeated public challenges to the validity of BTMU's federal

licenses and the widespread press attention those challenges have received cause BTMU to

suffer injury-in-fact.  An injury-in-fact is "'an invasion of a legally protected interest' that is

'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo,*

*Inc.* v. *Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555,

560 (1992)).  The DFS has publicly challenged BTMU's authority to conduct its normal business

operations in New York under its federal licenses.  This places BTMU in an untenable position.

BTMU now must operate under the constant threat that the federal licenses that enable it to

conduct banking activities in New York may somehow be invalidated by its former state

regulator, which then might seek to penalize BTMU NY for failing to comply with purportedly

applicable state-law requirements that do not apply to federal branches.  The threat of such DFS

action is exacerbated by the unprecedented disclosure of confidential supervisory information

about BTMU.  BTMU should not be forced to endure such uncertainty and reputational injury.

        85.    BTMU also is operating under the significant threat of a DFS enforcement

action.  Such a threat is sufficient to confer standing.  *See MedImmune, Inc.* v. *Genentech, Inc.*,

549 U.S. 118, 128-29 (2007) (holding that plaintiff challenging threatened government

enforcement need not "expose himself to liability before bringing suit to challenge the basis for

the threat"); *Siedman* v. *Chobani, LLC*, No. 14-CV-4050, 2016 WL 1271066, at \*4-5 (S.D.N.Y.

Mar. 29, 2016) (courts "routinely find actual 'case or controversy'" for purposes of declaratory

judgment where there is a threat of enforcement); *N.Y. Civil Liberties Union* v. *Acito*, 459 F.

Supp. 75, 81 (S.D.N.Y. 1978) (although state agency had not "threatened" enforcement "in so

many words," plaintiff's showing of "very definite possibility" of unlawful enforcement was

sufficient to establish standing for declaratory judgment**)**.

        86.     Likewise, unless the Court declares that federal law preempts the DFS

Order, the DFS will continue to claim that BTMU is subject to that Order, even though the DFS

has no continuing legal authority over BTMU.  BTMU should not be subject to an order that

violates federal law, interferes with BTMU's exercise of federally-protected banking powers and

asserts that BTMU NY remains subject to a host of substantive New York laws and regulations

that no longer apply to it.

        87.     Lastly, the DFS's retaliatory acts and the media attention they have

received have damaged BTMU's reputation and will continue to do so absent judicial relief.  The

DFS has publicly challenged the validity of BTMU's federal licenses, publicly criticized

MUFG's regulatory compliance and made clear its intent to commence an enforcement action

against BTMU.  Such acts by the DFS are likely to continue absent declaratory and injunctive

relief in this action.

**COUNT I – DECLARATORY RELIEF**
**(Claim for Declaratory Judgment Under 28 U.S.C. §§ 2201–2202**
**That BTMU's Federal Licenses Are Valid and Effective)**

        88.     BTMU incorporates and realleges each and every allegation contained in

paragraphs 1–87 of this Amended Complaint as though fully set forth herein.

89.     In the DFS Order, on the record at the November 9 conference and in the November 13 DFS Letter published in its entirety by *The Wall Street Journal*, the DFS has challenged the validity of the licenses issued to BTMU by the OCC.

90.     The DFS has asserted that BTMU's federal licenses are invalid under the following provisions of New York and federal law: (i) New York Banking Law § 605, (ii) 12 U.S.C. § 35, (iii) 12 U.S.C. § 3102(b), and (iv) Section 612 of the Dodd-Frank Act.  The DFS also has contended that the OCC's approval of BTMU's conversion of its licenses was inconsistent with the informal policy guidance in the Licensing Manual and the FFIEC Statement.

91.     The DFS's challenge to the validity of BTMU's federal licenses lacks merit.  The statutes cited by the DFS in the DFS Order and the November 13 DFS Letter do not apply to license conversions of foreign banks' branches and agencies, and the policy statements cited by the DFS are not binding on the OCC or subject to judicial review and, in any event, were not violated here.

92.     BTMU NY should not be forced to conduct its banking business in New York under the constant threat of a challenge by the DFS to BTMU NY's federal licenses—and all of the uncertainty that such a threat, supported by disparaging remarks, creates.  BTMU thus requires a declaratory judgment that its federal licenses are valid and effective.

93.     This dispute presents an "actual controversy" arising under federal law. This Court therefore has authority under the Declaratory Judgment Act to "declare the rights and other legal relations" of BTMU and the DFS with respect to BTMU NY's federal licenses.  *See* 28 U.S.C. § 2201.

94.     The parties' controversy is ripe for decision.  BTMU and the DFS "'hav[e] adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Fed. Ins. Co.* v. *SafeNet, Inc.*, 758 F. Supp. 2d 251, 261 (S.D.N.Y. 2010) (quoting *SR Int'l Bus. Ins. Co.* v. *Allianz Ins. Co.*, 343 Fed. App'x 629, 631–32 (2d Cir. 2009)).  Although the DFS has not yet filed a lawsuit challenging the validity and effectiveness of BTMU's federal licenses, it has publicly challenged those licenses on multiple occasions, including (i) in the DFS Order, (ii) on the record at the November 9, 2017 conference in this action, and (iii) in the November 13 DFS Letter published by *The Wall Street Journal*.  A declaratory judgment that the licenses are valid and effective "'will serve a useful purpose in clarifying or settling the legal issues involved'" and "'offer relief from uncertainty.'"  *SafeNet*, 758 F. Supp. 2d at 261–62 (quoting *Duane Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005)).  Accordingly, the parties' controversy is ripe for judicial resolution under the Declaratory Judgment Act.  *See id*.

## COUNT II – DECLARATORY AND INJUNCTIVE RELIEF
### (Federal Preemption of the DFS's Threatened Enforcement Action and Other Forms of Visitorial Powers By 12 U.S.C. §§ 24(Seventh), 484 & 3102(b), and 12 C.F.R. § 7.4000)

95.     BTMU incorporates and realleges each and every allegation contained in paragraphs 1–94 of this Amended Complaint as though fully set forth herein.

96.     Subject to limited exceptions not applicable here, federal law grants the OCC exclusive visitorial powers over national banks and expressly preempts any exercise of visitorial powers by the DFS.  *See* 12 U.S.C. § 484(a) ("No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized."); 12 C.F.R. §  7.4000(a) ("Under 12

U.S.C. 484, only the OCC or an authorized representative of the OCC may exercise visitorial

powers with respect to national banks.").

97.     These limitations on the exercise of visitorial powers by state regulators

also apply to foreign banks' federally-licensed branches.  *See* 12 U.S.C. § 3102(b); 12 C.F.R.

§ 28.13(a).

98.     Visitorial powers include (i) examining the foreign banks' branches,

(ii) inspecting the branches' books and records, (iii) regulating or supervising activities

authorized or permitted by federal banking law, and (iv) enforcing compliance with any

applicable federal or state law concerning those activities, "including through investigations that

seek to ascertain compliance through production of non-public information by the bank."  12

C.F.R. § 7.4000(a)(2).  Regulatory actions are visitorial if they "directly concern a banking

practice" or are "banking industry specific."  *Minnesota* v. *Fleet Mortg. Corp.*, 158 F. Supp. 2d

962, 966 (D. Minn. 2001).

99.     In *Cuomo*, the Supreme Court held that the New York Attorney General's

attempt to issue administrative subpoenas to national banks "on his own authority under New

York Executive Law" in an effort to investigate an alleged violation of state law was visitorial

and thus preempted by federal law.  557 U.S. at 536.  This preemption analysis also applies to a

state administrative agency's attempt to issue subpoenas or to otherwise exercise visitorial

powers.

100.     These comprehensive limitations on the exercise of visitorial powers by

any regulator other than the OCC apply with full force to any attempted enforcement action by

the DFS directed at pre-conversion conduct by BTMU NY.  *See McGraw*, 563 F. Supp. 2d at

622 (holding that state regulator "cannot exercise visitorial powers over a national bank

regardless of when the activities sought to be investigated occurred," even if they occurred pre-conversion).  As the *McGraw* court explained, there is no basis for a court to "fashion a special rule that states, in essence, that . . . a state official may exercise visitorial powers . . . so long as (1) the state seeks to investigate activities that the bank engaged in before achieving national bank status, and (2) the state's investigation began before the bank converted to a national bank." *Id.*

101.    The November 13 DFS Letter's public claim of an ongoing enforcement investigation and its extraordinary allegations of misconduct, together with Paragraph 3 of the DFS Order, establish a genuine threat of an enforcement action against BTMU.  This threat extends not only to BTMU's pre-conversion conduct, but to BTMU's ongoing conduct as well.  While BTMU is entitled to expect that its ongoing compliance practices will be subject to the OCC's supervisory expectations and judgments and the requirements of federal law (not New York law), the DFS has publicly challenged that position.  Paragraph 2 of the DFS Order states that BTMU "shall comply with all New York laws, regulations, orders and agreements," revealing the DFS's expectation that BTMU will continue to comply with New York requirements that are distinct from federal requirements.  Further evidencing the risk of enforcement, Paragraph 4 of the DFS Order imposes ongoing document preservation requirements that focus on BTMU's sanctions compliance, among other topics.

102.    BTMU should not be required to operate under the looming and publicly made threat of a DFS enforcement action, including by taking the risk on a daily basis that the DFS will penalize it for adhering to federal, not New York, compliance requirements.

103.    This threat of enforcement activity is sufficient to confer standing.  *See MedImmune*, 549 U.S. at 128–29; *Siedman*, 2016 WL 1271066, at \*4–5; *N.Y. Civil Liberties Union*, 459 F. Supp. at 81.

104.    BTMU is entitled to a declaratory judgment that federal law preempts any enforcement action, investigation or any other exercise of visitorial powers by the DFS directed at BTMU and an injunction prohibiting the DFS from commencing such an enforcement action or investigation against or attempting to exercise any other visitorial powers over BTMU now that BTMU is federally licensed.

### COUNT III – DECLARATORY AND INJUNCTIVE RELIEF
### (Federal Preemption of the DFS Order By 12 U.S.C. §§ 24(Seventh), 484 & 3102(b), and 12 C.F.R. § 7.4000)

105.    BTMU incorporates and realleges each and every allegation contained in paragraphs 1–104 of this Amended Complaint as though fully set forth herein.

106.    The International Banking Act, the National Bank Act and the OCC's implementing regulations preempt the DFS Order because BTMU's New York branches are now federally-licensed.

107.    The National Bank Act and related regulations vest in the OCC exclusive visitorial authority over national banks, subject only to a very limited exception not applicable here.  *See* 12 U.S.C. §§ 24(Seventh), 484(a), 1818(b); 12 C.F.R. § 7.4000.  Under the International Banking Act, this exclusive visitorial authority applies equally to federally-licensed branches of foreign banks.  *See* 12 U.S.C. § 3102(b); 12 C.F.R. § 28.13(a).

108.    Through the DFS Order, the DFS seeks to continue to regulate and supervise the banking activities of the federally-licensed branches of BTMU.  Because the OCC now has exclusive visitorial authority over those branches, the DFS Order is preempted under

Article VI of the United States Constitution, by the International Banking Act, by the National

Bank Act and by 12 C.F.R. § 7.4000.

109.    The DFS Order also is preempted because its provisions prevent or

significantly interfere with BTMU's exercise of federally-protected banking powers under the

International Banking Act, the National Bank Act and the Dodd-Frank Act.  *See Barnett Bank*,

517 U.S. at 33 (state laws are preempted if they "prevent or significantly interfere with" exercise

of federal banking powers); *see also* Dodd-Frank Act, Pub. L. 111-203, 124 Stat. 1376-2223,

2015 (2010) (providing for preemption even in the case of state consumer financial laws if such

laws meet the standard articulated in *Barnett Bank*, discriminate against national banks or are

preempted by another federal law).

110.    Because the DFS attempted to examine BTMU NY after the conversion

and has refused to rescind the DFS Order, the validity and enforceability of that Order present an

"actual controversy" arising under federal law.  BTMU is entitled to a judicial declaration that

the DFS Order is invalid under federal law and an injunction prohibiting the DFS from taking

any action under the DFS Order.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd. demands judgment

against Defendant Maria Vullo, in her official capacity as Superintendent of Financial Services

of the New York State Department of Financial Services, for the following relief:

A.    A judgment declaring that the licenses issued to Plaintiff by the OCC on

November 7, 2017 are valid and effective as a matter of federal law;

B.    A judgment declaring that any exercise of visitorial powers by the DFS over

Plaintiff and/or its directors, officers, employees or agents, including the commencement of any

investigation or enforcement action against Plaintiff and/or its directors, officers, employees or agents, is preempted under Article VI of the United States Constitution, the International Banking Act, the National Bank Act and the OCC's implementing regulations;

C.      A judgment declaring that the DFS Order violates federal law and that federal law prohibits Defendant and her agents from exercising any authority over Plaintiff's banking operations under that Order or otherwise because any such action against Plaintiff and/or its directors, officers, employees or agents is preempted under Article VI of the United States Constitution, the International Banking Act, the National Bank Act and the OCC's implementing regulations;

D.      A permanent injunction enjoining Defendant and her agents from commencing any enforcement action against Plaintiff, from taking any action under the DFS Order, from otherwise taking any action that interferes with, either directly and indirectly, Plaintiff's banking operations in New York, and from otherwise exercising any visitorial powers over Plaintiff and/or its directors, officers, employees or agents; and

E.      The grant to Plaintiff of such other and further relief, including costs, as the Court may deem just and proper.

Dated:  New York, New York
        December 6, 2017

Respectfully submitted,


By:  /s/ Richard C. Pepperman II
Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000
peppermanr@sullcrom.com
newtonb@sullcrom.com


Robert A. Long, Jr. (*pro hac vice*)
Henry B. Liu (*pro hac vice*)
Jonathan Y. Mincer (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000
rlong@cov.com
hliu@cov.com
jmincer@cov.com

*Attorneys for Plaintiff*