UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,

               Plaintiff,

        v.

MARIA VULLO, in her official capacity as Superintendent Financial Services of the New York State Department of Financial Services,

               Defendant.

1:17-cv-08691

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Robert A. Long, Jr. (*pro hac vice forthcoming*)
Henry B. Liu (*pro hac vice forthcoming*)
Jonathan Y. Mincer (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

*Attorneys for Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF THE CASE............................................................................. 4

    A.    The Bank's U.S. Operations ................................................... 4

    B.    The Conversion of the Bank's Branches to Federal Licenses ............... 5

    C.    The DFS's Attempt to Continue to Supervise the Bank ..................... 8

ARGUMENT ...................................................................................................... 11

I.    THE BANK IS LIKELY TO SUCCEED ON THE MERITS........................ 12

    A.    The DFS Seeks to Exercise Visitorial Powers That Are Exclusively Reserved for the OCC........................................................... 12

    B.    The DFS's Order Prevents or Significantly Interferes with the Bank's Exercise of Federally-Protected Banking Powers................................. 15

II.    THE BANK WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.................................................................................... 17

III.    THE BALANCE OF HARMS DECISIVELY FAVORS IMMEDIATE INJUNCTIVE RELIEF..................................................................... 19

IV.    THE PUBLIC INTEREST FAVORS GRANTING INJUNCTIVE RELIEF. ................ 20

CONCLUSION.................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andino v. Fischer*,
    555 F. Supp. 2d 418 (S.D.N.Y. 2008).....................................................................................11

*Bank One v. Guttau*,
    190 F.3d 844 (8th Cir. 1999) ......................................................................................19, 20

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
    517 U.S. 25 (1996) ......................................................................................................15

*Cal. Pharm. Ass'n v. Maxwell-Jolly*,
    563 F.3d 847 (9th Cir. 2009) ........................................................................................18

*Capital One Bank (USA), N.A. v. McGraw*,
    563 F. Supp. 2d 613 (S.D. W. Va. 2008) ......................................................................15

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)...........................................................................................11

*Claire v. Office of Fed. Hous. Enter. Oversight*,
    355 F. Supp. 2d 56 (D.D.C. 2004)................................................................................20

*Colo. River Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985) ........................................................................................18

*Conference of State Bank Supervisors v. Conover*,
    715 F.2d 604 (D.C. Cir. 1983) ......................................................................................14

*Cuomo v. Clearing House Ass'n, L.L.C.*,
    557 U.S. 519 (2009)........................................................................................12, 13, 14

*Epps v. JP Morgan Chase Bank, N.A.*,
    675 F.3d 315 (4th Cir. 2012) ........................................................................................16

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
    458 U.S. 141 (1982)....................................................................................................13

*First Union Nat'l Bank v. Burke*,
    48 F. Supp. 2d 132 (D. Conn. 1999).............................................................................20

*Hess v. Port Auth. Trans-Hudson Corp.*,
    513 U.S. 30 (1994) ......................................................................................................18

*Home Box Office, Inc. v. Pay TV of Greater New York, Inc.*,
467 F. Supp. 525 (E.D.N.Y. 1979) ..................................................18

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. and Rehab. Servs.*,
31 F.3d 1536 (10th Cir. 1994) ......................................................18

*Monroe Retail, Inc. v. RBS Citizens, N.A.*,
589 F.3d 274 (6th Cir. 2009) ........................................................16

*Pac. Capital Bank, N.A. v. Connecticut*,
542 F.3d 341 (2d Cir. 2008)...........................................................15

*Rose v. Chase Bank USA, N.A.*,
513 F.3d 1032 (9th Cir. 2008) ......................................................16

*Stagg P.C. v. U.S. Dep't of State*,
158 F. Supp. 3d 203, 208 (S.D.N.Y. 2016).................................11

*Street v. Vitti*,
685 F. Supp. 379 (S.D.N.Y. 1988) ...............................................18

*Stromfeld v. Smith*,
557 F. Supp. 995 (S.D.N.Y. 1983) ..............................................17

*Tiffany v. Nat'l Bank of Mo.*,
85 U.S. 409 (1873)...........................................................................16

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995)...............................................................17

*Trans World Airlines, Inc. v. Mattox*,
897 F.2d 773 (5th Cir. 1990) ........................................................19

*Watters v. Wachovia Bank, N.A.*,
550 U.S. 1 (2007)..............................................................3, 12, 13

**Statutes**

12 U.S.C. § 24(Seventh) ...............................................................15

12 U.S.C. § 25b(a)(1)......................................................................14

12 U.S.C. § 25b(b)(1)(B) ...............................................................15

12 U.S.C. § 484(a) ......................................................................3, 13

12 U.S.C. § 3102(b) ...........................................................3, 13, 15, 16

12 U.S.C. § 3102(f).......................................................................6, 8

18 U.S.C. § 641 ...............................................................................................17

N.Y. Banking Law § 10 ...................................................................................14

N.Y. Banking Law § 39 .....................................................................................8

N.Y. Banking Law § 44 .....................................................................................8

N.Y. Fin Servs. Law § 201 ..............................................................................14

**Other Authorities**

U.S. Const. Art. VI, cl. 2 .................................................................................12

12 C.F.R. § 4.37(b) ..........................................................................................17

12 C.F.R. § 7.4000 ..........................................................................3, 12, 13, 14

12 C.F.R. § 28.12 ...............................................................................................7

12 C.F.R. § 28.13(a) ..............................................................................3, 13, 15

12 C.F.R. § 252.153 ...........................................................................................8

OCC*, Comptroller's Licensing Manual: Federal Branches and Agencies* (Oct. 2017), *available at* https://www.occ.gov/publications/publications-by-type/licensing-manuals/lm-fba2.pdf ...........................................................6

OCC, *Approach to Federal Branch and Agency Supervision* (Oct. 2017), *available at* https://www.occ.treas.gov/publications/ publications-by-type/other-publications-reports/approach-to-fba-supervision.pdf ...........................7

OCC Interp. Letter No. 280 (Dec. 1, 1983) .....................................................14

Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU" or the "Bank") submits this memorandum in support of its motion for a temporary restraining order and preliminary injunction against Defendant Maria Vullo, in her official capacity as Superintendent Financial Services of the New York State Department of Financial Services ("DFS").

## PRELIMINARY STATEMENT

On November 8, 2017, the DFS issued an order that would require the Bank to violate the terms of its recently issued federal licenses and federal law.  Without immediate relief from this Court, the Bank will be placed in the untenable position of being subject to an order that requires it to violate federal law and of being subject of competing demands from two different banking regulators.

The Bank provides services in the United States to customers through a national bank subsidiary in California and branch and agency offices in California, Illinois, New York, and Texas.  On October 30, 2017, the Bank filed applications with the Office of the Comptroller of the Currency ("OCC") to convert all of its state-licensed branch and agency offices, including two New York branches that were licensed and supervised by the DFS at the time, to federally-licensed branch and agency offices.  These conversions were part of the Bank's larger effort to consolidate its U.S. banking operations, including by concentrating its supervisory and regulatory requirements under the same federal banking agency:  the OCC.  The OCC approved the Bank's conversion applications and issued federal licenses to the Bank's branches and agencies, including the New York branches, on November 7, 2017.  In its approval letter, the OCC ordered that, effective immediately, the Bank's branches and agencies are no longer subject to the DFS's supervisory authority:

> Upon the effective date of the conversions, the Federal licenses for the Federally-licensed BTMU . . . Branches and Agencies supersede and replace the state licenses of the BTMU . . . Branches

1

and Agencies previously operated at such locations, and the Federally-licensed BTMU . . . Branches and Agencies *shall not be subject to the visitorial powers of the state authority by which each of their predecessors was licensed prior to the conversions*."

Letter from the OCC dated November 7, 2017, attached as Exhibit A ("*OCC Decision Letter*") (emphasis added).[1]

Notwithstanding that the OCC's issuance of federal licenses divested the DFS of all authority to regulate and supervise the Bank or its New York branches, the DFS has taken action that would upend the OCC's authority, in clear contravention of federal law.  One day after the Bank received its federal licenses from the OCC, the DFS issued an order, signed by Executive Deputy Superintendent Shirin Emami, requiring that:  (i) "[a]ll supervision activity of the [DFS] shall continue uninterrupted and unimpeded, including, but not limited to, the ongoing examination of the New York Branch currently being conducted by the Department" and (ii) "[t]he Bank and New York Branch remain subject to all supervisory and enforcement activities." *DFS Order Pursuant to NY Banking Law and Financial Services Law*, attached as Exhibit C ("*DFS Order*").

The DFS's action would require the Bank to violate the terms of its federal licenses, the OCC's order, and federal banking law.  Accordingly, the Bank respectfully requests that the Court enter a temporary restraining order and preliminary injunction.

*First*, federal law clearly preempts the DFS's actions because it seeks to exercise supervisory powers over federally-licensed branches that are now subject to the OCC's exclusive

---

[1] All exhibits referenced herein are attached to the accompanying Declaration of Michael F. Coyne dated November 9, 2017 ("Coyne Decl.").

visitorial authority.[2]  Under the International Banking Act and the National Bank Act, the Bank's federally-licensed branches and agencies are now, with limited exceptions not applicable here, subject to the OCC's exclusive "visitorial powers."  *See* 12 U.S.C. §§ 484(a), 3102(b); 12 C.F.R. § 28.13(a).   Visitorial powers broadly include (i) the "[e]xamination of a bank," (ii) the "[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law," and (iii) "[e]nforcing compliance with any applicable Federal or state laws concerning those activities."  12 C.F.R. § 7.4000.   Once a branch is federally licensed—as the Bank's branches are now—a state regulatory agency such as the DFS may not "prevent or . . . significantly impair the exercise of authority" by the OCC over that branch's activities. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007).   Accordingly, the DFS's attempt to continue supervising the Bank's New York branches—now federally-licensed branches—is preempted by, and contrary to, federal law.  *See* Letter from OCC to DFS dated November 8, 2017, attached as Exhibit D ("*OCC DFS Letter*") ("Because the conversion has been completed, the NYDFS is no longer the supervisor for the Branches and may no longer assert visitorial authority with respect to their operations.").

*Second*, the DFS's unlawful actions will inflict immediate and irreparable harm on the Bank.  As discussed above, the Bank's New York branches are now federally-licensed and therefore subject to the exclusive supervision of the OCC.  The DFS Order would require the Bank's New York branches to violate federal law by subjecting themselves to the supervisory authority of a regulator other than the OCC.  Moreover, the DFS Order treats the Bank's conversion to federal licenses as legally ineffective and deprives the Bank of its federal right to

---

[2] The DFS Order does not distinguish between the Bank's two New York branches, and as such, BTMU understands the Order to purport to apply to both branches.

exercise its federally-protected banking powers and be subject to an exclusive federal regulator, the OCC.  Unless the Court declares that the order is preempted by federal law, the Bank will continue to be subject to an order from a state banking regulator that requires it to violate the terms of both its license from the OCC and federal law.

*Third*, the balance of the equities favors a TRO or preliminary injunction.  In contrast to the significant and immediate irreparable damage to the Bank, the DFS will not be harmed by an injunction.  While a TRO or preliminary injunction is in effect, the Bank's branches will remain fully subject to the OCC's regulatory authority and visitorial powers, including enforcement of federal laws and regulations that now govern the Bank's branches.  Furthermore, as a condition of its approval of the Bank's federal licenses, the OCC is imposing a consent order with substantive provisions that mirror those of previous consent orders imposed on the Bank by the DFS.  The OCC is fully qualified to supervise the Bank and has virtually the same enforcement tools as the DFS.  To the extent that the DFS argues otherwise, it is effectively challenging the OCC's capacity to discharge its supervisory responsibilities over financial institutions as well as the conversion process authorized by federal law.

For those reasons, the Bank respectfully requests that the Court enter a temporary restraining order and preliminary injunction forestalling these severe consequences pending a final adjudication on the merits.

## STATEMENT OF THE CASE

### A.    The Bank's U.S. Operations

Plaintiff BTMU is one of two primary banking institutions owned by Mitsubishi UFJ Financial Group, Inc. ("MUFG"), a bank-holding company incorporated under the Companies Act of Japan.  (*See* Coyne Decl. ¶ 2.)  The other of the banking institutions owned by MUFG,

Mitsubishi UFJ Trust and Banking Corporation ("MUTB"), is a major trust bank in Japan that operates primarily through a branch in New York.  With offices throughout Japan and 40 other countries, BTMU provides a broad range of domestic and international banking and other financial services to its global customer base.  (*Id.* ¶ 3.)  In the United States, BTMU operates through (i) MUFG Union Bank N.A. ("Union Bank"), a federally-chartered national bank in California, and (ii) branch and agency offices in California, Illinois, New York, and Texas.  (*Id.*)

In New York, BTMU conducts extensive U.S. operations through two branch offices (collectively, "BTMU NY").  BTMU NY provides a full range of commercial- and investment-banking services to corporate-banking clients around the world.  (Coyne Decl. ¶ 3.)

### B.     The Conversion of the Bank's Branches to Federal Licenses

Before the conversion of their licenses, BTMU's U.S. banking operations were subject to multiple supervisory and regulatory schemes.  Four different state regulators (in California, Illinois, New York, and Texas) and the Federal Reserve System supervised BTMU's state-licensed branches and agency offices.  (Coyne Decl. ¶ 5.)  The OCC has long supervised Union Bank—MUFG's largest U.S. banking operation.  (*Id.* ¶ 6.)  This patchwork of supervisory and regulatory schemes created inefficiencies and imposed additional costs on the Bank's operations in the United States.  (*Id.*)

To simplify the supervisory and regulatory framework applicable to the Bank's U.S. operations, the Bank, along with MUTB, submitted applications to the OCC to convert its state-licensed branches and agency offices to federally-licensed branches and agency offices.  (Coyne Decl. ¶ 5.)  In the wake of the conversions, which are expressly permitted by federal statute, business managers across the Bank's U.S. operations are now subject to the consistent set of standards and supervisory expectations of a single regulator (the OCC) on a host of issues.  (*Id.* ¶ 6.)  The Bank's entire U.S. operations thus are now able to share resources, operate more

efficiently, and serve customers more effectively.  (*Id.*)  What is more, the Bank already has extensive experience complying with the OCC's regulatory regime through MUFG's Union Bank subsidiary.  (*Id.*)  In short, it is far more efficient and effective to have all of the Bank's U.S. operations under the OCC's supervision.

Section 4 of the International Banking Act expressly authorizes the conversions of state-licensed branches or agencies of foreign banks to federally-licensed branches or agencies.  *See* 12 U.S.C. § 3102(f); 12 C.F.R. § 28.12.   In determining whether to approve a conversion application, the OCC generally considers six factors:

> (1) The financial and managerial resources and future prospects of the applicant foreign bank and the Federal branch or agency; (2) Whether the foreign bank has furnished to the OCC the information the OCC requires to assess the application adequately, and provided the OCC with adequate assurances that information will be made available to the OCC on the operations or activities of the foreign bank or any of its affiliates that the OCC deems necessary to determine and enforce compliance with the IBA and other applicable Federal banking statutes; (3) Whether the foreign bank and its United States affiliates are in compliance with applicable United States law; (4) The convenience and needs of the community to be served and the effects of the proposal on competition in the domestic and foreign commerce of the United States; (5) With respect to an application to establish a Federal branch or agency outside of the foreign bank's home state, whether the foreign bank is subject to comprehensive supervision or regulation on a consolidated basis by its home country supervisor . . . ; and (6) Whether the home country supervisor has consented to the proposed establishment of the Federal branch or agency.

12 C.F.R. § 28.12(b).  The OCC also considers whether the applicant's financial condition poses any supervisory concerns, whether there are any safety or soundness concerns, whether conversion is inconsistent with applicable laws or regulations, and whether the applicant is trying to escape supervisory action by its current regulator.  *See* OCC, *Comptroller's Licensing*

*Manual: Federal Branches and Agencies* 47 (Oct. 2017), *available at* https://www.occ.gov/publications/publications-by-type/licensing-manuals/lm-fba2.pdf.[3]

After consideration of these factors, the OCC approved the Bank's and MUTB's applications and issued federal licenses to their branches and agencies. (Coyne Decl. ¶ 8.) The OCC granted the Bank's federal licenses on November 7, 2017, and the Bank notified the DFS of the OCC's approval of its application that evening. *See* OCC Final Approval Letter dated November 7, 2017 ("*Final Approval Letter*"), attached as Exhibit B (OCC acknowledging that the Bank "performed all the necessary steps to convert to federal branches and/or agencies" and issuing federal licenses "effective November 7, 2017"). As of the date that the OCC granted these licenses, the Bank's branches and agencies became subject to the OCC's exclusive visitorial authority, and state regulators were divested of all visitorial authority over them. *See OCC Decision Letter* at 5 ("Upon the effective date of the conversions, the Federal licenses for the Federally-licensed BTMU . . . Branches and Agencies supersede and replace the state licenses of the BTMU . . . Branches and Agencies previously operated at such locations, and the Federally-licensed BTMU . . . Branches and Agencies shall not be subject to the visitorial powers of the state authority by which each of their predecessors was licensed prior to the conversions."). In line with the Bank's efforts to consolidate their U.S. operations, those offices

---

[3] The OCC has extensive experience licensing and supervising federal branches and agencies of foreign banks operating in the United States. *See* OCC, *Approach to Federal Branch and Agency Supervision* 1 (Oct. 2017), *available at* https://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/approach-to-fba-supervision.pdf ("The OCC supervises federal branches and agencies of FBOs based in Africa, the Americas, Asia, Australia, Europe, and the Middle East. Federal branches and agencies typically operate in major U.S. cities and primarily conduct wholesale business, such as trade and corporate finance.").

are now governed by a consistent set of regulatory standards and expectations under the supervision of a single federal regulator.  (Coyne Decl. ¶¶ 6, 11.)[4]

Before the OCC's grant of federal licenses, BTMU had entered into consent decrees with the DFS in 2013 and 2014 arising out of BTMU's provision of U.S. dollar clearing services to certain entities in Iran, Sudan, and Myanmar.  *See Consent Order Under N.Y. Banking Law §§ 39 and 44, In the Matter of The Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch* (2014) ("2014 Consent Order"); *Consent Order Under N.Y. Banking Law § 44, In the Matter of The Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch* (2013) ("2013 Consent Order").  In approving the Bank's conversion applications, the OCC imposed conditions on BTMU to "ensure [that] the converted [BTMU NY] branch continues to be subject to the substantive requirements" in the 2013 and 2014 Consent Orders.  *OCC Decision Letter* at 3.  Specifically, the OCC required that, within five business days of its approval letter, BTMU NY enter into a superseding consent order with the OCC that "contain[s] substantive requirements based on the NYDFS Orders and would remain in effect until the branch has fully complied with the terms of the OCC order," which BTMU will do.  *Id.*

## C.     The DFS's Attempt to Continue to Supervise the Bank

Notwithstanding that federal law expressly authorizes the OCC to approve conversion applications, *see* 12 U.S.C. § 3102(f), the DFS has issued an order that threatens to significantly interfere with the OCC's exclusive authority and require the Bank to violate federal law.

---

[4] U.S. banking agencies increasingly have favored policies that call for the centralization of U.S. operations of foreign banks, for example, by requiring the formation of intermediate holding companies to hold the U.S. subsidiaries and non-branch assets of large foreign banks; by imposing certain centralized risk management standards on the combined U.S. operations of foreign banking organizations; and by communicating other informal guidance and supervisory expectations to foreign banks. *See, e.g.*, 12 C.F.R. § 252.153.  Consolidating the supervision and regulation of the Bank's U.S. operations under a single primary banking agency is consistent with these policies.

On October 31, 2017, the Bank notified its state regulators, including the DFS, that it had filed conversion applications with the OCC.  (Coyne Decl. ¶ 7.)  On November 7, 2017, the OCC approved BTMU's application and issued federal licenses to BTMU's branch and agency offices effective immediately.  *See Final Approval Letter* at 1 (OCC issuing the federal licenses "effective November 7, 2017").  Shortly thereafter, BTMU informed the DFS of the OCC's issuance of these federal licenses.  (Coyne Decl. ¶ 9.)

Notwithstanding the OCC's issuance of federal licenses that divested the DFS of continuing supervisory authority under federal law, the DFS issued an order on November 8, 2017 requiring, effective immediately, that:

> 1.   All supervision activity of the [DFS] shall continue uninterrupted and unimpeded, including, but not limited to, the ongoing examination of the New York Branch currently being conducted by the Department, unless and until any such conversion to an OCC license becomes legally effective (should that event occur).
>
> 2. The Bank and the New York Branch shall comply with all New York laws, regulations, orders and agreements, including, but not limited to, all reporting and record keeping requirements.
>
> 3. The Bank and the New York Branch remain subject to all supervisory and enforcement activities, including the investigation and prosecution of any violations of the Banking Law or the Financial Services Law, for any conduct occurring during the time period of its license from the Department.
>
> 4. The Bank and the New York Branch shall preserve all documents and information in their possession, custody or control that pertain, directly or indirectly, to:
>
>> (a) the affairs, operations or business of the New York Branch;
>>
>> (b) compliance, or lack of compliance, with New York laws or regulations including, but not limited to, compliance (or lack of compliance) with laws and regulations pertaining to BSA/AML and OFAC matters;

9

(c) all documents relating to matters raised or discussed in any report (written or oral) prepared by the BTMU Consultant;

(d) information collected by or provided to the BTMU Consultant, including but not limited to, any information or documents relating to (ii) additional concerns or issues identified by the BTMU Consultant that relate to the Bank's BSA/AML and OFAC sanctions compliance programs and (ii) compliance with the 2013 and 2014 Consent Orders;

(e) information self-reported by the Bank and the New York Branch to the BTMU Consultant or the Department about compliance with applicable laws and regulations, including the Bank's BSA/AML and OFAC sanctions compliance programs; and

(f) all communications with the Department relating to the 2013 Consent Order and the 2014 Consent Order.

5. Unless and until any conversion of the license issued by the Department to the Bank to a Federal branch shall become legally effective, and only in the event that such conversion becomes legally effective, the Bank and the New York Branch shall then carry out such conversion in a manner that is in full compliance with the Banking Law, including, but not limited to, Section 605 of the Banking Law, and all other applicable laws of the State of New York.

*DFS Order* at 3-4.[5]

The timing of the DFS Order—after the DFS had already been informed that the OCC had issued federal licenses—indicates that the DFS took this action solely in an effort to obstruct the Bank's conversion of its state licenses to federal licenses and to challenge the OCC's exclusive authority over the Bank.  Notably, on the morning of November 8, 2017, BTMU NY employees allowed three DFS examiners to enter BTMU NY premises, for the purpose of retrieving their personal belongings; once on the premises, two of those examiners refused to

---

[5] It is unclear why the DFS's order mentioned Section 605 of the Banking Law, which addresses voluntary liquidation, not conversion.  *See* N.Y. Banking Law § 605.

leave the building for the remainder of the day.  (Coyne Decl. ¶ 15.)  In response to the DFS's actions, the OCC advised the DFS:  "Because the conversion has been completed, *the NYDFS is no longer the supervisor for the Branches and may no longer assert visitorial authority with respect to their operations*. . . . *The continued presence of NYDFS staff at the Branches would interfere with the OCC's supervision of the Branches*.  As a result, *the OCC expects that NYDFS staff will cease any visitation of the Branches*, and we have informed [the Bank] of our expectations."  *OCC DFS Letter* at 1 (emphasis added).

## ARGUMENT

A TRO or preliminary injunction is warranted upon a showing of "a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the [Bank's] favor, and that an injunction is in the public interest." *Stagg P.C. v. U.S. Dep't of State,* 158 F. Supp. 3d 203, 208 (S.D.N.Y. 2016) (internal quotation marks omitted), *aff'd sub nom. Stagg P.C. v. U.S. Dep't of State*, 673 F. App'x 93 (2d Cir. 2016); *see also Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in th[e] [Second] Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").  The Second Circuit applies the "serious questions" standard, which "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction . . . [and where] the moving party . . . establish[es] that the 'balance of hardships tips decidedly' in its favor." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

The Bank meets each of the requirements for a TRO or preliminary injunction.  This Court thus should grant such relief pending further proceedings in this case.

## I.   THE BANK IS LIKELY TO SUCCEED ON THE MERITS.

The Bank is likely to succeed on the merits of its claims because the DFS Order is preempted by the International Banking Act and National Bank Act.  Under the Supremacy Clause of the Constitution, federal law prevails over contrary state law.  *See* U.S. Const. Art. VI, cl. 2.  The DFS's order is contrary to the OCC's exclusive visitorial authority over federally-licensed branches of foreign banks.  The DFS's action also significantly interferes with the branches' exercise of their federally-protected banking powers under the International Banking Act and National Bank Act.

### A.   The DFS Seeks to Exercise Visitorial Powers That Are Exclusively Reserved for the OCC.

The National Bank Act affords the OCC exclusive regulatory, supervisory, examination, and enforcement authority over national banks.  Section 484 of the Act provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law."  12 U.S.C. § 484(a).  The Supreme Court has explained that visitorial powers are "a sovereign's supervisory powers over corporations," *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 535 (2009), which includes "the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations," *Watters*, 550 U.S. at 14 (quoting *Guthrie v. Harkness*, 199 U.S. 148, 158 (1905)).

Consistent with the National Bank Act, OCC regulations provide that "[o]nly the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks."  12 C.F.R. § 7.4000(a)(1).  The OCC defines visitorial powers broadly to include

"(i) [e]xamination of a bank; (ii) [i]nspection of a bank's books and records; (iii) [r]egulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) [e]nforcing compliance with any applicable federal or state laws concerning those activities."   12 C.F.R. § 7.4000(a)(2).   Federal law thus "preserve[s] a regime of exclusive administrative oversight [of national banks] by the Comptroller."   *Cuomo*, 557 U.S. at 530 (emphasis added); *see also Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982) (holding that federal regulations have "no less pre-emptive effect than federal statutes"). Under these well-settled principles of federal law, once a bank is federally licensed, visitorial powers are vested solely in the OCC, and a State "***cannot confer on its commissioner examination and enforcement authority over mortgage lending, or any other banking business done by national banks***."   *Watters*, 550 U.S. at 14–15 (emphasis added).

These provisions apply equally to branches of foreign banks operating in the United States.   Under the International Banking Act, the operations of a foreign bank's federally-licensed branches "shall be conducted with the same rights and privileges as a national bank" and are "subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank," with limited exceptions not applicable here.   12 U.S.C. § 3102(b); *see also* 12 C.F.R. § 28.13(a) (clarifying that federal branches of foreign banks are afforded "the same rights and privileges" as a "national bank").   Because the Bank's branches in the United States are now licensed and regulated by the OCC, they no longer are subject to state visitorial powers, including by the DFS. The OCC has expressly made this clear in its approval order here:   "[T]he Federally-licensed BTMU . . . Branches and Agencies ***shall not be subject to the visitorial powers of the state authority by which each of their predecessors was licensed prior to the conversions***."   *OCC*

13

*Decision Letter* at 3 (emphasis added); *see also Conference of State Bank Supervisors v. Conover,* 715 F.2d 604, 614–17 (D.C. Cir. 1983) (discussing International Banking Act's "overriding objective of national treatment" of federal branches); OCC Interp. Letter No. 280 (Dec. 1, 1983) (foreign banks' federal branches "are treated as national banks" under the National Bank Act and subject to the OCC's exclusive regulatory authority); *cf.* 12 U.S.C. § 25b(a)(1) (defining "national bank" to include "any Federal branch established in accordance with the International Banking Act" for purposes of state-law preemption standards for national banks).

There can be no question that the DFS's actions here intrude on the OCC's exclusive oversight of the Bank's federally-licensed New York branches.  The DFS has issued an order requiring the Bank and its branches, effective immediately, to be subject to "[a]ll supervision activity" and "all supervisory and enforcement activities."  *DFS Order* at 3.  Furthermore, under New York Banking Law, the DFS is responsible for "supervis[ing] and regulat[ing]" all banking organizations "in such manner as to insure the safe and sound conduct of such business, . . . to eliminate unsound and destructive competition among such banking organizations."  N.Y. Banking Law § 10; *see also* N.Y. Fin Servs. Law § 201.  After the OCC issued licenses to the Bank's branches on November 7, 2017, however, the DFS no longer has the authority under state law to exercise such power over the Bank's branches.  By operation of federal law, the OCC now has "exclusive administrative oversight" over those branches.  *Cuomo,* 557 U.S. at 530 (emphasis added); *see also OCC DFS Letter* at 1 (concluding that "the NYDFS is no longer the supervisor for the Branches and may no longer assert visitorial authority with respect to their operations" and "continued presence of NYDFS staff at the Branches would interfere with the OCC's supervision of the Branches"); 12 C.F.R. § 7.4000(a)(2) (visitorial powers include

14

"[e]xamination of a bank," "[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law," and "[e]nforcing compliance with any applicable federal or state laws concerning those activities"); *Capital One Bank (USA), N.A. v. McGraw*, 563 F. Supp. 2d 613, 622 (S.D. W. Va. 2008) (holding that state regulator "cannot exercise visitorial powers over a national bank regardless of when the activities sought to be investigated occurred").

**B.    The DFS's Order Prevents or Significantly Interferes with the Bank's Exercise of Federally-Protected Banking Powers.**

The DFS's order is preempted for a second reason:  it prevents or significantly interferes with the Bank's exercise of its federally-protected banking powers.  *See Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996) (state laws are preempted if they "prevent or significantly interfere with [a] national bank's exercise" of its powers).

The International Banking Act affords foreign banks' federally-licensed branches "the same rights and privileges" that national banks possess under the National Bank Act.  12 U.S.C. § 3102(b); *see also* 12 C.F.R. § 28.13(a)(1).  Under the National Bank Act, a national bank may exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24(Seventh).  In its approval order, the OCC expressly recognized and provided that such "rights and privileges" that attach to a federally-licensed branch of a foreign bank include "being subject to state law to the same extent and in the same manner that would apply if such Federal branch[] . . . [was a] national bank[] operating at the same location." *OCC Decision Letter* at 5.

National banks are "'instrumentalit[ies] of the Federal government, created for a public purpose.'" *Pac. Capital Bank, N.A.  v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008) (quoting *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978)). Accordingly, "'States can exercise no control over [national banks], nor in any wise affect their

operation, except in so far as Congress may see proper to permit.'"  *Id.* (quoting *Watters*, 550 U.S. at 1).  As the Supreme Court recognized over a century ago, the exclusive federal regulatory framework that applies to national banks represents Congress's intent to "protect [national banks] against possible unfriendly State legislation."  *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 412 (1873).  As a result, state laws that "prevent or significantly interfere with [a] national bank's exercise" of its powers are preempted by federal law.  *Barnett Bank*, 517 U.S. at 33 (1996); 12 U.S.C. § 25b(b)(1)(B) (codifying *Barnett Bank*'s preemption standard with respect to state consumer financial laws).  And, by virtue of 12 U.S.C. § 3102(b), precisely the same is true for a federally-licensed branch of a foreign bank:  state laws that prevent or significantly interfere with a federally-licensed branch's exercise of its powers are preempted by federal law.

Further, under the National Bank Act, the "usual presumption against federal preemption of state law is inapplicable."  *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037 (9th Cir. 2008).  Instead, courts often "give[] [national banks] the benefit of the doubt in preemption questions."  *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 321 (4th Cir. 2012) (internal quotation marks omitted).  Consequently, "the level of 'interference' that gives rise to preemption under the [National Bank Act] is not very high."  *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009).  Again, by virtue of 12 U.S.C. § 3102(b), the same is true for a federally-licensed branch of a foreign bank.

The DFS's order significantly interferes with the Bank's federally-protected powers.  The Order would require the Bank and its branches to "comply with all New York laws, regulations, orders and agreements, including, but not limited to, all reporting and record keeping requirements."  *DFS Order* at 3.  The Order also treats the branches' federally-issued licenses as legally ineffective, stating that conversion must be carried out "in a manner that is in full

16

compliance with the [New York] Banking Law."  *Id.* at 4.  As a result, the DFS's actions are preempted by federal law because they will prevent the Bank from exercising its federally-protected power to operate without interference from the DFS.

## II.   THE BANK WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Absent immediate judicial intervention, the DFS's order will have a significant and irreversible impact on the Bank.  "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks omitted).

Here, the Bank will suffer actual and imminent harm absent injunctive relief.  Under the DFS Order, which is "effective immediately," the Bank's New York branches would be required to have "[a]ll supervision activity of [DFS] . . . continue uninterrupted and unimpeded."  *DFS Order* at 3.  As discussed above, the Bank's New York branches are now federally-regulated and therefore subject to the exclusive supervision of the OCC.  The DFS Order therefore would require the Bank's New York branches to immediately violate federal law by subjecting themselves to the supervisory authority of a regulator other than the OCC.  For example, the OCC has stringent rules restricting federal branches subject to its visitorial powers from sharing with other parties confidential supervisory information developed in the context of its ongoing regulation and oversight of such branches.  *See* 12 C.F.R. § 4.37(b).  Violations of such restrictions can result in criminal liability.  *See* 18 U.S.C. § 641.

Courts routinely hold that this type of imminent harm is sufficient to warrant a TRO or preliminary injunction.  *See Stromfeld v. Smith*, 557 F. Supp. 995, 999 (S.D.N.Y. 1983) (stating that courts are "obligat[ed] to enjoin government action that violates applicable statutes"); *Street*

*v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1988) ("We find that permitting defendant to nullify plaintiffs' statutory right . . . would constitute irreparable harm as well."); *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.*, 467 F. Supp. 525 (E.D.N.Y. 1979) (finding that "where . . . a defendant shows no justification for continuing to violate a plaintiff's clear statutory rights, there is no reason to withhold preliminary relief even without a showing of the same quantum of 'irreparable' damage as would be required where plaintiff's ultimate success was more doubtful").  This is especially the case where the challenged action forces the moving party to itself violate the law.  *See Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 850-51 (9th Cir. 1985) (suggesting that action forcing plaintiff to break the law would constitute irreparable harm).

Furthermore, because these injuries will result from regulatory actions undertaken by the Superintendent in her official capacity, the Bank likely will be unable to recover its losses through an award of money damages.  *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (monetary damages from Superintendent barred by Eleventh Amendment).  When the Eleventh Amendment bars a legal remedy in damages, a plaintiff's injury is irreparable.  *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. and Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (citing *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991)); *see also Cal. Pharm. Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (following *Kan. Health Care Ass'n* as "[t]he most relevant authority on this issue"), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012).  The injuries suffered by the Bank thus qualify as irreparable harm that justifies the issuance of a TRO and preliminary injunction.

III.    **THE BALANCE OF HARMS DECISIVELY FAVORS IMMEDIATE INJUNCTIVE RELIEF.**

In contrast to the significant and immediate irreparable harm that the Bank will suffer without relief, the DFS will not be harmed by an injunction.  A TRO or preliminary injunction will preserve the status quo while the issues in this case are litigated.   While a TRO or preliminary injunction is in effect, the Bank's New York branches will remain fully subject to the OCC's regulatory authority and visitorial powers, including enforcement of the successor consent order that incorporates the substantive terms of the prior DFS Consent Orders.  Because the Bank's New York branches will continue to be fully regulated by the OCC, a TRO or preliminary injunction will not create any regulatory gap or pose a risk of harm to the Bank's customers, the public, or the banking system.[6]

To the contrary, it is the DFS's action itself that poses such a threat.  As described above, if this Court denies preliminary injunctive relief and the Bank is required to comply with the DFS Order, it would be forced into the impossible position of being subject to competing legal requirements from two different banking regulators.

Moreover, a state has no injury to weigh when it seeks to enforce a preempted state law. *See Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999) (holding that if bank proves that state's enforcement of preempted state law will cause it irreparable harm, "then the question of harm to the State . . . drop[s] from the case, for [the bank] will be entitled to injunctive relief no matter what the harm to the State"); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) ("[T]here is no injury to the states to weigh against that which they threaten to inflict

---

[6] Nothing has changed in recent days, weeks, or months with respect to the Bank's stability, liquidity, or financial condition that could possibly warrant such an order by the DFS.  The only event that appears to have precipitated the DFS's order is the Bank's receipt of federal licenses from the OCC.

on the airlines.  Since Congress expressly preempted this area of regulation, the states are not

injured by the [preliminary] injunction."), *aff'd in part, rev'd in part on other grounds*, 504 U.S.

374 (1992).  Accordingly, this factor strongly weighs in favor of issuing a TRO or a preliminary

injunction.

## IV.     THE PUBLIC INTEREST FAVORS GRANTING INJUNCTIVE RELIEF.

The public interest likewise will be served by temporarily enjoining the DFS's effort to

exercise supervisory authority over the Bank in contravention of federal law.  As explained

above, the OCC exercises, and will continue to exercise, regulatory authority over the Bank's

New York branches.  The OCC is an agency with decades of experience serving the public's

interest in maintaining safe and efficient markets through oversight of financial institutions.  *See*

*First Union Nat'l Bank v. Burke*, 48 F. Supp. 2d 132, 150 (D. Conn. 1999) ("[P]ublic interest in

consumer protection will not be altered by issuance of an injunction directed at who will enforce

the applicable state law.").  In contrast, if this Court declines to grant temporary injunctive relief,

the Bank will be required to violate federal law and the terms of its recently issued federal

licenses.

In addition to these consequences, "there is substantial public interest in ensuring that [an

agency] acts within the limits of its authority."  *Claire v. Office of Fed. Hous. Enter. Oversight*,

355 F. Supp. 2d 56, 66 (D.D.C. 2004).  The public interest is not served when a state agency

disregards federal law and violates the Supremacy Clause.  *See Guttau*, 190 F.3d at 848 (8th Cir.

1999) (holding that "the public interest will perforce be served by enjoining the enforcement of

the invalid provisions of state law"); *Mattox*, 897 F.2d at 784 (holding that the public interest

requirement for a preliminary injunction against a state's enforcement of its law was satisfied

"by the finding of Congress that exclusive federal regulation" in the area was "in the public

interest"). Accordingly, the public interest strongly favors granting a TRO and a preliminary injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion For Temporary Restraining Order and Preliminary Injunction should be granted.

DATED:  New York, New York
         November 8, 2017

Respectfully submitted,


By:  /s/ Richard C. Pepperman II
Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000
peppermanr@sullcrom.com
newtonb@sullcrom.com

Robert A. Long, Jr. (*pro hac vice forthcoming*)
Henry B. Liu (*pro hac vice forthcoming*)
Jonathan Y. Mincer (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
rlong@cov.com
hliu@cov.com
jmincer@cov.com

*Attorneys for Plaintiff*