UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,

                Plaintiff,

        v.

MARIA VULLO, in her official capacity as Superintendent of Financial Services of the New York State Department of Financial Services,

                Defendant.

           1:17-cv-08691-SHS

---

**DEFENDANT SUPERINTENDENT MARIA VULLO'S ANSWER, DEFENSES, AND COUNTERCLAIMS**

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
By:  Jonathan D. Conley
     Shannan C. Krasnokutski
Assistant Attorneys General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8108

*Counsel for Defendant*

Defendant Maria Vullo in her official capacity as Superintendent of Financial Services of the New York State Department of Financial Services ("DFS") files this Answer and Counterclaims to Plaintiff Bank of Tokyo Mitsubishi's ("BTMU") Amended Complaint.[1] DFS brings its claims against BTMU seeking declaratory relief and the imposition of a monetary civil penalty under New York Banking Law Section 44.

## INTRODUCTORY STATEMENT

Foreign banks such as BTMU maintain branch offices in New York, in part, to have the legal authority to process U.S. dollar denominated transactions for the bank's customers. In recent years, BTMU has processed in excess of $20 trillion in U.S. dollar transactions each year through its New York Branch, a staggering sum which comes with great risk of money laundering and terrorist financing if the bank does not employ strong compliance and transaction monitoring controls. As a licensee of DFS, BTMU was obligated to comply with New York and federal laws which include requirements that BTMU monitor financial transactions to ensure that BTMU complied with its obligations under the Bank Secrecy Act, regulations issued by the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC"), and general anti-money laundering laws. *See., e.g,.* N.Y. Comp. Codes R. & Regs. tit. 3, Part 115; 3 N.Y.C.R.R. Part 116; 3 N.Y.C.R.R. Part 416; 3 N.Y.C.R.R. Part 417. These state and federal laws are intended to deny terrorists, criminal organizations and the countries, corporations, and individuals subject to sanction by the government access to the U.S. banking system.

Since 2002 (if not earlier), while acting under a New York license, BTMU has utterly failed to comply with the applicable New York and federal sanctions laws. BTMU has intentionally directed its employees to systematically remove information from U.S. dollar

---

[1] Capitalized terms not defined in this Answer bear the meanings ascribed to them in the Amended Complaint.

payment messages that identify the involvement of sanctioned countries, entities, and individuals in a banking transaction. DFS discovered these deficiencies and BTMU paid a $250 million penalty in 2013 to New York State for its violations. But DFS later learned that BTMU engaged in deceptive and evasive conduct in order to withhold full information from DFS enforcement personnel by instructing PricewaterhouseCoopers to hide information from DFS in order to conceal the true scope of BTMU's misconduct. Accordingly, after a second DFS investigation, BTMU paid a $315 million penalty in 2014 to New York State for the additional discovered misconduct.

Yet, BTMU's illegal activity continued after 2014, as uncovered by DFS and an independent monitor approved by DFS to review BTMU's compliance and investigate any additional compliance failures pursuant to two consent orders entered into by DFS and BTMU. As DFS learned as part of this ongoing investigation, from November 19, 2014, through November 7, 2017, BTMU failed to comply with the two consent orders that it had entered into with DFS in connection with the payment of the $250 million and $315 million penalties. BTMU also relied on deficient sanctions filtering programs that would have failed to identify and block U.S. dollar denominated transactions involving North Korea and other sanctioned countries, entities, and individuals. BTMU failed to timely disclose and timely correct these deficient sanctions filtering programs. BTMU also lied about its deficient sanctions filtering programs. BTMU's deputy general counsel made a series of false statements regarding the bank's internal assessment of the remediation of its deficient systems. And, astonishingly, BTMU terminated the New York chief compliance officer that had been the primary source of cooperation with DFS's investigation. All of this conduct occurred while BTMU held a New York license and DFS's investigation was proceeding. In other words, all of this conduct occurred prior to the evening of

November 7, 2017, when the Office of the Comptroller of the Currency purported to issue federal licenses to BTMU's New York branches pursuant to an application filed just eight days earlier without any input from DFS. These licenses are contrary to law, invalid, and not effective as they were issued pursuant to federal agency action that was arbitrary and capricious, an abuse of discretion, and not in accordance with law. Furthermore, after its further misconduct was discovered and after it fired its New York-based chief compliance officer who had been transparent with DFS, BTMU fired the independent consultant approved by DFS in the only way it could, by switching regulators in an unprecedented 8-day turnaround for a $2.6 trillion institution.

Irrespective of the validity of BTMU's federal licenses, DFS is plainly authorized to enforce New York law against BTMU for its illegal conduct that occurred prior to November 7, 2017 when it indisputably was a licensee subject to New York law. In addition to answering and disputing each of the claims set forth in BTMU's Amended Complaint, this pleading therefore includes Counterclaims against BTMU to enforce New York law for pre-November 7, 2017 conduct. No bank or financial institution (or anyone else) is permitted to avoid responsibility for its prior illegal conduct by moving jurisdiction from a state-licensed entity to a federally-licensed entity (or between states). BTMU willfully and repeatedly violated New York law and two DFS consent orders while it was operating under a license issued by the State of New York and under DFS's jurisdiction. The enforcement counterclaims included here ensure that BTMU will be held fully accountable for its illegal conduct. Even if regulatory arbitrage were acceptable going forward (and it is not), the conversion of a foreign bank from a state license to a federal license cannot and does not permit an institution to obtain immunity from conduct occurring while licensed by its predecessor licensor and subject to New York law.

## ANSWER

DFS responds to the allegations contained in the numbered paragraphs of BTMU's Amended Complaint as set forth below. DFS denies the allegations and characterizations in the Amended Complaint unless expressly admitted in the following paragraphs.

1.      Paragraph 1 purports to describe the relief that BTMU seeks, to which no response is required. To the extent a response is required, DFS denies that BTMU is entitled to any of the relief requested.

2.      DFS denies the allegations in paragraph 2 and refers the Court to the November 13 DFS Letter, the transcript of the November 9, 2017 Court conference ("November 9 Conference Transcript"), and the DFS Order for their contents.

3.      Paragraph 3 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

4.      Paragraph 4 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

5.      DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 5.

6.      DFS denies the allegations in paragraph 6.

7.      DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 7.

8.      Paragraph 8 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations, except admits that it issued the DFS Order on November 8, 2017, and refers the Court to that order for its contents.

9.      DFS admits the allegations in Paragraph 9, except denies that any provision in the

4

DFS Order is without support.

10.     DFS denies the allegations in paragraph 10, except states that the paragraph purports to characterize and describe the November 13 DFS Letter, and refers the Court to that letter for its contents.

11.     DFS denies the allegations in paragraph 11 and refers the Court to the November 13 DFS Letter for its contents.

12.     Paragraph 12 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

13.     Paragraph 13 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the cited legal authorities for their contents.

14.     Paragraph 14 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

15.     Paragraph 15 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the DFS Order and November 9 Conference Transcript for their contents.

16.     DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first two sentences of paragraph 16; admits the allegations in the third sentence of this paragraph; and denies the allegations in the fourth sentence of this paragraph.

17.     DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17.

18.     DFS admits that Defendant Maria Vullo is the Superintendent of Financial Services of DFS and refers the Court to the applicable statutory authority for a description of her

duties and responsibilities.

19.    Paragraph 19 purports to describe BTMU's claims and the relief that it seeks, to which no response is required. To the extent a response is required, DFS denies that BTMU is entitled to any of the relief requested, and states that BTMU's claims are meritless.

20.    Paragraph 20 asserts a legal conclusion to which no response is required. To the extent a response is required, DFS denies the allegations.

21.    Paragraph 21 asserts legal conclusions to which no response is required. To the extent a response is required, DFS does not contest that this Court has subject matter jurisdiction over this action. DFS also admits that BTMU purports to state a cause of action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, but denies that there is any factual or legal basis for the declaratory judgment action or that BTMU is entitled to the relief it seeks.

22.    Paragraph 22 asserts legal conclusions to which no response is required. To the extent a response is required, DFS does not contest that venue is proper in this action.

23.    Paragraph 23 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

24.    Paragraph 24 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

25.    Paragraph 25 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

26.    Paragraph 26 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

27.    Paragraph 27 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

28.     Paragraph 28 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

29.     Paragraph 29 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

30.     DFS admits the allegations in paragraph 30.

31.     DFS admits that BTMU has two branches in New York, and states that it lacks information or knowledge sufficient to form a belief about the truth of the remaining allegations in paragraph 31.

32.     DFS admits that BTMU has branches and agencies in California, Illinois, and Texas. DFS lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 32.

33.     DFS admits that Union Bank is a subsidiary of BTMU. DFS further admits that Union Bank has operations in New York and provides a range of financial services. DFS lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 33.

34.     DFS denies the allegations in paragraph 34, except states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning MUFG's initiatives to integrate the management, strategy, and control of its United States operations.

35.     DFS denies the allegations in the first two sentences of paragraph 35, and states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations in the last sentence of this paragraph.

36.     DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36.

37.     DFS denies the allegations in paragraph 37, except states that it lacks knowledge or information sufficient to form a belief about the truth of the allegation concerning BTMU's reasons for seeking to convert its state licenses.

38.     DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 38, and denies the allegations in the second sentence of this paragraph.

39.     DFS denies the allegations in paragraph 39.

40.     Paragraph 40 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations, except states that it lacks knowledge or information sufficient to form a belief about the truth of the allegation that the OCC "generally considers" the six factors listed in this paragraph when "determining whether to approve a conversion application."

41.     DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41.

42.     DFS denies the allegations in paragraph 42, except admits that the OCC issued a letter granting conditional approval for BTMU's conversion applications in the evening on November 7, 2017.

43.     DFS admits that BTMU entered into consent orders with DFS in 2013 and 2014, and refers the Court to those orders for their contents. DFS lacks sufficient knowledge or information to form a belief about the truth of the allegations in the second, third, fourth, and fifth sentences of this paragraph. DFS denies the allegations in the last sentence of this paragraph.

44.     DFS denies the allegations in paragraph 44, except states that the paragraph

purports to describe and quote portions of the OCC Consent Order, and refers the Court to that order for its contents.

45.     Paragraph 45 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

46.     Paragraph 46 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations, except admits that it has the legal authority to bring an enforcement action against BTMU.

47.     DFS denies the allegations in paragraph 47, except states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations relating to the notice BTMU provided to its other state regulators.

48.     DFS denies the allegations in paragraph 48, except admits that the OCC provided it with a copy of the letter conditionally approving BTMU's applications in the evening on November 7, 2017, and further admits that the OCC did not provide DFS with a copy of the letter granting final approval of BTMU's applications. DFS refers the Court to those letters for their contents.

49.     DFS denies the allegations in paragraph 49.

50.     DFS denies the allegations in paragraph 50, except states that the paragraph describes and quotes portions of the DFS Order; admits that it issued the DFS Order on November 8, 2017; and refers the Court to the DFS Order for its contents.

51.     DFS denies the allegations in paragraph 51 and refers the Court to the DFS Order for its contents.

52.     DFS denies the allegations in paragraph 52, except admits that it has not rescinded the DFS Order; states that this paragraph purports to describe and quote portions of the DFS

Order; and refers the Court to that order for its contents.

53.    Paragraph 53 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the DFS Order and the cited legal authorities for their contents.

54.    DFS responds that paragraph 54 purports to describe and quote portions of the DFS Order, and refers the Court to that order for its contents.

55.    Paragraph 55 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the DFS Order and the cited legal authorities for their contents.

56.    DFS denies the allegations in paragraph 56, except states that it lacks information or knowledge sufficient to form a belief about the truth of the allegations concerning the OCC's reasons for preparing the November 8 OCC Letter; states that paragraph 56 purports to describe and quote portions of the November 8 OCC Letter; and refers the Court to that letter for its contents.

57.    Paragraph 57 purports to describe the relief that BTMU sought in its November 8, 2017 Complaint for Declaratory Relief, Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, to which no response is required. DFS admits that BTMU filed this action on November 8, 2017, and otherwise denies the allegations in this paragraph.

58.    DFS denies the allegations in paragraph 58, except admits that the Court conducted an initial conference in this action on November 9, 2017; states that this paragraph purports to describe certain statements made by DFS during that conference; and refers the Court to the November 9 Conference Transcript for its contents.

59.    DFS denies the allegations in paragraph 59.

60.     DFS denies the allegations in paragraph 60, except admits that it sent the November 13 DFS Letter to the OCC; states that this paragraph purports to describe and quote portions of the November 13 DFS Letter; and refers the Court to that letter for its contents.

61.     DFS denies the allegations in paragraph 61, except states that the paragraph purports to describe and quote portions of the November 13 DFS Letter, and refers the Court to that letter for its contents.

62.     Paragraph 62 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

63.     Paragraph 63 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

64.     Paragraph 64 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations, except admits that BTMU's branches and agencies in the United States are not federally insured.

65.     DFS denies the allegations in paragraph 65.

66.     DFS responds that paragraph 66 purports to describe the November 13 DFS Letter and refers the Court to that letter for its contents.

67.     Paragraph 67 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the November 13 DFS Letter and Section 36(10) of the New York Banking Law for their contents.

68.     Paragraph 68 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the November 13 DFS Letter and the DFS Order for their contents.

69.     DFS denies that the November 13 DFS Letter makes incendiary assertions. DFS

further responds that paragraph 69 purports to describe and quote portions of the November 13 DFS Letter, and refers the Court to that letter for its contents.

70.     DFS denies the allegations in paragraph 70 and refers the Court to the November 13 DFS Letter for its contents.

71.     DFS denies the allegations in paragraph 71 and refers the Court to the November 13 DFS Letter for its contents.

72.     DFS denies the allegations in paragraph 72, except states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations pertaining to BTMU's compliance-program developments, recruitment efforts, or its reasons for launching a Global Financial Crimes Division.

73.     DFS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 73.

74.     DFS denies the allegations in paragraph 74, except states that the paragraph purports to describe and quote certain statements made by DFS's Executive Deputy Superintendent for Enforcement during a court hearing in *Vullo v. OCC*, No. 17 Civ. 3574 on November 21, 2017, and refers the Court to the transcript of the referenced hearing for its contents.

75.     DFS denies the allegations in paragraph 75, except states that that it lacks knowledge or information sufficient to form a belief about the truth of the allegations relating to the matters set forth in the November 17 OCC Response; further states that the paragraph purports to describe and quote portions of the November 17 OCC Response; and refers the Court to that document for its contents.

76.     DFS denies the allegations in paragraph 76, except states that it lacks knowledge

or information sufficient to form a belief about the truth of the allegations relating to the matters set forth in the November 17 OCC Response; further states that the paragraph purports to describe and quote portions of the November 17 OCC Response; and refers the Court to that document for its contents.

77.     DFS denies the allegations in paragraph 77, except states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations relating to the matters set forth in the November 17 OCC Response; further states that the paragraph purports to describe and quote portions of the November 17 OCC Response; and refers the Court to that document for its contents.

78.     DFS denies the allegations in paragraph 78, except states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations relating to BTMU's reasons for proposing a stipulation to DFS; admits that BTMU proposed to DFS the stipulation attached as Exhibit J to the Amended Complaint; and further admits that it did not agree to the terms of that stipulation.

79.     Paragraph 80 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations, except admits that it disputes the validity of the licenses that the OCC issued to BTMU on November 7, 2017.

80.     DFS denies the allegations in paragraph 80, except admits that it has the legal authority to bring an enforcement action against BTMU.

81.     DFS denies the allegations in paragraph 81, except admits that it has not rescinded the DFS Order.

82.     DFS denies the allegations in paragraph 82.

83.     DFS denies the allegations in paragraph 83 and refers the Court to the November

9 Conference Transcript and cited legal authorities for their contents.

84. DFS denies the allegations in paragraph 84 and refers the Court to the cited legal authorities for their contents.

85. DFS denies the allegations in paragraph 85 and refers the Court to the cited legal authorities for their contents.

86. DFS denies the allegations in paragraph 86.

87. DFS denies the allegations in paragraph 87.

88. DFS repeats and realleges its responses to paragraphs 1–87 of the Amended Complaint with the same force and effect as if fully restated herein.

89. DFS responds that paragraph 89 purports to characterize the DFS Order, November 9 Conference Transcript, and November 13 DFS Letter, and refers the Court to those documents for their contents.

90. DFS denies the allegations in paragraph 90, except admits that BTMU's federal licenses are invalid under New York and federal law.

91. DFS denies the allegations in paragraph 91.

92. DFS denies the allegations in paragraph 92.

93. DFS admits that BTMU purports to state a cause of action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, but denies that there is any factual or legal basis for the declaratory judgment action or that BTMU is entitled to the relief it seeks.

94. Paragraph 94 asserts legal conclusions to which no response is required. To the extent a response is required, DFS admits that BTMU purports to state a cause of action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, but denies that there is any factual or legal basis for the declaratory judgment action or that BTMU is entitled to the relief it seeks.

95.     DFS repeats and realleges its responses to paragraphs 1–94 of the Amended Complaint with the same force and effect as if fully restated herein.

96.     Paragraph 96 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the cited legal authorities for their contents.

97.     Paragraph 97 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the cited legal authorities for their contents.

98.     Paragraph 98 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the cited legal authorities for their contents.

99.     Paragraph 99 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations and refers the Court to the U.S. Supreme Court's decision in *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519 (2009) for its contents.

100.    DFS denies the allegations in paragraph 100.

101.    DFS denies the allegations in paragraph 101 and refers the Court to the DFS Order and November 13 DFS Letter for their contents.

102.    DFS denies the allegations in paragraph 102.

103.    Paragraph 103 asserts legal conclusions to which no response is required. To the extent a response is required, DFS denies the allegations.

104.    DFS denies the allegations in paragraph 104.

105.    DFS repeats and realleges its responses to paragraphs 1–104 with the same force

and effect as if fully restated herein.

106.    DFS denies the allegations in paragraph 106.

107.    Paragraph 107 asserts legal conclusions to which no response is required. To the
extent a response is required, DFS denies the allegations.

108.    DFS denies the allegations in paragraph 108.

109.    DFS denies the allegations in paragraph 109.

110.    DFS denies the allegations in paragraph 110.

DFS denies that BTMU is entitled to any of the relief requested in paragraphs A–E of its
Request for Relief.

## DEFENSES

DFS asserts the following defenses, without assuming the burden of proof on such
defenses that would otherwise rest with BTMU:

1.    The Amended Complaint fails to state a claim upon which relief can be granted.

2.    The licenses issued to BTMU by the OCC on or about November 7, 2017, are
contrary to law, and therefore invalid and not effective.

3.    The licenses issued to BTMU by the OCC on or about November 7, 2017, are
arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and
therefore invalid and not effective.

4.    The OCC's actions in licensing BTMU were unlawful such that the licenses
issued to BTMU should be set aside.

5.    The OCC's actions in licensing BTMU were arbitrary and capricious such that the
licenses issued to BTMU should be set aside.

6.    The OCC's actions in licensing BTMU were an abuse of discretion such that the

licenses issued to BTMU should be set aside.

7.     The OCC's actions in licensing BTMU were not in accordance with law such that the licenses issued to BTMU should be set aside. The licenses issued to BTMU on or about November 7, 2017, do not affect DFS's authority to enforce the law for the period BTMU was licensed by DFS.

<b>COUNTERCLAIMS</b>

1.     These counterclaims for the enforcement of New York law arise from BTMU's extensive pattern of illegal conduct, unsafe and unsound banking practices, and flagrant disregard of its legal, compliance, and regulatory obligations while it was indisputably a licensee of DFS.

2.     During the approximately three-year period immediately prior to November 7, 2017, DFS conducted an investigation into BTMU's compliance with applicable New York and federal laws and regulations concerning anti-money laundering ("AML") compliance, including the Bank Secrecy Act ("BSA"), as well as its compliance with two consent orders executed between DFS and BTMU in 2013 and 2014.

3.     Based on this investigation, DFS has amassed significant evidence showing that BTMU's internal controls—in particular, its AML, BSA, and Office of Foreign Assets Control ("OFAC") sanctions compliance programs—at its New York Branch (as well as at its other branches around the world) were systematically deficient during the period beginning on or before November 18, 2014, and continuing up and until November 7, 2017. Not only were these internal control failures serious, persistent, reckless, intentional, and willful violations of New York and federal law, but they also violated two prior consent orders between BTMU and DFS.

4.       In summary, over a three-year period from November 18, 2014, through

November 7, 2017:

- BTMU utilized deficient sanctions filtering programs that were incapable of adequately screening for suspicious or illegal transactions;
- BTMU failed to adequately correct its deficient sanctions filtering programs;
- BTMU failed to timely disclose its failure to adequately correct its deficient sanctions filtering programs;
- BTMU made false and misleading statements about its failure to correct its deficient sanctions filtering programs;
- BTMU intentionally circumvented its sanctions filters at its New York Branch;
- BTMU failed to screen for sanctioned shipping vessels;
- BTMU failed to undertake due diligence for transactions involving cities bordering North Korea;
- BTMU failed to properly screen at least 70,000 transactions involving nested accounts; and
- BTMU sought to undermine cooperation with the independent consultant engaged pursuant to the two consent orders BTMU had executed with DFS in 2013 and 2014.

5.       All of the conduct underlying this enforcement counterclaim occurred while

BTMU's New York branches were operating pursuant to licenses issued by DFS, and before the

United States Office of the Comptroller of the Currency ("OCC") issued federal licenses to

BTMU on or about November 7, 2017.

6.       BTMU has a long history of engaging in conduct that violates both New York and

federal laws. In 2013, BTMU paid a $250 million fine to New York for intentionally stripping

information from banking transactions in order to enable the bank to process illegal transactions

involving Iran, Myanmar, and other sanctioned countries. In 2014, BTMU paid a $315 million

penalty to New York for orchestrating a multi-party conspiracy designed to hide information

from DFS about the bank's past illegal conduct. Even after these actions, BTMU continued its

deceit and illegal conduct, brought to light only by DFS's persistent investigation of the bank's

compliance practices. Indeed, DFS's recent investigation revealed that BTMU's pattern of misconduct has persisted unabated, even after the bank entered into two separate consent orders with DFS purporting to cure its past violations.

7.     BTMU has attempted, by seeking and obtaining federal licenses for its banking operations in the United States, to avoid the consequences of its pervasive misconduct and the scourge of DFS's ongoing efforts to address that misconduct.

8.     No bank or financial institution should be permitted to avoid responsibility for its prior illegal conduct by blithely trading enforcement regimes through a conversion from a state-licensed entity to a federally-licensed entity. This enforcement counterclaim ensures that BTMU will be held to account for its illegal conduct and violations of New York law while it was operating under a license issued by New York State and regulated by the Department. BTMU violated New York law while it was operating under a license issued by the State of New York and regulated by DFS, the New York agency also charged with enforcing New York's banking and financial services laws. Even were this kind of regulatory arbitrage acceptable going forward (and it is not), it cannot and does not erase the misdeeds of the past, indisputably committed under a New York license.

9.     When the OCC granted BTMU a federal license on November 7, 2017, it did not—and indeed could not—simultaneously provide BTMU with a clean slate and immunity for its past conduct. DFS has the authority to enforce New York banking laws and the two consent orders executed between DFS and BTMU in 2013 and 2014. And given that BTMU violated those banking laws and consent orders while it was licensed by DFS, DFS is empowered to enforce those violations against BTMU. This enforcement counterclaim ensures that BTMU will be held accountable for its illegal conduct.

10.     Accordingly, DFS brings this counterclaim for the enforcement of New York law and the imposition of penalties against BTMU for conduct committed by BTMU prior to November 7, 2017 (*see* Counts I–VI *infra*).

11.     DFS further seeks a declaratory judgment that it may initiate and maintain an adjudicatory proceeding against BTMU for the enforcement of New York law and the imposition of penalties for conduct committed by BTMU prior to November 7, 2017 (*see* Count VII *infra*).

### *Jurisdiction and Venue*

12.     This Court has subject matter jurisdiction over the counterclaims under 28 U.S.C. § 1367(a) because these claims arise out of the subject matter of the original action.

13.     BTMU has consented to the jurisdiction of this Court by filing its Amended Complaint.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b).

### *Parties*

15.     Counterclaim Plaintiff Maria Vullo is the Superintendent of DFS. As the Superintendent of DFS, she has broad authority under the New York Financial Services Law, the New York Banking Law, and the New York Insurance Law to enforce the laws of the state, including the power to take "such actions as the superintendent deems necessary to … protect users of financial products and services." N.Y. Fin. Serv. L. § 301(c)(1). Indeed, DFS was created in 2011 to provide for a single state agency responsible for "the effective and efficient enforcement of the banking and insurance laws." *Id.* § 102(c). The legislature directed the Superintendent to "take such actions as the superintendent believes necessary to: … (2) ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services; … (4) protect users of financial products and services from financially impaired or insolvent providers of such services; … [and] (6) eliminate financial fraud, other

criminal abuse and unethical conduct in the industry ….” *Id.* § 201(b). The Superintendent also possesses “the rights, powers, and duties in connection with financial services and protection in this state, expressed or reasonably implied by [the financial services law] or any other applicable law of this state.” *Id.* § 202(a). Furthermore, New York’s Financial Services Law provides that DFS is also a law enforcement agency in addition to its other duties and powers. *Id.* § 403.

16.     BTMU is the fifth-largest bank in the world, with approximately $2.6 trillion in total assets. *See* Standards & Poor, S&P Global Market Intelligence, Data Dispatch: the world’s 100 Largest Banks, Apr. 11, 2017 *available at* http://www.snl.com/web/client?auth=inherit#news/article?id=40223698&cdid=A-40223698-11568. (https://goo.gl/r6dHjs). From 1952 until November 7, 2017, BTMU was licensed by DFS to operate two foreign branches in New York State (collectively referred to as the “New York Branch”). In addition, an affiliate of BTMU – Mitsubishi UFJ Trust and Banking Corporation (“MUTB”) – also maintained a branch licensed by DFS. As of November 7, 2017, the New York Branch maintained approximately $141.5 billion in assets. As of September 30, 2017, the New York Branch of MUTB maintained approximately $25.4 billion in total assets.

### *Factual Background*

17.     Preventing terrorist financing, money laundering and other illicit financial transactions is a chief imperative of law enforcement agencies and financial industry regulators. International terrorist groups, organized criminal enterprises, and cybercriminals across the globe seek every day to conscript the international financial system to their illicit purposes. Law enforcement agencies nationally and abroad work diligently to detect, prevent, and prosecute such transactions.

18.     Global financial institutions serve as the first line of defense against such illegal financial transactions in today’s fast-paced, interconnected financial network. Both federal and

New York law require financial institutions to design, implement, and execute policies and systems to prevent and detect illegal financial transactions.

19.     New York law requires these institutions to establish and maintain programs that both monitor financial transactions and assure their own compliance with the BSA. *See* 3 N.Y.C.R.R. Part 115; 3 N.Y.C.R.R. Part 116; 3 N.Y.C.R.R. Part 416; 3 N.Y.C.R.R. Part 417. For financial institutions licensed by DFS, DFS is the New York State agency responsible for enforcing compliance with the BSA and other relevant sanctions laws. BTMU, as a licensee of DFS, was obligated to comply fully with these laws and is subject to enforcement for any violations.

20.     Under the BSA, financial institutions must file reports and keep appropriate records that are useful in investigating and uncovering money laundering, terrorism, and other illegal activities. *See* 12 U.S.C. §§ 1829b, 1951–1959; 31 U.S.C. § 5311–5314, 5316–5323. For example, financial institutions are required to report suspicious transactions to the U.S. Treasury Department's Financial Crimes Enforcement Network, enabling law enforcement agencies to conduct investigations that result in the future interdiction of these transactions and, ultimately, prosecution or even elimination of bad actors. *Id.* The BSA also requires financial institutions operating in the United States to have solid anti-money laundering systems in place to ensure that they do not become conduits for terrorist financing or facilitators of money laundering. *Id.*

21.     New York law tasks the Superintendent with the enforcement of those requirements. *See, e.g.,* N.Y. Fin. Serv. L. §§ 102, 201, 301, 403, 201(b); N.Y. Banking L. § 44; 3 N.Y.C.R.R. Part 115; 3 N.Y.C.R.R. Part 116; 3 N.Y.C.R.R. Part 416; 3 N.Y.C.R.R. Part 417. Compliance with these obligations is critical to ensuring that U.S. dollar clearing transactions conducted through New York financial institutions are not used to facilitate illicit activities.

22.     U.S. dollar clearing is the process by which U.S. dollar-denominated transactions are satisfied between counterparties through a U.S. bank or U.S. branch of a foreign bank. At the simplest level, clearing activities involving U.S. dollars are overseen and regulated by the Federal Reserve. Certain banking institutions have accounts at the Federal Reserve. When foreign banking clients transfer U.S. dollars to a client of another bank, the ultimate transfer of dollars takes place between the banks' respective accounts at the Federal Reserve itself. Thus, if a bank does not have an account at the Federal Reserve, it generally must maintain an account with a bank that has an account at the Federal Reserve in order to process U.S. dollar-denominated transactions.

23.     To be a member of the Federal Reserve, a bank generally must maintain a branch, agency, or representative office in the United States that is state- or federally-licensed, which, in turn, requires compliance with U.S. law. Thus, to process a U.S. dollar-denominated transaction for its clients, a bank must either maintain a branch in the United States or maintain an account with a bank that does. This is a primary reason why many foreign banks choose to open branches in New York—so they can satisfy U.S. dollar-denominated transactions for their clients.

24.     Under federal law and regulations issued by the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC"), financial institutions must implement systems reasonably designed to identify and block suspicious and illegal transactions. *See* 50 U.S.C. §§ 1701–1706; 50 U.S.C. §§ 5, 16; 31 C.F.R. Chapter V. This requirement is also incorporated into New York law and subject to independent enforcement by DFS. *See* 3 N.Y.C.R.R. Part 116. Among its duties, OFAC issues a list of "Specially-Designated Nationals," or "SDNs": these are individuals and companies specifically designated as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of, targeted

countries. OFAC also lists individuals, groups, and entities, such as terrorists and narcotics traffickers, designated under sanctions programs that are not country-specific.

25.     Every financial institution doing business in the United States must establish a compliance program based on the particular risks faced by the institution, considering such factors as its size, geographical reach, and the specific lines of business it engages in. Moreover, the institution must employ or engage a sufficient number of trained compliance professionals to ensure its systems run properly. The ultimate responsibility for the design and implementation of these policies and systems rests with the top echelon of the institution. The board of directors and senior management of each institution must devote careful study to the design of the anti-money laundering and other compliance systems that lie at the core of this first line of defense. The board and senior management must provide sufficient resources to undergird these systems and structures, including appropriate and evolving technology where cost effective. This requires both adequate staffing and ongoing training. This is the minimum that is required of financial institutions operating in both New York and the United States.

26.     DFS requires transparency from its licensed entities about their financial condition, compliance adequacy, market conduct, and transactions with New York consumers. A state-licensed financial institution operating in New York must observe a duty of prompt and complete disclosure of improper conduct to DFS, including misconduct engaged in by the entity itself. This transparency is critical to DFS in fulfilling its mandate of ensuring the safety and soundness of the banking, financial services, and insurance industries; protecting consumers from abusive conduct; and determining whether its licensed institutions are complying with New York law. Mandated transparency and focused supervision, coupled with investigation and

enforcement where necessary, has been DFS's successful approach to preventing illicit transactions involving these institutions operating under a New York license.

27.     A state-licensed bank or branch's disclosure obligations are clearly set forth in the New York Banking Law and its implementing regulations. Under the governing law and regulations, a state-licensed bank or branch must:

(a)     submit a report to the Superintendent immediately upon discovering fraud, dishonesty, making of false entries or omission of true entries, or other misconduct, whether or not a criminal offense (3 N.Y.C.R.R. § 300.1(a));

(b)     submit a report to the Superintendent of incidents that appear to relate to a plan or scheme that would be of interest to other banks or licensed entities located in the same area (3 N.Y.C.R.R. § 300.4); and

(c)     maintain or make available at its New York Branch true and accurate books, accounts and records reflecting all transactions and actions (N.Y. Banking L. § 200-c).

28.     In addition to these affirmative disclosure requirements, state-licensed banks and branches are also prohibited from, inadvertently or intentionally, submitting false or misleading information in any report required by the Superintendent. Under New York law, DFS is not limited to the exercise of its supervisory powers. DFS also has broad enforcement authority. DFS was created to be the single state agency in New York responsible for enforcing the banking (and insurance and financial services laws) in an effective and efficient manner. *See, e.g.*, N.Y. Fin. Servs. L. §§ 102, 102(c). This enforcement authority, which has been regularly exercised by DFS since its formation in 2011, protects New Yorkers—as well as the banking, insurance, and financial services markets—by ensuring that the illegal conduct of a bank (or insurer, or other licensed or supervised agent) is punished, that the entity or individuals are rehabilitated, and that other potential bad actors are deterred.

29.     Before November 7, 2017, BTMU's New York Branch served as the primary facility through which BTMU cleared U.S. dollar transactions. Upon information and belief, in the year preceding November 2017, BTMU cleared in excess of $20 trillion through the New York Branch.

30.     A correspondent bank such as BTMU with poor compliance controls in place can provide a portal into the U.S. and global financial systems for its international affiliates by providing U.S. dollar services to high-risk institutional clients without verifying that those clients have done the due diligence on their own customers. It is similarly critical for correspondent banks to be able to detect when another financial institution transacting through it attempts to circumvent its own obligation to know its customer and pass that information on. Poor compliance controls in correspondent banking therefore expose the U.S. and global financial systems to a frightening array of money-laundering, drug-trafficking, and terrorist-financing risks.

I.     **The 2013 and 2014 Consent Orders: BTMU's History of Illegal Activity Relating to Transactions with Iran and Other Sanctioned Countries**

31.     In the years leading up to 2013, DFS conducted an investigation of BTMU and found that, from at least 2002 through 2007, BTMU had failed to maintain an effective and compliant anti-money laundering program and OFAC compliance program, in violation of 3 N.Y.C.R.R. § 116, and moved billions of dollars through its New York Branch for State and privately-owned entities in Iran.

32.     BTMU accomplished this illegal activity through a practice known as "wire stripping," by which BTMU directed its employees in Tokyo to systematically remove information that could be used to identify the involvement of sanctioned parties from U.S. dollar payment messages before those payments were routed through its New York Branch.

33.     BTMU even went so far as to establish written operational instructions for its employees in Tokyo on how to remove information from messages in order to avoid increased scrutiny from U.S. regulators. These instructions, translated from Japanese into English, read,

> [I]n case of a P/O addressed to the U.S., attention should be paid in order to avoid freezing of funds, e.g., the 'ORDERING BANK' field should be filled in with the name of [BTMU], while the entry of the name of the final receiving bank (in an enemy country) and the particulars of remittance should be omitted.

34.     Using these and other non-transparent means, from 2002 through 2007, BTMU estimates that it cleared approximately 28,000 U.S. dollar payment transactions through the New York Branch totaling approximately $100 billion that involved Iran. BTMU also facilitated additional payments involving Sudan, Myanmar, and certain entities on OFAC's SDN list.

35.     In 2007, BTMU engaged a team from PricewaterhouseCoopers LLP (the "PwC Engagement Team") to review its U.S. dollar clearing activity between April 1, 2006, and March 31, 2007 (the "Historic Transaction Review"). The purported goal of this review was to: (a) identify any U.S. dollar transactions that potentially should have been frozen, blocked or reported under applicable OFAC requirements; (b) investigate the New York Branch's international remittance and trade finance activity for compliance with OFAC requirements; and (c) present PwC's "key findings and results" to DFS and its other U.S. regulators.

36.     In June 2008, BTMU submitted the report prepared by the PwC Engagement Team (the "HTR Report") to DFS and other U.S. regulators. BTMU represented to DFS that the HTR Report was the product of an "objective" and "methodologically sound" process.

37.     During DFS's ongoing investigation into BTMU's past U.S. dollar clearing activities, BTMU notified DFS that many of the payment messages from 2002 through 2007 were unavailable. As an alternative solution, BTMU suggested that DFS rely on the HTR Report's findings as a basis to extrapolate the approximate number of improper transactions

processed by BTMU through the New York Branch and other New York-based financial institutions. BTMU knew that DFS required this information to accurately assess the scope of the Bank's misconduct, and would use it to determine an appropriate penalty.

**A. BTMU Executes the 2013 Consent Order and Agrees to Pay a $250 Million Penalty**

38.     Following DFS's investigation—and in reliance on the HTR Report and representations made to DFS by BTMU—BTMU and DFS entered into a Consent Order on June 19, 2013 (the "2013 Consent Order"). Pursuant to this Consent Order, BTMU agreed to

a.  pay a civil monetary penalty of $250 million;

b.  engage—and fully cooperate with—an independent consultant to conduct a comprehensive review of the BSA/AML-related sanctions compliance programs, policies and procedures in place at the New York Branch; and

c.  create and implement a variety of plans designed to improve the programs, policies and procedures in place at the New York Branch to ensure adequate compliance with the BSA, OFAC requirements, and the 2013 Consent Order.

39.     BTMU also admitted that, from at least 2002 through 2007, it unlawfully cleared through the New York Branch and other New York-based financial institutions an estimated 28,000 payments in U.S. dollars—valued at approximately $100 billion—on behalf of certain sanctioned countries and parties, and for entities on OFAC's SDN list, in violation of 3 N.Y.C.R.R. § 116.2.

40.     Pursuant to the 2013 Consent Order, BTMU engaged Kroll Associates, Inc. ("Kroll") as the independent consultant (the "Independent Consultant" or "Consultant"). DFS oversaw and approved the appointment of Kroll, which began to regularly report on its review of BTMU to DFS.

41.     In addition to the penalties and commitments outlined above, the resolution of BTMU's violations and improper conduct was specifically predicated on its continued compliance with the 2013 Consent Order:

> This Consent Order resolves all matters before DFS relating to the conduct set forth in the Consent Order or disclosed to DFS in connection with this matter, provided that BTMU complies with the terms of the Consent Order. This Consent Order does not apply to conduct that BTMU did not disclose to DFS in connection with this matter.

**B.  BTMU Orchestrated a Scheme to Mislead DFS.**

42.     Shortly after entering into the 2013 Consent Order, DFS obtained evidence that PwC had doctored the HTR Report at the direction of BTMU to conceal the Report's methodological flaws from DFS. Upon acquiring this credible evidence, DFS opened an investigation into PwC's involvement in the matter.

43.     In the course of its investigation of PwC's conduct, DFS reviewed voluminous documents, including correspondence between PwC and BTMU, and took sworn testimony from eight current and former PwC professionals who had been members of the PwC Engagement Team. The investigation revealed that BTMU had successfully convinced the PwC Engagement Team, including two principals from PwC's advisory group, to remove excerpts from preliminary drafts of the HTR Report that would have cast doubt upon the thoroughness, objectivity, and reliability of the findings contained in the HTR Report that was ultimately submitted to DFS and other U.S. regulators on behalf of BTMU. Submission of this report to DFS violated N.Y. Banking L. § 204.

44.     The investigation also revealed that, on May 1, 2008—after more than a year of review, and before completion of the HTR Report—BTMU and the PwC Engagement Team made an interim presentation to various U.S. banking regulators, including DFS. At this presentation, according to PwC's notes from the meeting, the regulators asked, in connection

with Iranian transactions, whether "BTMU removed information such as originating bank, originating party or beneficiary party from [ ] wire messages" as a matter of course.

45.     In response to this direct question from the regulators, a very senior BTMU official "emphatically" denied that the Bank did so. DFS accepted this denial as an assurance that BTMU did not have any special written procedures to strip U.S. dollar-denominated SWIFT wire messages of information that, if detected, would have triggered screening alerts for potential violations of OFAC regulations. SWIFT, which stands for Society of Worldwide Interbank Financial Telecommunications, is a worldwide interbank electronic messaging service that provides financial institutions with a network to complete international financial transactions.

46.     Despite this unequivocal representation, DFS's subsequent investigation uncovered that, on May 23, 2008, just one month prior to completion of the HTR Report, BTMU disclosed to the PwC Engagement Team for the first time a written BTMU procedure to strip and falsely populate SWIFT data fields with BTMU's identifying information instead of its clients (and its clients' clients) from OFAC-sanctioned "enemy countries."

47.     These instructions, which were included in BTMU's Global Service Center Administrative Procedures Manual for Foreign Transfers, provided that:

> Banks located in countries designated by the U.S. as enemy countries hold their U.S. dollar accounts outside of the U.S. Upon receipt of U.S. dollar-denominated payment orders of which the ordering or receiving bank is such bank, use the cover payment method and not the one payment method. The method for filling out vouchers is the same as in "Section 2- Payments to Other Banks Located in Japan." However, exert care to avoid the funds being frozen by, among other means, providing our Bank as the ordering bank and not specifying the final receiving bank (the name of the enemy country).

48.     Knowing the significance these instructions would have to DFS in evaluating the Historic Transaction Review, the PwC Engagement Team inserted it into drafts of the HTR Report after receiving it from BTMU.

49.     During the same week of May 2008, BTMU also informed the PwC Engagement Team that BTMU utilized its sanctions screening filter in Tokyo to stop U.S. dollar-denominated SWIFT wire messages that contained language capable of triggering screening alerts in New York. The Tokyo filter worked this way so that BTMU employees were able to—and did—strip language identifying sanctioned entities before those messages were transmitted to New York; and then resubmitted these messages without the identifying language. In this way, payment messages that would have required further review and potentially blocking or freezing in New York, instead completely bypassed OFAC filters at the New York Branch, in violation of 3 N.Y.C.R.R. § 116.2. This was blatant misconduct intended to evade New York law.

50.     PwC's Engagement Team understood that improper data manipulation could significantly compromise the Historic Transaction Review's integrity. Consequently, the PwC Engagement Team inserted an express acknowledgement into a draft of the HTR Report that, "had PwC know[n] about these special instructions at the initial phase of the HTR then we would have used a different approach in completing this project." If this statement had remained in the report, it would have forewarned BTMU's regulators that PwC had serious reservations about the underlying methodology of the Historic Transaction Review, and that PwC, in hindsight, would have recommended at the beginning of the review that BTMU undertake a more intrusive examination of the Bank's wire transfers.

51.     But at a meeting between PwC and BTMU on June 13, 2008, some of BTMU's most senior Anti-Money Laundering, Compliance & Legal Division managers objected to PwC's disclaimer appearing in the HTR Report, and demanded its removal. Accordingly, the PwC Engagement Team removed it, and inserted in its place the following wholly misleading language: "[W]e have concluded that the written instructions would not have impacted the

completeness of the data available for the HTR and our methodology to process and search the HTR data was appropriate."

52.     Moreover, upon the discovery of the special written procedures for wire stripping, and the improper use of the sanctions screening filter in Tokyo, the PwC Engagement Team recommended to BTMU that PwC conduct a forensic investigation into BTMU's U.S. dollar-denominated payment processes and wire transfer messages. BTMU flatly rejected this recommendation, however, insisting that its own Internal Audit Office would investigate the issue instead. Because of BTMU's demand (and PwC's acquiescence) to remove PwC's recommendation from the HTR Report, DFS never learned that the PwC Engagement Team had recommended a forensic review—let alone that PwC had uncovered serious and systematic attempts by BTMU to conceal its wrongdoing.

53.     Approximately one week before the HTR Report was finalized and submitted to DFS, the manager of BTMU's Anti-Money Laundering Office, Compliance & Legal Division (the "BTMU Compliance Manager") reviewed a draft of the report. In one portion of the draft report, the PwC Engagement Team expressed concern that the core methodology PwC employed in the HTR review was potentially unsound because certain wire payment messages had not been reviewed. The BTMU Compliance Manager then asked that PwC consider deleting the offending language from the draft "because we do not want to give the impression to the reader of the report that there are some important [payment messages that] were not successfully reviewed." The PwC Engagement Team again bowed to BTMU's demands, removing the paragraph from the Report—and thus from DFS's scrutiny.

54.     Similarly, the PwC Engagement Team suggested in its draft HTR Report that BTMU's Internal Audit Office investigate (a) the genesis of the special written procedures for

32

wire stripping, (b) the possible existence of other "similar instructions," and (c) the Bank's "intentional omission of search terms" from payment messages. The PwC Engagement Team cautioned that "[t]he potential impact from the findings from [any such] investigation will need to be considered when evaluating this [HTR] Report."

55.    In response, the BTMU Compliance Manager forwarded the following request on behalf of BTMU: "[C]an you possibly delete this sentence?" PwC's Engagement Team again complied, removing the recommendation on how an internal BTMU audit should proceed. PwC further removed questions that it had raised to be addressed by such an investigation.

56.    Also at the request of BTMU, the PwC Engagement Team removed other information from drafts of the HTR Report that would surely have invited deeper regulatory scrutiny, including:

- Deleting the English translation of BTMU's wire stripping instructions, which referenced the Bank doing business with "enemy countries" of the U.S; the BTMU Compliance Manager requested that the PwC Engagement Team delete the English translation of the written procedures for wire stripping, writing, "it is the opinion of our NY people, also [our Bank's counsel] is also basically agreeing on this as well, that mentioning the exact wordings of the Instructions, especially the words 'to avoid the funds being frozen by,' might cause unnecessary concern to the regulators.";

- Deleting a regulatory term of art that PwC used throughout the report in describing BTMU's wire-stripping instructions ("Special Instruction") and replacing it with a nondescript reference that lacked regulatory significance ("Written Instruction");

- Deleting most of PwC's discussion of BTMU's wire-stripping activities;

- Deleting information concerning BTMU's potential misuse of OFAC screening software in connection with its wire-stripping activities;

- Deleting several forensic questions that PwC identified as necessary for consideration in connection with the Historic Transaction Review Report; and

- Deleting a section of the Historic Transaction Review Report that discussed the appearance of special characters (such as"#","-" and",") in wire transfer

33

messages, which had prevented PwC's filtering system from detecting certain transactions involving Sudan and Myanmar.

57.    After rejecting PwC's suggestion that BTMU's U.S. dollar-denominated payment processes and wire messages undergo a forensic review, the Bank's Internal Audit Office ostensibly conducted its own investigation into the Bank's stripping of information from wire messages, and issued a "Report on the Additional Investigation related to the Historical Transaction Review" to DFS and BTMU's other U.S. regulators in October 2008. But in light of the undisclosed PwC findings, this report was inadequate, too limited in scope, and did not employ the type of forensic review originally recommended by PwC. And for these reasons, the report was misleading to DFS.

### C.  BTMU Executes the 2014 Consent Order and Agrees to an Additional $315 Million Penalty.

58.    Following the revelation of the Bank's deceptive misconduct, BTMU and DFS entered into a second consent order on November 18, 2014 (the "2014 Consent Order") to resolve DFS's additional investigation into PwC and ensure BTMU was faithfully complying with the 2013 Consent Order. Under this Order, BTMU agreed that it had violated the terms of the 2013 Consent Order and multiple New York laws and regulations. In particular, BTMU admitted to:

- Misleading DFS in reaching the settlement terms of the 2013 Consent Order;

- Failing to maintain or make available at its New York Branch true and accurate books, accounts and records reflecting all transactions and actions, in violation of N.Y. Banking Law § 200-c;

- Knowingly violating 3 N.Y.C.R.R. § 300.1, which required BTMU to submit a report to the Superintendent immediately upon the discovery of fraud, dishonesty, making of false entries and omissions of true entries, and other misconduct, whether or not a criminal offense, in which any BTMU employee was involved; and

- Knowingly making or causing to be made false entries in books, reports and statements and omitting to make true entries of material particularly pertaining to the U.S. dollar clearing business of BTMU through its New York Branch or other New York-based financial institutions, and misleading the Superintendent and examiners of DFS who were lawfully appointed to examine BTMU's conditions and affairs.

59.     Under the 2014 Consent Order, BTMU agreed to the imposition of

another civil monetary penalty—an additional $315 million. Importantly, BTMU also agreed to

several significant terms to ensure that it could no longer abuse its dollar-clearing privileges

through the New York Branch. Among other things, BTMU agreed (a) to an extension of the

engagement of the Independent Consultant for a period of 18 months, if determined necessary by

DFS; (b) to relocate its U.S. BSA/AML and OFAC sanctions compliance programs to New

York, and that these New York-based programs would have U.S. compliance oversight over all

transactions affecting the New York Branch—including those transactions performed outside the

U.S. that affect the New York Branch; and (c) that the Independent Consultant would oversee,

evaluate and test the implementation of those programs, as well as the BSA/AML and OFAC

sanctions compliance programs that operate outside the United States and relate to transactions

affecting the New York Branch.

60.     Again, the 2014 Consent Order provided BTMU with only limited immunity for

the conduct specified and disclosed in connection with the 2014 Consent Order:

> No further action will be taken by DFS against BTMU for the conduct set forth in this [Second] Consent Order, **provided that BTMU complies with the terms of this Consent Order**. Notwithstanding another provision contained in this Consent Order, however, **DFS may undertake action against BTMU for transactions or conduct that BTMU did not disclose to DFS** in the written materials that BTMU submitted to DFS in connection with this matter.

(Emphasis added.)

61.     In a similar vein, there is nothing in the 2013 or 2014 Consent Orders that restricts DFS's authority to investigate and maintain an enforcement action against BTMU for acts taken while licensed by DFS.

## II.     Between November 18, 2014, and November 7, 2017, BTMU Continued to Violate New York Law

62.     As set forth more fully below, as determined by both the Independent Consultant and DFS, between November 18, 2014 and November 7, 2017, BTMU engaged in conduct that sought to frustrate and undermine the 2013 and 2014 Consent Orders, continued to deploy deficient sanctions filtering programs, and intentionally attempted to avoid regulatory scrutiny in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44-a.

63.     Even after the 2013 and 2014 Consent Orders, BTMU failed to comply with its legal obligations under New York law. In summary, as set forth in the Independent Consultant's "Sanctions Governance Report," dated March 1, 2017, BTMU "lack[ed] a critical compliance mindset and culture, at least regarding U.S. dollar issues." Similarly, a former BTMU compliance official, when interviewed by the Independent Consultant, characterized BTMU's compliance function as a "dumpster fire."

64.     Specifically, between November 18, 2014, and November 7, 2017, BTMU:

- utilized deficient sanctions filtering programs that were incapable of adequately screening for suspicious or illegal transactions;

- failed to adequately correct its deficient sanctions filtering programs;

- failed to timely disclose its failure to adequately correct its deficient sanctions filtering program;

- made false and misleading statements regarding its failure to correct the deficient sanctions filtering programs;

- intentionally circumvented its sanctions filters at the New York Branch;

- failed to screen for sanctioned shipping vessels;

- failed to undertake due diligence for transactions involving cities bordering North Korea;

- failed to properly screen over 70,000 transactions involving nested accounts; and

- sought to undermine cooperation with the independent consultant.

## A. BTMU Utilized Deficient Sanctions Filtering Programs that were Incapable of Adequately Screening for Suspicious or Illegal Transactions.

65.    Pursuant to the 2014 Consent Order, the Independent Consultant was required to review and report on BTMU's U.S. BSA, AML, and OFAC Sanctions compliance programs, policies and procedures, as well as those compliance programs that operate outside the United States and relate to the transactions affecting BTMU's New York Branch. The Independent Consultant was also required to oversee, evaluate, and test those programs, policies, and procedures. Similar requirements existed under the 2013 Consent Order to ensure that BTMU remediated its compliance failures, and to ensure that DFS could take any necessary actions against BTMU if it failed to do so.

66.    To oversee, evaluate, and test BTMU's compliance programs, policies, and procedures, the Independent Consultant worked with the Bank to schedule several visits to BTMU branches outside of New York. The Independent Consultant determined that visits to the Singapore and Tokyo branches of BTMU were priorities based on the large volume of U.S. dollar transactions that are processed through those branches.

67.    The Independent Consultant scheduled a visit to BTMU's Singapore Branch for April 2016. Shortly before that visit, in March 2016, BTMU first notified the Independent Consultant of serious "truncation" issues at the Singapore Branch.

68.    In processing cash payments, BTMU first inputs customer information into its core banking systems. The information is then electronically transferred to BTMU's "HotScan"

system, which is a filtering program designed to block financial transactions prohibited by U.S. sanctions law including transactions with countries and individuals identified by OFAC.

69.     For the HotScan system to function effectively, all of the information identifying the beneficiary of a financial transaction must be transferred into the HotScan system. Such information typically includes (i) beneficiary's name (individual or corporation); (ii) the address, including country location; (iii) the name of the bank; and (iv) the account and sub-account number, as applicable.

70.     When banks communicate with other banks, they typically use SWIFT, which provides an electronic communications network through which banks exchange wire transfer messages with other financial institutions, including U.S. correspondent banks. Each SWIFT message contains various blank fields for information to be inserted. The financial institution originating the communication is responsible for inserting the necessary information into the fields, including information about the beneficiary.

71.     Shortly before its visit to the Singapore Branch, BTMU informed the Independent Consultant of two significant issues at the branch, each of which raised serious concerns that transactions were not being properly screened for sanctions violations. The first issue involved the transfer of information from BTMU's customer interface at the branch to BTMU's core banking system. The customer interface allows for five lines of information: four lines for the beneficiary's information and a fifth line for the country code. The core banking system, however, only allowed for the entry of four lines of information, which meant that anytime all four lines were used in the customer interface for the beneficiary's information, the country code would be truncated. And when that happened, the HotScan system would be unable to screen the (truncated) information for sanctioned countries. Notwithstanding its obligations under the 2014

38

Consent Order, BTMU informed the Independent Consultant in 2016 that this serious deficiency had been occurring for almost ten years—since 2007—but had never before been disclosed to DFS.

72.     The second HotScan deficiency related to the country "drop-down menu"—the field in the input screen where the user (often a bank customer) can select the country of the beneficiary for the transaction. The drop-down menu used by the Singapore branch did not include an option for North Korea—one of the most sanctioned countries in the world. Compounding the problem, an existing drop-down menu option, identified as "Country Not Found on List," was not a selection that would be flagged and stopped by BTMU's HotScan system. As a result, transactions involving North Korea were not screened. Notwithstanding its obligations under the 2014 Consent Order, BTMU informed the Independent Consultant in 2016 that this serious deficiency had been occurring for at least five years—since 2011—but had never before been disclosed to DFS.

73.     Discovery of these issues led BTMU to commence a broader review of its sanctions-filtering software at other branches in a variety of countries. Through this review, BTMU eventually determined that at least 31 other branches outside the United States also suffered from serious truncation and sanction-filtering issues that caused their sanctions filtering systems to be grossly inadequate. In other words, BTMU's truncation crisis was systemic.

74.     Nevertheless, BTMU concealed the extent of the truncation and other sanctions filtering programs from the Independent Consultant as long as it could, in violation of both the 2013 and 2014 Consent Orders.

75.     For example, in July 2016, BTMU discovered other, serious truncation issues at the BTMU branch in Ho Chi Minh City, Vietnam. The local cash management banking system

in the Ho Chi Minh City branch was configured to have customers enter country names in the

form of a two-digit code. But the Vietnam HotScan system did not screen words with less than

three characters, so regardless of the country code a customer at the Ho Chi Minh City branch

entered for the beneficiary of the transaction—be it IR (Iran), NK (North Korea), or any other

U.S. sanctioned country—that code was not screened. And despite having identified these

truncation issues in July 2016, BTMU did not disclose this critical information to the

Independent Consultant until December 2016—mere days before the Consultant was scheduled

to visit the Ho Chi Minh City Branch.

76.     BTMU's pattern of failing to notify the Independent Consultant and DFS of

deficiencies in its sanctions compliance programs until days before the Independent Consultant

would have inevitably discovered the deficiencies on its own is further evidence of BTMU's

years-long practice of taking significant and illegal actions to evade DFS's oversight and shirk its

obligations under New York law.

77.     BTMU's truncation problems also occurred at the New York Branch. After

transactions in U.S. dollars are screened in other jurisdictions, they remain subject to additional

screening once they are submitted for clearance at the New York Branch. But as with BTMU's

filtering programs elsewhere, the filtering program utilized by the New York Branch suffered

from multiple serious truncation issues.

78.     Chief among them, BTMU's core banking system limited the number of

characters for the fields used to input beneficiary information in its corporate-customer system.

As a result, when the information was converted to a SWIFT message, some of the information

could be truncated and not screened for sanctions. This truncation issue at the New York Branch

existed from the installation of the New York corporate customer system in 2013 until April

40

2016. During this three-year period, the New York Branch cleared many trillions of dollars in transactions.

79.     The truncation problems at BTMU's New York Branch were not confined to its corporate-customer system. BTMU's system for processing individual wire transfers at its New York Branch was riddled with truncation issues as well. Similar to the problem found in the Ho Chi Minh City branch, the flaw in BTMU's individual wire system related to the input of country codes. BTMU's system permitted a customer wishing to send a wire transfer to input the full name of the country of the beneficiary party. When BTMU's system formatted the wire transfer request into an outgoing SWIFT payment message, the country name was changed to a two-digit country code—the standard format in SWIFT messages. But BTMU deliberately configured its New York Branch's HotScan system so that it would only screen terms that had a minimum of three characters. Consequently, none of the country codes for outgoing payment messages sent by individual customers of the New York Branch—which were all in a two-letter format—were ever screened. The implications of this screening failure are striking: between 2013 and April 2016, the country codes for individual wire transactions at BTMU's New York Branch were never screened. If, at any point during this three-year period, a customer at BTMU's New York Branch inputted a message with the country code for North Korea ("NK"), or Iran ("IR"), the transaction would have sailed through BTMU's sanctions filtering system.

80.     Similarly, if a beneficiary's individual or corporate name contained a word with three characters or less and the person was on the SDN list issued by OFAC, transactions involving that beneficiary were also passed through BTMU's sanctions filtering system without being blocked. This BTMU sanctions deficiency also persisted for approximately three years.

81.     These were not the only significant truncation and technical issues endemic to BTMU's systems at its New York Branch.

82.     For example, Trade 360 is a transaction-processing system used by BTMU to transmit letters of credit necessary to execute trade-finance transactions through the New York Branch. These letter-of-credit messages pass through BTMU's electronic system, Americas Messaging Hub, prior to HotScan transaction screening.

83.     Prior to November 7, 2017, a significant systems error in the processing of trade-finance transactions at BTMU caused numerous deficiencies, including (1) the truncation of messages containing "special characters," and (2) the potential corruption of any words within a SWIFT message including or adjoining special characters. As a result, key names of individuals, entities, or addresses with or near special characters were at heightened risk for deficient screening during the period prior to November 7, 2017, resulting in heightened risk that BTMU was regularly processing U.S. dollar transactions through the New York Branch that were prohibited under New York and federal law.

**B. BTMU Failed to Adequately Correct These Deficient Sanctions Filtering Programs and Further Failed to Notify the Independent Consultant and DFS of the Ongoing Deficiencies in the Programs.**

84.     After the truncation issues and sanction-program failures were first disclosed to the Independent Consultant in April 2016, BTMU sought to implement an interim fix in the affected branches. This interim fix was described to the Independent Consultant and DFS as corrective measures to remediate the deficient sanctions filtering programs.

85.     Between June and October 2016, BTMU's Internal Audit Office conducted an audit to assess the effectiveness of the interim remediation program. The Internal Audit Office determined that this "interim fix" was failing significantly in a number of branches in high-risk jurisdictions, including China, Russia, Brazil and Mexico, as well as other branches (the "Interim

Fix Audit"). Indeed, the Interim Fix Audit identified six branches in China alone where the interim fix had failed.

86.     Although BTMU was obligated to immediately notify the Independent Consultant of these deficiencies in the interim fix, it failed to do so.

87.     The failure to timely notify the Independent Consultant and DFS of the continued truncation issues and the deficiencies in the interim fix were breaches of the 2013 Consent Order, the 2014 Consent Order, and of BTMU's ongoing obligation to fully cooperate and be transparent with DFS.

### C.  BTMU Made False and Misleading Statements to the Independent Consultant Regarding its Failure to Correct the Deficient Sanctions Filtering Programs.

88.     BTMU hid the results of the Interim Fix Audit from the Independent Consultant and made several false statements about the existence of the audit results.

89.     On January 27, 2017, the Independent Consultant attended a meeting with senior BTMU compliance personnel, BTMU's outside counsel, and a consulting firm. During this meeting, the Independent Consultant asked whether BTMU had tested the interim controls intended to remediate the truncation crisis, and if so, whether those controls had been found to be effective. The senior BTMU compliance officials stated during the meeting that the Bank had tested the interim controls and found them to be effective. This was a false statement. The Interim Fix Audit had found the exact opposite.

90.     On February 21, 2017, the Independent Consultant again asked senior BTMU compliance personnel whether the Bank had tested the interim controls intended to remediate the truncation crisis, and whether those controls had been found to be effective. The Bank responded in writing on February 24, 2017, and reported that the interim controls, "as designed" were deemed adequate and "were tested at the time of implementation and will continue to be tested

on an ongoing basis." This statement was false and intentionally misleading, as the Interim Fix Audit had found that the interim fix was not effective.

91.    These two false statements were part of BTMU's plan to hide the deficiencies identified in the Interim Fix Audit from DFS and the Independent Consultant. The Deputy General Counsel of Mitsubishi UFJ Financial Group—BTMU's parent company—whose office is located at BTMU's New York Branch, participated in a conference call on January 31, 2017, and an in-person meeting on February 17, 2017, where he and other senior BTMU personnel discussed whether (or not) to disclose the Interim Fix Audit to the Independent Consultant and U.S. regulators. The Interim Fix Audit was not disclosed to the Independent Consultant as a result of these calls and meetings.

92.    If DFS and the Independent Consultant had not pursued the investigation of BTMU, the findings of the Interim Fix Audit would have never come to light. Indeed, even after the investigation was well under way, BTMU's deceit continued.

93.    On April 6, 2017, the Independent Consultant asked the Deputy General Counsel when he first learned of the results of the Interim Fix Audit. The Deputy General Counsel responded that he first learned of the deficiencies identified in the audit on March 29, 2017, when the Independent Consultant specifically requested a copy of the audit report. This was another false statement. The Deputy General Counsel had been aware of the results of the Interim Fix Audit from, at the latest, January 31, 2017, when he began participating in internal discussions about whether BTMU had an obligation to disclose the audit to the Independent Consultant or U.S. regulators.

**D.  BTMU Intentionally Circumvented its Sanctions Filters at its New York Branch.**

94.     From May 20, 1997, to October 7, 2016, Myanmar was subject to financial and economic sanctions under U.S. law. These sanctions were imposed in response to a history of human-rights abuses and large-scale repression of democratic opposition in Burma.

95.     Prior to October 7, 2016, banking staff at BTMU's Tokyo Branch employed a special procedure for processing transactions related to Myanmar. For these transactions only, a BTMU branch would ensure it had a U.S. dollar balance in a U.S. dollar account in BTMU's Tokyo Branch. The BTMU branch would then send a payment message to a Myanmar bank showing the transaction; however, the branch would not run the transaction through the New York Branch. Instead, it would simply do an internal bookkeeping measure in Tokyo, debiting the U.S. dollar account from the BTMU branch and crediting the U.S. dollar account of the Myanmar correspondent bank.

96.     As a result of this special procedure, BTMU would effectively transfer U.S. dollars to a customer of the Myanmar correspondent bank without any payment message clearing through the sanctions filter at BTMU's New York Branch. BTMU failed to prevent, remedy, or disclose this deliberate attempt to evade its obligations under New York and federal law to implement and maintain systems reasonably designed to identify and block transactions involving sanctioned countries.

**E.  BTMU Failed to Screen for Sanctioned Shipping Vessels.**

97.     In October 2016, the Independent Consultant learned that from approximately October 2015 until October 2016, BTMU's New York Branch failed to screen incoming international payment messages against the International Maritime Shipping Numbers assigned to identify vessels listed as SDNs by OFAC. The Bank had mapped the vessel list in its sanctions screening filter, HotScan, to a field that payment messages were not screened against, meaning

that any payment messages referencing an SDN vessel that was processed by the Bank that year would not have been stopped for OFAC-sanctions review. This failure affected approximately four million payment messages.

### F.   BTMU Failed to Conduct Due Diligence for Transactions Involving Cities that Border North Korea.

98.     Prior to November 7, 2017, employees of the BTMU branch in Hong Kong expressed concerns about the serious risk that some branch customers were conducting a significant amount of financial transactions with counterparties in three Chinese cities bordering North Korea: Dandong, Yanji and Hunchun. BTMU compliance staff, in an effort to enhance customer due diligence, added the names of these three cities to the HotScan filter, so that any transactions involving these cities would be screened for sanctions prohibitions.

99.     But after a number of customers complained about the enhanced scrutiny, the BTMU management officials at the Hong Kong branch reversed course, overruled the compliance staff, and amended the screening policy so that transactions involving these three cities would receive less scrutiny than other transactions.

100.     BTMU accomplished this by creating a "repeated-transaction" program. Under this program, customers at BTMU's Hong Kong branch could conduct subsequent transactions in these high-risk jurisdictions out of the compliance spotlight if a transaction involving the same counterparties had previously been subjected to due diligence. This lack of due diligence meant that numerous transactions originating in BTMU branches near the North Korea border would not be properly scrutinized. In other words, when BTMU's compliance staff identified high-risk customers, BTMU management officials put measures in place designed to ensure that those same customers would be *less* scrutinized than others. In so doing, BTMU deliberately placed its economic interests ahead of its compliance obligations under New York and federal law.

### G.  BTMU Engaged in Risky Nested Accounts Activity.

101.    Between November 18, 2014, and November 7, 2017, BTMU engaged in significant "nested account" activity. Nested accounts are a significant compliance risk for banks that conduct correspondent banking. A nested account occurs when a foreign bank or financial institution gains access to the U.S. financial system by operating through a U.S. correspondent account belonging to another foreign bank. If the foreign bank with the U.S. dollar account is unaware that its foreign-correspondent-financial-institution customer is providing such access to a third-party foreign financial institution, that third-party financial institution can effectively gain anonymous access to the U.S. financial system.

102.    During one of the Independent Consultant's visits to BTMU's Head Office in Tokyo in December 2016, the Consultant notified BTMU of serious weaknesses in BTMU's Know-Your-Customer procedures for foreign correspondent banks. Subsequently, in March 2017, BTMU uncovered nested account activity in foreign correspondent accounts in the Tokyo branch. BTMU identified 153 foreign-correspondent-account clients: approximately two-thirds of the accounts were for regional Japanese banks, with the remaining accounts for BTMU branches and affiliates. Thirty of these nested accounts had cleared U.S. dollars through the New York Branch over the prior year.

103.    According to BTMU's disclosure to the Independent Consultant, BTMU's foreign correspondent account base included numerous high-risk banks with sanctions, money services business, terror finance and other financial crime exposures. More than 60 percent of BTMU's non-Japanese foreign correspondent account holders operate in high-risk jurisdictions.

104.    BTMU later identified approximately 74,000 individual transactions that involved nested activity that were never adequately screened for U.S. sanctions and regulatory issues. All

of these transactions occurred before November 7, 2017. BTMU wholly failed to identify and implement safeguards to address this compliance risk.

### H. BTMU Sought To Frustrate Cooperation with the Independent Consultant.

105.    BTMU also tried to prevent its employees from cooperating with the Independent Consultant. In April 2017, BTMU instituted a new policy that chilled cooperation with the Independent Consultant. This new policy required that BTMU employees notify the BTMU Regulatory Affairs Office prior to communicating with the Independent Consultant. The policy also required a representative of the Regulatory Affairs Office be present whenever a BTMU employee had a discussion of any type with the Independent Consultant.

106.    The protocol, which was introduced by BTMU in or about April 2017 applied only to "regulatory communications, inquiries, and document sharing … as they relate to inquiries of U.S. Dollar denominated transactions and compliance with U.S. OFAC sanctions and U.S. BSA/AML laws and regulations."

107.    As designed, the new policy not only prevented employees from freely communicating with the Independent Consultant, but also required that records be kept of who witnessed any communications, as well as a "summary of noteworthy/significant discussion matters (as applicable)."

108.    The new policy fundamentally interfered with the work of the Independent Consultant by discouraging BTMU employees from being frank and candid with the Independent Consultant. This policy was plainly designed to chill cooperation with the Independent Consultant, as well as withhold negative information from DFS and the Independent Consultant, and is a blatant violation of the 2013 and 2014 Consent Orders and therefore constituted violations of N.Y. Banking Law § 44.

109.     BTMU further frustrated cooperation by its employees with the Independent Consultant and interfered with DFS's investigation of BTMU by terminating the Chief Compliance Officer for the Compliance Division of the Americas ("NY CCO") in March 2007. By virtue of his position, and consistent with BTMU's obligations under the 2013 and 2014 Consent Orders, the NY CCO had been working and cooperating with the Independent Consultant.

110.     The NY CCO worked at BTMU's New York Branch from June 2015 until March 2017. The NY CCO was a dedicated and experienced compliance professional. He pushed the bank to observe the mandates of the 2013 and 2014 Consent Orders, and worked tirelessly to ensure that the New York Branch properly policed U.S. dollar transactions being cleared through that Branch. The Independent Consultant described the NY CCO "as virtually the lone consistent voice within the Bank forcefully arguing for strong compliance controls and culture."

111.     Among other things, the NY CCO repeatedly informed BTMU's Head Office in Tokyo that the New York Branch was receiving inadequate information about remediation steps required by the 2013 and 2014 Consent Orders, and pressed the Tokyo office for additional information and resources.

112.     For example, in December 2016, when the NY CCO was giving a presentation on compliance issues, Chief Compliance Officers from BTMU branches in Pakistan and Mexico expressed concerns about raising compliance issues with their local branches for fear of retaliation by the local branch manager. Later, the NY CCO shared this exchange with BTMU's Chief Legal and Compliance Officer, and urged the Chief Legal and Compliance Officer to issue a written policy against such retaliation. The Chief Legal and Compliance Officer, however, while saying there was no reason to worry about retaliation, refused to issue such a policy.

113.    Upon information and belief, after determining that the NY CCO (a) had been transparent with the Independent Consultant about the Bank's compliance deficiencies and (b) was indeed a "consistent voice within the Bank forcefully arguing for strong compliance controls and culture," BTMU terminated the NY CCO effective March 31, 2017.

114.    After the termination of the NY CCO, DFS's investigation and the work of the Independent Consultant continued and was active through November 7, 2017. In the months preceding November 7, 2017, BTMU and DFS had agreed to significantly extend the term of the Independent Consultant and had exchanged drafts of a supplemental consent order that would have accomplished the extension. DFS had also amassed significant evidence of the misconduct and violations of law that BTMU had committed since November 19, 2014, and was poised to undertake additional enforcement actions against BTMU. On October 30, 2017, in the midst of the ongoing investigation and without any prior notice to DFS, BTMU filed conversion applications for licensure with the OCC. Eight days later and without any input from DFS, during the evening of November 7, the OCC granted conditional approval and then, several hours later, granted final approval of BTMU's applications subject to additional requirements. The next day, on November 8, BTMU terminated the Independent Consultant and DFS's access to the institution, thus removing the only individuals that were actively investigating its pre-conversion misconduct.

<u>COUNT I: CLAIM FOR PENALTIES</u>
**(Claim for Violation of N.Y. Banking Law § 44(2) & 3 N.Y.C.R.R. § 116.2)**

115.    DFS incorporates and realleges each and every allegation contained in paragraphs 1–114 of this Counterclaim as though fully set forth herein.

116.     Section 44(2) of the N.Y. Banking Law imposes a $5,000 penalty per day for each violation of the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, or any written agreement entered into with the Superintendent, including consent orders.

117.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch in an unsafe and unsound manner in violation of N.Y. Banking Law § 44(2).

118.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without sufficient and adequate policies, procedures, practices or systems to assure effective transaction monitoring and transaction filtering, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2).

119.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without effective BSA/AML policies, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2).

120.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without independent testing sufficient to ensure compliance with BSA/AML and OFAC regulations, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2).

121.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted

operations of the New York Branch without a system of internal controls to assure compliance with the applicable laws and regulations, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2).

122.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without a sufficient Know Your Customer/Customer Identification Program, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2).

123.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without adequate senior management and home office governance and oversight, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2).

124.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without having in place risk-based policies, procedures and practices to ensure, to the maximum extent practicable, that its transaction complied with OFAC requirements, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2).

125.     The Superintendent is entitled to a judgment equal to $5,000 per day for each such violation of N.Y. Banking Law § 44(2). Such judgment shall be payable to the General Fund of the State of New York.

## COUNT II: CLAIM FOR PENALTIES
### (Claim for Violation of N.Y. Banking Law § 44(3) & 3 N.Y.C.R.R. § 116.2)

126.     DFS incorporates and realleges each and every allegation contained in paragraphs 1–125 of this Counterclaim as though fully set forth herein.

127.    Section 44(3) of the N.Y. Banking Law imposes a $25,000 penalty per day for each violation of the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, or any written agreement entered into with the superintendent that is also part of a pattern of misconduct or that results in more than a minimal loss or pecuniary gain or other benefit to a foreign banking corporation licensed by the Superintendent to maintain a branch in the state.

128.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch in an unsafe and unsound manner and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU, in violation of N.Y. Banking Law § 44(3).

129.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without sufficient and adequate policies, procedures, practices or systems to assure effective transaction monitoring and transaction filtering, and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3).

130.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without effective BSA/AML policies, and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further

resulted in more than a minimal loss or pecuniary gain to BTMU, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3).

131.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without independent testing sufficient to ensure compliance with BSA/AML and OFAC regulations, and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3).

132.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without a system of internal controls to assure compliance with the applicable laws and regulations, and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3).

133.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without a sufficient Know Your Customer/Customer Identification Program, and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3).

134.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without adequate senior management and home office governance and oversight, and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further resulted in pecuniary gain to BTMU, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3).

135.     On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without having in place risk-based policies, procedures and practices to ensure, to the maximum extent practicable, that its transaction complied with OFAC requirements, and that such deficient operation of the New York Branch was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU, in violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3).

136.     The Superintendent is entitled to a judgment equal to $25,000 per day for each such violation of N.Y. Banking Law § 44(3). Such judgment shall be payable to the General Fund of the State of New York.

## COUNT III: CLAIM FOR PENALTIES
### (Claim for Violation of N.Y. Banking Law § 44(4) & 3 N.Y.C.R.R. § 116.2)

137.     DFS incorporates and realleges each and every allegation contained in paragraphs 1–136 of this Counterclaim as though fully set forth herein.

138.     Section 44(4) of the N.Y. Banking Law imposes a penalty equal to $250,000 (or, if lesser, one percent of the total assets of a foreign banking corporation licensed by the Superintendent to maintain a branch in the state) per day for any of the following violations committed by a foreign bank licensee where such foreign bank licensee has knowingly or

recklessly incurred so substantial a loss as a result of the violation or practice as to threaten the safety and soundness of the foreign bank licensee: (a) knowingly and willfully violating the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, or any written agreement entered into with the superintendent; (b) knowingly and willfully engaging in an unsafe or unsound practice; or (c) knowingly committing a violation the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, or any written agreement entered into with the superintendent which substantially undermines public confidence in the foreign banking licensee or foreign banking licensees, generally.

139.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch knowingly and willfully conducted operations of the New York Branch in an unsafe and unsound manner. BTMU knowingly or recklessly incurred so substantial a loss as a result of this practice as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

140.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without sufficient and adequate policies, procedures, practices or systems to assure effective transaction monitoring and transaction filtering, in violation of 3 N.Y.C.R.R. § 116.2. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

141.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without effective BSA/AML policies, in violation of 3 N.Y.C.R.R. § 116.2, BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

142.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without independent testing sufficient to ensure compliance with BSA/AML and OFAC regulations, in violation of 3 N.Y.C.R.R. § 116.2. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

143.    On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without a system of internal controls to assure compliance with the applicable laws and regulations, in violation of 3 N.Y.C.R.R. § 116.2. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or

recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

144.   On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without a sufficient Know Your Customer/Customer Identification Program, in violation of 3 N.Y.C.R.R. § 116.2. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

145.   On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without adequate senior management and home office governance and oversight, in violation of 3 N.Y.C.R.R. § 116.2. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

146.   On multiple occasions beginning on or before November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch conducted operations of the New York Branch without having in place risk-based policies, procedures and practices to ensure, to the maximum extent practicable, that its transaction complied with OFAC requirements, in violation of 3 N.Y.C.R.R. § 116.2. BTMU committed these violations willfully

and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

147.    The Superintendent is entitled to a judgment equal to $250,000 per day for each such violation of N.Y. Banking Law § 44(4). Such judgment shall be payable to the General Fund of the State of New York.

<u>**COUNT IV: CLAIM FOR PENALTIES**</u>
**(Claim for Violation of N.Y. Banking Law § 44(2))**

148.    DFS incorporates and realleges each and every allegation contained in paragraphs 1–147 of this Counterclaim as though fully set forth herein.

149.    Section 44(2) of the N.Y. Banking Law imposes a $5,000 penalty per day for each violation of the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, or any written agreement entered into with the Superintendent, including consent orders.

150.    On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(2), by failing to cooperate with the Independent Consultant by not providing the Independent Consultant with access to all relevant personnel.

151.    On or about March 31, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(2), by failing to cooperate with the Independent Consultant by terminating the employment of the New York Branch's chief compliance officer.

152.    On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(2), by failing to cooperate with the Independent Consultant by not providing the Independent Consultant with access to all relevant records and information.

153.    On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(2), by failing to cooperate with the Independent Consultant by making false statements to the Independent Consultant.

154.    The Superintendent is entitled to a judgment equal to $5,000 per day for each such violation of N.Y. Banking Law § 44(2). Such judgment shall be payable to the General Fund of the State of New York.

**COUNT V: CLAIM FOR PENALTIES**
**(Claim for Violation of N.Y. Banking Law § 44(3))**

155.    DFS incorporates and realleges each and every allegation contained in paragraphs 1–154 of this Counterclaim as though fully set forth herein.

156.    Section 44(3) of the N.Y. Banking Law imposes a $25,000 penalty per day for each violation of the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, or any written agreement entered into with the superintendent that is also part of a pattern of misconduct or that results in more than a minimal loss or pecuniary gain or other benefit to a foreign banking corporation licensed by the Superintendent to maintain a branch in the state.

157.    On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(3), by failing to cooperate with the

Independent Consultant by not providing the Independent Consultant with access to all relevant personnel, and where such violation was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU.

158.    On or about March 31, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(3), by failing to cooperate with the Independent Consultant by terminating the employment of the New York Branch's chief compliance officer, and where such violation was also part of a pattern of misconduct and that further resulted in more than a minimal loss or pecuniary gain to BTMU.

159.     On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(3), by failing to cooperate with the Independent Consultant by not providing the Independent Consultant with access to all relevant records and information, and where such violation was also part of a pattern of misconduct and that further resulted in pecuniary gain to BTMU.

160.    On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, and N.Y. Banking Law § 44(3), by failing to cooperate with the Independent Consultant by making false statements to the Independent Consultant, and where such violation was also part of a pattern of misconduct and that further resulted in pecuniary gain to BTMU.

161.    The Superintendent is entitled to a judgment equal to $25,000 per day for each such violation of N.Y. Banking Law § 44(3). Such judgment shall be payable to the General Fund of the State of New York.

## <u>COUNT VI: CLAIM FOR PENALTIES</u>
### (Claim for Violation of N.Y. Banking Law § 44(4))

162.    DFS incorporates and realleges each and every allegation contained in paragraphs 1–161 of this Counterclaim as though fully set forth herein.

163.    On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order by failing to cooperate with the Independent Consultant by not providing the Independent Consultant with access to all relevant personnel. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

164.    On or about March 31, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order by failing to cooperate with the Independent Consultant by terminating the employment of the New York Branch's chief compliance officer. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

165.    On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, by failing to cooperate with the Independent Consultant by not providing the Independent Consultant with access to all relevant records and information. BTMU committed these violations willfully and knowingly. These violations substantially undermined

public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

166.     On multiple occasions beginning after November 18, 2014, and continuing up and until November 7, 2017, BTMU and the New York Branch violated the 2013 Consent Order and 2014 Consent Order, by failing to cooperate with the Independent Consultant by making false statements to the Independent Consultant. BTMU committed these violations willfully and knowingly. These violations substantially undermined public confidence in BTMU and in foreign bank licensees, generally. BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU. BTMU's conduct violated N.Y. Banking Law § 44(4).

167.     The Superintendent is entitled to a judgment equal to $250,000 per day for each such violation of N.Y. Banking Law § 44(4). Such judgment shall be payable to the General Fund of the State of New York.

## COUNT VII: DECLARATORY RELIEF
**(Claim for Declaratory Judgment under 28 U.S.C. §§2201-2202 that DFS May Initiate and Maintain an Adjudicatory Proceeding Against BTMU for the Enforcement of Violations of New York Law Committed by BTMU Prior to November 7, 2017)**

168.     DFS incorporates and realleges each and every allegation contained in paragraphs 1–167 of this Counterclaim as though fully set forth herein.

169.     Subdivisions 2, 3, and 4 of Section 44 of the New York Banking Law authorize the Superintendent, after notice and hearing, to require a foreign banking corporation licensed by the superintendent to maintain a branch in this state to pay to the people of the State of New

York a penalty for a violation of the N.Y. Banking Law, any regulated promulgated under the N.Y. Banking Law, and/or any written agreement entered into with the Superintendent.

170.    The Superintendent has the power and authority to commence and maintain an adjudicatory proceeding against BTMU pursuant to subdivisions 2, 3, and 4 of Section 44 of the N.Y. Banking Law for violations of the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, the 2013 Consent Order, and 2014 Consent Order based on conduct that occurred prior to November 7, 2017 when BTMU was operating under a licensed issued by DFS.

171.    The Superintendent is entitled to a declaratory judgement that the commencement and maintenance of an adjudicatory proceeding against BTMU pursuant to subdivisions 2, 3, and 4 of Section 44 of the N.Y. Banking Law for violations of the N.Y. Banking Law, regulations promulgated under the N.Y. Banking Law, the 2013 Consent Order, and 2014 Consent Order based on conduct that occurred prior to November 7, 2017 when BTMU was operating under a licensed issued by DFS is not affected by BTMU's subsequent receipt of a federal license.

## **REQUEST FOR RELIEF**

WHEREFORE, Maria Vullo, in her capacity as Superintendent of Financial Services of the New York State Department of Financial Services, demands judgment against Counterclaim Defendant BTMU, for the following relief:

A.    A judgment denying every claim asserted in the Amended Complaint and dismissing the Amended Complaint with prejudice;

B.    A judgment equal to $5,000 per day for each violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(2);

C.    A judgment equal to $25,000 per day for each violation of 3 N.Y.C.R.R. § 116.2 and N.Y. Banking Law § 44(3);

D.      A judgment equal to $250,000 per day for each violation of 3 N.Y.C.R.R. § 116.2

and N.Y. Banking Law § 44(4);

E.      A judgment equal to $5,000 per day for each violation of the 2013 Consent Order,

2014 Consent Order, and N.Y. Banking Law § 44(2);

F.      A judgment equal to $25,000 per day for each violation of the 2013 Consent

Order, 2014 Consent Order, and N.Y. Banking Law § 44(3);

G.      A judgment equal to $250,000 per day for each violation of the 2013 Consent

Order, 2014 Consent Order, and N.Y. Banking Law § 44(4); and

H.      A judgment declaring that the commencement and maintenance of an

adjudicatory proceeding by DFS and/or the Superintendent against BTMU pursuant to

subdivisions 2, 3, and 4 of Section 44 of the New York Banking Law for violations of the N.Y.

Banking Law, regulations promulgated under the N.Y. Banking Law, the 2013 Consent Order,

and the 2014 Consent Order based on conduct that occurred prior to November 7, 2017, when

BTMU was operating under a licensed issued by DFS is not affected by BTMU's subsequent

receipt of a federal license.

Dated: New York, New York
January 31, 2018

Respectfully submitted,

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
By:  Jonathan D. Conley
      Shannan C. Krasnokutski
Assistant Attorneys General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8108

*Counsel for Defendant*