UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,

                       Plaintiff,

           v.

MARIA VULLO, in her official capacity as Superintendent of Financial Services of the New York State Department of Financial Services,

                       Defendant.

1:17-cv-08691-SHS

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Robert A. Long, Jr. (*pro hac vice*)
Henry B. Liu (*pro hac vice*)
Jonathan Y. Mincer (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000

*Attorneys for Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

March 19, 2018

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 5

    A.    BTMU's License Conversion and Complaint.................................... 5

    B.    DFS's Counterclaims ....................................................................... 6

    C.    DFS's Allegations Regarding BTMU................................................ 8

ARGUMENT ...................................................................................................... 10

I.    DFS's Claims for Monetary Penalties Are an Exercise of Administrative
Visitorial Powers That Is Preempted by Federal Law. .................................... 10

    A.    As a Matter of Federal Law, DFS No Longer May Exercise Any Visitorial
Powers Over BTMU's New York Branches.................................... 11

    B.    DFS Is a Supervisory Agency That May Seek Monetary Penalties Solely
Through an Administrative Proceeding. ............................................. 12

    C.    DFS's Claims for Penalties Are a Preempted Exercise of Visitorial
Powers............................................................................................. 13

        1.    A DFS Administrative Proceeding Is Not a Lawsuit in a "Court of
Appropriate Jurisdiction."........................................................ 15

        2.    DFS Is Not a State Attorney General or Other "Chief Law
Enforcement Officer."............................................................... 18

        3.    DFS Does Not Seek To Enforce Laws of General Applicability
Against BTMU........................................................................... 18

    D.    The Timing of the Underlying Conduct Challenged by DFS Does Not
Change the Preemption Analysis. .................................................... 20

    E.    The OCC Has Exclusive Authority To Supervise BTMU With Respect to
the Alleged Conduct Underlying DFS's Counterclaims...................... 22

II.    Counts I-VI of DFS's Counterclaims Also Fail as a Matter of New York Law............... 24

    A.    DFS Lacks Authority To Assert Counts I-VI in Court. ........................ 24

    B.    DFS's Conclusory Allegations Fail to State a Claim Under Sections 44(4)
or 44(3) of the Banking Law........................................................... 28

C.      DFS Fails To State a Claim Under DFS Regulation 3 N.Y.C.R.R. § 116.2 ......... 29

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona* v. *United States*,
  567 U.S. 387 (2012) ........................................................................................30

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ........................................................................................29

*Capital One Bank (USA), N.A.* v. *McGraw*,
  563 F. Supp. 2d 613 (S.D. W. Va. 2008) ...................................................2, 21, 22

*City of New York* v. *Fedex Ground Package Sys., Inc.*,
  314 F.R.D. 348 (S.D.N.Y. 2016) ....................................................................26

*Clarke* v. *Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ........................................................................................14

*Cmty. Bd. 7 of Borough of Manhattan* v. *Schaffer*,
  84 N.Y.2d 148 (N.Y. 1994) ....................................................................24, 25, 26

*Cty. of Nassau* v. *Expedia, Inc.*,
  971 N.Y.S.2d 664 (Sup. Ct. 2013) ..................................................................28

*Cuomo* v. *Clearing House Ass'n, L.L.C.*,
  557 U.S. 519 (2009) .............................................................................. *passim*

*Durudogan* v. *City of N.Y.*,
  20 N.Y.S.3d 75 (1st Dep't 2015) ....................................................................16

*Excess Line Ass'n of N.Y. (ELANY)* v. *Waldorf & Assocs.*,
  87 N.E.3d 117 (N.Y. 2017) .............................................................................27

*Fidelity Fed. Sav. & Loan Ass'n* v. *de la Cuesta*,
  458 U.S. 141 (1982) ........................................................................................14

*First Nat'l Bank in St. Louis* v. *State of Mo. at inf. Barrett*,
  263 U.S. 640 (1924) ........................................................................................14

*First Union Nat. Bank* v. *Burke*,
  48 F. Supp. 2d 132 (D. Conn. 1999) ..............................................................23

*Gen. Motors Corp.* v. *Abrams*,
  897 F.2d 34 (2d Cir. 1990) .............................................................................23

*Guilles* v. *Sea-Land Serv., Inc.*,
   12 F.3d 381 (2d Cir. 1993) ........................................................................26

*I & T Petroleum Inc.* v. *Lascalia*,
   880 N.Y.S.2d 873 (Sup. Ct. 2009) ............................................................24

*Martin* v. *Wells Fargo Bank, N.A.*,
   2012 WL 13008385 (D. Md. Nov. 30, 2012) ...........................................14

*Mellon Bank, N.A.* v. *Foster*,
   1990 WL 10007676 (W.D. Pa. May 31, 1990) ..........................................17

*Pooler* v. *Pub. Serv. Comm'n*,
   58 A.D.2d 940 (N.Y. 3d Dep't 1977), *aff'd*, 372 N.E.2d 797 (N.Y. 1977) ............28

*Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*,
   136 S. Ct. 1938 (2016) ...............................................................................21

*Saratoga Lake Prot. & Improvement Dist.* v. *Dep't of Pub. Works of City of Saratoga Springs*,
   809 N.Y.S.2d 874 (Sup. Ct. 2006) ............................................................28

*Scott* v. *N.Y. State Racing & Wagering Bd.*,
   843 N.Y.S.2d 42 (1st Dep't 2007) .............................................................16

*United States* v. *Phila. Nat'l Bank*,
   374 U.S. 321 (1963) ...................................................................................19

*Watters* v. *Wachovia Bank, N.A.*,
   550 U.S. 1 (2007) ...............................................................................12, 24

*Yonkers Comm'n on Human Rights* v. *City of Yonkers*,
   654 F. Supp. 544 (S.D.N.Y. 1987) ............................................................27

**Statutes**

12 U.S.C. § 25b ..............................................................................11, 12, 18

12 U.S.C. § 484(a) ...............................................................................11, 20

12 U.S.C. § 1818(i) ..................................................................................3, 22

12 U.S.C. § 3102(b) .............................................................................11, 20

N.Y. Banking Law § 9-b .................................................................................25

N.Y. Banking Law § 9-c .................................................................................25

N.Y. Banking Law § 10 ...................................................................................12

N.Y. Banking Law § 21(3) ...........................................................................13, 26, 27

N.Y. Banking Law § 38(1) ...........................................................................16

N.Y. Banking Law § 44 ...........................................................................*passim*

N.Y. C.P.L.R. § 7803 ...........................................................................16

N.Y. Exec. Law § 63(1) ...........................................................................18

N.Y. Exec. Law § 63(12) ...........................................................................27

N.Y. Fin. Serv. Law. § 102 ...........................................................................27

N.Y. Fin. Serv. Law. § 201 ...........................................................................12

N.Y. Fin. Serv. Law § 301 ...........................................................................13, 26

N.Y. Fin. Serv. Law § 309 ...........................................................................25

N.Y. Fin. Serv. Law § 403 ...........................................................................13, 26

N.Y. Fin. Serv. Law § 408 ...........................................................................13, 26

N.Y. Fin. Serv. Law § 409 ...........................................................................13, 26

N.Y. Ins. Law § 109 ...........................................................................27

**Regulations**

12 C.F.R. § 4.36(d) ...........................................................................24

12 C.F.R. § 7.4000 ...........................................................................*passim*

12 C.F.R. § 28.13 ...........................................................................11

3 N.Y.C.R.R. § 116.2 ...........................................................................*passim*

3 N.Y.C.R.R. § G111 ...........................................................................15

3 N.Y.C.R.R. § G111.2 ...........................................................................15

3 N.Y.C.R.R. § G111.5 ...........................................................................16

3 N.Y.C.R.R. § G111.10 ...........................................................................16

**Other Authorities**

FY 2018 New York State Executive Budget:  Transportation, Economic
    Development, and Environmental Conservation, Article VII Legislation,

Part Y ................................................................................................................................25

N.Y. State Div. of the Budget, Mem. in Support of FY 2018 New York State
    Executive Budget: Transportation, Economic Development & Environmental
    Conservation Article VII Legislation........................................................................25

OCC Advisory Letter, AL 2002-90 (Nov. 25, 2002)....................................................22

OCC Release No. NR 2010-16 (Feb. 18, 2010) ...........................................................22

OCC Release No. NR 2012-110 (July 18, 2012) .........................................................22

Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") respectfully submits this memorandum in support of its motion to dismiss the Counterclaims of Defendant Maria Vullo, in her official capacity as Superintendent of Financial Services of the New York State Department of Financial Services ("DFS"), for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

On November 7, 2017, the U.S. Treasury Department's Office of the Comptroller of the Currency ("OCC") issued federal banking licenses to BTMU's branches in New York, providing the OCC immediate and exclusive supervisory authority over those branches. Although federal law expressly forecloses any state officials from exercising "visitorial powers" over federally licensed branches of a foreign bank, DFS's counterclaims attempt to do just that. DFS is a regulatory agency, established by New York's Financial Services Law, that is responsible for the administrative oversight of certain financial institutions licensed or chartered by the State of New York. Given its role, DFS is precluded by federal law from asserting its claims for penalties in any forum against federally licensed branches. Even under New York law, DFS lacks authority to sue banks in court for penalties and instead can seek penalties only through an internal administrative proceeding that DFS itself adjudicates. Indeed, to our knowledge, DFS has *never* brought such claims in any state or federal court.

Although the conduct that DFS challenges now lies within the exclusive federal jurisdiction of the OCC—and DFS lacks capacity to pursue penalties for violations of New York banking law in any court—DFS asks this Court to impose hundreds of millions of dollars in monetary penalties against BTMU under Section 44 of the New York Banking Law. DFS's regulatory overreach and interference with the OCC's supervisory mandate should be rejected— and its counterclaims should be dismissed as a matter of law—for the following principal reasons:

*First*, DFS's counterclaims are an exercise of visitorial powers that improperly encroaches upon the OCC's exclusive oversight of BTMU's federally licensed branches. Federal law defines preempted visitorial powers to include not only state investigations, but also state enforcement actions (whether judicial or administrative) that arise from and effectively function as supervision.  *See Cuomo* v. *Clearing House Ass'n, L.L.C.*, 557 U.S. 519 (2009).  The OCC regulation that implements federal banking statutes defines "visitorial powers" to include "[e]nforcing compliance with any applicable Federal or state laws concerning [banking] activities."  12 C.F.R. § 7.4000(a)(2)(iv).  DFS's counterclaims, on their face, seek to exercise visitorial powers by enforcing compliance with state law concerning banking activities.  It is of no consequence that the counterclaims concern conduct that occurred when BTMU was licensed by DFS.  Under federal law, a state "cannot exercise visitorial powers over a national bank regardless of when the activities sought to be investigated occurred."  *Capital One Bank (USA), N.A.* v. *McGraw*, 563 F. Supp. 2d 613, 622 (S.D. W. Va. 2008).

DFS's counterclaims are not covered by the limited exception for non-preempted actions by state officials.  The OCC regulation exempts from preempted "visitorial powers" actions "in a court of appropriate jurisdiction brought by a state attorney general (or other chief law enforcement officer) to enforce an applicable law."  12 C.F.R. § 7.4000(b).  The counterclaims in this case are not asserted by the New York Attorney General ("NYAG") or the "chief law enforcement officer" of New York (nor could they be); this Court does not have "appropriate jurisdiction" to entertain a claim by DFS for monetary penalties; and DFS seeks to enforce state banking laws and regulations and state bank regulatory orders, not a generally applicable law.

*Second*, contrary to DFS's rhetoric, the application of federal preemption principles here creates no "gap" in enforcement authority that would enable BTMU to escape accountability for

pre-conversion conduct.  (Counterclaims ¶ 8.)  In arguing that the conversion created such a "gap," DFS misses the point:  The question is not whether state law can be enforced against BTMU—it can—but rather which agency may enforce it.  As a result of BTMU's license conversion, the OCC, not DFS, is the appropriate enforcement agency.  Accordingly, the OCC required BTMU, as a prerequisite to the conversion of its licenses, to enter into a new OCC consent order that (i) contains the same substantive remedial provisions as the two DFS consent orders that the counterclaims seek to enforce, (ii) empowers the OCC to enforce compliance with all actions required under the two DFS consent orders and (iii) expressly supersedes (and independently preempts) the DFS consent orders.  The OCC also has broad statutory authority to impose monetary penalties for a violation of "any law or regulation," including both federal and state law.  12 U.S.C. § 1818(i)(2).  The OCC thus is fully equipped to take any enforcement action it deems appropriate based on BTMU's pre-conversion conduct.  Indeed, as a condition of its license conversion, BTMU agreed to submit to such an OCC enforcement action, including for pre-conversion conduct.  DFS's attempt to impose draconian monetary penalties based on that very same conduct improperly interferes with "exclusive administrative oversight by the Comptroller."  *Cuomo*, 557 U.S. at 530.

*Third*, all of DFS's claims for monetary penalties fail as a matter of state law because New York law does not authorize DFS to bring an enforcement action for penalties against a bank in any judicial forum.  And DFS's individual counterclaims fail for other reasons.  For example, the counterclaims are devoid of any well-pleaded allegation that BTMU "incurred so substantial a loss as a result of [the alleged] violation . . . as to threaten [its] safety and soundness," as required by Section 44(4) of the Banking Law.  DFS also does not state a claim under DFS regulation 3 N.Y.C.R.R. § 116.2 because it does not allege a single violation of

federal sanctions law and many of its allegations are premised on alleged conduct by BTMU branches outside of New York.

*     *     *

It bears emphasis that, while DFS seeks hundreds of millions of dollars from BTMU for purported sanctions-compliance failures, its counterclaims do not identify *any* actual sanctions violation. Indeed, in the three years between the 2014 DFS consent order and the conversion of BTMU's banking licenses, DFS never threatened that BTMU would be required to pay any regulatory penalty for violation of any banking law. Throughout this period, BTMU was subject to the ongoing scrutiny of a DFS-mandated Independent Consultant retained by BTMU under the 2014 DFS consent order. Although the parties exchanged drafts of a proposed supplemental consent order last summer that would have extended the consultant's engagement (Counterclaims ¶ 114), DFS nowhere alleges that its proposed order asserted any violation of law by BTMU or sought any monetary penalty. In fact, as DFS knows, multiple historical lookbacks of millions of transactions analyzing the issues described in the counterclaims did not find a single transaction that violated any sanctions law.

It is telling that DFS has asserted these claims only after BTMU converted to federal licenses and instituted this declaratory-judgment action to resolve issues created by DFS's refusal to acknowledge the validity of those licenses. DFS's counterclaims—and its selective and unprecedented release of confidential supervisory information ("CSI") about BTMU in both the counterclaims and other public statements regarding the conversion—appear to be an attempt to retaliate against BTMU for exercising its right to convert to federal banking supervision, and to deter other banks under DFS jurisdiction from applying for such conversions in the future. BTMU's motion should be granted in full.

# BACKGROUND

Because the Court must accept as true the counterclaims' well-pleaded allegations of fact for purposes of this motion, BTMU does not respond to each of DFS's factual assertions in this memorandum.  Although many of those allegations are demonstrably false, this memorandum focuses only on the background needed to resolve BTMU's legal challenges to DFS's counterclaims.

### A.    BTMU's License Conversion and Complaint

"From 1952 until November 7, 2017, BTMU was licensed by DFS to operate two foreign branches in New York State . . . ."  (Counterclaims ¶ 16.)  As DFS acknowledges, the OCC "issued federal licenses to BTMU on or about November 7, 2017."  (*Id.* ¶ 5; *see also id.* ¶ 7 (BTMU has "obtain[ed] federal licenses for its banking operations in the United States"); *id.* ¶ 9 ("the OCC granted BTMU a federal license on November 7, 2017").)  After being advised of BTMU's conversion of its licenses, DFS took the extraordinary step on November 8, 2017 of issuing its *Order Pursuant to New York Banking Law and Financial Services Law* (the "DFS Order") purporting to continue exercising visitorial powers over BTMU's federally licensed New York branches.  (Am. Compl. Ex. D, ECF No. 17-4.)  To this day, DFS has not withdrawn that order, and it has publicly challenged the validity of BTMU's federal licenses, including in its recently filed answer.

BTMU filed this action shortly after the DFS Order was issued.  In its Amended Complaint, BTMU seeks a declaratory judgment that (i) BTMU's federal licenses are valid and effective, (ii) federal law preempts DFS from bringing an enforcement action against or exercising any other visitorial powers over BTMU now that its branches are federally licensed and (iii) federal law preempts the DFS Order.  In addition to seeking declaratory relief, BTMU requests an injunction preventing DFS from pursuing any enforcement action against, or

exercising any other form of visitorial powers over, BTMU. DFS answered BTMU's claims and sought to exercise further visitorial powers over BTMU by asserting its own counterclaims.

### B. DFS's Counterclaims

Although BTMU is now federally licensed, DFS seeks to assert "counterclaims for the enforcement of New York [banking] law." (*Id.* ¶ 1.) DFS's counterclaims assume the validity of BTMU's federal licenses. (*See id.* ¶¶ 5, 7, 9, 114.) Indeed, DFS pleads *no* facts in its counterclaims that impugn the validity of BTMU's federal licenses. DFS's silence on this issue in its counterclaims is notable. Although DFS has denied the validity of BTMU's licenses in its answer (Answer & Counterclaims at 3), DFS has stopped short of seeking to invalidate those licenses by commencing an action against the OCC under the Administrative Procedure Act.

DFS instead seeks to enforce New York law against BTMU and impose monetary penalties for conduct that allegedly occurred *before* BTMU's federal licenses were issued. (Counterclaims ¶ 10.) DFS alleges that "[a]ll of the conduct underlying [its] counterclaim[s] occurred while BTMU's New York branches were operating pursuant to licenses issued by DFS." (*Id.* ¶ 5.) DFS also requests "a declaratory judgment that it may initiate and maintain an adjudicatory proceeding against BTMU for the enforcement of New York law and the imposition of penalties for conduct committed by BTMU prior to November 7, 2017." (*Id.* ¶ 11.)

According to DFS, "[d]uring the approximately three-year period immediately prior to November 7, 2017, DFS conducted an investigation into BTMU's compliance with applicable New York and federal laws and regulations concerning anti-money laundering ('AML') compliance . . . as well as compliance with two consent orders executed by DFS and BTMU in 2013 and 2014." (*Id.* ¶ 2.) DFS nowhere alleges that it advised BTMU of any purported violations of law at any time during that three-year period. Following BTMU's conversion to federal licensing, however, DFS now asserts that it "has amassed significant evidence showing

that BTMU's internal controls . . . at its New York Branch (as well as at its other branches around the world) were systematically deficient during the period beginning on or before November 18, 2014, and continuing up and until November 7, 2017." (*Id*. ¶ 3.)

Based on those allegations, DFS seeks to assert six different claims under the New York Banking Law and regulations and its prior consent orders for potentially hundreds of millions of dollars in penalties:

- Count I:  DFS alleges that BTMU operated its New York branches in an unsafe and unsound manner and without sufficient policies, procedures and systems to assure effective compliance with federal sanctions and AML requirements, in violation of Section 44(2) of the Banking Law and DFS regulation 3 N.Y.C.R.R. § 116.2.  (*Id*. ¶¶ 115-25.)  DFS seeks a penalty of $5,000 per day for each such alleged violation.  (*Id*. ¶ 125.)

- Count II:  DFS contends that BTMU's alleged conduct was part of a "pattern of misconduct" and resulted in "more than a minimal loss or pecuniary gain" to BTMU, in violation of Section 44(3) of the Banking Law and/or DFS regulation 3 N.Y.C.R.R. § 116.2.  (*Id*. ¶¶ 126-36.)  DFS seeks a penalty of $25,000 per day for each such alleged violation.  (*Id*. ¶ 136.)

- Count III:  DFS argues that BTMU's conduct further violated Section 44(4) of the Banking Law because (i) BTMU's violations of DFS regulation 3 N.Y.C.R.R. § 116.2 were willful and knowing and substantially undermined public confidence in BTMU and (ii) "BTMU knowingly or recklessly incurred so substantial a loss as a result of these violations as to threaten the safety and soundness of BTMU."  (*Id*. ¶¶ 137-47.)  DFS seeks a penalty of $250,000 per day for each such alleged violation.  (*Id*. ¶ 147.)

- Counts IV-VI:  DFS asserts that BTMU also violated Sections 44(2), 44(3) and 44(4) of the Banking Law as a result of alleged violations of DFS's 2013 and 2014 consent orders.  (*Id*. ¶¶ 148-67.)  DFS seeks penalties of $5,000, $25,000 and $250,000, respectively, per day for each such alleged violation.  (*Id*. ¶¶ 154, 161, 167.)

In its claim for declaratory relief (Count VII), DFS argues that "Subdivisions 2, 3, and 4 of Section 44 of the New York Banking Law authorize the Superintendent, after notice and hearing, to require a foreign banking corporation licensed by the Superintendent to maintain a branch in this state to pay to the people of the State of New York a penalty for a violation of the N.Y. Banking Law, any regulation promulgated under the N.Y. Banking Law, and/or any written agreement entered into with the Superintendent."  (*Id.* ¶ 169.)  According to DFS, "[t]he Superintendent has the power and authority to commence and maintain an adjudicatory proceeding against BTMU" under New York law for such violations "based on conduct that occurred prior to November 7, 2017 when BTMU was operating under a licensed [*sic*] issued by DFS."  (*Id.* ¶ 170.)  DFS contends that it "is entitled to a declaratory judgment" that the Superintendent's power to commence and maintain such an adjudicatory proceeding "is not affected by BTMU's subsequent receipt of a federal license."  (*Id.* ¶ 171.)

### C.    DFS's Allegations Regarding BTMU

Notwithstanding that its claims for penalties are limited to the three-year period beginning on November 18, 2014, DFS devotes much of its counterclaims to rehashing allegations from the consent orders that BTMU reached with DFS in 2013 and 2014 for matters that are as much as a decade old.  (*See id.* ¶¶ 31-61.)[1]  Although the 2013 and 2014 DFS consent orders included allegations of misconduct that caused BTMU to process transactions that violated United States sanctions laws, DFS's counterclaims do not allege a single transaction during the three-year period at issue here that violated such laws.  DFS could not make such an

---

[1] Nearly half of the 24 pages that DFS devotes to recounting purported factual findings relates to alleged conduct pre-dating BTMU's agreement to the second consent order with DFS on November 18, 2014.  DFS has already assessed penalties against BTMU for this alleged conduct, which BTMU has fully paid.

allegation in good faith because multiple lookback reviews provided to DFS found *no* prohibited transaction with *any* sanctioned country or party.  In addition, on December 20, 2017, the Treasury Department's Office of Foreign Asset Control ("OFAC")—which administers the Nation's sanctions laws—issued a No Action Letter to BTMU (with a copy to DFS) based on what OFAC described as a careful review of the entire file.  By failing to plead a single violation of any applicable federal sanctions law or regulation, DFS effectively concedes BTMU's compliance with federal requirements after 2014.  That forecloses DFS's sanctions claims under DFS regulation 3 N.Y.C.R.R. § 116.2.

DFS's own conduct belies its assertion of imminent compliance and safety-and-soundness risks.  (*See id*. ¶¶ 139-46.)  Under the 2013 consent order, BTMU engaged an Independent Consultant to review its compliance programs.  (*Id*. ¶ 40.)  BTMU agreed to extend "the engagement of the Independent Consultant" in the 2014 consent order.  (*Id*. ¶ 59.)  DFS and/or the Independent Consultant have known the key facts underlying DFS's counterclaims for a year or more.  If DFS believed that those facts demonstrated "serious, persistent, reckless, intentional, and willful violations of New York and federal law" (*id*. ¶ 3)—and thus required extraordinary monetary penalties per day for each violation (*id*. ¶¶ 138, 147, 167)—then DFS surely would have acted when it served as BTMU's regulator.  DFS's inaction until after BTMU's license conversion demonstrates that BTMU did not commit any conduct warranting an enforcement action or any penalties.

DFS's conduct in proposing a "supplemental consent order" with BTMU reinforces that conclusion.  DFS alleges that the parties exchanged drafts of a proposed supplemental consent order over the summer and fall of 2017.  (*Id*. ¶ 114.)  But that proposed order focused on extending the Independent Consultant's engagement after DFS had allowed it to expire in May

2017. (*See id.*) Despite DFS's assertion that it had "amassed significant evidence of . . . violations of law" and "was poised to undertake additional enforcement actions against BTMU" (*id.*), DFS nowhere alleges that its drafts of the supplemental consent order asserted any violation of law or sought any penalty. Even the DFS Order issued on November 8, 2017—the day after the license conversion took effect—did not allege a violation of law or seek any penalty.

Notwithstanding this history, DFS contends that BTMU converted its licenses to avoid an enforcement action. (*See id.* ¶¶ 7-8.) That assertion ignores that the OCC took three important steps to account for the prior DFS consent orders and BTMU's ongoing compliance reforms. As conditions of the conversion, the OCC (i) required BTMU to enter into a consent order with the OCC that covers the same conduct addressed in DFS's consent orders, with the same substantive requirements; (ii) stated that it will continue to review BTMU's "compliance with BSA/AML and OFAC requirements" and might take "additional enforcement action"; and (iii) secured BTMU's commitment to accept any such enforcement action. (Am. Compl. Ex. A at 3.)

## ARGUMENT

### I. DFS's Claims for Monetary Penalties Are an Exercise of Administrative Visitorial Powers That Is Preempted by Federal Law.

The inherently regulatory nature of DFS's authority is fatal to its counterclaims. As a supervisory agency responsible for administrative oversight of the banks it licenses, DFS may pursue penalties under the Banking Law and DFS regulations only through an internal administrative proceeding, not in state or federal court. Any such administrative proceeding is an exercise of visitorial oversight and, as such, would be preempted by federal law in light of BTMU's license conversion. Indeed, given DFS's role as a banking regulator and the nature of its claims under state banking law and regulation, *any* action by DFS for penalties would be preempted even if it could be brought in court. Accordingly, DFS's claims for monetary

penalties (Counts I-VI) should be dismissed, and the Court should deny DFS's request for a declaratory judgment that it may seek penalties in "an adjudicatory proceeding" (Count VII).

A.   **As a Matter of Federal Law, DFS No Longer May Exercise Any Visitorial Powers Over BTMU's New York Branches.**

On November 7, 2017, the OCC granted federal licenses to BTMU's New York branches. (Counterclaims ¶¶ 5, 16.)  As a result, those branches now are subject to exclusive oversight by the OCC and the residual authority of the Federal Reserve, and they are no longer subject to DFS's supervision.

The National Bank Act ("NBA") and the International Banking Act ("IBA") preempt states' exercise of "visitorial powers" over the banking activities of foreign banks' federally licensed branches, subject only to very limited exceptions not applicable here.   Under Section 484 of the NBA, "[n]o national bank shall be subject to *any* visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress . . . ."  12 U.S.C. § 484(a) (emphasis added).  The IBA makes this limitation applicable to branches of foreign banks licensed by the OCC.  *See* 12 U.S.C. § 3102(b) (federally licensed branches of foreign banks "shall be conducted with the same rights and privileges as a national bank" and are "subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank"); 12 C.F.R. § 28.13(a)(1) (same); *cf.* 12 U.S.C. § 25b(a)(1)(B) (defining "national bank" to include "any Federal branch established in accordance with the International Banking Act" for purposes of state-law preemption).   Congress thus created a system of federally regulated banks—and federally licensed branches of foreign banks under 12 U.S.C. § 3102(b)— immunized from state visitorial powers.  As the Supreme Court has recognized, "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking . . . is

-11-

precisely what the NBA was designed to prevent." *Watters* v. *Wachovia Bank, N.A.*, 550 U.S. 1, 13-14 (2007).

Visitorial powers broadly encompass all acts of "administrative oversight" by a sovereign over an entity subject to its jurisdiction. *See Cuomo*, 557 U.S. at 530. Courts historically have understood "visitation" to include not only supervision, examination and regulation, but also acts by a sovereign to "enforce an observance of its laws and regulations." *Id.* at 526. Applying *Cuomo*, the OCC—the federal agency charged with administering the NBA and IBA—has defined "visitorial powers" to include examination of a bank, inspection of a bank's books and records, regulation and supervision of authorized banking activities and "[e]nforcing compliance" with applicable laws concerning those banking activities. 12 C.F.R. § 7.4000(a); *see also* 12 U.S.C. § 25b(i)(1). The only exception is for enforcement of generally applicable laws in "a court of appropriate jurisdiction . . . by a state attorney general (or other chief law enforcement officer)." 12 C.F.R. § 7.4000(b).

### B.    DFS Is a Supervisory Agency That May Seek Monetary Penalties Solely Through an Administrative Proceeding.

DFS is a supervisory agency vested with visitorial, not law-enforcement, powers. *See* N.Y. Fin. Serv. L. § 201(a) ("It is the intent of the legislature that the superintendent shall *supervise* the business of, and the persons providing, financial products and services . . . .") (emphasis added); N.Y. Banking Law § 10 ("It is hereby declared to be the policy of the state of New York that the business of all banking organizations shall be *supervised and regulated* through the department of financial services . . . .") (emphasis added).

Consistent with its role as a supervisory agency responsible for administrative oversight, DFS has no power to assert claims for monetary penalties under the New York Banking Law in either state or federal court. Section 44(2)(a) of the Banking Law authorizes DFS to impose

-12-

penalties on New York-licensed or -chartered banks or branches only through its own internal administrative proceeding.  *See infra* Section II.A.  In fact, DFS is not even authorized to bring an action in court to enforce the penalties that it imposes against a bank through its own administrative proceeding.  Instead, if DFS seeks to recover unpaid administrative penalties, its only option is to report the matter to the NYAG, who then may "institute such action or proceedings as the facts may warrant."  N.Y. Banking Law § 21(3).  As a result of these clear limits on its power, DFS and its predecessors have never—until this action—asserted claims in federal or state court against any person or entity to impose or enforce monetary penalties under the Banking Law.[2]

**C.     DFS's Claims for Penalties Are a Preempted Exercise of Visitorial Powers.**

Tacitly acknowledging that it is not authorized to pursue claims for monetary penalties in court, DFS seeks a declaration that it is free "to commence and maintain an adjudicatory [*i.e.*, administrative] proceeding against BTMU pursuant to subdivisions 2, 3, and 4 of Section 44 of the N.Y. Banking Law," even though BTMU's New York branches are no longer licensed by DFS.  (Counterclaims ¶ 170.)  Under the Banking Law, such an administrative proceeding is the only option available to DFS if it wishes to assert claims for monetary penalties.  *See infra*

---

[2] Attempting to create the misimpression that it has "broad enforcement authority" (Counterclaims ¶ 28), DFS cites other provisions of the Banking and Financial Services Laws empowering DFS to investigate and adjudicate violations.  (Counterclaims ¶ 28; *see also id.* ¶¶ 15, 21.)  But those provisions grant DFS authority to act only through its internal administrative proceeding, and they instruct DFS to refer fraud and other violations of the Banking and Financial Services Laws to the NYAG for enforcement in court.  For example, Section 403 of the Financial Services Law permits DFS to create a financial frauds and consumer protection unit and designate its employees as "peace officers" authorized to investigate consumer fraud.  If DFS identifies violations, however, it is limited to imposing penalties administratively or reporting violations to the NYAG or the relevant district attorney.  *See* N.Y. Fin. Serv. L. §§ 403, 408, 409(a); *see also id.* § 301(c) (empowering DFS to "protect users of financial products and services," including "cooperating with, assisting and, when appropriate, *referring matters to the attorney general* in the carrying out of the attorney general's legal enforcement responsibilities") (emphasis added).

Section II.A.   Because DFS administrative proceedings are visitorial, however, federal law preempts DFS from commencing such a proceeding against BTMU.   And even if DFS could sue for penalties in court—which it clearly cannot—such claims also would be preempted by federal law.

Under the NBA and IBA, state law-enforcement activities fall outside the realm of preempted visitorial powers only if they are conducted in a court of appropriate jurisdiction by a chief law-enforcement officer asserting claims under laws of general applicability.   The OCC's implementing regulation defines "visitorial powers" to include "prosecuting enforcement actions."   12 C.F.R. § 7.4000(a)(1).   The only exception to this definition of preempted "visitorial powers" is enforcement actions brought "in a court of appropriate jurisdiction . . . by a state attorney general (or other chief law enforcement officer) to enforce an applicable law against a national bank [or federal branch of a foreign bank]."   *Id.* § 7.4000(b).   Adopted through notice-and-comment rulemaking, the OCC's regulation has "no less pre-emptive effect than federal statutes."   *Fidelity Fed. Sav. & Loan Ass'n* v. *de la Cuesta*, 458 U.S. 141, 153 (1982); *see also Clarke* v. *Sec. Indus. Ass'n*, 479 U.S. 388, 403-04 (1987) (OCC's construction of NBA is entitled to "great weight").

Accordingly, state law-enforcement activities are exempt from federal preemption only if they meet each of three requirements:   they must be (i) brought "in a court of appropriate jurisdiction" (ii) by "a state attorney general (or other chief law enforcement officer)" (iii) "to enforce an applicable law against a national bank."   12 C.F.R. § 7.4000(b); *see also Cuomo*, 557 U.S. at 529-30.[3]   A DFS administrative proceeding to impose monetary penalties based on

---

[3] *See also First Nat'l Bank in St. Louis* v. *State of Mo. at inf. Barrett*, 263 U.S. 640, 660 (1924) (upholding authority of Missouri *Attorney General* to sue national bank in *judicial proceeding*); *Martin* v. *Wells Fargo Bank, N.A.*, 2012 WL 13008385, at *4 (D. Md. Nov. 30, 2012) ("[T]he term 'visitorial (continued…)

alleged violations of New York banking laws, regulations and consent orders does not satisfy *any* of these requirements.  Even if DFS could assert its claims for penalties in court (which it plainly cannot), such claims also would be preempted under this standard.

### 1.   A DFS Administrative Proceeding Is Not a Lawsuit in a "Court of Appropriate Jurisdiction."

DFS can hardly dispute that its own administrative proceeding would not be a lawsuit filed "in a court of appropriate jurisdiction."  Under *Cuomo* and the NBA, judicial process and procedural safeguards are important factors characterizing non-preempted state enforcement actions.  *See* 557 U.S. at 531.  An internal DFS administrative proceeding—the only forum available to DFS to impose monetary penalties under New York law—lacks those safeguards and bears little resemblance to a judicial proceeding:

- Under DFS regulations, the Superintendent may appoint a DFS officer as the presiding hearing officer in an administrative proceeding.  *See* 3 CRR-NY Sup. Proc. § G111.2. The Superintendent also remains free unilaterally to issue written "findings of fact or conclusions of law that conflict with the findings, conclusion or recommended decision of the hearing officer."  *Id.* § G111.2(a)(4)(iv).  Thus, far from being "treated like a litigant," *Cuomo*, 557 U.S. at 531, DFS is both the prosecutor and the adjudicator of its own claims in an administrative proceeding.

- DFS regulations do not provide for motion practice in an administrative proceeding and do not incorporate state rules of procedure or evidence.  *See* 3 CRR-NY § G111.  DFS thus would not be required to "survive a motion to dismiss, endure the rules of procedure and discovery, [or] risk sanctions if [its] claim is frivolous or [its] discovery tactics abusive."  *Cuomo*, 557 U.S. at 531.

---

powers' [under NBA] do[es] not refer to, and thus do[es] not limit, *a state attorney general's power to bring suit* to enforce state law against a national bank." (emphasis added) (citing *Cuomo*, 557 U.S. at 535-36)).

- DFS's power to seek documents and testimony is far broader in an administrative proceeding than in a judicial action. In an administrative proceeding, DFS has expansive authority to inspect a bank's books and records and require production of such documents. *See* N.Y. Banking Law § 38(1). DFS's administrative powers thus allow it to "inspect books and records at any time for any or no reason," without any judicial oversight to "prevent 'fishing expeditions' or an undirected rummaging through bank books and records for evidence of some unknown wrongdoing." *Cuomo*, 557 U.S. at 531 ("In New York, civil discovery is far more limited than the full range of 'visitorial powers' that may be exercised by a sovereign.").

- In an administrative proceeding, the subject bank also has no right to pre-hearing disclosure of DFS's evidence or witnesses. *See* 3 N.Y.C.R.R. § G111.5 (limiting DFS's disclosure obligations to "the case of license revocation hearings"). In addition, the bank's ability to obtain *any* evidence is subject to DFS's discretion. *See id.* This imbalanced arrangement is a far cry from the judicial discovery process.

- To prevail on its claims in an administrative proceeding, DFS does not need to meet a specified burden of proof. *See* N.Y. Comp. Codes R. & Regs. tit. 3, § G111.10 (requiring only that a DFS decision "be in writing or stated in the record and shall include findings of fact and conclusions of law").

- If a bank seeks to challenge DFS's decision, its only recourse is an Article 78 proceeding in which the reviewing court grants substantial deference to DFS's findings of fact and asks only whether DFS's decision is "supported by substantial evidence." N.Y. C.P.L.R. § 7803; *see, e.g., Scott* v. *N.Y. State Racing & Wagering Bd.*, 843 N.Y.S.2d 42, 43 (1st Dep't 2007) (holding that hearing officer's findings were "entitled to considerable deference"); *see also Durudogan* v. *City of N.Y.*, 20 N.Y.S.3d 75, 77 (1st Dep't 2015) (holding that "an administrative tribunal can rely upon credible hearsay evidence").

An administrative enforcement proceeding with these characteristics closely parallels the state actions held preempted in *Cuomo* and differs markedly from the state lawsuits found not to be preempted. In *Cuomo*, the NYAG sought to investigate possible racial discrimination by national banks in residential real-estate lending and threatened to bring enforcement actions

against those banks in state court under New York's broad antidiscrimination-in-lending laws of general applicability.  557 U.S. at 522-23.  The Supreme Court held that the NYAG could pursue such actions in court because lawsuits brought by the NYAG to enforce anti-discrimination laws would not be an exercise of "its power of visitation."  *Id.* at 531.  The Court, however, distinguished such judicial actions from the NYAG's issuance of informal "letters of inquiry" requesting that the banks voluntarily produce non-public information about their mortgage-lending policies and practices.  According to the Court, those informal requests were preempted exercises of visitorial powers because the NYAG issued the requests "on his own authority" under New York law and not through a judicial process.  *Id.* at 536.  The administrative action that DFS seeks permission to bring against BTMU similarly would proceed on DFS's "own authority," subjecting BTMU to the full weight of DFS's administrative powers virtually unmediated by judicial supervision.  As a matter of federal law, such an action against BTMU's federally licensed branches is a preempted exercise of visitorial powers by a state regulator.

Notwithstanding *Cuomo*, DFS appears to take the *per se* position that *all* enforcement actions fall outside the scope of federal preemption, regardless of whether they proceed in a judicial or administrative forum.  (*See* Counterclaims ¶¶ 8-9, 15, 21, 28.)  Under *Cuomo*, however, the only state law-enforcement actions that are not preempted are those asserting claims under laws of general applicability in a court of appropriate jurisdiction.  *See* 557 U.S. at 530 (NBA provision reserving state powers "vested in the courts of justice" was intended "to preserve *normal civil and criminal lawsuits*") (emphasis added).  Other courts also have held that enforcement actions by state regulators against national banks outside the judicial process are visitorial and thus preempted.  *See, e.g., Mellon Bank, N.A.* v. *Foster*, 1990 WL 10007676, at *3-*4, *6 (W.D. Pa. May 31, 1990) (bank demonstrated likelihood of success on claim that state

regulator was preempted from bringing "administrative proceeding" against bank seeking penalties for alleged insurance law violations).  A DFS administrative proceeding seeking to impose penalties on BTMU would fall squarely within this category of preempted state action.

### 2.   DFS Is Not a State Attorney General or Other "Chief Law Enforcement Officer."

The limited exception to preemption for state enforcement actions is not applicable here for a second reason:  DFS is neither the attorney general nor the "chief law enforcement officer" of New York.  *Cf.* 12 C.F.R. § 7.4000(b); *Cuomo*, 557 U.S. at 536.  In fact, DFS does not even have power under New York law to sue in court to enforce the penalties it imposes under Section 44 of the Banking Law.  But even if it had the authority to seek penalties in court, DFS would remain a regulator under New York law with authority limited to the insurance and banking industries; it still would not be New York's "chief law enforcement officer."  The NYAG plainly serves that function.  *See* N.Y. Exec. Law § 63(1) (NYAG "shall . . . [p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state"); *see also* Letter from Eric T. Schneiderman, Attorney Gen. of the State of N.Y., to Hon. Andrew M. Cuomo, Governor of the State of N.Y. (Feb. 14, 2017) (noting that DFS lacks "civil law enforcement authority").  Federal law thus would preempt DFS's counterclaims even if DFS could sue in court for penalties under the Banking Law.  *See* 12 C.F.R. § 7.4000(b); 12 U.S.C. § 25b(i)(1).

### 3.   DFS Does Not Seek To Enforce Laws of General Applicability Against BTMU.

Besides DFS's inability to sue for penalties in court and its role as a regulator, not New York's "chief law enforcement officer," the agency seeks to enforce New York banking laws and regulations and its own consent orders—not laws of general applicability.  DFS's attempt to use

this Court as a forum to assert state banking laws, regulations and orders against BTMU is a preempted exercise of visitorial powers.  *See* 12 C.F.R. § 7.4000(b); *Cuomo*, 557 U.S. at 529-30.

All of DFS's counterclaims attempt to apply New York banking laws, regulations and consent orders against BTMU's federally licensed branches.  Counts I-III attempt to regulate the "safety and soundness" of BTMU's New York branches through New York banking laws and regulations.  (*See* Counterclaims ¶¶ 117 (Count I), 128 (Count II), 139 (Count III).)  Those counts are based on alleged violations of DFS's own regulation, 3 N.Y.C.R.R. § 116.2, which applies only to entities licensed by DFS, *id.* § 116.1.  Counts IV-VI allege violations of DFS-issued consent orders that regulated the banking activities of BTMU's New York branches.  (*See* Counterclaims ¶¶ 150 (Count IV), 157 (Count V), 163 (Count VI).)  And Count VII seeks a declaratory judgment that would permit DFS to enforce, in an "adjudicatory" proceeding, violations of the same New York banking laws, regulations and orders.  (*See id.* ¶¶ 168-71.)

DFS's counterclaims are thus a classic exercise of visitorial powers.  As New York's bank regulator, DFS seeks to impose New York banking laws, regulations and consent orders on BTMU's federally licensed branches.  Such "administrative oversight" is preempted, even if DFS attempts to conduct it through the courts.  *See Cuomo*, 557 U.S. at 530 (explaining that NBA "preserve[s] a regime of exclusive administrative oversight by" OCC); *see also United States* v. *Phila. Nat'l Bank*, 374 U.S. 321, 329 (1963) (observing that, under their "broad visitorial power," federal bank examiners "are equipped with a formidable array of sanctions" if "they discover unsound banking practices").

*Cuomo* supports this conclusion.  In that case, the Supreme Court ruled that the NYAG could bring an enforcement action in state court asserting claims under New York's broad antidiscrimination-in-lending laws of general applicability because such an action would be the

"ordinary enforcement of the law."  557 U.S. at 525, 536.  *Cuomo* did not involve banking-specific laws, regulations or consent orders.  Here, by contrast, DFS's counterclaims are an effort by New York's bank *regulator* to enlist the aid of the Court to impose *regulatory* penalties on BTMU's New York branches for asserted violations of banking laws, regulations and consent orders.  Such claims do not concern the "ordinary" enforcement of the law.  Instead, they directly conflict with the OCC's exclusive visitorial powers over BTMU's federally licensed branches under Section 484 of the NBA and are therefore preempted.

### D.   The Timing of the Underlying Conduct Challenged by DFS Does Not Change the Preemption Analysis.

Attempting to avoid preemption under the NBA, the IBA, *Cuomo* and the OCC's regulation, DFS seeks to shift focus from the timing of its claims to the timing of BTMU's alleged conduct.  DFS asserts that it retains authority to pursue claims for penalties against BTMU, despite BTMU's license conversion, so long as those claims relate to pre-conversion conduct.  (*See* Counterclaims ¶¶ 5, 10, 170-71.)  That BTMU's New York branches were licensed by DFS when the underlying conduct supposedly occurred does not authorize DFS to continue exercising visitorial powers over BTMU's federally licensed branches.

The NBA, the IBA and the OCC's regulations allow for no exemption from preempted visitorial powers for a state's post-conversion attempt to regulate conduct occurring before the bank received its federal license.  The NBA categorically provides that "[n]o national bank shall be subject to *any* visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress."  12 U.S.C. § 484(a) (emphasis added); *see* 12 U.S.C. § 3102(b) (making this provision applicable to federal branches of foreign banks).  If Congress had intended to exclude pre-conversion conduct of national banks or federal branches from the statutory prohibition on state visitorial powers, it would have said so

explicitly in the NBA or the IBA.   Those statutes contain, respectively, the provisions establishing the relevant preemption standard and permitting conversion of foreign bank branches to federal supervision, either of which would have been a logical location for a timing-based exception *if* Congress had intended to create one.   Because it did not do so expressly, there is no basis to imply such an exception.   *See*, *e.g.*, *Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1947 (2016) ("Had Congress intended to alter [a] fundamental detail of [a statutory scheme], we would expect the text . . . to say so . . . ." (internal citation omitted)).

This question was confronted directly in *Capital One*, where the court refused to "conjure . . . a rule" permitting a state to exercise visitorial powers over a formerly state-licensed bank after the bank's conversion to a federal license—even if the exercise was limited to pre-conversion conduct.   *See* 563 F. Supp. 2d at 622 (state "cannot exercise visitorial powers over a national bank regardless of when the activities sought to be investigated occurred").   This was the case even though the state had initiated the enforcement proceeding *before* the conversion occurred.   The *Capital One* court thus enjoined the state from exercising visitorial powers over the converted bank by enforcing a subpoena that it had served before the conversion.   *Id.* at 621.

Moreover, DFS's proposed rule would be unworkable because it would be impossible in an enforcement proceeding to maintain the artificial distinction between pre- and post-conversion conduct.   DFS alleges that BTMU's internal controls relating to its AML and OFAC sanctions-compliance program were "systematically deficient" "up and until November 7, 2017"—the date of the conversion.   (Counterclaims ¶¶ 3, 139.)   BTMU's controls are now subject to exclusive regulation and review by the OCC.   Thus, although DFS has limited the penalties it seeks to the pre-conversion time period, its claims are an indictment of a compliance program currently regulated by the OCC.   Any finding by DFS that BTMU's compliance

-21-

program is deficient would interfere with the OCC's exercise of its exclusive visitorial powers over BTMU and could subject BTMU to conflicting regulatory obligations.

DFS's counterclaims further demonstrate why it is essential that courts uphold the visitorial powers prohibition as Congress wrote it.  Any judicially imposed time-based exception would chill, and quite possibly freeze, conversions to a federal license.  If state banking regulators could exercise visitorial powers with respect to pre-conversion conduct to extract a prohibitive "exit tax," the dual banking system created by Congress would be undermined.

### E.    The OCC Has Exclusive Authority To Supervise BTMU With Respect to the Alleged Conduct Underlying DFS's Counterclaims.

DFS asks the Court to countenance an unprecedented exercise of state visitorial powers over a federally licensed bank on the theory that BTMU otherwise would escape liability for alleged pre-conversion violations of New York law.  (*Id*. ¶ 8.)  Contrary to DFS's suggestion, however, the OCC has full authority to impose penalties on BTMU for violations of federal and state law, regardless of when the underlying conduct occurred.  *See* 12 U.S.C. § 1818(i)(2)(A)(i) (permitting OCC to impose penalties for violations of "any law or regulation"); *see also* OCC Advisory Letter, AL 2002-90 (Nov. 25, 2002) (addressing "Questions Concerning Applicability and Enforcement of State Laws:  Contacts From State Officials").  If the OCC determines that DFS's allegations have merit, it has broad authority to take action against BTMU.[4]

---

[4] The OCC has used its authority to take enforcement action against a converted bank based on pre-conversion conduct in the past.  In particular, following the decision in *Capital One*, the OCC reviewed Capital One's pre-conversion account closing practices that the state had sought to investigate and, as a result, required the bank to reimburse customers for damages caused by those practices.  *See* OCC Release No. NR 2010-16 (Feb. 18, 2010) (noting that "[t]he practices in question occurred . . . before the Bank became a national bank").  The OCC and Capital One subsequently entered into a consent order regarding related unfair practices, under which Capital One paid a $35 million monetary penalty and $150 million in restitution to customers.  *See* OCC Release No. NR 2012-110 (July 18, 2012).

Indeed, DFS's state-law counterclaims seek to vindicate *federal* sanctions and AML policies.  *See* DFS Answer at 1 (citing OFAC regulations and the Bank Secrecy Act).  The OCC enforces these requirements vigorously and expressly accounted for the possibility of a related enforcement action when it approved BTMU's conversion of its licenses.  In its conditional approval letter, the OCC stated that it was "continuing its review of the Applicants' compliance with BSA/AML and OFAC requirements" and that, following additional examination, the OCC might "determine that an additional enforcement action to address BSA/AML or OFAC compliance issues at the [New York branches] is warranted."  (Am. Compl. Ex. A at 3.)  BTMU affirmatively agreed to submit to any such enforcement action.  (*Id.*)

BTMU also entered into a consent order with the OCC covering the same conduct addressed in the 2013 and 2014 DFS consent orders, with the same substantive requirements.  (*Id.*)  The OCC's consent order expressly supersedes the DFS consent orders and has independent preemptive effect, rendering the DFS orders ineffective as of the date of the conversion.  *See*, *e.g.*, *Gen. Motors Corp.* v. *Abrams*, 897 F.2d 34, 39 (2d Cir. 1990) ("[A] consent order reflecting a reasonable policy choice of a federal agency and issued pursuant to a congressional grant of authority may preempt state legislation.").

Far from filling a non-existent enforcement "gap," DFS's pursuit of claims for penalties would interfere with the OCC's exclusive supervision of BTMU.  *See First Union Nat. Bank* v. *Burke*, 48 F. Supp. 2d 132, 149 (D. Conn. 1999) (Connecticut Banking Administrator's issuance of cease-and-desist orders against national bank branches would interfere with OCC's exclusive enforcement authority).  Were it permitted to pursue such claims, DFS could force BTMU to devote substantial resources to responding to the claims, potentially interfering with BTMU's exercise of federally protected banking powers as well as the OCC's exclusive supervisory

authority.  Such "[d]iverse and duplicative superintendence of [federal bank branches'] . . . engagement in the business of banking . . . is precisely what the NBA was designed to prevent." *Watters*, 550 U.S. at 13-14.

DFS's counterclaims also rely extensively on the selective and unprecedented disclosure of CSI that it obtained by virtue of its former visitorial powers over BTMU.  To provide context for DFS's selective disclosures and rebut its numerous inaccurate assertions, BTMU itself would need to disclose and rely on other CSI both pre- and post-dating the conversion, much of which is now subject to the OCC's CSI restrictions.  *See* 12 C.F.R. § 4.36(d) (prohibiting "supervised entity" from disclosing "non-public OCC information without the prior written permission of the OCC").  DFS's claims thus could place BTMU in the untenable position of sacrificing evidence necessary to defend itself in order to comply with OCC restrictions on disclosure of CSI.

## II.    Counts I-VI of DFS's Counterclaims Also Fail as a Matter of New York Law.

Besides being preempted by federal law, DFS's six counterclaims seeking monetary penalties fail under New York law.

### A.    DFS Lacks Authority To Assert Counts I-VI in Court.

As noted above, DFS lacks authority to assert claims for penalties under Section 44 of the New York Banking Law in either state or federal court.  *See supra* Section I.B.  That lack of authority to sue in court independently requires dismissal of Counts I-VI.

Under New York law, state agencies "have neither an inherent nor a common-law right to sue."  *Cmty. Bd. 7 of Borough of Manhattan* v. *Schaffer*, 84 N.Y.2d 148, 155-56 (N.Y. 1994).  Instead, agencies can assert claims in court only if the legislature has granted them that power.  *Id.*; *see also I & T Petroleum Inc.* v. *Lascalia*, 880 N.Y.S.2d 873 (Table) (Sup. Ct. 2009) (explaining that "capacity" to sue is "threshold question" concerning "a litigant's power to appear and bring its grievance before the court").  Power to sue may "be inferred as a necessary

implication from the agency's powers and responsibilities," but only if "there is no clear legislative intent negating" that inference. *Schaffer*, 84 N.Y.2d at 156 (internal citation omitted).

The New York Legislature has not granted DFS power to assert claims for penalties in court under Section 44 of the Banking Law.  Instead, DFS's authority to enforce the Banking Law in court is limited to three provisions, none of which empowers DFS to seek penalties.  *See* N.Y. Fin. Serv. L. § 309(a) (authorizing DFS to sue for injunctive relief to redress violations of Banking Law, Financial Services Law or Insurance Law); N.Y. Banking L. § 9-b (permitting DFS to sue for dissolution or annulment of New York corporations under specified circumstances); *id.* § 9-c(1) (permitting DFS to sue to dissolve corporations based on specified misconduct).  Nor should the Court infer power to sue "as a necessary implication from [DFS]'s powers and responsibilities," for at least two reasons.

*First*, "there is . . . clear legislative intent negating" such an inference:  In 2017, the New York Legislature considered and *rejected* a bill proposed by Governor Cuomo that would have authorized DFS to bring civil lawsuits to recover penalties imposed administratively under Section 44 of the Banking Law.[5]  That bill would not have been necessary if DFS already possessed authority to bring such a suit in court.  *See* N.Y. State Div. of the Budget, Mem. in Support of FY 2018 New York State Executive Budget:  Transportation, Economic Development & Environmental Conservation Article VII Legislation, at 23 (memorandum published by Governor's budget office in support of proposed legislation, explaining that it would "*empower*

---

[5] *See* FY 2018 New York State Executive Budget:  Transportation, Economic Development, and Environmental Conservation, Article VII Legislation, Part Y (proposing amendment to Section 44 of Banking Law to provide that DFS "may maintain a civil action in the name of the people of the state to recover a judgement for a money penalty imposed by law"); *see also*, *e.g.*, Letter from Eric T. Schneiderman, Attorney Gen. of the State of N.Y., to Andrew M. Cuomo, Governor of the State of N.Y., et al. (Feb. 14, 2017) (arguing that DFS should not be granted civil law-enforcement authority and noting that "the law now requires DFS to report violations of civil penalties imposed under the financial services law . . . to the Office of the Attorney General . . . an appropriate agency, or relevant district attorney").

the Superintendent to initiate, prosecute and retain control over a civil action to recover [a] monetary penalty or to enforce a DFS order") (emphasis added).  The Legislature's rejection of this proposal evidences an intent to maintain the limits on DFS's administrative oversight role. *See*, *e.g.*, *Guilles* v. *Sea-Land Serv., Inc.*, 12 F.3d 381, 387 (2d Cir. 1993) (rejection of proposed amendment "indicate[s] that our reading is consistent with congressional intent").  It would defy common sense to suggest that the Legislature intended to grant DFS power to sue to *impose* penalties in court when it rejected a recent proposal to authorize suits to *enforce* such penalties in court.  *See Schaffer*, 84 N.Y.2d at 158 (holding that municipal community board lacked implied capacity to sue because municipality had considered and rejected proposal to amend board's charter to provide express authority to assert claims in court).

The Legislature's rejection of this recent proposal on DFS's behalf is consistent with the other provisions of the Banking and Financial Services Laws empowering DFS to investigate and adjudicate violations but not to redress such violations in court.  *See supra* Section I.B. (citing Fin. Serv. L. §§ 301, 403, 408, 409(a)).  These provisions reflect a clear and consistent regulatory scheme:  DFS has power to investigate and impose penalties on the financial institutions it licenses and regulates through its internal administrative proceeding, but law-enforcement authority and the power to sue in court are conferred on the NYAG, not DFS.

DFS could not cure its inability to assert its claims for penalties in court by joining the NYAG as a counterclaim-plaintiff.  Under the Banking Law, the NYAG lacks power to seek monetary penalties in the first instance and instead may sue only to recover penalties imposed administratively by DFS.  *See* N.Y. Banking Law § 21(3).  The New York Executive Law, the principal statute granting the NYAG general law-enforcement authority, also does not empower the NYAG to seek penalties.  *See*, *e.g.*, *City of New York* v. *Fedex Ground Package Sys., Inc.*,

314 F.R.D. 348, 362 (S.D.N.Y. 2016) ("As the text of N.Y. Exec. Law § 63(12) makes clear, the State is generally limited to the three enumerated remedies when bringing actions under that provision—injunctive relief, restitution, and damages—and civil penalties are not included.").[6]

*Second*, where the Legislature has seen fit to empower DFS to sue to recover penalties in court, it has done so expressly.   Section 109 of the New York Insurance Law explicitly authorizes DFS to bring civil actions to recover unpaid monetary penalties imposed through DFS's administrative process.   *See Excess Line Ass'n of N.Y. (ELANY)* v. *Waldorf & Assocs.*, 87 N.E.3d 117, 119-20 (N.Y. 2017) (explaining that "legislature[] inten[ded] that DFS be the primary enforcer *of the Insurance Law* and corresponding regulations") (emphasis added).   But the Legislature chose not to grant DFS corresponding authority under the Banking Law.

In arguing otherwise, DFS cites the Financial Services Law's broad language describing DFS's role and purpose.   (Counterclaims ¶ 15.)   Such generic language is insufficient to create authority to sue in court.   *Compare* N.Y. Fin. Serv. L. § 102(c) (stating that DFS was created to provide for "effective and efficient enforcement of the banking and insurance laws"), *with*, *e.g.*, *Yonkers Comm'n on Human Rights* v. *City of Yonkers*, 654 F. Supp. 544, 545 n.2, 552 (S.D.N.Y. 1987) (holding that Yonkers Commission on Human Rights lacked power to sue to redress civil rights violations despite broad statutory authority to investigate violations, "take such action as

---

[6] The fact that the NYAG signed DFS's answer and counterclaims as DFS's counsel is not an exercise of the NYAG's own law-enforcement authority here.   DFS asserts counterclaims in its own name, and the NYAG is acting only as DFS's counsel.   (*See* Counterclaims ¶ 15; *see also* Letter from Maria T. Vullo, N.Y. State Dep't of Fin. Servs., to Senator John J. Flanagan, et al. 3 (Feb. 15, 2017) (explaining that when NYAG "has represented the Department of Financial Services in certain civil enforcement proceedings . . . the Attorney General acts as DFS's counsel, in an attorney-client relationship").)   Moreover, DFS asserts claims under Section 44 of the Banking Law (which permits DFS to impose penalties through its own administrative proceeding), not Section 21(3) (which permits the NYAG to sue in court to recover unpaid penalties imposed by DFS).   Answer & Counterclaims at 1.

may be designed to alleviate . . . tensions and conflict [among various groups]," and "appoint such attorneys . . . as may be necessary" to fulfill its mandates) (internal citation omitted).[7]

Finally, Section 44 of the Banking Law no longer applies to BTMU's New York branches.  By its terms, Section 44 applies to the branches of foreign banks only if they are licensed by DFS.  *See* N.Y. Banking L. § 44(2)(a) (authorizing DFS to penalize "foreign banking corporation[s] *licensed by the superintendent* to maintain a branch, agency or representative office in this state") (emphasis added).  Upon receipt of federal licenses, BTMU's New York branches ceased to be licensed by DFS.   Contrary to DFS's suggestion (Answer & Counterclaims at 3), BTMU will not thereby "obtain immunity" for alleged pre-conversion state-law violations because its New York branches are no longer subject to Section 44:  the OCC has authority to bring an enforcement action against BTMU for violations of any applicable law, regardless of when the underlying conduct occurred.  *See supra* Section I.D.

**B.     DFS's Conclusory Allegations Fail to State a Claim Under Sections 44(4) or 44(3) of the Banking Law.**

DFS also fails to state a claim under Sections 44(4) or 44(3) of the Banking Law.  To plead a violation of Section 44(4), DFS must allege, among other things, that BTMU "incurred so substantial a loss as a result of [the alleged] violation or [unsafe and unsound] practice as to threaten [its] safety and soundness."  DFS does not plead a single fact suggesting that BTMU

---

[7] *See also*, *e.g.*, *Pooler* v. *Pub. Serv. Comm'n*, 58 A.D.2d 940, 940 (N.Y. 3d Dep't 1977) (New York Consumer Protection Board lacks capacity to sue despite express authority to participate in certain cases and "to represent consumers before state administrative and regulatory agencies"), *aff'd*, 372 N.E.2d 797 (N.Y. 1977).  New York courts have found capacity to sue by implication only in rare and distinct cases, such as where a municipal entity seeks to enforce laws that it enacted itself or where an agency would be unable to perform its express obligations without power to sue.  *See*, *e.g.*, *Cty. of Nassau* v. *Expedia, Inc.*, 971 N.Y.S.2d 664, 667 (Sup. Ct. 2013) ("[T]he powers and responsibilities of a county imply that it must have capacity to enforce its own tax laws.");  *Saratoga Lake Prot. & Improvement Dist.* v. *Dep't of Pub. Works of City of Saratoga Springs*, 809 N.Y.S.2d 874, 878-79 (Sup. Ct. 2006) (environmental agency had capacity to sue where it had broad "responsibilities to supervise, manage, and control" lake, and those obligations would be meaningless if agency lacked capacity to sue).

incurred *any* loss as a result of the alleged violation, much less a loss "so substantial . . . as to threaten [its] safety and soundness." Similarly, to plead a violation of Section 44(3), DFS must allege that BTMU's conduct resulted in "more than a minimal loss [or] pecuniary gain." DFS again alleges no such facts. Instead, in attempting to plead these claims, DFS makes only bald conclusions that track the elements of Sections 44(4) and 44(3), without any supporting factual allegations. (Counterclaims ¶¶ 126-47, 155-67.) Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to state a claim. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

### C. DFS Fails To State a Claim Under DFS Regulation 3 N.Y.C.R.R. § 116.2.

DFS attempts to penalize BTMU for alleged historical flaws in its payment and sanctions-screening systems under 3 N.Y.C.R.R. § 116.2. That attempt fails as a matter of law.

*First*, DFS fails to plead that the purported flaws resulted in noncompliance with federal sanctions requirements. Indeed, DFS does not allege a *single transaction* that violated OFAC sanctions. DFS instead appears to argue that, even if BTMU satisfied its OFAC obligations, BTMU is still subject to penalties for not having in place "risk-based policies, procedures and practices to ensure, *to the maximum extent practicable*, that its transactions will comply with OFAC requirements." 3 N.Y.C.R.R. § 116.2(d) (emphasis added). But Section 116.2(f) expressly provides that "[c]ompliance with applicable Federal requirements shall constitute compliance with this Part." Thus, Section 116.2 does not impose any obligations on DFS-licensed banks that exceed federal sanctions requirements. Were DFS able to impose penalties merely by showing that a bank could have taken one additional "practicable" measure to improve its chances of OFAC compliance—regardless of whether an OFAC violation occurred—DFS would significantly depart from, and interfere with, federal sanctions law. Federal sanctions law

does not prescribe compliance procedures or penalize inadequate procedures, but rather prohibits certain transactions and imposes after-the-fact reporting requirements.[8]

*Second*, Section 116.2 applies only to the sanctions policies and practices of BTMU's *New York* branches.  *See* 3 N.Y.C.R.R. § 116.2 (applying to "foreign banking corporation"); *id.* § 116.1(c) (defining "foreign banking corporation" as "any branch, agency or representative office *located in New York State* of a foreign banking corporation licensed to maintain such a facility") (emphasis added).  In alleging violations of Section 116.2, DFS nevertheless attempts to rely on conduct supposedly occurring at BTMU's branches in Singapore, Vietnam, Myanmar, Tokyo and Hong Kong.  (*See* Counterclaims ¶¶ 67-75, 85, 94-96, 98-100, 102-03.)  That attempt fails under the plain language of Section 116.

## CONCLUSION

The Court should dismiss DFS's counterclaims with prejudice and deny DFS's request for declaratory relief.

---

[8] DFS incorrectly asserts that under "federal law and regulations issued by [OFAC]," financial institutions must "implement systems reasonably designed to identify and block suspicious and illegal transactions."  (Counterclaims ¶ 24.)  None of DFS's cited authorities supports that assertion.  DFS's attempt to impose penalties that are untethered to actual OFAC violations would interfere with the federal government's prerogative to administer and calibrate sanctions enforcement and would thus be barred by principles of conflict preemption.  *See, e.g.*, *Arizona* v. *United States*, 567 U.S. 387, 406 (2012) (holding preempted state-law provision that "attempts to achieve one of the same goals as federal law" but "involves a conflict in the method of enforcement").

Dated:  New York, New York
        March 19, 2018

                                    Respectfully submitted,


                                    By: /s/ Richard C. Pepperman II
                                    Richard C. Pepperman II
                                    Beth D. Newton
                                    SULLIVAN & CROMWELL LLP
                                    125 Broad Street
                                    New York, New York 10004-2498
                                    (212) 558-4000
                                    peppermanr@sullcrom.com
                                    newtonb@sullcrom.com

                                    Robert A. Long, Jr. (*pro hac vice*)
                                    Henry B. Liu (*pro hac vice*)
                                    Jonathan Y. Mincer (*pro hac vice*)
                                    COVINGTON & BURLING LLP
                                    One CityCenter
                                    850 Tenth Street, NW
                                    Washington, D.C. 20001-4956
                                    (202) 662-6000
                                    rlong@cov.com
                                    hliu@cov.com
                                    jmincer@cov.com

                                    *Attorneys for Plaintiff*