# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:17-cv-08691-SHS |
| MARIA VULLO, in her official capacity as Superintendent of Financial Services of the New York State Department of Financial Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

### AMICUS CURIAE BRIEF OF THE OFFICE OF THE COMPTROLLER OF THE CURRENCY IN SUPPORT OF PLAINTIFF BANK OF TOKYO-MITSUBISHI UFJ, LTD.

KAREN SOLOMON
Acting Senior Deputy Comptroller
 and Chief Counsel
CHARLES M. STEELE
Deputy Chief Counsel
GREGORY F. TAYLOR
Director of Litigation
DOUGLAS B. JORDAN
GABRIEL A. HINDIN
MICHAEL K. MORELLI
Office of the Comptroller of the
 Currency
400 7th Street S.W.
Washington, D.C. 20219

*Attorneys for Amicus Curiae Office
of the Comptroller of the Currency*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................................... i

**INTRODUCTION**.................................................................................................................... 1

**STATEMENT OF THE CASE** ............................................................................................... 2

  **I.**   **THE OFFICE OF THE COMPTROLLER OF THE CURRENCY** ............................ 2

  **II.**  **STATUTORY AND REGULATORY FRAMEWORK** ............................................. 2

      A.    International Banking Act of 1978 and Implementing OCC Regulations.................... 3

      B.    Statement of the Facts ......................................................................................... 6

**ARGUMENT** ......................................................................................................................... 12

  **I.**   **BTMU'S FEDERAL BANKING LICENSES ARE EFFECTIVE AND
CONSISTENT WITH THE INTERNATIONAL BANKING ACT** ........................... 12

      A.    The OCC Properly Applied Statutory and Regulatory Requirements to BTMU's
Conversion Applications ................................................................................... 13

      B.    The International Banking Act Provides the Exclusive Statutory Provision Governing
the Conversion of State-Licensed Branches of Foreign Banks to Federally Licensed
Branches of Foreign Banks ................................................................................ 15

      C.    The OCC Followed All Applicable Policies and Procedures When Evaluating and
Approving BTMU's Conversion Applications .......................................................... 17

  **II.**  **FEDERAL LAW PRECLUDES DFS FROM BRINGING AN ENFORCEMENT
ACTION AGAINST BTMU, INCLUDING CHARGES BASED ON PRE-
CONVERSION CONDUCT** ............................................................................... 20

      A.    Federal Law Precludes State Supervisory Agencies Such As DFS from Asserting
Visitorial Authority over National Banks, and therefore Federally Licensed Branches
of Foreign Banks ............................................................................................... 21

      B.    DFS's Multiple Post-Conversion Assertions of Authority over the Federal Branches
Represent Assertions of Visitorial Authority Precluded by Federal Law .................. 23

**CONCLUSION** ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Capital One Bank (USA), N.A. v. McGraw,*
  563 F. Supp. 2d 613 (S.D. W. Va. 2008) ........................................................................24-25

*Conference of State Bank Supervisors v. Conover,*
  715 F.2d 604 (D.C. Cir. 1983) .................................................................................... 3

*Cruz-Miguel v. Holder,*
  650 F.3d 189 (2d Cir. 2011)...................................................................................... 19

*Cuomo v. Clearing House Ass'n, LLC,*
  557 U.S. 519 (2009) ................................................................................ 5, 22, 23, 25

*Gross v. FBL Fin. Servs., Inc.,*
  557 U.S. 167 (2009) .................................................................................................. 16

*Nat'l Commercial Banking Corp. of Austl., Ltd. v. Harris,*
  125 Ill. 2d 448 (Ill Sup. Ct. 1988) ........................................................................... 22

*Pearl River Union Free Sch. Dist. v. Duncan,*
  56 F. Supp. 3d 339 (S.D.N.Y. 2015)........................................................................ 19

*Schweiker v. Hansen,*
  450 U.S. 785 (1981) .................................................................................................. 19

*United States v. N.Y. Tel. Co.,*
  644 F.2d 953 (2d Cir. 1981)..................................................................................... 19

**Statutes**

12 U.S.C. § 1 .................................................................................................................. 2
12 U.S.C. § 1(a) ............................................................................................................. 2
12 U.S.C. § 25b(a)(1)(B) ............................................................................................. 23
12 U.S.C. § 25b(i)(1) ................................................................................................... 22
12 U.S.C. § 35................................................................................................. 9, 15, 16
12 U.S.C. § 93 .............................................................................................................. 21
12 U.S.C. § 481 ............................................................................................................ 21
12 U.S.C. § 484................................................................................... 8, 20, 21, 23, 25
12 U.S.C. § 484(a) ................................................................................................. 5, 25
12 U.S.C. § 548............................................................................................................ 22
12 U.S.C. § 612 ............................................................................................................ 15
12 U.S.C. § 612(b) ........................................................................................... 15, 16, 17

12 U.S.C. § 612(d)(2) ........................................................................................ 9

12 U.S.C. § 1044(i)(1) ...................................................................................... 21

12 U.S.C. § 1813(c)(3) ........................................................................................ 5

12 U.S.C. § 1818 ...................................................................................... 5, 8, 21

12 U.S.C. §§ 1818(a) ........................................................................................... 5

12 U.S.C. §§ 1818(b) ........................................................................................... 5

12 U.S.C. §§ 1818(b)(1) ....................................................................................... 6

12 U.S.C. §§ 1818(e) ........................................................................................... 5

12 U.S.C. Chapter 32, § 3101 ............................................................................... 2

12 U.S.C. § 3101(3) ............................................................................................. 2

12 U.S.C. § 3102 ............................................................................................... 24

12 U.S.C. § 3102(b) .............................................................. 3, 4, 8, 9, 16, 20, 22, 25

12 U.S.C. § 3102(c) ........................................................................................... 13

12 U.S.C. § 3102(f) ............................................................................... 1, 3, 13, 15

12 U.S.C. § 3105 ................................................................................................. 5

12 U.S.C. § 3111 ................................................................................................. 2

## Regulations

12 C.F.R. § 5.70 ............................................................................................... 13

12 C.F.R. § 7.4000 ........................................................................................ 8, 23

12 C.F.R. § 7.4000(a) ............................................................................... 5, 22, 24

12 C.F.R. § 7.4000(a)(1) .................................................................................... 22

12 C.F.R. § 7.4000(b) ............................................................................... 5, 22, 24

12 C.F.R. § 7.4000(c) ............................................................................... 5, 22, 24

12 C.F.R. § 28.11(f)(4) ......................................................................................... 4

12 C.F.R. § 28.12 ............................................................................................. 13

12 C.F.R. § 28.12(b) .................................................................................... 4, 6, 8

12 C.F.R. § 28.12(b)(1) ...................................................................................... 14

12 C.F.R. § 28.12(b)(2) ...................................................................................... 13

12 C.F.R. § 28.12(b)(3) ...................................................................................... 14

12 C.F.R. § 28.12(b)(5) ...................................................................................... 14

12 C.F.R. § 28.12(b)(6) ...................................................................................... 14

12 C.F.R. § 28.13(a) ............................................................................................. 4

## Other Authorities

S. Rep. No. 111-176 (2010) ............................................................................... 16

## INTRODUCTION

The Office of the Comptroller of the Currency ("OCC") submits this amicus curiae brief in support of the Motion to Dismiss filed by the plaintiff in this action, the Bank of Tokyo-Mitsubishi UFJ, LTD ("BTMU" or "Bank").  This brief affirms that the OCC's approval of the conversion of BTMU branches located in New York from state to federal licenses was lawful and effective.[1]  This brief also affirms that, after the conversion, the OCC became the primary regulator of the Federal Branches and enjoys exclusive visitorial authority over them as provided by federal law.  12 U.S.C. §§ 484, 3102(f).

The Court should dismiss the New York State Department of Financial Services' ("DFS") asserted counterclaims because DFS lacks the authority to exercise the supervisory and enforcement powers that provide the basis for them.  DFS's authority to seek civil money penalties or take any other enforcement action with respect to the Branches ended as a matter of federal law on November 7, 2017, upon the OCC's approval of federal licenses for those Branches.  In connection with its approval, the OCC issued enforcement orders that are substantively identical to and supersede the enforcement orders issued by DFS in 2013 and 2014. The terms of the OCC's approval impose additional enforceable conditions on the Bank and the Federal Branches, including their pre-commitment to consent to a range of supervisory actions should the OCC discover additional regulatory compliance issues or, within a specified post-conversion time period, uncover material new information that differs from the record the agency relied upon when approving the conversion applications.  Accordingly, federal law precludes

---

[1] This brief refers to BTMU's pre-conversion, state-licensed branches located in New York as the "Branches" and to those same entities after their conversion to federal licenses as the "Federal Branches."

DFS from the further exercise of any authority regarding the supervision of the Federal

Branches, and the Court should grant the Bank's Motion to Dismiss.

## STATEMENT OF THE CASE

### I.    THE OFFICE OF THE COMPTROLLER OF THE CURRENCY

The OCC is an independent bureau of the U.S. Department of the Treasury with primary

supervisory responsibility over national banks under the National Bank Act of 1864, codified at

12 U.S.C. § 1 *et seq.*, as amended ("NBA").  The OCC is charged with ensuring that national

banks, and other entities subject to its jurisdiction, operate in a safe and sound manner and in

compliance with laws and regulations; treat customers fairly; and provide fair access to financial

services.  *See id.* § 1(a).  Among its operations, the OCC is authorized to receive and, if

appropriate, to approve, applications from foreign banks to establish or convert from state-

licensed to federally licensed branches.[2]

### II.    STATUTORY AND REGULATORY FRAMEWORK

The OCC's authority to license federal branches of foreign banks is contained in the

International Banking Act of 1978 ("IBA"), codified at 12 U.S.C. Chapter 32, §§ 3101-3111.

The OCC supervises federal branches of foreign banks based in Africa, the Americas, Asia,

Australia, Europe, and the Middle East.  Federal branches typically operate in major U.S. cities

and primarily conduct wholesale business, such as trade and corporate finance.  A federal branch

can have a broad purpose, such as providing growth opportunities to the foreign bank through

---

[2] "Branch" is defined as "any office or any place of business of a foreign bank located in any
State of the United States at which deposits are received."  12 U.S.C. § 3101(3).  While state-
licensed agencies were also converted as part of this transaction, because they are not part of the
subject litigation, we refer only to branches, though the legal framework described here generally
also applies to federal agencies in the same manner.

expansion in the United States, or a more specific focus, such as serving the banking needs of the foreign bank's customers.  As described below, the OCC reviews all applications for federal branch licenses and considers them in the context of safe and sound operations and quality of risk management, governance, and controls.

**A.  International Banking Act of 1978 and Implementing OCC Regulations**

The IBA provides the legal structure for certain foreign bank operations in the United States.  Its provisions include authorization and standards for the establishment of federal branches of foreign banks and for the conversion of state-licensed branches of foreign banks to federally licensed branches.

1. Conversion of a State-Licensed Branch of a Foreign Bank to a Federally Licensed Branch Under the International Banking Act

    *i.    Statutory Authority*

Under the IBA, "[a]ny branch . . . operated by a foreign bank in a State pursuant to State law . . . may be converted into a Federal branch . . . with the approval of the Comptroller." 12 U.S.C. § 3102(f).  "In establishing and operating a Federal branch . . . , a foreign bank shall be subject to such rules, regulations, and orders as the Comptroller considers appropriate to carry out this section . . . ."[3]  *Id.* at § 3102(b).  The OCC has promulgated regulations, detailed below, to implement this provision.

---

[3] The OCC is accordingly entitled to deference in interpreting the terms of the IBA.  *See Conference of State Bank Supervisors v. Conover*, 715 F.2d 604, 622 (D.C. Cir. 1983) (pre-*Chevron* decision upholding Comptroller's interpretation of the IBA because "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference").

ii.     *Standards for Conversion*

OCC regulations set forth the following factors that the OCC will consider in reviewing

an application to convert[4] a state branch into a federal branch:

1.  The financial and managerial resources and future prospects of the applicant
    foreign bank and the federal branch;

2.  Whether the foreign bank has furnished to the OCC the information the OCC
    requires to assess the application adequately and assurances that information will
    continue to be made available to the OCC;

3.  Whether the foreign bank and its U.S. affiliates are in compliance with applicable
    U.S. law;

4.  The convenience and needs of the community to be served and the effects of the
    proposal on competition in the domestic and foreign commerce of the United
    States;

5.  Whether the foreign bank is subject to comprehensive supervision or regulation
    on a consolidated basis by its home country supervisor; and

6.  Whether the home country supervisor has consented to the proposed conversion
    of the federal branch.

12 C.F.R. § 28.12(b).

Upon conversion to a federal license, a branch of a foreign bank is regulated as if it were

a national bank:

> Except as otherwise specifically provided in [the IBA] or in rules, regulations, or
> orders adopted by the Comptroller under this section, operations of a foreign bank
> at a Federal branch . . . shall be conducted with the same rights and privileges as a
> national bank at the same location and shall be subject to all the same duties,
> restrictions, penalties, liabilities, conditions and limitations that would apply
> under the [NBA] to a national bank doing business at the same location [subject to
> conditions not applicable here].

12 U.S.C. § 3102(b); *see also* 12 C.F.R. § 28.13(a).

---

[4] Under the OCC's regulations, foreign banks' applications to convert a branch from state to
federal license are evaluated under the same factors as apply when a foreign bank applies to
establish a new federal branch.  12 C.F.R. § 28.11(f)(4).

2. <u>Visitorial Exclusivity Under the National Bank Act and Enforcement Authority Under the Federal Deposit Insurance Act</u>

Because they are treated as national banks, federal branches of foreign banks are subject to the OCC's exclusive visitorial authority in the same way as national banks:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice, or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

12 U.S.C. § 484(a).[5]  Accordingly, "only the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks" and "State officials may not exercise visitorial powers with respect to national banks, such as conducting examinations, inspecting or requiring the production of books or records of national banks, or prosecuting enforcement actions, except in limited circumstances authorized by federal law."  12 C.F.R. § 7.4000(a).  OCC regulations specify with particularity those state actions that are precluded by the statute and those that are not.  *Id.* § 7.4000(b)-(c); *see also Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 535-36 (2009) (interpreting § 484(a)'s reference to "visitorial powers").

Section 8 of the Federal Deposit Insurance Act (codified at 12 U.S.C. § 1818) establishes the principal enforcement authorities of the OCC and the other federal banking agencies.  Section 8 authorizes the OCC to bring enforcement actions with respect to federal branches[6] (as well as national banks and federal savings associations) for a range of enforcement remedies, including cease-and-desist orders, civil money penalties, and, with respect to bank-affiliated individuals, removal and prohibition orders.  *See generally* 12 U.S.C. §§ 1818(a)-(b), (e).

---

[5] The OCC's exclusive visitorial authority over federal branches does not preclude the Board of Governors of the Federal Reserve System from exercising visitorial authority under relevant federal law, including 12 U.S.C. § 3105.

[6] *See* 12 U.S.C. § 1813(c)(3).

Section 8 specifically permits a federal banking agency, including the OCC, to seek a cease-and-desist order if an institution violates a condition imposed in writing in connection with the approval of an application.  *Id.* § 1818(b)(1).

## B.  Statement of the Facts

The contours of this case and the respective positions of the OCC and DFS regarding the central issues in this litigation emerged in a series of issuances, beginning with the OCC's approval of BTMU's conversion applications on November 7, 2017, and continuing in a series of orders and letters by and between the two agencies.  The relevant facts are described below.

### 1.   November 7, 2017 OCC Approval

On November 7, 2017, the OCC granted conditional approval to BTMU to convert its Branches to Federal Branches.  BTMU Am. Compl. Ex. A.  The approval letter, issued by the OCC's Deputy Comptroller for Licensing ("OCC Approval Letter"), noted that the Bank has its main office in Tokyo, conducts some of its U.S. banking operations through the Branches that were the subject of the application, and has an affiliate national bank supervised by the OCC, MUFG Union Bank, N.A., located in San Francisco, California ("Union Bank").  BTMU represented that the conversions were designed to simplify and enhance the effectiveness of the supervisory and regulatory framework for its U.S. banking operations.  *Id.* at 2.  The OCC Approval Letter noted that the proposal was consistent with U.S. regulatory objectives, which favor the centralization of U.S. operations of foreign banks.  *Id.* at 3.  After considering all of the factors identified in the OCC's regulation at 12 C.F.R. § 28.12(b), the Approval Letter concluded that the factors were "consistent with approval."

Notwithstanding this conclusion, the OCC qualified its approval on the Federal Branches' compliance with certain conditions, including their agreement to "execute a Stipulation and

Consent to the Issuance of a Cease and Desist Order agreeing to the OCC's issuance of a Cease

and Desist Order issued by Consent imposing substantive requirements on the [Federal

Branches] based on the requirements imposed on the [Branch] by the [DFS] Orders."  OCC

Approval Letter at 6.  This provision refers to two outstanding consent orders (one in 2013 and

one in 2014) issued by DFS with respect to the activities of one of the Branches ("DFS Consent

Orders").  Both of the DFS Consent Orders related to deficiencies in the Branch's practices

regarding Bank Secrecy Act ("BSA")/Anti-Money Laundering ("AML") requirements and

related Office of Foreign Assets Control ("OFAC") obligations.  The OCC's approval included a

requirement that BTMU and the Federal Branches enter into a superseding consent order with

the OCC that would contain substantively identical requirements to those in the DFS Consent

Orders and that would remain in effect until the Federal Branches had fully complied with the

OCC order to the satisfaction of the OCC ("OCC Consent Order").  *Id.* at 3.  The OCC Consent

Order was executed on November 9, 2017.  *See* BTMU Am. Compl. Ex. F ("OCC-BTMU

Consent Order").

Significantly, the OCC Approval Letter also included a condition that the OCC would

continue to review the Federal Branches' compliance with BSA/AML and OFAC requirements

and that the OCC could consider, as appropriate, additional formal or informal enforcement

action on the basis of that review.  *Id.*  BTMU and the Federal Branches agreed to consent to any

such OCC action.  *Id.*  Similarly, the OCC Approval Letter included a condition that the OCC

could, for a period of 180 days after the conversions (subject to extension), impose additional

conditions on the Federal Branches based on information it obtained after conversions that

"materially differ[s] from the record the OCC relied upon" when approving BTMU's

applications.  *Id.*  The condition also allowed for the OCC to extend this time period if, in its

discretion, the OCC deemed an extension necessary.  *Id.*  The OCC Approval Letter stated that the OCC had reviewed the applications, considered all the applicable factors, and determined that approval was warranted.  OCC Approval Letter at 4-5 (citing 12 C.F.R. § 28.12(b)).

As noted in the OCC Approval Letter, by operation of Section 2 of the IBA, the operations of the Federal Branches would thereafter be conducted with the same rights and privileges and subject to the same duties, restrictions, penalties, liabilities, conditions, and limitations as would apply if the Federal Branches were national banks operating the same location.  12 U.S.C. § 3102(b).  The OCC Approval Letter stated that, by reference to provisions of the NBA and implementing regulations, the Federal Branches would therefore be subject to the OCC's visitorial exclusivity as if they were national banks operating at the same location.  OCC Approval Letter at 5 (citing 12 U.S.C. § 484; 12 C.F.R. § 7.4000).

The OCC Approval Letter also included a series of other conditions to the approval not relevant here.  *Id.* at 6-7.  All of the conditions in the OCC Approval Letter are enforceable by the OCC under its enforcement statute, 12 U.S.C. § 1818.  Subject to those conditions, the OCC Approval Letter authorized the conversions to be effected immediately.  *Id.* at 7.[7]

2. November 8, 2017 DFS Order

On November 8, 2017, DFS issued an Order, signed by its Executive Deputy Director for Banking and "[p]ursuant to the New York Banking Law and Financial Services Law," to the Bank and to its primary Federal Branch ("Nov. 8 DFS Order").[8]  The Nov. 8 DFS Order recited

---

[7] A separate letter was also issued by the OCC to the applicants on November 7, 2017 (BTMU Am. Compl. Ex. B) stating that certificates of authorization would be issued under separate cover (*Id*. at Ex. C).  These certificates of authorization were also issued on November 7, 2017.

[8] The Nov. 8 DFS Order does not specify which Branch the order applies to, but the OCC presumes that it applies to the primary Federal Branch as the other Federal Branch performs only limited functions.

the outstanding DFS Consent Orders and noted that the Bank had applied to the OCC to convert

its Branches from state licenses to federal licenses.  Nov. 8 DFS Order at 2-3.  The Nov. 8 DFS

Order does not reflect any DFS awareness that the conversions had become effective the

previous day.  Instead, the Nov. 8 DFS Order states that the Bank and the primary Federal

Branch remained subject to DFS's authority, which would continue its examination activities

"until any such conversion to an OCC license becomes legally effective (should that event

occur)."  *Id.* at 3.  The Nov. 8 DFS Order further informed the Bank and the primary Federal

Branch that they remained subject to all New York laws and to all supervisory and enforcement

activities for "any conduct occurring during the time period of its license from the Department."

*Id.*  The Nov. 8 DFS Order also instructed the Bank and the primary Federal Branch to preserve a

broad range of documents and to comply with state law "unless and until any conversion of the

licenses issued by the Department . . . shall become legally effective."  *Id.* at 3-4.[9]

### 3.  November 13, 2017 DFS Letter

On November 13, 2017, DFS wrote to the OCC Director for District Licensing in

response to the OCC's November 1, 2017 request for information related to the proposed

conversions ("Nov. 13 DFS Letter").  The letter criticized the OCC's approval of the

conversions, both substantively and procedurally.  Substantively, DFS claimed that federal law

requires that the conversions be subject to a DFS "no objection" review:

> We believe that sections 35 and 3102(b) of Title 12 of United States Code and
> Section 612(d)(2) of the Dodd-Frank Act required that DFS not object to the
> conversion in order for [the OCC] to proceed.  DFS has not provided its "no

---

[9] On November 8, 2017, the OCC responded to the Nov. 8 DFS Order with a letter stating that "because the conversion has been completed, [DFS] is no longer the supervisor for the [Federal Branches] and may no longer assert visitorial authority with respect to their operations."  BTMU Am. Compl. Ex. H.  The letter further stated that "the OCC expects that [DFS] staff will cease any visitation of the [Federal Branches]" and that the OCC had informed the Bank of those expectations.  *Id.*

objection" to the BTMU conversion or any plan in connection with these requirements.

Nov. 13 DFS Letter at 6.  Procedurally, DFS objected to the nature of the OCC approval, which it termed "precipitous" and "without precedent."  *Id.*  The letter also argued that the timeline of the OCC's approval precluded the OCC from reviewing information in DFS's possession about the Branches, resulting in an alleged departure from standard procedures set forth in the Comptroller's Licensing Manual for Federal Branches and Agencies, November 2014, updated October 2017 ("Licensing Manual") and the Federal Financial Institutions Examination Council's Statement on Regulatory Conversions ("FFIEC Statement").  *Id.* at 5.  It is worth noting, however, that the OCC *did* in fact request information regarding the Branches from DFS, seven days prior to approving the conversions.[10]  Those requests remain unanswered.

4.  November 17, 2017 OCC Letter to DFS

The OCC responded to the Nov. 13 DFS Letter on November 17, 2017.  BTMU Am. Compl. Ex. I ("Nov. 17 OCC Letter").  The OCC rejected DFS's assertion that federal law required DFS's "no-objection" to the conversion on the grounds that the statutory provision

---

[10] The OCC's letter to DFS, dated November 17, 2017, reflects that

> [o]n November 1, 2017, the [OCC] asked [DFS] to provide copies of the most recent reports of examination as well as copies of any outstanding enforcement actions related to the subject branches.  The OCC requested that these items, as well as any comments [DFS] would like to provide, be sent to our office by November 7, 2017.  The OCC made similar requests to the other state regulators potentially affected by the conversion.  Following up on our information requests, the OCC contacted [DFS] on November 7, 2017.  [DFS] informed the OCC that [DFS] would not be able to provide a response to our request for information until a later date.  The OCC reiterated its interest in receiving documents or any information from [DFS], even if it would be submitted after the OCC's approval of the conversions.

BTMU Am. Compl. Ex. I at 1 n.1.

relied upon by DFS does not apply to branch conversions: "Nothing in the materials cited in your letter (or elsewhere in Federal law) grants a state regulator a 'veto' over a proposed branch conversion . . . ." *Id.* at 3. The letter also rejected DFS's related suggestion that a conversion must be held in abeyance so long as DFS's supervisory work is ongoing. *Id.*[11]

With respect to DFS's invocation of general provisions of the Licensing Manual and the FFIEC Statement, the Nov. 17 OCC Letter pointed out that the objectives of these policies had been satisfied. The policies are intended to ensure that an institution does not, through conversion, escape compliance with a state enforcement order to which the institution is subject at the time of conversion. Here, the DFS Consent Orders were both encompassed in and superseded by the OCC Consent Order that substantively imposes the same obligations to address deficiencies as originally imposed by DFS. Moreover, and contrary to DFS's assertions, DFS had not initiated any other enforcement actions against the Branches, nor sought consent to any new enforcement orders, at the time of conversion. Accordingly, the Bank and the Branches did not escape sanctions through "regulatory arbitrage" as DFS asserted.

Additionally, the OCC explained that it had sufficient information to approve the conversions. The substantive standards for approval of a foreign bank's conversion of state-licensed branches to federal branches, provided by the OCC's regulations, were applied and determined to be satisfied. *Id.* at 2. The record that supported favorable findings included review by experienced OCC staff from several disciplines of information provided by BTMU in connection with pre-filing discussions. *Id.* That record also included information gathered about

---

[11] The Nov. 17 OCC Letter noted further that federal law prescribes no minimum time, or waiting period, for the OCC to consider an application for conversion from a state branch license to a federal branch license. *Id.* at 2 n.2.

the Branches and about BTMU and its parent company derived from the OCC's ongoing

supervisory activities with respect to Union Bank, BTMU's affiliate and a national bank subject

to OCC supervision.  *Id.*  Further, the OCC determined that the purpose of the conversions[12]

reflected legitimate business reasons, especially in light of the OCC's preexisting supervision of

Union Bank, the OCC's related relationship and coordination with the Governors of the Federal

Reserve System ("FRB"), and the OCC's extensive consultation with the Japan Financial

Services Agency ("JFSA"), BTMU's home country regulator, as part of the formal application

process.  *Id.*

Finally, the OCC renewed its requests for relevant information concerning the Branches

from DFS, in particular reports prepared by an independent consultant engaged by the Bank

pursuant to the DFS Consent Orders.  *Id.* at 4.  That specific request remains unfulfilled.

## ARGUMENT

I.   **BTMU'S FEDERAL BANKING LICENSES ARE EFFECTIVE AND
     CONSISTENT WITH THE INTERNATIONAL BANKING ACT**

DFS's argument that the OCC's approval of BTMU's conversion applications was

ineffective or contrary to law mistakenly conflates provisions of the NBA with provisions of the

IBA.  *See* Answer at 3, 16-17 (Defenses ¶¶ 2-7); *see also* BTMU Am. Compl. Ex. E, at 6.  DFS

also mischaracterizes both the OCC's thorough review of BTMU's conversion applications and

---

[12] The OCC concluded that the purpose of the conversions was to "simplify and enhance the
effectiveness of the supervisory and regulatory framework applicable to [BTMU's parent
company's] U.S. operations, to enable BTMU to operate more efficiently and effectively in the
United States, and to facilitate orderly resolution of [the parent company's] U.S. operations."  *Id.*
at 2.  The Nov. 17 OCC Letter stated that "[t]hese are legitimate business reasons to file branch
conversion applications with the agency, especially in light of the OCC's supervision of [Union
Bank] and our ongoing relationship and coordination with the [FRB] and the Japan Financial
Services Agency (JFSA) in connection with the supervision of [Union Bank]."  *Id.*

the legal force of the Licensing Manual and the FFIEC Statement. *See id.* at 5-6. The OCC's consideration of, and action on, the applications were in accord with governing law. Its process was entirely proper: The OCC consulted the appropriate standards and policies, identified those that pertained to the conversions, and applied them to the Bank's applications. The OCC also developed a comprehensive record that supported the approval of these applications. Accordingly, DFS's assertions are incorrect both as a matter of law and of fact.

**A. The OCC Properly Applied Statutory and Regulatory Requirements to BTMU's Conversion Applications**

The Court should conclude that the OCC properly applied the relevant statutory and regulatory requirements when it processed BTMU's conversion applications. As noted, 12 U.S.C. § 3102(f) authorizes the conversion of a state-licensed branch to a federally licensed branch. This section imposes no specific requirements in connection with these conversions except "the approval of the Comptroller." 12 U.S.C. § 3102(f). Pursuant to this authority, the OCC reviews conversion applications using the standards outlined in its implementing regulations, 12 C.F.R. §§ 5.70 and 28.12. These standards incorporate provisions set out in the IBA. *See* 12 U.S.C. § 3102(c).

As discussed above, *supra* pp. 6-8, the OCC rigorously applied each of these standards to BTMU's conversion applications. DFS's primary response to date has been to suggest that the OCC issued its approval "without the full factual record," *see* Nov. 13 DFS Letter at 2, or that the OCC was barred from granting the conversion absent the concurrence of DFS. Neither contention has merit.

With respect to the argument that the OCC lacked sufficient information to consider the application, BTMU provided the OCC with all the information that the OCC required in order to assess the Bank's submissions, *see* 12 C.F.R. § 28.12(b)(2). Specifically, BTMU submitted a

draft business plan and other supporting documentation that generally reflected its current operations. Moreover, the OCC's ongoing supervisory oversight of Union Bank, a BTMU affiliate, provided another important source of information about BTMU and the Branches. *See* Nov. 17 OCC Letter at 2. Consequently, the OCC's supervision of Union Bank afforded the agency extensive knowledge and familiarity with BTMU and its parent company. *Id.*

In addition, BTMU is subject to comprehensive, consolidated supervision by its home country regulator, the JFSA. *See* 12 C.F.R. § 28.12(b)(5). The JFSA supervises and oversees Japanese financial institutions and makes policy for the overall Japanese financial system. As its home country supervisor, the JFSA conducts inspections of BTMU and requires it to submit periodic reports on its operations. Before approving BTMU's applications, the OCC consulted with the JFSA as part of the formal application review process. *Id.* § 28.12(b)(6). The OCC's discussions with the JFSA indicated that the JFSA supported the Bank's efforts to convert its state-licensed branches to federally licensed branches. *See* Nov. 17 OCC Letter at 2.

Based on the information before it, the OCC assessed BTMU's financial and managerial resources and determined that they were "consistent with approval." *See* OCC Approval Letter at 6; *see also* 12 C.F.R. § 28.12(b)(1). Similarly, the OCC addressed any regulatory compliance issues—the same area where DFS claims the OCC lacks sufficient knowledge—in the OCC Consent Order issued immediately following the conversions. *See* OCC-BTMU Consent Order; *see also* 12 C.F.R. § 28.12(b)(3). Finally, the OCC placed conditions on the approval permitting the agency to take further enforcement action aimed at any remaining BSA/AML and OFAC compliance issues discovered during the OCC's post-conversion supervision of the Federal Branches. *See* OCC Approval Letter at 6.

**B.  The International Banking Act Provides the Exclusive Statutory Provision Governing the Conversion of State-Licensed Branches of Foreign Banks to Federally Licensed Branches of Foreign Banks**

In the Nov. 13 DFS Letter, DFS asserts that Section 612(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act")[13] precluded the OCC from acting on BTMU's applications.  *Id.* at 6.  This position is based on an erroneous analysis that disregards 12 U.S.C. § 3102(f), which is the exclusive statutory provision governing conversions of state-licensed branches of foreign banks to their federal equivalents.

The provision relied upon by DFS, Section 612(b), does limit charter conversions by state *banks* and state *savings associations* that are subject to certain state enforcement orders.[14]  But the Branches at the time of the conversion were neither state banks nor state savings associations; they were state-licensed branches of a foreign bank.  As such, BTMU's conversion applications are governed by the IBA, the text of which says that "[a]ny branch . . . operated by a foreign bank in a State pursuant to State law . . . may be converted into a Federal branch . . . with the approval of the Comptroller."  *Id.* § 3102(f).  Had Congress intended to apply Section 612's conversion restrictions to the Branches, it could have added a similar limitation to § 3102(f)

---

[13] Codified at 12 U.S.C. § 35.

[14] The statute provides in relevant part that

> [t]he Comptroller of the Currency may not approve the conversion of a State bank or State savings association to a national banking association or Federal savings association during any period in which the State bank or State savings association is subject to a cease and desist order (or other formal enforcement order) issued by, or a memorandum of understanding entered into with, a State bank supervisor or the appropriate Federal banking agency with respect to a significant supervisory matter or a final enforcement action by a State Attorney General.

12 U.S.C. § 35.

when it amended 12 U.S.C. § 35 as part of the Dodd-Frank Act. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174-75 (2009) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally.").[15]

Moreover, the OCC satisfied the policy concerns that underlie the restriction contained in Section 612(b). Congress adopted Section 612(b) in order to ensure that state banks and savings associations could not use a charter conversion to escape compliance with state enforcement orders to which they were subject, thereby "undermin[ing] the supervisory process." S. Rep. No. 111-176, at 87-88 (2010). Here, the OCC satisfied that goal by conditioning its approval of BTMU's conversion applications on, among other things, (1) BTMU's and the Federal Branches' consent to an enforcement order that is substantively the same as the outstanding DFS Consent Orders, (2) BTMU's and the Federal Branches' consent in advance to any additional conditions—including a separate enforcement action—that the OCC may impose on the Federal Branches concerning BSA/AML or OFAC compliance issues that the OCC discovers during its supervision of the Federal Branches, and (3) BTMU's and the Federal Branches' consent in advance to additional conditions should information gathered by the OCC within six months of the conversions materially differ from the record the OCC relied on in approving the conversion applications. OCC Approval Letter at 5-8. Taken together, these conditions demonstrate that BTMU's conversion has not, and will not, undermine the efficacy of the prudential supervisory

---

[15] The "national treatment" principle reflected in 12 U.S.C. § 3102(b) does not mandate a different result. Section 3102(b) requires that federal branches be treated similarly to national banks, but does not extend that principle to state branches. Meanwhile, Section 612(b) only places restrictions on state banks wishing to convert to national banks. Therefore, Section 612(b) does not apply because it does not contain a restriction upon which § 3102(b)'s "national treatment" principle can operate.

framework.  Accordingly, adherence to the text of Section 612(b)'s reference to state-chartered banks and saving associations, and not to state-licensed branches, is both sensible and justified.

## C. The OCC Followed All Applicable Policies and Procedures When Evaluating and Approving BTMU's Conversion Applications

DFS also mistakenly asserts that the OCC did not abide by its stated policies for evaluating state-licensed branch conversion applications.  Nov. 13 DFS Letter at 5-6. Notwithstanding its selective reading of the FFIEC Statement and the Licensing Manual, DFS provides no basis for concluding that the OCC acted inconsistently with these documents' terms.

### 1.  The FFIEC Statement Did Not Apply to BTMU's Conversion Applications

The FFIEC Statement was focused on charter conversions of banks and savings associations, not uninsured branches of foreign banks.  Notably, the FFIEC Statement indicates that the "prospective *chartering* authority"—as opposed to the prospective *licensing* authority— should consult with the FDIC in its role as deposit insurer and receiver before granting a conversion application.  FFIEC Statement (emphasis added).  BTMU, a foreign bank seeking an uninsured federal branch license, does not receive deposit insurance from the FDIC.  By its terms, the FFIEC Statement does not cover conversions of foreign bank branches.

Similarly, the FFIEC Statement suggests that a prospective chartering authority should not entertain conversion requests that are submitted while "serious or material enforcement actions are pending" with the current chartering authority, because such requests could "delay or undermine appropriate supervisory actions."  However, the conversions did not undercut the FFIEC Statement's animating concerns, i.e., the OCC did not "delay or undermine" the DFS Consent Orders to which the Branches were subject at the time of the conversion.  The conditions imposed by the OCC in connection with the approval actually *strengthened* the supervision of the Federal Branches and the OCC's ability to promptly address any issues at the

17

Federal Branches based on pre-conversion activity.  First, the OCC conditioned the approval of

the application upon an agreement by the Federal Branches to enter into a consent order that

contains substantively identical terms as the outstanding DFS Consent Orders.  Second, the OCC

Approval Letter included a condition that the OCC would continue to review the Federal

Branches' compliance with BSA/AML and OFAC requirements and that the OCC could

consider, as appropriate, additional formal or informal enforcement action on the basis of that

review.  Crucially, the Federal Branches have already agreed to consent to any such OCC action.

Third, the OCC Approval Letter included another condition that the OCC could, for a period of

180 days after the conversions, impose additional conditions on the Federal Branches based on

information it obtained after conversions that "materially differ[s] from the record the OCC

relied upon" when approving BTMU's applications.  *Id.*  This condition also allowed for the

OCC to extend this time period if, in its discretion, the OCC deemed an extension necessary.  *Id.*

In short, the conversions did not excuse BTMU or the Branches from compliance with

their existing regulatory and supervisory requirements.

2.  DFS Misstates the Legal Force of the Licensing Manual

DFS's argument that the OCC was bound to follow a certain procedure set forth in the

Licensing Manual when it reviewed BTMU's applications, Nov. 13 DFS Letter at 5-6, attempts

to impose a rigidity upon the OCC's processes in a way that misstates the law and distorts the

document's legal effect.  The Licensing Manual describes the process of evaluating a conversion

application in ordinary circumstances.  It is not intended to be applied without exception; the

Licensing Manual acknowledges that the OCC may tailor this process in particular cases.[16]  *See*

---

[16] *See also* Licensing Manual at 46 ("Notwithstanding the general principles outlined in this manual, depending on the facts and circumstances of a particular application, the OCC may consider additional factors that it deems relevant . . . .").

*Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (holding that a Social Security Administration Manual had no legal force and did not bind government).  Second, and as stated above, because BTMU was not subject to any new enforcement action from DFS at the time of the conversion, the Licensing Manual's statement that the OCC "[g]enerally . . . will not consider a conversion application submitted while a material enforcement action is pending" is inapplicable.  Licensing Manual at 46.  Finally, DFS's position disregards ample caselaw holding that these "internal guidance documents are not binding agency authority," *Cruz-Miguel v. Holder*, 650 F.3d 189, 200 (2d Cir. 2011), and "do[] not have the effect of law," *United States v. N.Y. Tel. Co.*, 644 F.2d 953, 959 n.10 (2d Cir. 1981).  Unlike rules issued pursuant to notice and comment, such documents do not purport to bind the issuing agency.  Therefore, DFS's attendant suggestion that DFS possesses an enforceable right to require the OCC's adherence to the Licensing Manual is misplaced.  *See, e.g.*, *Pearl River Union Free Sch. Dist. v. Duncan*, 56 F. Supp. 3d 339, 374 (S.D.N.Y. 2015) (concluding that internal agency procedures did not create any public rights).

      3.  <u>The Policy Goals of the Licensing Manual and the FFIEC Statement Have Been Met</u>

      The OCC ensured that approval of BTMU's conversion applications met the policy goals that animate the Licensing Manual and the FFIEC Statement.  The Licensing Manual provides that the OCC should, when evaluating conversion applications, generally consult with the current supervisor of a state-licensed branch in order to obtain relevant supervisory information.  Licensing Manual at 47.  The FFIEC Statement contains similar language, acknowledging the useful role that inter-agency consultation can play in obtaining this information.  In this instance, however, BTMU met with the OCC in several pre-filing meetings, during which time it presented the OCC with comprehensive draft applications.  BTMU also provided, to the extent permitted by applicable law, all information that the OCC requested and considered relevant to

evaluating BTMU's condition and outstanding enforcement actions.  Similarly, the OCC's existing supervisory relationship with one of BTMU's affiliates, Union Bank, afforded it extensive preexisting knowledge regarding BTMU and its parent company.  Moreover, while the OCC has requested, and remains interested in, receiving information from DFS and other supervisory entities,[17] the OCC had access to a robust pool of information that was sufficient to allow the agency to determine that BTMU had taken significant steps toward remediating the identified issues and to deem the goals of the cited provisions fulfilled.

## II.   FEDERAL LAW PRECLUDES DFS FROM BRINGING AN ENFORCEMENT ACTION AGAINST BTMU, INCLUDING CHARGES BASED ON PRE-CONVERSION CONDUCT

BTMU is correct in its argument that federal law precludes the assertion of DFS supervisory and enforcement authority against BTMU and the Federal Branches at any time after the conversions, including any action to recover penalties for alleged pre-conversion misconduct. The IBA provides that the banking operations of federally licensed branches of foreign banks "shall be conducted with the same rights and privileges as a national bank at the same location." 12 U.S.C. § 3102(b).  Those "rights and privileges" include protection against "any visitorial powers" not authorized by Federal law.  12 U.S.C. § 484.  Because the enforcement action threatened by DFS cannot be visited upon the state-licensed branches that no longer exist, it would necessarily need to be asserted against the Federal Branches subject to the exclusive visitorial authority of the OCC.  Accordingly, federal law precludes the supervisory and enforcement authority asserted by DFS here.

---

[17] Going forward, the OCC intends to consult with the FRB (which maintains a supervisory role over the Federal Branches under the IBA) as part of its ongoing supervision of the Federal Branches.  The OCC also requested examination-related information from DFS on November 1, 2017.  DFS indicated on November 7, 2017, that it would not be able to respond to the OCC's request until a later date.  As previously noted, the OCC has not yet received the requested information from DFS.

**A.  Federal Law Precludes State Supervisory Agencies Such As DFS from Asserting Visitorial Authority over National Banks, and therefore Federally Licensed Branches of Foreign Banks**

The OCC has comprehensive authority over the chartering, supervision, and regulation of virtually every aspect of the operation of banks organized under the NBA.  In its capacity as administrator of the national bank system, the OCC conducts extensive examinations of the banking operations of national banks that evaluate these banks' compliance with principles of safe and sound banking and with applicable laws and rules concerning the bank's activities. 12 U.S.C. § 481.  Federal law authorizes the OCC to inspect a bank's records and to supervise its activities, and provides the OCC with an extensive array of supervisory tools with which to address unsafe or unsound banking practices or violations of law.  *See, e.g.*, *id.* §§ 93 (forfeiture of charter, civil money penalties), 1818 (cease and desist orders; restitution; removal of officers and directors; civil money penalties).  Through its supervisory, regulatory, and enforcement authority, the OCC oversees the activities of national banks and takes action to maintain the integrity and sound operation of the national banking system.

The NBA prescribes that, except where federal law otherwise provides, the OCC's visitorial authority over national bank operations is exclusive:

> **No national bank shall be subject to any visitorial powers** except as authorized by federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

*Id.* § 484 (emphasis added).  The OCC has promulgated a regulation to implement the prohibition and the exceptions:

> [O]nly the OCC . . . may exercise visitorial powers with respect to national banks. State officials may not exercise visitorial powers with respect to national banks, such as conducting examinations, inspecting or requiring the production of books or records of national banks, or prosecuting enforcement actions, except in limited circumstances authorized by federal law.

12 C.F.R. § 7.4000(a)(1); *see also Cuomo*, 557 U.S. at 535 (holding that requests in lieu of subpoenas issued by state attorney general for information from national banks were prohibited as assertions of visitorial powers).[18]  The multiple assertions of supervisory authority by DFS in the Nov. 8 DFS Order, its correspondence, and its Counterclaims and requested Relief—ranging from assertions of control over books and records and continued examination authority to an asserted intent to bring an administrative adjudication—therefore fall squarely within the regulation's definition of "visitorial power."  12 C.F.R. § 7.4000(a).

Under the IBA, visitorial exclusivity applies to operations of a foreign bank at a federal branch to the same extent it applies to operations at a national bank:

> Except as otherwise specifically provided in [the IBA] or in rules, regulations, or orders adopted by the Comptroller under this section, operations of a foreign bank at a Federal branch . . . shall be conducted with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the [NBA] to a national bank doing business at the same location [subject to conditions not applicable here].

12 U.S.C. § 3102(b).  Visitorial exclusivity is among the "rights and privileges" held by national banks and therefore, by operation of law, federal branches of foreign banks.  *Cf. Nat'l Commercial Banking Corp. of Austl., Ltd. v. Harris*, 125 Ill. 2d 448, 453 (Ill Sup. Ct. 1988) (concluding that § 3102(b) operates with 12 U.S.C. § 548 to preempt contrary state tax law).  Furthermore, when Congress acted in 2010 to codify *Cuomo* in Section 1044(i)(1) of the Dodd-Frank Act (12 U.S.C. § 25b(i)(1)), it also expressly defined "national bank" to include federal

---

[18] In addition to specified exceptions, visitorial exclusivity does not preclude a judicial "action against a national bank in a court of appropriate jurisdiction brought by a state attorney general (or other chief law enforcement officer) to enforce an applicable law . . . and to seek relief as authorized by such law."  12 C.F.R. § 7.4000(b); *see also Cuomo*, 557 U.S. at 535.  Here, where DFS seeks authority to conduct an administrative adjudication applying state banking statutes, that exclusion is inapplicable.

branches for purposes of Section 1044.  12 U.S.C. § 25b(a)(1)(B).  Because *Cuomo* addressed the scope of the OCC's exclusive visitorial powers under § 484, the inclusion of federal branches in Section 1044(i)(1)'s visitorial powers provision strongly indicates that § 484 applies to federal branches.  Accordingly, the authority developed under § 484 and § 7.4000 applies with equal force to the Federal Branches here.

**B.  DFS's Multiple Post-Conversion Assertions of Authority over the Federal Branches Represent Assertions of Visitorial Authority Precluded by Federal Law**

DFS has acted—and continues to act—in contravention of federal law notwithstanding the OCC Approval Letter stating that the Federal Branches, upon conversion, would be subject to the OCC's visitorial exclusivity as if they were national banks operating at the same location.

The Nov. 8 DFS Order states that the Bank and the primary Federal Branch remain subject to the authority of the DFS, and that DFS would continue examination activities "until any such conversion to an OCC license becomes legally effective (should that event occur)." Nov. 8 DFS Order at 3.  The Nov. 8 DFS Order instructed the Bank and the primary Federal Branch that they remained subject to all New York laws and to all supervisory and enforcement activities for "any conduct occurring during the time period of its license from the Department." *Id.* at 3.  The Nov. 8 DFS Order instructed the Bank and the primary Federal Branch to preserve a broad range of documents.  *Id.* at 3-4.  The Nov. 8 DFS Order also instructed the Bank and the primary Federal Branch to comply with state law "unless and until any conversion of the licenses issued by the Department . . . shall become legally effective." *Id.* at 4.  All of these assertions as to the primary Federal Branch, including the claim to enforcement authority over pre-conversion conduct, are contrary to federal statute and the OCC's regulation.  DFS has taken no steps to withdraw the Nov. 8 DFS Order or to disavow its content.

In its January 31, 2018 Answer, Defenses, and Counterclaims, DFS asserts that even if the conversions were valid, "DFS is plainly authorized to enforce New York law against BTMU for its illegal conduct that occurred prior to November 7, 2017 when it indisputably was a licensee subject to New York law." [19]  *Id.* at 5.  DFS argues that that conclusion follows from the proposition that "conversion of a foreign bank from a state license to a federal license cannot and does not permit an institution to obtain immunity from conduct occurring" before the conversion. As explained above, DFS mistakenly relies upon inapplicable statutory provisions for that proposition.  Moreover, BTMU is not "immune" from enforcement action; the OCC has issued the OCC-BTMU Consent Order that may be enforced and the Bank has consented to any additional enforcement actions that the OCC determines to be warranted.  Similarly, DFS repeats these assertions in Counts 7 through 11 of its Counterclaims, and states in Count 11 that it "seeks a declaratory judgment that it may initiate and maintain an adjudicatory proceeding against BTMU for the enforcement of New York law and the imposition of penalties for conduct committed by BTMU" before the conversion.  *See also* Count VII: Declaratory Relief ¶¶ 168-171 and Request for Relief H.  Each of these assertions is precluded by federal law.  *See* 12 C.F.R. § 7.4000(a)-(c).

In a case with similar facts, where a state-chartered bank converted to a national charter, a district court concluded that a state investigative action could not be brought against the national bank for conduct engaged in when it had operated as a state-chartered bank.  *Capital*

---

[19] DFS cannot avoid the application of visitorial exclusivity by purporting to address only BTMU rather than the Federal Branches, because the Federal Branches have no separate corporate identity.  Section 3102 speaks to the "operations of a foreign bank at a Federal branch."  Accordingly there is no discrete set of BTMU operations distinct from the operations through the Federal Branch that could be the basis for a DFS enforcement action.

*One Bank (USA), N.A. v. McGraw*, 563 F. Supp. 2d 613, 621 (S.D. W. Va. 2008).[20]  During the time the bank was state-chartered, the state attorney general had issued subpoenas seeking information about consumer complaints relating to credit card marketing, and then had filed petitions to enforce the subpoenas in state court.  Following the conversion to a national bank, Capital One filed suit seeking a declaration that the state attorney general could not enforce the subpoenas, pursue state court action for enforcement of the subpoenas, or otherwise investigate the national bank for banking activities.  The attorney general argued that he should be permitted to enforce subpoenas for pre-conversion conduct.  The district court ruled for the bank.  "[R]egardless of what time period the defendant is investigating, the subpoena will be enforced against a national bank, not a state bank."  *Id.* at 622.  The court elaborated that

> [t]he [attorney general] defendant would have the court fashion a special rule that states, in essence, that notwithstanding § 484(a) of the NBA, a state official may exercise visitorial powers over a national bank so long as (1) the state seeks to investigate activities that the bank engaged in before achieving national bank status, and (2) the state's investigation began before the bank converted to a national bank.  I will not conjure such a rule.  If the defendant enforces its subpoena as amended against Capital One, it will be exercising visitorial power over a national bank.  Section 484 prohibits such actions.

*Id.*  Similarly, here, the administrative actions that DFS seeks to initiate would exercise visitorial powers over a federally licensed branch of a foreign bank that federal law treats as it would a national bank.  Section 484, in conjunction with § 3102(b), prohibits such actions.

## CONCLUSION

The OCC respectfully submits that, on the basis of the arguments above, the Court should grant the Bank's requested relief and deny DFS's requested relief.

---

[20] Because the state attorney general tried to exercise its administrative authority to investigate the bank's operations, the *Capital One* decision is not affected by the later decision in *Cuomo*.

Dated: March 26, 2016                         Respectfully submitted,

                                              */s/ Gabriel A. Hindin*
                                              KAREN SOLOMON
                                              CHARLES M. STEELE
                                              GREGORY F. TAYLOR
                                              DOUGLAS B. JORDAN
                                              GABRIEL A. HINDIN
                                              MICHAEL K. MORELLI
                                              Office of the Comptroller of the
                                                Currency
                                              400 7th Street S.W.
                                              Washington, D.C. 20219
                                              Telephone: (202) 649-6300
                                              Fax: (202) 649-5709
                                              gregory.taylor@occ.treas.gov
                                              douglas.jordan@occ.treas.gov
                                              gabriel.hindin@occ.treas.gov
                                              michael.morelli@occ.treas.gov

                                              *Attorneys for Amicus Curiae Office*
                                              *of the Comptroller of the Currency*