UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF TOKYO-MITSUBISHI UFJ,
LTD.,

                            Plaintiff,

                v.

MARIA VULLO, in her official capacity as
Superintendent of Financial Services of the New
York State Department of Financial Services,

                          Defendant.

1:17-cv-08691-SHS

---

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

BARBARA D. UNDERWOOD
Attorney General of the State of New York
By: Jonathan D. Conley
    Shannan Krasnokutski
Assistant Attorneys General
28 Liberty St.
New York, New York 10005
(212) 416-8108

*Counsel for Defendant Superintendent Maria Vullo*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ....................................................................................................................4

    A.    The New York Department of Financial Services was created for the effective and efficient enforcement of the Banking and Insurance Laws .................................................4

    B.    BTMU's New York branches repeatedly and systematically violated federal and state law while licensed by DFS............................................................................................6

    C.    The OCC issued federal licenses to BTMU over DFS's objection ...........................8

ARGUMENT ..........................................................................................................................9

I.    BTMU'S motion to dismiss is premature because it assumes the validity of BTMU'S conversion to federal licenses ............................................................................9

    A.    There are disputed issues of fact and need for discovery regarding the question whether BTMU's conversion was arbitrary and capricious ..................................10

    B.    BTMU's conversion is invalid because DFS never consented to it......................16

II.    DFS's counterclaims are not federally preempted under the National Bank Act ..................19

    A.    DFS's counterclaims are not preempted under the National Bank Act because they relate exclusively to BTMU's pre-conversion conduct .........................................19

        1.    The exclusion of pre-conversion conduct from the definition of visitorial powers is consistent with the National Bank Act, regulatory policy, and all other principles of immunity and preemption law ............................................19

        2.    *Capital One v. McGraw* is neither binding precedent nor persuasive authority ............25

    B.    DFS's counterclaims are not preempted under the National Bank Act because they are an exercise of the Superintendent's law enforcement authority.............................26

        1.    Federal preemption under the National Bank Act is narrower than BTMU and the OCC allege........................................................................................................26

        2.    DFS's exercise of its law enforcement authority in this case is not preempted .................................................................................................................29

III.     DFS's counterclaims state plausible claims for relief under New York law..............................33

         A.     DFS possesses the statutory authority to bring an enforcement action against
                BTMU ...............................................................................................................................33

         B.     DFS's counterclaims state viable claims ...................................................................35

CONCLUSION.........................................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Amerijet Int'l, Inc. v. Pistole,*
    753 F.3d 1343 (D.C. Cir. 2014)................................................................16

*Anderson Nat'l Bank v. Luckett,*
    321 U.S. 233 (1944).....................................................................32

*Calderon v. Thompson,*
    523 U.S. 538 (1998).....................................................................23

*Califano v. Sanders,*
    430 U.S. 99 (1977)......................................................................15

*Capital One Bank (USA), N.A. v. McGraw,*
    563 F. Supp. 2d 613 (S.D. W. Va. 2008)......................................*passim*

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ....................................................................15

*City of New York v. City Civil Serv. Comm'n,*
    60 N.Y.2d 436 (1983) ..................................................................34

*Clarke v. Mathewson,*
    37 U.S. 164 (1838)......................................................................21

*Clinton v. Jones,*
    520 U.S. 681 (1997) ....................................................................21

*Cmty. Bd. 7 of Borough of Manhattan v. Schaffer,*
    84 N.Y.2d 148 (1994) ..................................................................33

*Coyne & Delany Co. v. Selman,*
    98 F.3d 1457 (4th Cir. 1996) .........................................................21

*Cuomo v. Clearing House, L.L.C.,*
    557 U.S. 519 (2009) .................................................................*passim*

*DiPietro-Kay Corp. v. Interactive Benefits Corp.,*
    825 F. Supp. 459 (D. Conn. 1993) .................................................21

*Dopico v. Goldschmidt,*
    687 F.2d 644 (2d Cir. 1982)..............................................11, 15, 16

*Drake v. Lab. Corp. of America Holdings,*
    458 F.3d 48 (2d Cir. 2006)...........................................................9, 15

*Grosso v. Surface Transp. Bd.*,
    804 F.3d 110 (1st Cir. 2016) ...................................................................................29

*Heath v. Alabama*,
    474 U.S. 82 (1985) ..................................................................................................24

*In re Nielsen*,
    No. 17-3345, 2017 U.S. App. LEXIS 27681 (2d Cir. Dec. 27, 2017) ....................16

*Ins v. Yueh-Shaio Yang*,
    519 U.S. 26 (1996) ..................................................................................................11

*Lusnak v. Bank of Am., N.A.*,
    883 F.3d 1185 (9th Cir. 2018) ..................................................................................9

*Martine's Serv. Ctr. v. Town of Wallkill*,
    554 F. App'x 32 (2d Cir. 2014) ..............................................................................32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................................11

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997) ........................................................................................15

*Perry v. P*I*E Nationwide, Inc.*,
    872 F.2d 157 (6th Cir. 1989) ..................................................................................21

*Smith v. Cohen Benefit Group, Inc.*,
    851 F. Supp. 210 (M.D.N.C. 1993) ........................................................................21

*Steel Inst. of N.Y. v. City of New York*,
    716 F.3d 31 (2d Cir. 2013) ......................................................................................29

*United States v. Lewis*,
    67 F.3d 225 (9th Cir. 1995) ....................................................................................18

*United States v. Wheeler*,
    435 U.S. 313 (1978) ................................................................................................23

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007) .........................................................................................19, 20, 26

*Williams v. Taylor*,
    529 U.S. 362 (2000) ................................................................................................34

*Younger v. Harris*,
    401 U.S. 37 (1971) ..................................................................................................22

## Statutes

12 U.S.C. § 35 ................................................................................................................17, 18, 19

12 U.S.C. § 3102(b) ........................................................................................................17, 18, 27

12 U.S.C. § 3202(b) ..................................................................................................................17

5 U.S.C. § 706(2)(A) ..................................................................................................... 11, 15, 16, 17

12 U.S.C. § 35. ..........................................................................................................18, 19, 23

N. Y. Banking L. § 44 ............................................................................................................*passim*

N.Y. CPLR § 302 .......................................................................................................................27

N.Y. Fin. Serv. L .§ 102 ...................................................................................................9, 38, 42, 43

N.Y. Fin. Serv. L. § 201(b) ..........................................................................................................9

N.Y. Fin. Serv. L. § 202(a) ....................................................................................................... 9, 42

N.Y. Fin. Serv. L. § 301(c)(1) .......................................................................................................9

N.Y. Fin. Serv. L. § 403 ...............................................................................................................9

N.Y. Gen. Municipal L. § 239 ....................................................................................................34

## Other Authorities

Arthur E. Wilmarth, Jr., *The OCC's Preemption Rules Exceed the Agency's Authority and Present a Serious Threat to the Dual Banking System and Consumer Protection*, 23 Ann. Rev. Banking & Fin. L. 225 (2004) ........................................................................................................30

Gillian E. Metzger, *Federalism and Federal Agency Reform*, 111 Colum. L. Rev. 1 (2011) ........................30

Jeff Bater, Bloomberg BNA, *Noreika Returns to Simpson Thacher After OCC Stint*, (Jan. 8, 2018) https://www.bna.com/noreika-returns-simpson-n73014473909/. ....................................................20

Keith R. Fisher, *Toward A Basal Tenth Amendment: A Riposte to National Bank Preemption of State Consumer Protection Laws*, 29 Harv. J.L. & Pub. Pol'y 981 (2006) ..............................................30

Office of the Comptroller of the Currency,  Joseph M. Otting Takes Office as the 31st Comptroller of the Currency (Nov. 27, 2017), https://www.occ.treas.gov/news-issuances/news-releases/2017/nr-occ-2017-141.html........................................................................20

Press Release, The White House, Joint Press Release from Vice President Mike Pence and Deputy Prime Minister Taro Aso on the Second Round of the U.S.–Japan Economic

Dialogue (Oct. 16, 2017), https://www.whitehouse.gov/briefings-statements/joint-press-release-vice-president-mike-pence-deputy-prime-minister-taro-aso-second-round-u-s-japan-economic-dialogue/. .................................................................................................................................19

Statement of John G. Heimann, Comptroller of the Currency before the Senate Committee on Banking, Housing and Urban Development (June 21, 1973)................................................... 23, 24

Statement of Robert Mundheim, General Counsel to the United States Department of Treasury before the Subcommittee on Financial Institutions of the Comm. on Banking, Housing, and Urban Affairs (June 21, 1973)............................................................................................................24

**Regulations**

12 C.F.R. § 28.13...................................................................................................................... 22, 35

12 C.F.R. § 7.4000......................................................................................................................*passim*

3 N.Y.C.R.R. § 116.2................................................................................................................ 6, 35

# PRELIMINARY STATEMENT

For 65 years, between 1952 and November 7, 2017, BTMU's operations in the United States were primarily conducted through two branches in New York City that were licensed by the New York State Department of Financial Services ("DFS") and its predecessor the New York Banking Department. A license is a privilege. The DFS licenses issued to BTMU allowed the bank to engage in all of the categories of banking activity specifically authorized under Article 5 of the New York Banking Law. BTMU profited handsomely in New York, earning many billions of dollars of revenue as a New York-licensee.

For the first fifty years of BTMU's business activity in New York, the bank experienced tremendous growth with no significant regulatory or enforcement issues. Beginning in 2002, however, BTMU began failing to comply with its obligations under the New York Banking Law, the Bank Secrecy Act, various asset money laundering (AML) laws, and regulations issued by the Treasury Department's Office of Foreign Asset Control ("OFAC"). In particular, in 2002, BTMU began systematically and intentionally concealing transactions involving U.S. dollars that were linked with Iran, Sudan, Myanmar and other sanctioned countries and that were processed through BTMU's New York branches. As the result of misconduct identified in several investigations, in 2013 and 2014, BTMU entered into consent orders with DFS and paid penalties of $250 million and $315 million, respectively, to address the underlying violations and dishonest acts. Pursuant to these consent orders, an independent consultant was engaged by BTMU to conduct a comprehensive review of the bank's sanctions compliance programs and report to DFS as part of its ongoing investigation.

Yet BTMU's misconduct continued. Between November 18, 2014, and November 7, 2017, BTMU engaged in a slew of additional illegal acts that violated the sanctions laws applicable to all foreign bank branches licensed by DFS under the New York Banking Law and DSF regulations. Throughout 2016 and 2017, DFS's enforcement team and the independent consultant were addressing

this continued misconduct with BTMU in a third enforcement action.

On October 30, 2017, in the midst of DFS's enforcement action, BTMU filed an application with the Office of the Currency Comptroller ("OCC") to convert its state-licensed branches in New York to OCC-issued licenses. At no time prior to October 30 did either BTMU or the OCC inform DFS of BTMU's plans to convert its licenses. Over DFS's objection and without DFS's consent, the OCC, in the final days of Acting Comptroller Noreika's controversial tenure, granted these licenses after just 8 days, on November 7. Two days later, on November 9, BTMU commenced this litigation seeking a declaratory judgment that its federal licenses are valid. They are not. Indeed, for a bank of this size, DFS can find no precedent for this incredibly quick action, which smells of regulatory arbitrage at every level, raising significant questions about the facts and circumstances of the purported license flip.

From the beginning of this litigation, DFS has disputed the validity of the federal licenses the OCC issued to BTMU. Nonetheless, DFS advised the Court that it would not be exercising any supervisory authority over BTMU until this case is resolved, and that it would not take any extra-judicial action to enforce the New York Banking Law against BTMU for conduct that predated November 7, 2017—despite the fact that such conduct occurred when BTMU's New York branches were indisputably licensed by DFS and unequivocally subject to the New York Banking Law.

On January 31, 2018, DFS filed its answer to BTMU's Amended Complaint. In its Answer, DFS disputes the validity of the conversion in its defenses and in its responses to BTMU's allegations. In addition, DFS's Answer includes counterclaims for the enforcement of the New York Banking Law against BTMU for conduct that predated November 7, 2017. Counts I through VI seek penalties from BTMU pursuant to New York Banking Law § 44 for pre-November 7, 2017 violations of the Banking Law, regulations promulgated under the Banking Law, and the two consent orders between DFS and BTMU from 2013 and 2014. Count VII seeks a declaratory judgment that the Superintendent may

initiate and maintain an adjudicatory proceeding under Section 44 for the enforcement of violations of the Banking Law committed by BTMU prior to November 7, 2017.

BTMU now moves to dismiss DFS's counterclaims on federal preemption grounds. The legal premise underlying all of BTMU's arguments is that DFS is federally preempted from enforcing New York law against BTMU for violations of New York law that occurred while its New York branches were operating under New York licenses. This is not the law. Federal preemption does not restrict a state's sovereign authority to vindicate and enforce its own laws against a bank for acts committed under a state license. BTMU was indisputably bound by New York law while it operated under a New York license, and neither the OCC nor any other federal agency has the authority to pardon or immunize BTMU for acts it committed while licensed by DFS.

This Court should deny BTMU's motion to dismiss for three principal reasons.

*First*, BTMU's motion to dismiss is premature because it rests on the assumption the federal licenses that OCC issued to BTMU on November 7, 2017, are valid—a matter that has not yet been litigated or adjudicated. If, as DFS maintains, BTMU's conversion was invalid because it was contrary to law or arbitrary and capricious, there are no legitimate federal licenses that could possibly preempt the enforcement actions set forth in DFS's counterclaims. Preemption is an affirmative defense that can only be raised in a motion to dismiss when there are no disputed facts. Here, the validity of the licenses issued by OCC is a disputed fact that forecloses BTMU's motion. Until DFS is afforded the opportunity to conduct discovery and fully litigate the issue of the OCC's decision to issue federal licenses to BTMU, the motion will remain premature. The troubling and unprecedented irregularities in the circumstances surrounding BTMU's conversion to federal licenses raise numerous factual questions about BTMU's motivations and whether the OCC acted in an arbitrary and capricious manner—facts that demand discovery.

*Second*, even if this Court were to consider the merits of BTMU's motion to dismiss, the

motion fails as a matter of law because DFS's counterclaims are *not* preempted by federal law. DFS's counterclaims address violations of state law committed by BTMU's New York branches while they were operating under New York licenses. Here, timing matters. Under no circumstance would these counterclaims *for pre-conversion conduct* trigger the preemption provisions of the National Bank Act (NBA) because the conduct in question occurred *before* the OCC had jurisdiction over BTMU. Such enforcement actions do not fall within the Supreme Court's definition of "visitorial power" in *Cuomo v. Clearing House, L.L.C.*, 557 U.S. 519 (2009), and are therefore not preempted by the NBA. Indeed, the single judicial decision cited by BTMU and the OCC in support of their position that states are precluded under federal law from enforcing state law against national banks for pre-conversion conduct —*Capital One Bank (USA), N.A. v. McGraw*, 563 F. Supp. 2d 613 (S.D. W. Va. 2008)—was ultimately reversed by the district court in light of *Cuomo*'s holding. There simply is no case law that supports BTMU's view that it can escape New York's enforcement of New York law for conduct it committed under a New York license.

*Third*, DFS possesses the clear statutory authority to bring an enforcement action against BTMU in any forum—an administrative proceeding, state court, or this Court—and its counterclaims allege viable claims under the New York Banking Law, DFS's implementing regulations, and the 2013 and 2014 Consent Orders. While BTMU's New York branches had the privilege of operating under DFS licenses, BTMU was subject to New York's banking laws, including its administrative proceedings, and BTMU cannot escape these provisions by switching to a different regulator. None of the challenges to DFS's counterclaims raised by BTMU have any merit. Accordingly, BTMU's motion should be denied.

## BACKGROUND

**A. The New York State Department of Financial Services was created for the effective and efficient enforcement of the Banking and Insurance Laws.**

In 2011, the former New York Banking Department and the New York Insurance

Department were merged to form a single state agency—the New York State Department of Financial Services ("DFS") under the leadership of the Superintendent of Financial Services ("Superintendent"). This merger occurred via a new statute, the New York Financial Services Law. The Financial Services Law makes clear that the Superintendent has broad and primary authority to enforce the laws of the state, including the power to take "such actions as the superintendent deems necessary to … protect users of financial products and services." N.Y. Fin. Serv. L. § 301(c)(1). Indeed, DFS was created to provide for a single state agency responsible for "the effective and efficient enforcement of the banking and insurance laws." *Id.* § 102(c).

The legislation creating DFS directs the Superintendent to take any actions she "believes necessary to … ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services"; "protect users of financial products and services from financially impaired or insolvent providers of such services"; and "eliminate financial fraud, other criminal abuse and unethical conduct in the industry." *Id.* § 201(b). The Superintendent also possesses "the rights, powers, and duties in connection with financial services and protection in this state, expressed or reasonably implied by [the Financial Services Law] or any other applicable law of this state." *Id.* § 202(a). And New York's Financial Services Law expressly provides that—in addition to its other duties and powers—DFS is a law enforcement agency. *Id.* § 403.

With respect to banks licensed by DFS, the Superintendent has all of the powers and responsibilities that the former Superintendent of Banks held, including the right to conduct bank examinations, to require the production of any relevant books or papers, and to subpoena witnesses, compel their attendance, and to examine them under oath. N.Y. Banking L. §§ 36, 38. Under Section 36 of the New York Banking Law, the Superintendent also has the authority to seek a penalty payable to the "people of the state" for violations of the Banking Law, regulations promulgated under the Banking Law, and any written agreement entered into by the Superintendent. Section 44 provides that

the Superintendent may obtain a penalty "in a proceeding after notice and hearing."

**B. BTMU's New York branches repeatedly and systematically violated federal and state law while licensed by DFS.**

BTMU is the fifth-largest bank in the world, with approximately $2.6 trillion in total assets. From 1952 until November 7, 2017, BTMU was licensed by DFS to operate two foreign branches in New York State. *See* Def.'s Counterclaims, ECF No. 25 ("Countercls.") ¶ 16.

BTMU's New York branches have been central to BTMU's global operations. As of November 7, 2017, these branches maintained approximately $141.5 billion in assets, and served as the primary facility through which BTMU cleared U.S. dollar transactions. *Id.* ¶ 29. In 2017, over $20 trillion in U.S. dollar transactions were cleared through BTMU's New York branches. *Id.* A similar magnitude of U.S. dollar transactions were cleared through these branches each year from 2002 through 2016. *Id.*

BTMU's New York branches also have a history of violating the law. *Id.* ¶¶ 31-114. In 2013, DFS completed an investigation of BTMU and found that, from at least 2002 through 2007, BTMU failed to maintain an effective and compliant anti-money laundering program and OFAC compliance program and cleared billions of U.S. dollars through its New York branches for State and privately-owned entities in Iran, in violation of 3 N.Y.C.R.R. § 116.2. *Id.* ¶ 31. Over this five-year period, BTMU processed approximately 28,000 separate U.S. dollar transactions through New York worth close to $100 billion involving Iran, Sudan, and Myanmar, as well as other banned entities on OFAC's Specially Designated Nationals and Blocked Persons list ("SDN list"). *Id.* ¶ 34.

Following DFS's investigation into BTMU's misconduct, BTMU and DFS entered into a Consent Order on June 19, 2013 (the "2013 Consent Order"). *Id.* ¶ 38. Under this order, BTMU agreed to pay a civil monetary penalty of $250 million. *Id.* BTMU also agreed to engage—and fully cooperate with—an independent consultant to conduct a comprehensive review of the BSA/AML

compliance programs at the New York branches. *Id.* DFS approved the appointment of Kroll

Associates, Inc. ("Kroll"), which began to regularly report on its review of BTMU to DFS. Notably,

Kroll's work continued up until BTMU's purported conversion to federal licenses, at which point

BTMU precipitously terminated Kroll. *Id.* ¶¶ 40, 114.

Shortly after entering into the 2013 Consent Order, DFS obtained evidence that BTMU had

directed the manipulation of certain information given to DFS as part of DFS's investigation. *Id.* ¶ 42.

BTMU sought to conceal the methodological flaws underlying that information in a key report (the

"HTR Report") that was prepared by PricewaterhouseCoopers ("PwC"), and provided to DFS to

calculate the penalty to be paid by BTMU under the 2013 Consent Order. Upon acquiring this

evidence, DFS opened a second investigation into both BTMU and PwC. *Id.* ¶¶ 42–57.

In the course of this second investigation, DFS found that BTMU had successfully convinced

PwC to remove excerpts from preliminary drafts of the HTR Report that would have cast doubt upon

the report's thoroughness, objectivity, and the reliability of its findings. *Id.*

BTMU and DFS entered into a second consent order on November 18, 2014 (the "2014

Consent Order") to resolve DFS's second investigation. *Id.* ¶ 58. Under the 2014 Consent Order,

BTMU admitted that it had misled DFS in reaching the settlement terms of the 2013 Consent Order.

*Id.* BTMU agreed to the imposition of an additional $315 million civil monetary penalty and also

agreed to several significant terms to ensure that it could no longer abuse its dollar-clearing privileges

through the New York branches, including an extension of the engagement of the independent

consultant for a period of 18 months, if determined necessary by DFS. *Id.* ¶ 59.

After executing the 2014 Consent Order, BTMU continued to engage in illegal activity. *Id.*

¶¶ 62–63. Specifically, between November 18, 2014, and November 7, 2017, BTMU:

- utilized deficient sanctions filtering programs that were incapable of adequately screening
  for suspicious or illegal transactions;

- failed to adequately correct its deficient sanctions filtering programs;

- failed to timely disclose its failure to adequately correct its deficient sanctions filtering program;

- made false and misleading statements regarding its failure to correct the deficient sanctions filtering programs;

- intentionally circumvented its sanctions filters at the New York branches;

- failed to screen for sanctioned shipping vessels;

- failed to undertake due diligence for transactions involving cities bordering North Korea;

- failed to properly screen over 70,000 transactions involving nested accounts; and

- sought to undermine cooperation with the independent consultant.

*Id.* ¶ 64. BTMU was fully aware of the misconduct that Kroll and DFS had discovered. Kroll regularly reported the results of its findings to BTMU, and DFS, BTMU, and Kroll regularly discussed BTMU's problematic activity. *Id.* ¶ 65–66.

Indeed, because of these significant problems, in the months preceding November 7, 2017, BTMU and DFS had agreed to a significant extension of the independent consultant's term and had exchanged drafts of a supplemental consent order that would have accomplished the extension. *Id.* ¶ 114. By that point, DFS had amassed significant evidence of the bank's misconduct and violations of law that BTMU had committed since November 19, 2014, and was poised to prosecute additional enforcement actions against BTMU. *Id.* With full knowledge of these facts, BTMU turned to the OCC, and in secretive discussions not disclosed to DFS, began negotiating the means by which it could avoid being prosecuted for its misconduct by absconding to a new regulator.

### C.  The OCC issued federal licenses to BTMU over DFS's objection.

On October 30, 2017, in the midst of the ongoing investigation by DFS and the Kroll, and without any prior notice to DFS, BTMU filed conversion applications for licensure with the OCC. *Id.* Upon first receiving this notice of BTMU's application on October 31, 2017, DFS advised the OCC of the pending enforcement actions and requested that the OCC provide DFS with two weeks to evaluate the conversion and raise appropriate concerns. For reasons that remain unknown and

undisclosed, the OCC refused to wait for DFS's comments, and at 5:47 pm on November 7, the OCC, over DFS's objection, conditionally approved BTMU's applications for conversion to federal licenses. Later that same evening, the OCC provided its final approval to BTMU.

DFS did not consent to BTMU's conversion to federal licenses. Nor has DFS ever indicated it has a no objection to the conversion. To the contrary, on November 1, November 2, and again on November 7, 2017, DFS advised the OCC that it had grave concerns with the proposed conversions in light of DFS's pending enforcement actions against BTMU for significant illegal conduct. DFS also advised the OCC that it was prohibited by law, the OCC's licensing manual, and prudent policy considerations from approving BTMU's applications for conversion without DFS's consent—which had not been provided.

The OCC nonetheless issued conditional and final approval for BTMU's federal licenses in a matter of days. Tellingly, one of the first official acts undertaken by the OCC after granting final approval to BTMU was terminating Kroll. And now, through this action, BTMU is improperly attempting to evade enforcement for misconduct that it perpetrated while indisputably a licensee of DFS.

## ARGUMENT

I.   **BTMU's motion to dismiss is premature because it assumes the validity of BTMU's conversion to federal licenses.**

BTMU's motion to dismiss DFS's enforcement counterclaims is premised on a contested point in this litigation—namely, the validity of BTMU's conversion to federal licenses. As courts in this Circuit have long recognized, preemption may not be raised affirmatively on a motion to dismiss when the claim hinges on disputed issues of fact. *See Drake v. Lab. Corp. of America Holdings,* 458 F.3d 48, 66 (2d Cir. 2006) (affirming the denial of a motion to dismiss where "preemption cannot be easily determined from the pleading" (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 128 F.3d 77, 84 (2d Cir. 1997))); *accord Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 (9th Cir. 2018). Until the validity of

BTMU's federal licenses is adjudicated by the Court, the merits of BTMU's motion cannot be decided.

BTMU commenced this action against DFS seeking a judgment declaring that the licenses issued to it by the OCC are valid and effective as a matter of federal law. DFS categorically disputes the validity of BTMU's conversion to federal licenses, and has raised multiple defenses disputing their validity. The issue of whether those federal licenses are valid is plainly a central point of dispute in this litigation. If, as DFS contends, BTMU's federal licenses are invalid, all of the arguments raised in BTMU's motion to dismiss and the amended complaint—which are uniformly grounded in the assumption that BTMU's New York branches are licensed by the OCC—would be rendered academic and moot. Consequently, until there is discovery on the facts and circumstances surrounding the OCC's decision to issue federal licenses to BTMU and a subsequent ruling on BTMU's claims in the amended complaint, BTMU's requested relief is entirely premature.

As discussed below, DFS will establish in this litigation that BTMU's conversion to federal licenses was invalid under federal law for two independent reasons. *First*, OCC's approval of BTMU's conversion applications was arbitrary and capricious because the OCC did not comply with a host of existing policies, procedures, and several decades of regulatory practice, and the circumstances surrounding the OCC's decision raise significant factual issues that warrant discovery.

*Second*, BTMU's conversion was invalid because DFS never consented to it. Under federal law, the OCC cannot approve the application of a state-licensed bank seeking to convert to a federal license while the bank is subject to an enforcement order entered into with the bank's state regulator absent the state regulator's consent. Here, DFS's pending enforcement actions barred BTMU's New York branches from converting to federal licenses without DFS's consent.  Because DFS never consented to BTMU's conversion to federal licenses, those licenses are invalid as a matter of law.

A. **There are disputed issues of fact and need for discovery regarding the question whether BTMU's conversion was arbitrary and capricious.**

In answering BTMU's amended complaint, DFS asserted several defenses challenging the

validity of the federal licenses the OCC issued to BTMU. Among these defenses, DFS argues that BTMU's conversion to federal licenses was "arbitrary, capricious," and "an abuse of discretion." 5 U.S.C. § 706(2)(A). In assessing whether a federal agency has acted arbitrarily and capriciously under the Administrative Procedures Act (APA), courts consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[A]gency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency*, 658 F.3d 200, 215 (2d Cir. 2011). The court's "inquiry must be searching and careful . . . [and] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* And while "an agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute an action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion within the meaning of the Administrative Procedures Act." *Ins v. Yueh-Shaio Yang*, 519 U.S. 26, 31–32 (1996). Key to this arbitrary and capricious standard is a factual review of the evidence that was (and was not) before the agency when it made its decision. *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982).

As DFS will establish in this litigation, the OCC's issuance of federal licenses to BTMU was arbitrary, capricious, and an abuse of discretion.[1]

---

[1] At the very least, before this Court can rule on the validity of the federal license, and thus on DFS's counterclaims, DFS is entitled to discovery on the full circumstances that led to the OCC's approval of BTMU's conversion applications, including communications regarding the purpose of the conversion, the factors actually considered by the OCC, and the reasons (if any) requiring a decision in eight days without input or consent from DFS. Based on publicly available information, it is manifestly clear that this discovery is critical to properly assessing the OCC's

First, the OCC failed to follow the policies, procedures, and practices set forth in its Licensing Manual for Federal Branches and Agencies ("Licensing Manual") and the Federal Financial Institutions Examination Council (FFIEC)'s Statement on Regulatory Conversions.[2] The Licensing Manual includes a policy statement that requires an applicant to discuss pending enforcement actions with the OCC prior to submitting a conversion application, and explicitly states that the OCC typically will not consider an application while an enforcement action is pending:

> A state branch or agency considering a license conversion that is subject to an outstanding enforcement action, or has notice of a pending enforcement action by its current federal and/or state supervisor, should discuss its conversion proposal with the OCC before submitting an application. Generally, the OCC will not consider a conversion application submitted while a material enforcement action is pending.

Licensing Manual at 46. The OCC failed to follow this policy with respect to the BTMU conversions.

Second, as a "decision criteria" for state to federal conversions, the Licensing Manual states that the OCC relies heavily on information received from the bank's state supervisor about the bank's condition and compliance record:

> In evaluating a proposal to convert an existing state-licensed foreign bank office to a federal branch or agency, the OCC draws heavily on information received from the office's current U.S. supervisor and other confidential and supervisory information available to the OCC. The OCC consults with the converting entity's current U.S. supervisor to obtain information on the current condition of the converting entity and any corrective programs instituted by the supervisor.

Licensing Manual at 47. Contrary to these requirements, the OCC approved BTMU conversion without consulting DFS and failed to obtain any information from DFS about BTMU's current condition or the corrective programs that DFS had instituted.

Third, as a prefiling procedure for a state to federal conversion, the Licensing Manual requires that OCC's licensing division "contact[] the institution's state and federal supervisors to determine if

---

decision under the APA.

[2] Copies of the OCC's Licensing Manual and the FFIEC's Statement on Regulatory Conversions are attached to this memorandum as Exhibits A and B, respectively. All exhibits referenced in this memorandum are attached to the accompanying Declaration of Jonathan D. Conley, dated May 25, 2018. ("Conley Decl.").

applicant meets eligible foreign bank criteria and if there are any issues with the proposal." Licensing Manual at 50. The OCC failed to satisfy this procedure too. In fact, neither the OCC nor BTMU provided DFS with any notice of the proposed conversions until after the applications were filed with the OCC. And once the applications were filed, the OCC refused to provide DFS with an appropriate amount of time to comment on the conversions.

In addition to failing to comply with the Licensing Manual in approving the BTMU conversions, the OCC also failed to comply with the FFIEC's Statement on Regulatory Conversions. This Statement, which stablishes a framework for conversions that addresses the need to prevent regulatory arbitrage to ensure that a regulated entity does not undermine appropriate supervisory actions, prohibits conversions when serious or material enforcement actions are pending:

> Conversion requests submitted while serious or material enforcement actions are pending with the current chartering authority or primary federal regulator should not be entertained. Such requests could serve to delay or undermine appropriate supervisory actions that if left unresolved, could place the institution at greater risk of failure. Before acting on any conversion request, the prospective supervisor should consult with the current supervisor to obtain information on any pending or outstanding supervisory actions.

The OCC's decision to issue licenses to BTMU's New York branches while they were facing DFS enforcement actions violated the clear restriction imposed by this FFIEC Statement.[3]

In addition to failing to comply with the policies and procedures in the Licensing Manual and the FFIEC statement, the information currently available to DFS also raises disputed factual issues as to whether the OCC appropriately evaluated the BTMU conversions. The OCC received the conversion applications from BTMU on October 30 and approved the applications on November 7. It is inconceivable that this one-week review time was sufficient to assess conversion applications for

---

[3] Contrary to the claim made by the OCC, the FFIEC's Statement on Regulatory Conversions is not limited to FDIC-insured entities. Nor is there any reason why regulatory arbitrage is any worse for an FDIC-insured entity than it is for branches of foreign banks. Logic and bank policy would dictate otherwise: providing a regulatory arbitrage benefit to uninsured foreign banks provides an advantage to foreign institutions that is not available to domestic banks in violation of clear congressional intent in the International Bank Act. *See supra* Point I.B.

entities whose combined assets exceeded $175 billion. By contrast, the OCC took more than four months to approve conversion applications submitted in late 2016 by two branches of UBS, AG, whose combined assets were less than half of BTMU's asset load. Similarly, the Royal Bank of Canada submitted an application in 2014 to establish a federally licensed branch in New Jersey. Notwithstanding the fact this branch had *de minimis* assets, it took the OCC more than a year to approve. The disparity between the time it took the OCC to evaluate and approve these two recent state-to-federal conversion applications (four months and one year) compared to BTMU's applications (one week) further demonstrates why discovery is necessary in this case, and why BTMU's motion to dismiss is premature.

There are additional facts available in the public record that raise serious questions concerning the OCC's decision to approve BTMU's applications. On October 16, 2017, the Vice President of the United States and the Deputy Prime Minister of Japan held bilateral trade talks. Although the public record of these talks is limited, the White House press release from the event indicates that the U.S. and Japanese leaders discussed "financial regulatory regimes."[4]

Two weeks after these talks, on October 30, BTMU filed its conversion applications with the OCC. Five days later, on November 4, President Donald Trump arrived in Japan for three days of meetings with Prime Minister Shinzo Abe. During this visit, on November 5, President Trump met with high-ranking military and business executives in Tokyo. On November 6, President Trump departed Japan. The very next day—November 7—the OCC conditionally approved BTMU's applications at 5:47 p.m. and then—ostensibly satisfied that those conditions had been met—issued its final approval a few hours later.

---

[4] Press Release, The White House, Joint Press Release from Vice President Mike Pence and Deputy Prime Minister Taro Aso on the Second Round of the U.S.–Japan Economic Dialogue (Oct. 16, 2017), https://www.whitehouse.gov/briefings-statements/joint-press-release-vice-president-mike-pence-deputy-prime-minister-taro-aso-second-round-u-s-japan-economic-dialogue/.

Additional irregularities surround the OCC's approval of BTMU's applications. For instance, Keith Noreika and Joseph Otting—the Acting Comptroller of the Currency and the nominee for Comptroller of the Currency at the time the BTMU applications were filed and approved by the OCC—both had long-standing and significant connections with BTMU. Mr. Noreika had represented BTMU and its affiliates in his private law practice during the years before his appointment as the Acting Comptroller.[5] And Mr. Otting was an Executive Vice President for a subsidiary of BTMU from 1994 through 2001.[6]

Taken together, the known facts and circumstances surrounding OCC's licensure decision—coupled with the OCC's radical deviation from its own policies, procedures, and past precedent—raise serious factual questions as to whether the decision was an abuse of discretion and arbitrary and capricious. Before the issue is ripe for adjudication, however, DFS is entitled to conduct discovery on the significant factual irregularities surrounding BTMU's conversion. *See Drake*, 458 F.3d at 66.

Indeed, BTMU's motion is premature because discovery is needed to bring the "whole record" to light as required by the APA. 5 U.S.C. § 706; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Dopico*, 687 F.2d at 654.[7]

Here BTMU and OCC ask this Court to do what the plain language of the APA and governing precedents instruct it not to do—that is, to assume the validity of an agency action without first

---

[5] Although Mr. Otting remains the Comptroller of the Currency, Mr. Noreika has returned to private practice and is at the same law firm where he had previously represented BTMU. Jeff Bater, Bloomberg BNA, *Noreika Returns to Simpson Thatcher After OCC Stint*, (Jan. 8, 2018) https://www.bna.com/noreika-returns-simpson-n73014473909/.

[6] Office of the Comptroller of the Currency,  Joseph M. Otting Takes Office as the 31st Comptroller of the Currency (Nov. 27, 2017), https://www.occ.treas.gov/news-issuances/news-releases/2017/nr-occ-2017-141.html; The White House, Seventeen Nominations Sent to the Senate Today (June 6, 2017), https://www.whitehouse.gov/presidential-actions/seventeen-nominations-sent-senate-today/.

[7] In *Overton Park*, the Supreme Court held that where a federal agency's decision is being challenged under the APA, the district court should not decide the case without the "whole record" before it. 401 U.S. at 419–20; *see also Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) ("[A]n extra-record investigation by the reviewing court may be appropriate ... where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice.").

allowing discovery to ensure the "whole record" is before the Court. The Second Circuit instructs that "[d]etermining what constitutes an agency's informational base is vital" and that "whether the complete record is before the reviewing court 'may itself present a disputed issue of fact when there has been no formal administrative proceeding.'" *In re Nielsen*, No. 17-3345, 2017 U.S. App. LEXIS 27681, at *8–9 (2d Cir. Dec. 27, 2017) (quoting *Dopico*, 687 F.2d at 654). Further, the OCC's bald proclamation that it "developed a comprehensive record that supported the approval" of BTMU's applications (OCC Amicus Br. 13) carries no weight under the APA. If federal agencies could rely on such post-hoc conclusory statements about the sufficiency of their decisions, it "would impede the court from conducting the thorough, probing, in-depth review of the agency action with which it is tasked." *Id.* at *8. For this reason, agency cannot justify its actions with "conclusory statements." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

In moving to dismiss DFS's counterclaims—which seek to enforce state law against a bank that was indisputably state licensed when it violated state law—BTMU assumes that its New York branches are now operating under valid federal licenses. Indeed, BTMU's motion to dismiss DFS's counterclaims is premised entirely on the disputed assumption that its federal licenses are valid. Until discovery is completed, and until the Court adjudicates the validity of BTMU's federal licenses, BTMU's motion to dismiss will remain premature and should be accordingly denied.

## B. BTMU's conversion is invalid because DFS never consented to it.

BTMU's assumption concerning the validity of its federal license is also improper given the fact that DFS did not consent to the conversion.

The OCC's issuance of a federal license to BTMU, like any other federal agency action, will be held unlawful if it is found to be "not in accordance with law." 5 U.S.C. § 706(2)(A). Because BTMU was under DFS enforcement actions at the time of the federal conversions, the OCC was required by federal law to obtain DFS's consent as a condition of issuing federal licenses to BTMU. The OCC

16

failed to do so—a point, as noted above, that raises serious issues of fact requiring discovery. BTMU's federal licenses were thus not issued "in accordance with law" and are invalid.

BTMU and the OCC rely on 12 U.S.C. § 3202(b) for the proposition that a federal branch of a foreign bank is subject to the same rights and privileges as a national bank at the same location. Because a state regulator cannot exercise visitorial powers over a national bank, BTMU and the OCC reason that a state regulator is also barred from exercising visitorial powers over a federally licensed branch of a foreign bank.

BTMU's argument has it backwards. Just as a federal branch of a foreign bank enjoys the same rights and privileges as a national bank, a federal branch is also "subject to all of the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the [NBA] to a national bank doing business at the same location." 12 U.S.C. §3202(b).

One of the "restrictions" or "limitations" on a federally-licensed branch of a foreign bank is the prohibition on the OCC's approval of a conversion of a state bank or state savings association to a federal institution during any period in which the state institution is "subject to a cease and desist order (or other formal enforcement order) issued by, or a memorandum of understanding entered into with, a State bank supervisor." *Id.* § 35. Although Section 35 contemplates restricting domestic banks, the restriction is incorporated into and made applicable to the framework governing a federally-licensed branch of a foreign bank through 12 U.S.C. § 3102(b) and 12 C.F.R. § 28.13(a)(1).

The only exception to Section 35 that would allow a conversion while a state enforcement order is pending would require the OCC to establish that the pertinent state regulator (in this case, DFS) had no objection to the conversion. *See* Dodd-Frank Act, Pub. L. 111-203, Section 612(d)(2) *codified at* 12 U.S.C. § 35. Because DFS never provided its consent to the BTMU conversion, the conversion was and remains unlawful under 5 U.S.C. § 706(2).

BTMU and the OCC contend that "Section 3102(b) is limited to the 'operations' of a

federally-licensed branch of a foreign bank," and "does not apply to a foreign bank's state-licensed branches before they convert their licenses or to OCC's determination whether to approve a foreign bank's application to convert its state-licensed branches to federally-licensed branches." *See* Am. Compl. ¶ 63; OCC Amicus Br. 15–17. This argument fails to find support in the statute, and, if accepted, would undermine the congressional policy of maintaining competitive equality between state-licensed banks and national banks within the dual banking system.  There is nothing in the language of Section 3102(b) that immunizes federal branches from the duties, restrictions, or liabilities of a national bank that are associated with initial licensure.

Indeed, the legislative history of the statute compels the application of Section 35 to initial licensure decisions. Section 3102(b) was enacted as part of the International Bank Act of 1978 (IBA). The purpose of this Act was to ensure that federal branches of foreign banks do not have any competitive advantages over domestic banks. *See* S. Rep. No. 1073, 95th Cong., 2d Sess. 6 ("This bill establishes the principle of parity of treatment between foreign and domestic banks."). If, as BTMU and the OCC contend, a branch of a foreign bank could convert from a state license to a federal license to avoid state regulatory enforcement actions, the foreign bank would hold an advantage over domestic banks that cannot be reconciled with the purpose of the IBA.[8]

It is universally accepted that regulatory arbitrage to evade an enforcement action by a banking institution is never appropriate. The only construction of Sections 35 and 3102(b) that would prohibit

---

[8] The OCC contends that the "national treatment" principle reflected in the IBA is inapplicable here because it "does not extend … to state branches." *See* OCA Amicus Br. 16 n.15. This is not true. The IBA was enacted to establish a principle of parity between foreign and domestic banks. This "national treatment" principle extends to *all* domestic banks—not just those operating under a federal license. *See, e.g., United States v. Lewis*, 67 F.3d 225, 230–31 (9th Cir. 1995) ("The IBA … was enacted to eliminate various 'competitive advantages' foreign banks operating in this country enjoyed over federally and state chartered domestic banks.") In a statement submitted to the U.S. Senate on an earlier version of the bill that eventually became the IBA, the Comptroller of the Currency expressly acknowledged this precise point: "The policy of national treatment, or nondiscrimination against foreign banks, dictates that foreign banks should have the same rights as domestic banks to seek federal licenses as well as state licenses." Statement of John G. Heimann, Comptroller of the Currency before the Senate Committee on Banking, Housing and Urban Development (June 21, 1973).

regulatory arbitrage by a branch of a foreign bank would require a state regulator's consent to conversion when an enforcement action was pending. It is undisputed that DFS did not provide its consent here. This fact is fatal to BTMU's motion to dismiss.

## II.     DFS's counterclaims are not federally preempted under the National Bank Act.

Even if its federal licenses had been validly issued by the OCC (and they were not), BTMU's motion to dismiss should be denied. Under New York law, the Superintendent is vested with both supervisory *and* law enforcement powers. Through DFS's counterclaims, the Superintendent seeks to use her law enforcement authority to enforce the New York Banking Law against BTMU for conduct that occurred when its New York branches were indisputably under DFS's exclusive jurisdiction. These counterclaims are therefore not preempted for two independent reasons. First, DFS's counterclaims seek to enforce the New York Banking Law against BTMU for conduct that occurred *before* BTMU was issued federal licenses and no law immunizes BTMU for that conduct. This is entirely distinct from visitorial powers subsequent to that date. Second, the Superintendent's use of her law enforcement authority is not an exercise of visitorial powers that is preempted by federal law. BTMU's motion thus fails as a matter of law.

### A.     DFS's counterclaims are not preempted under the National Bank Act because they relate exclusively to BTMU's pre-conversion conduct.

DFS's counterclaims involve conduct that occurred before November 7, 2017 when BTMU's New York branches were unquestionably state-licensed and operating subject to DFS's exclusive supervision. Federal preemption does not apply here because the OCC did not have *any* authority over BTMU during this time period.

#### 1.     The exclusion of pre-conversion conduct from the definition of visitorial powers is consistent with the National Bank Act, regulatory policy, and all other principles of immunity and preemption law.

The NBA has never been interpreted to concern itself with the activities of state-licensed banks. Rather, the Act was designed to prevent "[d]iverse and duplicative superintendence of national

banks' engagement in the business of banking." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 14 (2007) (citations omitted). As a result, States are precluded under the NBA from "prevent[ing] or significantly interfer[ing] with the national bank's or the national bank regulator's exercise of its powers." *Id.* at 12. But as a corollary, the NBA has never limited a state's authority to enforce state law against a bank licensed by that state, particularly here where all of the conduct at issue occurred under a state license.

DFS's counterclaims addressing BTMU's pre-conversion conduct do not "prevent or significantly interfere" with BTMU's exercise of its powers under the NBA or the IBA. They simply require BTMU to defend against the assertion of civil penalties for illegal acts that its New York branches engaged in before being issued federal licenses. Holding BTMU accountable for its past illegal conduct when it was supervised by DFS is not the type of *diverse and duplicative superintendence* or business *interference* that the NBA intended to address through preemption.

Moreover, DFS's counterclaims do not seek to exercise any of this supervisory or visitorial control or authority over BTMU during the time period of its purported OCC license. To the contrary, DFS seeks to hold BTMU accountable for violations of New York law it committed while operating under a New York license. These enforcement actions have no bearing on BTMU's operations since November 7, 2017. Nor do they interfere with or impact the OCC's supervision of BTMU. Given that all of the alleged misconduct occurred before November 7, and that DFS already possesses all of the relevant information and records needed to prove the misconduct, DFS's counterclaims cannot, as a matter of law, be characterized as an exercise of visitorial powers.

As noted above, DFS challenges the conversions, but for the purposes of these arguments only, assumes that BTMU is no longer subject to DFS's oversight. But the fact that DFS's counterclaims operate on the assumption that BTMU's federal licenses are valid does not mean BTMU is immune from DFS's enforcement for conduct that occurred when it indisputably was subject to DFS's licensure and supervision. This claimed immunity from accountability to the State of

New York for past misconduct—for which BTMU advocates—is contrary to every analogous legal principle. A criminal defendant cannot avoid a prosecutor's jurisdiction over past criminal conduct by moving from the place of criminal activity. *See* 18 U.S.C. § 1073 (making flight across jurisdictions to avoid prosecution a separate crime). A civil defendant cannot avoid a court's jurisdiction for past conduct by moving their residency, domicile, or business activity to another jurisdiction. *See Clarke v. Mathewson*, 37 U.S. 164, 171 (1838) ("If, after the commencement of the suit, the original plaintiff had removed into, and become a citizen of Rhode Island, the jurisdiction over the cause, would not have been divested by such change of domicile."); N.Y. C.P.L.R. § 302 (conferring jurisdiction over any person "who commits a tortious act within the state" regardless of domicile). Even the President of the United States does not enjoy immunity from civil misconduct that occurred prior to taking office. *See Clinton v. Jones*, 520 U.S. 681, 694 (1997)

Federal-preemption cases in the context of Employee Retirement Income Security Act ("ERISA") plans supports this conclusion. Because ERISA plans enjoy immunity from state law, states are generally preempted from regulating them. But this preemption and immunity does *not* apply to conduct that occurs prior to the formation of the plan. *See, e.g., Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1469 (4th Cir. 1996) (ERISA does not preempt a state malpractice claim for malpractice by an insurance agent in inducing a business to leave its current plan to form an ERISA plan).[9]

This line of cases rests on the proposition that entities cannot evade prosecution for past violations of law by switching to a different regulatory regime. The same holds true here. If banks could escape prosecution for past violations of state law by converting from a state to a federal license,

---

[9] *Perry v. P\*I\*E Nationwide, Inc.*, 872 F.2d 157 (6th Cir. 1989) (ERISA does not preempt employees' state law claims against employer for misrepresentations made before employees joined plan); *Smith v. Cohen Benefit Group, Inc.*, 851 F. Supp. 210 (M.D.N.C. 1993) (ERISA does not preempt employee's state law claim against plan administrator for misrepresentations about coverage that induced employee to join plan); *DiPietro-Kay Corp. v. Interactive Benefits Corp.*, 825 F. Supp. 459 (D. Conn. 1993) (ERISA does not preempt employer's misrepresentation claims against insurer from which it purchased benefits plan).

these converting banks would be the sole category of individual or entities that would be afforded immunity by simply changing jurisdictions. This immunity loophole would both provide an avenue for troublesome banks to escape liability for misconduct, and would create a regulatory gap every time a state-licensed bank converted to a federal license, or vice versa. If state regulators are prohibited from prosecuting enforcement actions for misconduct that occurred before the state-licensed bank converted to a federal license—that is, while the bank was still under state supervision—that misconduct would be fully immune from redress.

BTMU and the OCC claim that BTMU is subject to OCC action. But that has nothing to do with New York's right to enforce its laws for past misconduct under a New York license. Even if a bank's past misconduct could be prosecuted by a new regulator, immunity from accountability from the prior regulator would allow the bank to pick the prosecutor that it wants to address its past misconduct—a wholly unprecedented proposition.

The powers that BTMU and the OCC seek to strip from the State of New York—to decide how and against whom its laws will be enforced—are each part of "how a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see also Younger v. Harris*, 401 U.S. 37, 45 (1971) ("Ordinarily, there should be no interference with [state prosecutors]; primarily, they are charged with the duty of prosecuting offenders against the laws of the state, and must decide when and how this is to be done.") (citation omitted).

DFS's mandate is to enforce New York law to protect the state and its consumers. It is through the enforcement of New York law, including the provisions of Section 44 of the Banking Law—that DFS has punished, prevented, and deterred misconduct. The strong deterrence for misconduct provided by Section 44 would be seriously compromised if a bank could simply avoid accountability to DFS and evade the reach of New York Banking Law by simply converting to a federal license after the bank's misconduct is about to be subject to action.

BTMU and the OCC seek to convert the states from enforcers of their own laws to mere bystanders, who must depend on the federal regulator to take action. But each state "has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses." *United States v. Wheeler,* 435 U.S. 313, 320 (1978), *superseded on other grounds*; *see also Calderon v. Thompson,* 523 U.S. 538 (1998). A regime that turns the States into supplicants, dependent on a federal agency for enforcement of their own laws, is no more tolerable than one that treats them as "mere departments of the National Government." *FERC v. Mississippi*, 456 U.S. 742, 795 (1982) (O'Connor, J., concurring in part and dissenting in part). "An essential attribute of the States' retained sovereignty [is] that they remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997).

In this vein, there are legitimate questions in this case over the OCC's reasons for granting BTMU's conversion applications and its position that DFS is foreclosed from enforcing state law against BTMU for pre-conversion conduct. *See Wultz v. Bank of China Ltd.*, 61 F. Supp. 3d 272, 292 (S.D.N.Y. 2013) (recognizing that "questions have repeatedly been raised about the OCC's independence from the banks it oversees"); *Cuomo*, 557 U.S. at 533.[10] At the time of BTMU's conversion, DFS was investigating its BSA/AML and OFAC compliance programs in light of serious deficiencies it had found. BTMU had reason to run to an agency "with a lighter touch."[11] And so it

---

[10] *See, e.g.,* Gillian E. Metzger, *Federalism and Federal Agency Reform*, 111 Colum. L. Rev. 1, 27 (2011) (noting that "[f]ederal agency failure loomed particularly large in the background of *Cuomo*, with the OCC repeatedly characterized as an agency captured by the entities it was charged with regulating, the classic example of agency failure" (citing amicus brief and scholarship)); Keith R. Fisher, *Toward A Basal Tenth Amendment: A Riposte to National Bank Preemption of State Consumer Protection Laws*, 29 Harv. J.L. & Pub. Pol'y 981, 1028–29 (2006) ("OCC largely subsists ... on fees paid by the institutions they regulate.... Those financial incentives make the agency's decision-making process susceptible to error in ways that are not as likely when the decision maker is an elected body."); Arthur E. Wilmarth, Jr., *The OCC's Preemption Rules Exceed the Agency's Authority and Present a Serious Threat to the Dual Banking System and Consumer Protection*, 23 Ann. Rev. Banking & Fin. L. 225, 232 (2004) ("Given the OCC's financial self-interest and its empire-building agenda, the OCC faces a clear conflict of interests.").

[11] In a November 17, 2017 interview, acting Comptroller of the Currency Keith Noreika emphasized the importance of OCC bank examiners having a "lighter touch" with the institutions they scrutinize. *See* Olivia Oran, *U.S. bank examiners to show lighter touch, OCC's Noreika says*, Reuters (Nov. 20, 2017), https://www.reuters.com/article/us-usa-banks-regulation-noreika/u-s-bank-examiners-to-show-lighter-touch-occs-noreika-says-idUSKBN1DK0CB.

did. And *immediately* after the conversion, the OCC terminated the Independent Consultant that was instrumental in identifying the misconduct giving rise to the counterclaims in this case.

Further, in arguing that there is no regulatory gap, BTMU and the OCC focus on the consent order they entered into as part of the conversion, which nominally contains the same substantive requirements as the 2013 and 2014 Consent Orders. But there are key omissions. Notably, the OCC's Consent Order does not subject BTMU to liability for conduct occurring before November 7, 2017, because it cannot—that enforcement is up to DFS, which licensed BTMU for that time period. And under the terms of the 2013 and 2014 Consent Orders, BTMU was subject to the scrutiny of an Independent Consultant. The OCC's Consent Order omits this critical provision. BTMU was plainly anxious to relieve itself of this oversight: the day after it was issued federal licenses, BTMU terminated the Independent Consultant and demanded that it exit BTMU's Tokyo headquarters. (Countercls. ¶¶ 40, 116; November 13 DFS Letter 3, ECF No. 17-5.)  As such, the substitution of the OCC for DFS did not maintain the status quo regarding the enforcement of New York law against BTMU for past misconduct.

The Supreme Court has repeatedly upheld the sovereign authority of each state to enforce its own laws. It has done so despite the fact that other entities may have power to enforce similar laws against the same entities. In *Heath v. Alabama*, 474 U.S. 82, 89 (1985), the Court stated that "[a] State's interest in vindicating its sovereign authority through enforcement of its laws by definition can never be satisfied by another State's enforcement of *its* own laws." 474 U.S. at 93. Similarly, in *Bartkus v. Illinois,* 359 U.S. 121 (1959), the Court determined that "[i]t would be in derogation of our federal system to displace the reserved power of States over state offenses by reason of prosecution of minor federal offenses by federal authorities beyond the control of the States." *Id.* at 137 (footnote omitted).

Against each of these strong considerations, there is no legal basis to prevent DFS from enforcing New York law against BTMU for conduct that occurred when BTMU was under the

exclusive regulatory jurisdiction of New York. Enforcement of New York law against BTMU in this case by DFS does not offend the Supremacy Clause but preserves the federalism principles reflected in the dual-system of bank regulation. Enforcement of New York law against BTMU in this case by DFS does not infringe on the OCC's jurisdiction because the OCC will retain exclusive supervisory authority over all of BTMU's conduct that occurs during the pendency of a valid federal license. Nor does the enforcement of New York law against BTMU in this case unfairly harm BTMU. BTMU should have every expectation that, having benefitted from operating under DFS licenses for over 60 years, it should be held to account in New York for any illegal activity it committed during that period.

### 2. *Capital One v. McGraw* is neither binding precedent nor persuasive authority.

BTMU's claim that the timing of its misconduct is irrelevant relies on a single case from the Southern District of West Virginia, *Capital One Bank (USA), N.A. V. McGraw*, 563 F. Supp. 2d 613, 622 (S.D. W. Va. 2008). There, Capital One Bank converted from a state to a federal license as it was being investigated for possible violations of West Virginia's consumer protection law. One year before *Cuomo*, the court held that West Virginia could not bring an enforcement proceeding against Capital One Bank for pre-conversion conduct because under the OCC's regulation interpreting the NBA, enforcement proceedings were an exercise of visitorial powers. *Id.*

*McGraw* is neither controlling nor persuasive. *McGraw* based its holding on the definition of "visitorial powers" in the OCC's regulation—12 C.F.R. § 7.4000. Because that regulation was subsequently invalidated by the Supreme Court in *Cuomo*, *McGraw* is inapplicable here.

But that is not the only reason *McGraw* is flawed precedent. In relying on *McGraw*, both BTMU and the OCC ignore the fact that, after *Cuomo*, the West Virginia Attorney General moved to modify the district court's decision. The Attorney General argued that, in light of *Cuomo*, its enforcement actions against Capital One were not federally preempted, and that it should thus be permitted to pursue them. The court agreed, and entered an order modifying the original judgment to

permit the contemplated enforcement actions by West Virginia. (Conley Decl. Ex. C.) Thus, the only authority cited by BTMU in support of its claim that states are precluded from enforcing their laws against national banks for pre-conversion conduct actually holds the exact opposite.

Moreover, although the *McGraw* court (prior to the Supreme Court's decision in *Cuomo*) felt compelled to rule against West Virginia because of the plain language of the OCC's (later invalidated) regulation, the court openly expressed significant regret with its decision:

> The broad definition of "visitorial" espoused by the OCC allows it to usurp West Virginia's power to investigate whether national banks have violated West Virginia consumer protection law. As noted by Judge Cardamone [in *Cuomo*], … § 7.4000 erodes a key aspect of state sovereignty, confuses the paths of political accountability, and allows a federal regulatory agency to have a substantial role in shaping state public policy.'

*McGraw*, 563 F. Supp. 2d at 622. With the benefit of the Supreme Court's decision in *Cuomo*, the *McGraw* court quickly reversed course, and permitted West Virginia to enforce its state law against Capital One Bank N.A. for conduct that was plainly subject to state law and not subject to federal preemption. The same principles compel the same holding here.

**B.     DFS's counterclaims are not preempted under the National Bank Act because they are an exercise of the Superintendent's law enforcement authority.**

**1.     Federal preemption under the National Bank Act is narrower than BTMU and the OCC allege.**

The NBA provides for the formation of national banks and grants these banks certain powers, including "'all such incidental powers as shall be necessary to carry on the business of banking.'" *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 17 (2007) (citations omitted). The enactment of the NBA ushered in a dual banking system under which banks could be chartered either by the OCC or by a State authority and be subject to different legal requirements and oversight from different regulatory bodies. Under this dual system of regulation, banks operating in the United States choose their initial charter—federal or state—and then are bound to the regulation and oversight that comes with that charter.

To prevent inconsistent state regulation from infringing upon the activities of national banks, the NBA preempts the exercise of "visitorial powers" by any state authority over a federally chartered bank. Specifically, the Act provides:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

12 U.S.C. § 484(a). The International Banking Act extends this limitation to branches of foreign banks that are federally licensed. *See* 12 U.S.C. § 3102(b); 12 C.F.R. § 28.13(a)(1).

Although the term "visitorial powers" is not defined in the NBA (or any other federal statute), the OCC has offered differing interpretations of the term over the years. In 2004, the OCC issued an amended regulation—12 C.F.R. § 7.4000—that interpreted the scope of "visitorial powers" under Section 484 of the NBA. In that regulation, the OCC broadly defined "visitorial powers" as the:

(i)   "Examination of a bank;"

(ii)  "Inspection of a bank's books and records;"

(iii) "Regulation and supervision of activities authorized and permitted pursuant to federal banking law;" and

(iv)  "Enforcing compliance with any applicable Federal or state laws concerning those activities."

*See* 12 C.F.R. § 7.4000(a)(2).

However, in 2009, the Supreme Court expressly invalidated subsection (iv) of this regulation on the ground that the Comptroller had erred in construing the NBA to bar states from enforcing their own laws, expressly distinguishing a state's "visitorial powers" and its power to enforce the law. *See Cuomo*, 557 U.S. at 526, 531 ("The Comptroller's regulation, therefore, does not comport with the statute.").

In invalidating this provision of the OCC's regulation, the Court focused on the historical distinction between a state's "visitorial powers" and its power to enforce the law, and concluded that the NBA did not intend to preempt the ability of a state to enforce its laws against national banks:

> Our cases have always understood visitation as this right to oversee corporate affairs, quite separate from this right to enforce the law … In sum, the unmistakable and utterly consistent teaching of our jurisprudence, both before and after enactment of the [NBA], is that a sovereign's 'visitorial powers' and its power to enforce the law are two different things. There is not a credible argument to the contrary. And contrary to what the Comptroller's regulation says, the [NBA] pre-empts only the former.

*Id.* at 527, 529.

In apparent defiance to *Cuomo*'s clear directive, the OCC has not revised its definition of visitorial powers in § 7.4000. Instead, the OCC amended its regulation to add a narrow exception to its broad (and invalidated) definition of visitorial powers in § 7.4000:

> In accordance with the decision of the Supreme Court in *Cuomo v. Clearing House Assn., L. L. C.*, 129 S. Ct. 2710 (2009), an action against a national bank in a court of appropriate jurisdiction brought by a state attorney general (or other chief law enforcement officer) to enforce an applicable law against a national bank and to seek relief as authorized by such law is not an exercise of visitorial powers under 12 U.S.C. 484.

12 C.F.R. § 7.4000(b). This was the only change the OCC made to § 7.4000 as a result of *Cuomo*. As amended, the OCC's regulation still includes the enforcement of laws in the definition of "visitorial powers" unless it satisfies the conditions outlined in the new section (b).

The Supreme Court's holding in *Cuomo*, however, was far broader than the new exclusion provision in Section 7.4000(b). Although the facts in *Cuomo* involved "an action against a national bank in a court of appropriate jurisdiction brought by a state attorney general," the Supreme Court did not limit its holding in this way.

*Cuomo* held that there is a clear distinction between visitation and enforcement, and that only acts of a visitorial nature are preempted by the NBA. *Cuomo* describes the exercise of visitorial powers as "the right to oversee corporate affairs," "general supervision and control," and "administrative oversight" that permits the inspection of books and records on demand. *Id.* at 535. In other words, the Supreme Court endorsed the first three subsections of OCC's definition of "visitorial powers"—(i) Examination of a bank; (ii) Inspection of a bank's books and records; and (iii) Regulation and supervision of activities authorized or permitted pursuant to federal banking law—but emphatically

rejected the fourth definition, which interpreted visitorial powers to preclude state enforcement of state laws.[12] *Id.* at 536 ("the Comptroller erred by extending the definition of 'visitorial powers' to include 'prosecuting enforcement actions'").

So while *Cuomo* holds that the "enforcement of laws" by a state-sovereign falls outside the scope of visitorial powers, it does not limit the meaning of that phrase to only those actions "against a national bank in a court of appropriate jurisdiction brought by a state attorney general." Instead, *Cuomo* establishes that a state's enforcement of its laws is not an exercise of visitorial powers—and thus is not preempted and remains a valid exercise of state authority—*unless* the state action involves an (1) examination of a bank; (2) inspection of a bank's books and records; or (3) regulation and supervision of activities authorized or permitted pursuant to federal banking law. Section (a)(2)(iv) of the OCC's regulation, which includes enforcement of laws in the definition of visitorial powers, was invalidated by *Cuomo*, has not been amended, and is therefore still invalid today.

Applying these principles here, the dispositive question is whether DFS's counterclaims—which seek *to enforce* the New York Banking Law against BTMU for conduct that occurred when its New York branches were indisputably licensed by DFS—constitute an exercise of visitorial powers preempted by the NBA. As set forth in Points II.B. and II.C. below, the answer is "no." And because none of the counterclaims constitute an exercise of visitorial powers, BTMU's motion to dismiss should be denied in full.

### 2.   DFS's exercise of its law enforcement authority in this case is not preempted.

All seven of DFS's counterclaims arise under its law enforcement authority in New York Banking Law § 44 and thus do not constitute an exercise of visitorial powers. In addition to possessing

---

[12] The regulation is also not entitled to deference because it purports to interpret a Supreme Court decision, *see Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 642 n.11 (2007), and define the preemptive scope of a statute, *see, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009). *See also Steel Inst. of N.Y. v. City of New York*, 716 F.3d 31, 39–40 (2d Cir. 2013); *Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 116–17 (1st Cir. 2016) (collecting cases).

supervisory powers over banking institutions licensed or chartered under New York law, DFS and the Superintendent have broad law enforcement authority. In fact, the enforcement of the New York Banking Law was made clear in the stated the purposes for DFS's creation in 2011:

> The legislative hereby declares that the purpose of this chapter is to consolidate the departments of insurance and banking, and provide for the enforcement of the insurance, banking and financial services laws, under the auspices of a single state agency to be known as the 'department of financial services' and to accomplish goals including the following …. (c) to provide for the effective and efficient enforcement of the banking and insurance laws…

N.Y. Fin. Serv. L. § 102(c); *see also id.* §§ 301(b), 301(c)(1), 309, 403(c), 403(d), 406(a), and 408(a)(1)(B).

Section 44 of the Banking Law grants DFS the power, separate and apart from "any [other] power granted to the superintendent under any other provision of [the Banking Law]" to take enforcement action, including the levying of penalties —up to $250 thousand a day per violation—for violations of the Banking Law and regulations issued thereunder. The Superintendent's authority under Section 44 permits the imposition of penalties to be paid "to the people of this state." *Id.* § 44(1)–(4). Enforcement of the New York Banking Law has been entrusted to the state executive agency with the most experience in banking matters: DFS. And the imposition of civil penalties is a law enforcement function.

All seven of DFS's counterclaims arise under its law enforcement authority in Section 44 of the New York Banking Law and thus do not constitute an exercise of visitorial powers. Counts I–VI seek—as direct claims to be adjudicated by this Court—penalties for BTMU's violation of the New York Banking Law while BTMU was licensed by DFS. In asserting these counterclaims, DFS is not seeking to conduct a bank examination. Nor is it seeking to supervise BTMU's internal organization or the adequacy of its capital structure. Rather, the counterclaims seek penalties for violations of the Banking Law, which, as the Supreme Court recognized in *Cuomo*, have been enforced against national banks for over 85 years. *Cuomo*, 557 U.S. at 534 ("States, on the other hand, have … enforced their banking-related laws against national banks for at least 85 years ….") Although the Superintendent is

asserting these counterclaims, they are being filed by the Superintendent "not in the capacity of sovereign-as-supervisor, but rather in the role of sovereign-as-law-enforcer." *Id.*.[13]

Even if the OCC's definition of visitorial powers in 12 C.F.R. § 7.4000 were consistent with *Cuomo* and entitled to deference, Counts I–VI of DFS's counterclaims would nevertheless fall within the regulation's exemption for law-enforcement activities because they: (i) are being brought in a court of appropriate jurisdiction; (ii) by DFS—the state agency responsible for enforcing New York's banking laws—with the NYAG as its counsel; (iii) to enforce an applicable state law (New York Banking Law) against BTMU for relief (civil penalties) authorized by such law. As a result, there is no credible claim that these counterclaims are an exercise of visitorial authority preempted by the NBA.

Count VII seeks a declaratory judgment that the Superintendent may initiate and maintain an adjudicatory proceeding under Section 44 for the enforcement of violations of the New York Banking Law committed by BTMU prior to November 7, 2017. Aside from the forum for adjudication, Count VII is identical to Counts I–VI: the underlying facts, law, penalties, and the enforcement nature of the claims are the same. The only difference is that Count VII would enforce the New York Banking Law against BTMU through an administrative hearing subject to review under Article 78 of the New York Civil Practice Law and Rules whereas Counts I–VI would be litigated entirely in this court.

DFS possesses the clear statutory authority to pursue enforcement actions in an administrative proceeding—an authority accepted by BTMU when it sought and operated under DFS licenses for 65 years. BTMU appears to challenge this authority on the grounds that an administrative proceeding

---

[13] Moreover, the New York Attorney General ("NYAG") is prosecuting these counterclaims as the legal representative of the Superintendent For this reason, BTMU's suggestion that DFS lacks the authority to pursue the imposition of monetary penalties under Section 44 of the New York Banking Law in federal or state court is baseless. Section 44 provides that DFS has the discretion to request that the NYAG institute an action to recover unpaid civil penalties or forfeitures *in the name of the Superintendent*. The NYAG is counsel to DFS in this action. Thus, even if DFS were barred from seeking relief from this Court in the absence of the NYAG, which it is not, BTMU's argument fails because the NYAG is participating in this litigation. The NYAG is statutorily authorized to defend state agencies, such as DFS, and to prosecute entities, such as BTMU, on a state agency's behalf. N.Y. Exec. L. § 63. And when doing so, the NYAG acts with the full force of its law-enforcement authority.

lacks sufficient procedural safeguards to be a nonpreempted enforcement action under *Cuomo*. But courts—including the Supreme Court in *Cuomo*— have recognized that the availability of subsequent judicial review in an administrative proceeding provides banks with sufficient due process. *See, e.g., Martine's Serv. Ctr. v. Town of Wallkill*, 554 F. App'x 32, 35 (2d Cir. 2014) (an Article 78 proceeding is adequate due process and a constitutionally "adequate state mechanism" for challenging administrative action). And here, it is undisputed that banks may seek judicial review following any decision issued by the Superintendent imposing penalties under the Banking Law. N.Y. Banking Law § 44(6).

*Anderson National Bank v. Luckett*, 321 U.S. 233 (1944) is instructive on this point. There, the Supreme Court held that the state commissioner of revenue was not federally preempted from enforcing a state abandoned-bank-deposit law through an administrative proceeding that was subject to subsequent judicial review. 321 U.S. at 246–47. In addressing the same due process concerns raised by BTMU here, *Luckett* rejected the idea that administrative proceedings subject to subsequent judicial review are lacking in due process protections. *Id.* Although *Luckett* was decided over 70 years ago, the Supreme Court erased any doubts about its continued vitality in *Cuomo. See Cuomo*, 557 U.S. at 534.

BTMU's motion rests on an expansive articulation of federal preemption that no court has ever recognized. Taken at face value, BTMU is saying that it does not matter if it violated state laws while it was subject to DFS's license, because even if it did break those laws, which it did, and even if DFS has evidence showing it broke those laws, which it does, BTMU can no longer be held accountable for those violations. BTMU asserts that neither DFS nor any other state official can prosecute these claims in an administrative proceeding or court of law. As BTMU sees it, once it converted its New York branches to federal licenses, DFS lost the authority to hold it accountable for *any* past violations of the New York Banking Law—regardless of when those violations occurred. This argument is not only contrary to New York law, but it also offends basic legal principles relevant to this case.

32

III.     **DFS's counterclaims state plausible claims for relief under New York law.**

   A.  **DFS possesses the statutory authority to bring an enforcement action against BTMU.**

BTMU maintains that DFS is prohibited from asserting its counterclaims because it is "a supervisory agency vested with visitorial, not law enforcement, powers." Mot. to Dismiss 12. But this argument ignores the fact that DFS is exercising its law enforcement powers as represented by the NYAG.

As a threshold matter, Count VII of DFS's counterclaims is not a lawsuit filed pursuant to Section 44, but rather seeks a declaratory judgment that DFS may maintain an administrative action against BTMU for its pre-conversion violations of New York law. As a result, even if DFS did not have authority to sue (and it does), Count VII would survive BTMU's motion.

More importantly, DFS is a proper counterclaimant in this law-enforcement action. DFS is statutorily charged with the "enforcement of the insurance, banking, and financial services laws" in New York. N.Y. Fin. Serv. L .§ 102. And the Superintendent possesses "the rights, powers, and duties in connection with financial services and protection in this state, expressed or reasonably implied by [the financial services law] or any other applicable law of this state." *Id.* § 202(a). And here, DFS is represented by the NYAG, who is specifically vested with the power to "[p]rosecute and defend all actions and proceedings in which the State is interested." N.Y. Exec. L. § 63(1).

As BTMU recognizes, the power to sue may be conferred expressly or "inferred as necessary implication from the agency's powers and responsibilities." *Cmty. Bd. 7 of Borough of Manhattan* v. *Schaffer*, 84 N.Y.2d 148, 155–56 (1994). Here, the legislature's overarching purpose in creating DFS was to "consolidate the departments of insurance and banking, and *provide for the enforcement of the insurance, banking, and financial services laws, under the auspices of a single state agency.*" N.Y. Fin. Serv. L. § 102. The legislative mandate to enforce state law plainly confers the power of enforcement. Otherwise the

mandate would be rendered hollow.[14] *See Williams v. Taylor*, 529 U.S. 362, 404 (2000).

BTMU also asserts that DFS has not previously asserted claims in federal or state court seeking to impose monetary penalties under the Banking Law, insinuating that therefore DFS must lack the authority to do so. But it ignores the unique circumstances of this case. It is true that DFS has historically pursued Section 44 penalties through an administrative proceeding (which it also seeks to do in Count VII of DFS's counterclaims). But DFS has historically never been haled into court by a bank in such a naked attempt to escape scrutiny and evade prosecution by converting to a federal license. Given that BTMU chose to commence this litigation against DFS in this Court to avoid DFS enforcement, DFS deemed this Court to be the most appropriate forum to seek a declaratory judgment that DFS can maintain an administrative action against BTMU under Section 44 or, alternatively, to assert its claims against BTMU in this Court. That decision speaks to DFS's concerns for judicial efficiency—not to its inability to bring an administrative proceeding against BTMU under Banking Law § 44. Ultimately, the Superintendent will enforce the New York Banking Law against BTMU for violations committed when BTMU was a DFS-licensee only once—either in an administrative proceeding pursuant to Count VII of its counterclaims or in this Court pursuant to Counts I–VI. The alternative pleading in DFS's counterclaims is a function of the procedural status of this case and is necessary to preserve all available remedies to enforce the New York Banking Law against BTMU for conduct occurring when it was undisputed that BTMU was licensed by DFS.

---

[14] Citing *Yonkers Comm'n on Human Rights v. City of Yonkers*, 654 F. Supp. 544, 553 (S.D.N.Y. 1987), BTMU argues that this broad mandate from the Legislature is insufficient to create the authority to sue. *Yonkers Comm'n on Human Rights* is inapposite. In that case, the court held that the Yonkers Commission on Human Rights lacked the power to sue because such power was not expressly provided by statute or reasonably inferred from the Commission's duty to foster mutual respect and understanding, study fields of human relationships, report allegations of unlawful discrimination to the division of human rights, and appoint attorneys when necessary. *Id.* (citing N.Y. Gen. Municipal L. § 239.) These statutory duties are a far cry from the broad grant of authority conferred upon the Superintendent of DFS to provide for *enforcement* of the Insurance, Banking, and Financial Services Laws. *See* N.Y. Fin. Serv. L. § 102; *see also City of New York v. City Civil Serv. Comm'n*, 60 N.Y.2d 436, 441 (1983) (a city official has the power to sue under statutory mandate "to enforce the civil service laws").

**B. DFS's counterclaims state viable claims.**

BTMU argues that DFS fails to state a claim under the New York Banking Law and 3 N.Y.C.R.R. § 116.2. *See* Mot. to Dismiss 28–30. This argument is meritless.

DFS asserts claims against BTMU under Sections 44(3) and 44(4) of the Banking Law. To plead a claim under Section 44(3), the Superintendent must allege that BTMU's New York branches "recklessly engaged in an unsafe and unsound practice," and that such deficient operation was part of a pattern of misconduct that resulted or was likely to result in more than a minimal loss or pecuniary gain. To plead a claim under Section 44(4), the Superintendent must allege that BTMU has knowingly or recklessly incurred so substantial a loss as a result of the violation or practice as to threaten its safety and soundness by, among other things, knowingly and willfully engaging in an unsafe or unsound practice.

DFS has sufficiently alleged facts to support the plausibility of its counterclaims against BTMU. DFS's counterclaims contain specific factual allegations showing that BTMU repeatedly and recklessly engaged in "unsafe and unsound practice[s]" over a three-year period. DFS alleges, among other things, that BTMU intentionally circumvented its sanctions filters at its New York branches, utilized deficient sanctions filtering programs that were incapable of adequately screening for suspicious or illegal transactions, made false and misleading statements about the status of those programs, and sought to undermine cooperation with the independent consultant. *Id.* ¶¶ 64–114. These detailed factual allegations of reckless misconduct easily satisfy federal pleading standards.

In sum, DFS's counterclaims state viable claims.

## CONCLUSION

For the foregoing reasons, BTMU's motion to dismiss should be denied.

Dated: New York, New York
      May 25, 2018

                  Respectfully submitted,

                  BARBARA D. UNDERWOOD
                  Attorney General
                  State of New York

                  By: Jonathan D. Conley
                     Shannan Krasnokutski
                  Assistant Attorneys General
                  28 Liberty St.
                  New York, New York 10005
                  (212) 416-8108

                  *Counsel for Defendant*