UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF TOKYO-MITSUBISHI UFJ,
LTD.,

                      Plaintiff,

              v.

MARIA VULLO, in her official capacity as
Superintendent of Financial Services of the New
York State Department of Financial Services,

                      Defendant.

1:17-cv-08691-SHS

---

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS
## MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

Richard C. Pepperman II
Beth D. Newton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Robert A. Long, Jr. (*pro hac vice*)
Henry B. Liu (*pro hac vice*)
Jonathan Y. Mincer (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000

*Attorneys for Plaintiff The Bank of Tokyo-Mitsubishi UFJ, Ltd.*
*(now known as MUFG Bank, Ltd.)*

June 13, 2018

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 2

I.   BTMU's Motion To Dismiss Is Not Premature.................................................................. 2

    A.   BTMU's Federal Licenses Are Presumptively Valid. ............................................ 3

    B.   DFS's Legal Challenges to the OCC's Issuance of Federal Licenses Fail. ............ 4

    C.   DFS's Claim That the OCC's Issuance of Federal Licenses Was Arbitrary
        and Capricious Can Be Brought Only in an APA Action Against the OCC. ......... 7

II.  Federal Law Preempts DFS's Counterclaims. .................................................................. 10

    A.   DFS Cannot Escape Preemption by Purporting To Challenge Only Pre-
        Conversion Conduct by Federally Licensed Branches. ....................................... 10

    B.   DFS's Claims for Penalties Are a Preempted Exercise of Visitorial
        Powers.............................................................................................................. 14

        1.   DFS's Claims Are Preempted Under the OCC's Regulation. .................. 14

        2.   DFS Fails To Demonstrate That the OCC's Regulation Is Invalid. ......... 15

        3.   DFS's Efforts To Portray Itself as a Law Enforcement Officer and
            To Seek Post-Conversion Penalties in an Administrative
            Proceeding Do Not Withstand Scrutiny................................................... 17

III. DFS Fails To Defend Its Claims Under New York Law. ................................................... 19

    A.   DFS Fails To Show That It Is Authorized To Assert Counts I–VI in Court. ....... 19

    B.   DFS Effectively Concedes Its Failure To State a Claim Under
        Sections 44(3) and 44(4) of the Banking Law and 3 N.Y.C.R.R. § 116.2. .......... 20

CONCLUSION...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aqua Creations USA Inc.* v. *Hilton Hotels Corp.*,
　2011 WL 1239793 (S.D.N.Y. Mar. 28, 2011), *aff'd sub nom. Aqua Creations
　USA Inc.* v. *Hilton Worldwide, Inc.*, 487 F. App'x 627 (2d Cir. 2012) ................................... 8

*AT&T Corp.* v. *FCC*,
　349 F.3d 692 (D.C. Cir. 2003) ................................................................................................. 3

*B.W.P. Distribs., Inc.* v. *OE Plus, Ltd.*,
　2009 WL 1154102 (S.D.N.Y. Mar. 31, 2009) ......................................................................... 8

*Bldg. Indus. Ass'n of Superior Calif.* v. *Babbitt*,
　979 F. Supp. 893 (D.D.C. 1997) ............................................................................................. 6

*Capital One Bank (USA), N.A.* v. *McGraw*,
　563 F. Supp. 2d 613 (S.D. W. Va. 2008) ........................................................................ 12, 13

*Citizens to Preserve Overton Park, Inc.* v. *Volpe*,
　401 U.S. 402 (1971) .............................................................................................................. 10

*Clarke* v. *Sec. Indus. Ass'n*,
　479 U.S. 388 (1987) .............................................................................................................. 16

*Cmty. Bd. 7 of Borough of Manhattan* v. *Schaffer*,
　84 N.Y.2d 148 (1994) ..................................................................................................... 19, 20

*Conference of State Bank Supervisors* v. *Conover*,
　715 F.2d 604 (D.C. Cir. 1983) .............................................................................................. 14

*Cuomo* v. *Clearing House Ass'n, L.L.C.*,
　557 U.S. 519 (2009) ...................................................................................................... *passim*

*Dopico* v. *Goldschmidt*,
　687 F.2d 644 (2d Cir. 1982) ................................................................................................. 10

*Felske* v. *Hirschmann*,
　2012 WL 716632 (S.D.N.Y. Mar. 1, 2012) ........................................................................... 20

*Fla. Power & Light Co.* v. *Lorion*,
　470 U.S. 729 (1985) .......................................................................................................... 9, 10

*George* v. *Gutierrez*,
   2007 WL 1029002 (E.D.N.Y. Mar. 28, 2007), *aff'd sub nom. George* v.
   *Evans*, 311 F. App'x 426 (2d Cir. 2009)........................................................................8

*Guzman* v. *Macy's Retail Holdings, Inc.*,
   2010 WL 1222044 (S.D.N.Y. Mar. 29, 2010) ................................................................20

*Karpova* v. *Snow*,
   402 F. Supp. 2d 459 (S.D.N.Y. 2005), *aff'd*, 497 F.3d 262 (2d Cir. 2007) ....................14

*Kurniawati* v. *JI Club Corp.*,
   2013 WL 1225865 (S.D.N.Y. Mar. 20, 2013) ..................................................................9

*Ledbetter* v. *Goodyear Tire & Rubber Co.*,
   550 U.S. 618 (2007)........................................................................................................16

*Martin* v. *Nat'l Bank of Alaska*,
   828 F. Supp. 1427 (D. Alaska 1992) ................................................................................6

*Mayo Found. for Med. Educ. & Research* v. *United States*,
   562 U.S. 44 (2011)..........................................................................................................16

*N.Y. Foreign Freight Forwarders & Brokers Ass'n* v. *Fed. Maritime Comm'n*,
   337 F.2d 289 (2d Cir. 1964)...........................................................................................16

*Nat'l Audubon Soc'y* v. *Hoffman*,
   132 F.3d 7 (2d Cir. 1997) ...............................................................................................10

*In re Nielsen*,
   2017 U.S. App. LEXIS 27681 (2d Cir. Dec. 27, 2017).....................................................10

*NRDC* v. *Muszynski*,
   268 F.3d 91 (2d Cir. 2001)................................................................................................9

*Odebrecht Constr., Inc.* v. *Sec'y, Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013) ......................................................................................14

*Pharaon* v. *Bd. of Governors of Fed. Reserve Sys.*,
   135 F.3d 148 (D.C. Cir. 1998) .........................................................................................6

*Radiancy, Inc.* v. *Viatek Consumer Prods. Grp., Inc.*,
   138 F. Supp. 3d 303 (S.D.N.Y. 2014)...............................................................................8

*Sage Realty Corp.* v. *U.S. Dep't of Treasury*,
   2000 WL 272192 (S.D.N.Y. Mar. 10, 2000) .....................................................................3

*Samsun Logix Corp.* v. *Bank of China*,
   740 F. Supp. 2d 484 (S.D.N.Y. 2010)...............................................................................5

*Shell Gulf of Mexico Inc.* v. *Ctr. for Biological Diversity, Inc.*,
    771 F.3d 632 (9th Cir. 2014) ................................................................................7

*Sierra Club* v. *U.S. Army Corps of Eng'rs*,
    772 F.2d 1043 (2d Cir. 1985)................................................................................3

*United States* v. *Backlund*,
    689 F.3d 986 (9th Cir. 2012) ................................................................................8

*Universal Health Servs., Inc.* v. *United States*,
    136 S. Ct. 1989 (2016) ........................................................................................5

*Watters* v. *Wachovia Bank, N.A.*,
    550 U.S. 1 (2007)................................................................................................11

*Wyeth* v. *Levine*,
    555 U.S. 555 (2009)....................................................................................14, 16

**Statutes**

5 U.S.C. § 703 ..............................................................................................................7

12 U.S.C. § 35 ...........................................................................................................4, 5

12 U.S.C. § 484 .....................................................................................................11, 16

12 U.S.C. § 1818 .........................................................................................................13

12 U.S.C. § 3102 ..................................................................................................4, 5, 11

N.Y. Banking L. § 21(3) ..............................................................................................18

N.Y. Banking L. § 44............................................................................................18, 20

N.Y. Exec. L. § 63(1)...................................................................................................15

N.Y. Fin. Serv. L. § 309 ..............................................................................................18

N.Y. Fin. Serv. L. § 403 ..............................................................................................18

N.Y. Fin. Serv. L. § 408 ..............................................................................................18

N.Y. Fin. Serv. L. § 409 ..............................................................................................18

N.Y. Ins. L. § 109 ........................................................................................................18

**Regulations**

12 C.F.R. § 5.2 .................................................................................................6

12 C.F.R. § 7.4000 ...............................................................................14, 15, 16

12 C.F.R. § 28.12 ...............................................................................................6

3 N.Y.C.R.R. § 116.2 ........................................................................................20

**Consent Orders**

*In re Citibank, N.A.*,
  OCC Consent Order No. AA-EC-2017-71 (Dec. 27, 2017) ...................................13

*In re Citibank, N.A.*,
  OCC Consent Order No. AA-EC-11-13 (Apr. 13, 2011) .......................................13

*In re Providian Nat'l Bank*,
  OCC Consent Order No. 2000-53 (June 23, 2000)................................................13

*In re Rabobank, N.A.*,
  OCC Consent Order No. AA-WE-2017-82 (Feb. 6, 2018) ....................................13

*In re U.S. Bank Nat'l Ass'n*,
  OCC Consent Order No. AA-EC-2018-84 (Feb. 13, 2018) ...................................13

**Other Authorities**

Daniel K. Tarullo, Bd. of Governors of the Fed. Reserve Sys., Testimony Before
  the Comm. on Fin. Servs., U.S. House of Reps., 2009 WL 3483311 (Oct. 29,
  2009) ...............................................................................................................5

Letter from Eric T. Schneiderman to Andrew M. Cuomo (Feb. 14, 2017) ...................................19

Letter from Maria T. Vullo to Senator John J. Flanagan, et al. (Feb. 15, 2017)............................15

OCC Release No. NR 2010-16 (Feb. 18, 2010) ............................................................13

## PRELIMINARY STATEMENT

To consolidate its U.S. operations under a single federal regulatory scheme, BTMU applied last fall to convert its state-licensed branches in California, Illinois and New York, as well as its state-licensed agencies in Texas, to federally licensed branches and agencies under the exclusive visitorial powers of the OCC—which already regulated BTMU's national bank subsidiary.  (Am. Compl. ¶¶ 5-6, 30-39.)  Recognizing the benefits of consolidated oversight, the OCC approved BTMU's conversion applications and issued federal licenses to BTMU's branches and agencies on November 7, 2017.  (*See id.* ¶¶ 7, 40-45; Am. Compl. Ex. I at 2.) BTMU filed this lawsuit after DFS issued an order on November 8 asserting continuing regulatory authority over BTMU's New York branches, notwithstanding the OCC's issuance of BTMU's federal banking licenses (Am. Compl. ¶¶ 8, 49-55)—an order DFS has refused to rescind (Answer ¶ 52).  After this action was filed, DFS also sent a letter to the OCC incorrectly asserting that the OCC was required to obtain DFS's consent before issuing licenses to BTMU and accusing BTMU of pre-conversion misconduct.  (Am. Compl. ¶¶ 60-73.)  BTMU therefore sought a declaration that federal law preempts the DFS order and any other exercise of visitorial powers by DFS, and that DFS's legal challenges to BTMU's licenses lack merit.  (*Id.* ¶¶ 88-110.) DFS responded by asserting counterclaims against BTMU under New York banking law.

The Court should grant BTMU's motion to dismiss DFS's counterclaims.  The OCC licenses are presumed valid, and DFS's legal challenges to the OCC's issuance of the licenses fail as a matter of law.  DFS's broader attempt in its opposition brief to challenge the OCC's action as arbitrary, capricious and an abuse of discretion can be asserted only in an action against the OCC under the Administrative Procedure Act ("APA"), which DFS has not brought even though the OCC issued the federal licenses over seven months ago.  Under the federal banking statutes, OCC regulations and relevant case law, DFS's unprecedented attempt to assert claims

for penalties against a federally licensed branch for alleged violations of state banking laws and DFS regulations and orders is a preempted exercise of visitorial powers.  DFS's counterclaims also fail under New York law and should be dismissed on that independent basis.

DFS's opposition brief further reveals the retaliatory nature of its counterclaims.  DFS contends that it "was poised to prosecute" an enforcement action against BTMU (Opp'n at 8) and "already possesse[d] all of the relevant information and records needed to prove the misconduct" *before* BTMU converted its licenses on November 7, 2017 (*id*. at 20).  Those contentions do not square with the following facts:  (i) DFS allowed the Independent Consultant's engagement to expire without objection in May 2017; (ii) DFS attempted to negotiate a supplemental consent order to renew and extend the Consultant's engagement (even after learning of BTMU's conversion applications) that did not mention any violation of law or seek any penalties; (iii) DFS never threatened an enforcement action that demanded any additional penalties until filing its counterclaims in February 2018—months *after* BTMU brought this lawsuit; and (iv) DFS has refused the OCC's repeated requests for evidence supporting DFS's accusations.  These facts belie the assertion that "BTMU turned to the OCC" to escape an imminent enforcement action (*id*. at 8) and strongly suggest that DFS's counterclaims seek to punish BTMU for converting to federal supervision and to deter other banks from doing the same.

## ARGUMENT

## I.   BTMU's Motion To Dismiss Is Not Premature.

DFS argues that BTMU's motion is "premature" because it is premised on the validity of BTMU's federal licenses.  Contrary to DFS's suggestion, the OCC's issuance of federal licenses to BTMU, like all federal agency actions, is presumptively valid.  And DFS's legal challenges to the licenses, which BTMU anticipated in its declaratory-judgment claim, fail as a matter of law.

DFS's broader argument in its opposition brief that the OCC's actions were "arbitrary and capricious" is misplaced here:  DFS can bring such a claim only in an APA action against the OCC.  Accordingly, this Court can and should give the OCC licenses their full preemptive effect.

> **A.** **BTMU's Federal Licenses Are Presumptively Valid.**

DFS contends that "[p]reemption is an affirmative defense that can only be raised in a motion to dismiss when there are no disputed facts."  (*Id.* at 3.)  According to DFS, "the validity of the licenses issued by OCC is a disputed fact that forecloses BTMU's motion" (*id.*) because the Court may not "assume the validity of an agency action without first allowing discovery" (*id.* at 15-16).  DFS thus suggests that the Court should presume that BTMU's licenses are invalid until BTMU prevails on its claim for a declaratory judgment that the licenses are valid.  That argument gets the law backwards.

It is black-letter law that "[c]ourts must defer to the action taken by [an] agency, which is presumed to be valid."  *Sierra Club* v. *U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051 (2d Cir. 1985).[1]  That presumption of validity attaches to the OCC's actions unless a challenger prevails in a properly asserted action under the APA.  Thus, to establish preemption, BTMU does not bear the burden of demonstrating that the OCC acted properly in issuing BTMU's federal licenses.  BTMU need show only that the OCC has issued the licenses, which then are presumed to be valid.  The OCC's issuance of licenses to BTMU is not in dispute here.  (*See* Countercls. ¶¶ 5, 7, 9, 114.)  Indeed, DFS itself states that its "counterclaims operate on the assumption that BTMU's federal licenses are valid."  (Opp'n at 20.)

---

[1] *See also AT&T Corp.* v. *FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003) ("Highly deferential, the arbitrary and capricious standard presumes the validity of agency action."); *Sage Realty Corp.* v. *U.S. Dep't of Treasury*, 2000 WL 272192, at *3 (S.D.N.Y. Mar. 10, 2000) ("[A] presumption of validity attaches to agency action.").

**B.      DFS's Legal Challenges to the OCC's Issuance of Federal Licenses Fail.**

DFS's legal arguments for invalidating the OCC licenses—that the OCC was required to obtain DFS's consent before approving BTMU's conversion applications and that the approval was inconsistent with certain non-binding policy statements—lack merit and should be rejected.

*First*, the OCC was not required to obtain DFS's consent to the conversion.  The statutory provision on which DFS relies, 12 U.S.C. § 35, applies only to conversions of state-chartered banks to national banks, not to conversions of state-licensed branches of foreign banks to federally licensed branches.  (*See* OCC Br. at 15-17.)  As amended by the Dodd-Frank Act, Section 35 prohibits the conversion of "*a State bank*" if the bank "is subject to a cease and desist order (or other formal enforcement order) issued by . . . a State bank supervisor . . . with respect to a significant supervisory matter," unless the state supervisor "does not object to the conversion" (emphasis added).  By contrast, conversions of state-licensed branches of foreign banks are governed by 12 U.S.C. § 3102(f), which simply provides that "[a]ny branch or agency operated by a foreign bank in a State pursuant to State law . . . may be converted into a Federal branch or agency with the approval of the Comptroller."

DFS concedes that 12 U.S.C. § 35 applies only to "domestic banks" but incorrectly contends that Section 35 is "made applicable to . . . a federally-licensed branch of a foreign bank through . . . § 3102(b)" of the International Banking Act ("IBA").   (Opp'n at 17.)  Section 3102(b) provides that:

> *operations* of a foreign bank at a *Federal* branch or agency shall be conducted with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank doing business at the same location.

12 U.S.C. § 3102(b) (emphasis added).  That provision is inapplicable here.  When the OCC approved BTMU's conversion applications, BTMU's branches were not federally licensed—they

were state-licensed.   Section 3102(b) subjects only federally licensed branches to the "restrictions" applicable to national banks.   It does not subject state-licensed branches to those restrictions—much less, as DFS asserts, to restrictions applicable to *state* banks.   Moreover, Section 3102(b) applies only to the "operations" of a federally licensed branch of a foreign bank. It does not extend to licensing, whether *de novo* or by conversion.   *See Samsun Logix Corp.* v. *Bank of China,* 740 F. Supp. 2d 484, 490 (S.D.N.Y. 2010) ("To read 'operations of a foreign bank' as equating to a 'foreign bank' renders the term 'operations' surplusage.").

Lacking a response based on statutory text or case law, DFS asserts that the construction urged by the OCC and BTMU "would undermine the congressional policy of maintaining competitive equality between state-licensed banks and national banks within the dual banking system."   (Opp'n at 18.)   But "policy arguments cannot supersede . . . clear statutory text." *Universal Health Servs., Inc.* v. *United States*, 136 S. Ct. 1989, 2002 (2016).   When Congress amended 12 U.S.C. § 35 as part of Dodd-Frank in 2010—nearly 40 years after the legislative history on which DFS bases its policy argument (Opp'n at 18 & n.8)—it expressly imposed the state-regulator "no-objection" requirement only on conversions of state banks, without altering the IBA provision (12 U.S.C. § 3102(f)) that governs conversions of state-licensed branches of foreign banks.   Dodd-Frank thus distinguished between conversions of state-chartered banks (which are FDIC-insured) and conversions of state-licensed branches of foreign banks (which, with very limited exceptions, are uninsured).   *See*, *e.g.*, Daniel K. Tarullo, Bd. of Governors of the Fed. Reserve Sys., Testimony Before the Comm. on Fin. Servs., U.S. House of Reps., 2009 WL 3483311, at *9 (Oct. 29, 2009) (explaining that Dodd-Frank would address possibility that "*insured* depository institutions" will seek "charter conversions . . . that are motivated by hopes of escaping current or prospective supervisory actions" (emphasis added)).

*Second*, DFS cannot show that the OCC's decision was contrary to law by arguing that it was inconsistent with statements in the OCC's Licensing Manual for Federal Branches and Agencies ("Manual") or the Federal Financial Institutions Examination Council's Statement on Regulatory Conversions ("FFIEC Statement").   An agency's decision "cannot be overturned based on the [agency's] alleged noncompliance with its own, nonbinding policy statements." *Bldg. Indus. Ass'n of Superior Calif.* v. *Babbitt*, 979 F. Supp. 893, 905 (D.D.C. 1997).

As the OCC explained (OCC Br. at 18-19), the Manual is just such a non-binding policy statement, which was not promulgated through notice-and-comment rulemaking or published in the Federal Register.   The Manual itself states that the described OCC licensing practices apply only "generally" and that the OCC makes decisions "on a case-by-case basis."   (Conley Decl. Ex. A at 8, 10, 47, 48.)   Moreover, OCC regulations describe the Manual as offering "guidance" and expressly reserve the OCC's discretion to adopt "materially different procedures for a particular filing." 12 C.F.R. § 28.12(j); *see also* 12 C.F.R. §§ 5.2(b)-(c).   Because the Manual is non-binding, adherence to it is not subject to judicial review.   *See Pharaon* v. *Bd. of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 155-56 (D.C. Cir. 1998) (rejecting APA challenge to Federal Reserve's divergence from non-binding policy document and concluding that "the agency had no obligation to explain any departure from it"); *Martin* v. *Nat'l Bank of Alaska*, 828 F. Supp. 1427, 1433 (D. Alaska 1992) (purpose of OCC handbook was "advisory" and handbook thus was "not a rule or regulation").   Likewise, the FFIEC Statement does not supply a basis to invalidate the OCC's licensing decision.   That one-page policy statement published by a group of banking regulators does not purport to restrict the OCC's discretion under the National Bank Act ("NBA"), the IBA or the OCC's own regulations.   (Conley Decl. Ex. B.)

Even if the Manual and FFIEC Statement were subject to judicial review, the OCC did

-6-

not depart from those policies.  (*See* OCC Br. at 19-20.)  According to DFS, the Manual and FFIEC Statement prohibit the OCC from considering "a conversion application submitted while a material enforcement action is pending."  (Opp'n at 12.)  But there was no such enforcement action pending at the time of BTMU's conversion.  Although DFS contends in its opposition brief that it was "poised to undertake additional enforcement actions," the only fact alleged in support of that contention is that the parties had exchanged drafts of a supplemental consent order solely for the purpose of extending the Independent Consultant's engagement. (Countercls. ¶ 114.)  DFS nowhere alleges that the draft order asserted any new violation of law or sought any penalty, or that DFS had advised BTMU or the OCC that DFS was planning an additional enforcement action.  DFS also claims that the OCC departed from the Manual's statement that the OCC typically consults with a converting bank's current regulator in assessing a conversion application.  (Opp'n at 12-13.)  But the OCC did just that here:  it contacted DFS and requested relevant documents and information.  (Am. Compl. Exs. E, I.)  DFS has not responded to the OCC's request for documents.  (OCC Br. at 20 n.17.)

### C.  DFS's Claim That the OCC's Issuance of Federal Licenses Was Arbitrary and Capricious Can Be Brought Only in an APA Action Against the OCC.

DFS's opposition brief also seeks to challenge the validity of BTMU's federal licenses by arguing more broadly that the OCC's licensing decision was "arbitrary, capricious, and an abuse of discretion," in violation of the APA.  (Opp'n at 11.)  But DFS has not asserted an APA claim, and, even if it had, the proper defendant for such a claim would be the OCC, not BTMU.

To challenge the OCC's actions as arbitrary, capricious and an abuse of discretion under the APA, DFS must bring an action against the OCC, which it has not done.  *See* 5 U.S.C. § 703 (permitting parties aggrieved by agency action to assert claims against "the United States, the agency by its official title, or the appropriate officer");  *Shell Gulf of Mexico Inc.* v. *Ctr. for*

-7-

*Biological Diversity, Inc.*, 771 F.3d 632, 636 (9th Cir. 2014) ("Actions under the APA may be brought only against federal agencies . . . . A claim under the APA cannot be asserted against a private party."); *Aqua Creations USA Inc.* v. *Hilton Hotels Corp.*, 2011 WL 1239793, at *7 (S.D.N.Y. Mar. 28, 2011) (dismissing claim seeking review of determination by Copyright Office because plaintiff "brought no claim against the Copyright Office"), *aff'd sub nom. Aqua Creations USA Inc.* v. *Hilton Worldwide, Inc.*, 487 F. App'x 627 (2d Cir. 2012); *George* v. *Gutierrez*, 2007 WL 1029002, at *6 (E.D.N.Y. Mar. 28, 2007) ("[C]laims under . . . the APA . . . can only be brought against federal agencies."), *aff'd sub nom. George* v. *Evans*, 311 F. App'x 426 (2d Cir. 2009).  DFS thus cannot mount a collateral attack on the OCC's decision under the APA in this action against BTMU.  *See United States* v. *Backlund*, 689 F.3d 986, 1000 (9th Cir. 2012) (rejecting attempted "end-run [around] the procedural requirements governing appeals of administrative decisions").

Besides proceeding against the wrong party, DFS's counterclaims fail to plead an APA claim.  None of the conspiracy theories and other speculative accusations included in DFS's "invalidity" argument (*see, e.g.*, Opp'n at 14-15) appears anywhere in DFS's counterclaims. Although DFS states that its answer "disputes the validity of the conversion in its defenses and in its responses to BTMU's allegations" (*id.* at 2), a motion to dismiss is limited to "the four corners of the Counterclaim."  *B.W.P. Distribs., Inc.* v. *OE Plus, Ltd.*, 2009 WL 1154102, at *6 n.5 (S.D.N.Y. Mar. 31, 2009); *see also Radiancy, Inc.* v. *Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 316 (S.D.N.Y. 2014) (facts not alleged in counterclaim "cannot be considered in determining the sufficiency of the pleadings on a motion to dismiss").[2]  Having pled no facts

---

[2] Even if the Court were to look beyond the counterclaims, DFS's answer simply denies BTMU's allegations that the licenses are valid (Answer ¶¶ 3, 64, 79, 90-91), asserts in conclusory fashion that the licenses are invalid (*id.* ¶¶ 79, 90), and raises defenses of invalidity without any supporting factual (continued…)

rebutting the presumption of validity that attaches to the OCC's actions, much less attempted to allege a viable APA claim against the OCC, DFS cannot avoid a ruling on BTMU's motion simply by asserting that the validity of BTMU's federal licenses is in dispute.[3]

Even if DFS were to commence a proper APA action against the OCC, DFS would have no right to the expansive discovery it seeks.  Far from permitting "discovery on the full circumstances that led to the OCC's approval of BTMU's conversion applications" (Opp'n at 11 n.1), the APA limits discovery to "the administrative record already in existence"—*i.e.*, "the record the agency presents to the reviewing court" in an APA challenge—and "not some new record made initially in the reviewing court."  *Fla. Power & Light Co.* v. *Lorion*, 470 U.S. 729, 743-44 (1985); *see also NRDC* v. *Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001) (APA review limited to "examining the administrative record to determine" whether agency committed "a clear error of judgment").  If a court concludes that the administrative record does not support the challenged agency action, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation," not to "conduct a *de novo* inquiry into the

---

allegations (Defenses Nos. 2-7).  These denials and legal conclusions are not well-pled factual allegations.  *See Kurniawati* v. *JI Club Corp.*, 2013 WL 1225865, at *1 (S.D.N.Y. Mar. 20, 2013) ("Defendants' 'counterclaims must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009))).

[3] DFS argues that "there are legitimate questions" about the OCC's approval of BTMU's conversion because the OCC subsists largely on fees paid by the institutions it regulates.  (Opp'n at 23 & n.10.)  The counterclaims are devoid of any such allegation.  Moreover, if the fees the OCC collects raise questions, there are even more serious questions about DFS's motivation for opposing BTMU's conversion:  DFS not only subsists on fees paid by the entities it regulates, but also, in recent years, has collected *billions* of dollars in penalties from the foreign-bank branches it licenses.  That revenue would be lost if other banks were to follow BTMU and convert their licenses.  In another unpled assertion, DFS claims that the OCC could not have "appropriately evaluated the BTMU conversions" in the time after BTMU formally filed its applications.  (*Id.* at 13.)  As the OCC explained, however, its review began well before the formal filing of BTMU's applications based on (i) information provided by BTMU in pre-filing discussions, (ii) information gathered through the OCC's preexisting supervision of BTMU's national bank subsidiary, and (iii) coordination with the Federal Reserve and the Japan Financial Services Agency, BTMU's home country regulator.  (*See* OCC Br. at 11-14, 19-20; Am. Compl. Ex. I at 2-3.)

matter being reviewed." *Fla. Power & Light*, 470 U.S. at 744.  Although DFS cites *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402 (1971), for the proposition that "the district court should not decide [an APA challenge] without the 'whole record' before it" (Opp'n at 15 n.7), the court there was referring to "the 'whole record' *compiled by the agency*" in response to a properly asserted APA claim, not to one created by the challenging party through plenary discovery.  401 U.S. at 419 (emphasis added).[4]

## II.  Federal Law Preempts DFS's Counterclaims.

DFS contends that its counterclaims are "not preempted for two independent reasons." (Opp'n at 19.)  *First*, DFS argues that its "counterclaims involve conduct before November 7, 2017 when BTMU's New York branches were . . . state-licensed" and when "the OCC did not have *any* authority over BTMU."  (*Id*.)  *Second*, DFS asserts that visitorial powers do not include a state official's enforcement of state law against a national bank or federally licensed branch, regardless of the identity of that state official, the forum in which the official proceeds or the nature of the state law at issue.  (*See id*. at 26-32.)  Neither argument has merit.

### A.  DFS Cannot Escape Preemption by Purporting To Challenge Only Pre-Conversion Conduct by Federally Licensed Branches.

DFS's principal argument against preemption is that its claims for penalties "seek to enforce New York Banking Law against BTMU for conduct that occurred *before* BTMU was issued federal licenses."  (*Id*. at 19.)  According to DFS, "[t]his is entirely distinct from visitorial powers subsequent to that date."  (*Id*.)  The relevant statutes, however, make no such distinction.

---

[4] The other cases cited by DFS hold only that limited additional discovery may be permitted in circumstances not present here, such as where an agency selectively withholds information in an APA case or where a particular statute requires a broader record.  *See In re Nielsen*, 2017 U.S. App. LEXIS 27681, at *9 (2d Cir. Dec. 27, 2017) (plaintiffs "identified specific materials that appear[ed] to be missing from the record"); *Dopico* v. *Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (same); *Nat'l Audubon Soc'y* v. *Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997) (applying special requirements of National Environmental Policy Act).

DFS nevertheless asks the Court to adopt an exception to Congress's categorical prohibition on state regulators' exercise of "*any* visitorial powers" based on the timing of the alleged activities a state official seeks to regulate.   12 U.S.C. § 484(a) (emphasis added); *see also* 12 U.S.C. § 3102(b).  There is no basis in the law for such an exception.

Although DFS is correct that "timing matters" (Opp'n at 4), what matters is the timing of a regulator's attempt to exercise supervisory authority, not the timing of the activities of the federally licensed branches.  Here, DFS seeks to exercise regulatory authority over BTMU *after* the conversion of its licenses, which the NBA and IBA foreclose.  Contrary to DFS's contention (*id*. at 20), forcing BTMU to defend against DFS's claims for penalties based on pre-conversion activities would amount to precisely the type of "[d]iverse and duplicative superintendence" that "the NBA was designed to prevent."  *Watters* v. *Wachovia Bank, N.A.*, 550 U.S. 1, 13-14 (2007). If federal and state banking regulators had overlapping jurisdiction over national banks and federally licensed branches for years after a license conversion, both sets of regulators independently could exercise enforcement authority over the same past matters, risking inconsistent or even conflicting orders.  DFS's timing argument would give a state banking regulator limitless authority to drag a national bank or federally licensed branch into far-reaching enforcement proceedings so long as the proceedings nominally are limited to pre-conversion activities.  Moreover, if, as DFS asserts, exercises of authority over pre-conversion matters are categorically excluded from preempted visitorial powers, then a state regulator could subject a converted bank or branch to *any* exercise of visitorial authority—including inspection or examination—as long as the exercise was limited to pre-conversion activities.

DFS does not cite a single case that supports its timing argument.  Instead, DFS relies on authority from inapposite contexts, such as ERISA and the flight of criminal defendants across

jurisdictions.  (Opp'n at 21 & n.9.)  None of these cases supports the notion that state regulators can assert visitorial powers over formerly state-licensed banks or branches by attempting to tie the exercise of those powers to conduct that occurred while the state licenses were in effect.

The only case that addresses DFS's timing argument, *Capital One Bank (USA), N.A.* v. *McGraw*, 563 F. Supp. 2d 613 (S.D. W. Va. 2008), squarely rejects it.  *McGraw* expressly holds that states "cannot exercise visitorial powers over a national bank *regardless of when the activities sought to be investigated occurred*."  *Id*. at 622 (emphasis added).  As that court explained, there is no basis to "fashion a special rule" that "a state official may exercise visitorial powers over a national bank so long as . . . the state seeks to investigate activities that the bank engaged in before achieving national bank status."  *Id.*

Contrary to DFS's false assertion (Opp'n at 25-26), the subsequent order entered in *McGraw* did not in any way reconsider that ruling.  The *McGraw* court instead modified its injunction only insofar as it could be read to prohibit the West Virginia Attorney General "from bringing lawsuits [against Capital One] to enforce non-preempted, substantive state laws." (Conley Decl. Ex. C at 2.)  This modification conformed the court's order to the holding in *Cuomo* v. *Clearing House Ass'n, L.L.C.*, 557 U.S. 519 (2009), and clarified that such lawsuits by state attorneys general are not preempted, regardless of when the underlying activities occurred. Because the timing of the challenged conduct was not relevant to whether such lawsuits by the West Virginia Attorney General are preempted, the *McGraw* court's subsequent order said nothing to suggest that other state officials can exercise visitorial powers over national banks as long as they limit themselves to conduct that occurred before a license conversion.

Lacking any support in the relevant statutes or cases, DFS invokes the specter of an "immunity loophole" or "regulatory gap" if it is not permitted to penalize BTMU for pre-

conversion conduct.  (Opp'n at 22.)  No such "loophole" or "gap" exists.  To the contrary, the OCC has broad statutory authority to take enforcement action, including by imposing penalties, for a violation of "*any* law or regulation," federal or state, regardless of when the violation occurred.  12 U.S.C. § 1818(i)(2) (emphasis added).  The OCC has used that power to take action based on (i) violations of state law, *see*, *e.g.*, *In re Providian Nat'l Bank*, OCC Consent Order No. 2000-53, at 7, 12-13, 17, 20-25, 51 (June 23, 2000); *In re Citibank, N.A.*, OCC Consent Order No. AA-EC-11-13 (Apr. 13, 2011), and (ii) *pre-conversion* conduct for a bank that converted from a state to a federal license, *see* OCC Release No. NR 2010-16 (Feb. 18, 2010) (enforcement action against Capital One following *McGraw* based on *pre-conversion* conduct). Other federal agencies such as the Federal Reserve, FinCEN and OFAC also have jurisdiction to enforce the same BSA/AML and OFAC requirements on which DFS's counterclaims are predicated.  This array of federal regulators refutes any notion of an "enforcement gap."

In addition, the OCC's superseding consent order with BTMU states that the OCC will review BTMU's "compliance with BSA/AML and OFAC requirements" and, if appropriate, will take "additional enforcement action."  (Am. Compl. Ex. A at 3.)  That order does not limit such an enforcement action to post-conversion conduct, and it contains remedial provisions that are substantively identical to those in DFS's 2013 and 2014 consent orders.  (*Id.*)  As a condition of approving BTMU's conversion, the OCC also secured BTMU's commitment to accept an OCC enforcement action based on pre-conversion conduct.  (*Id.*; *see also* OCC Br. at 6-8.)[5]

To the extent that DFS complains that preemption infringes on state sovereignty (*see*

---

[5] DFS asserts that BTMU converted its licenses to "run to an agency 'with a lighter touch.'" (Opp'n at 23-24.)  As the OCC's recent consent orders demonstrate, however, it enforces BSA/AML and OFAC requirements aggressively.  *See*, *e*.*g*., *In re U.S. Bank Nat'l Ass'n*, OCC Consent Order No. AA-EC-2018-84 (Feb. 13, 2018); *In re Rabobank, N.A.*, OCC Consent Order No. AA-WE-2017-82 (Feb. 6, 2018); *In re Citibank, N.A.*, OCC Consent Order No. AA-EC-2017-71 (Dec. 27, 2017).

Opp'n at 23-24), the Supremacy Clause contemplates precisely this result. *Wyeth* v. *Levine*, 555 U.S. 555, 584 (2009) ("[A]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States."); *see also Conference of State Bank Supervisors* v. *Conover*, 715 F.2d 604, 615-16 (D.C. Cir. 1983) (rejecting state challenge to issuance of OCC licenses and recognizing Congress's intent in IBA to accord foreign banks national treatment). Indeed, a consistent national approach to bank regulation is nowhere more compelling than in the area of economic sanctions, which, as a tool of United States foreign policy, is the province of the federal government. *Cf. Karpova* v. *Snow*, 402 F. Supp. 2d 459, 466 (S.D.N.Y. 2005), *aff'd*, 497 F.3d 262 (2d Cir. 2007); *see also Odebrecht Constr., Inc.* v. *Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1272 (11th Cir. 2013).

### B.   DFS's Claims for Penalties Are a Preempted Exercise of Visitorial Powers.

As DFS acknowledges, "the term 'visitorial powers' is not defined in the NBA (or any other federal statute)." (Opp'n at 27.) As the agency charged with administering the NBA, the OCC has issued a regulation construing that term. Under that regulation, DFS's counterclaims are an exercise of visitorial powers, and DFS falls far short of demonstrating that the OCC's regulation is invalid under *Cuomo*. DFS's other attempts to defeat preemption are unavailing.

### 1.   DFS's Claims Are Preempted Under the OCC's Regulation.

DFS's counterclaims plainly are preempted under the OCC's regulation, which defines "visitorial powers" to include "prosecuting enforcement actions" unless such actions are brought (i) by "a state attorney general (or other chief law enforcement officer)" (ii) "in a court of appropriate jurisdiction" (iii) "to enforce an applicable law." 12 C.F.R. §§ 7.4000(a)–(b). Despite its arguments to the contrary (Opp'n at 31), DFS fails each of these three requirements.

*First*, DFS is not "a state attorney general (or other chief law enforcement officer)," but rather a state banking regulator. Contrary to DFS's suggestion, DFS is not transformed into New

York's "chief law enforcement officer" simply because "the NYAG [is acting] as its counsel" in this case.  (*Id.*)  As DFS previously acknowledged, when the NYAG represents DFS in litigation, "the Attorney General acts as DFS's counsel, in an attorney-client relationship."  Letter from Maria T. Vullo to Senator John J. Flanagan, et al. 3 (Feb. 15, 2017); *see also* N.Y. Exec. Law § 63(1) (requiring NYAG to "have charge and control of all the legal business of . . . any office [of state] *which requires the services of attorney or counsel*" (emphasis added)).

*Second*, DFS cannot properly assert claims for penalties "in a court of appropriate jurisdiction."  New York law instead requires DFS to proceed in an internal administrative proceeding (BTMU Opening Br. at 12-13), as DFS seeks permission to do in Count VII.  An internal DFS administrative proceeding is not a lawsuit "in a court of appropriate jurisdiction."

*Third*, DFS does not seek to enforce a generally "applicable law against a national bank." Rather, DFS seeks to penalize BTMU for alleged violations of New York Banking Law and DFS's own regulations and consent orders.  (Countercls. ¶¶ 117, 128, 139, 150, 157, 163, 168-71.)  Such enforcement efforts are an exercise of visitorial authority under 12 C.F.R. § 7.4000(b).

### 2.  DFS Fails To Demonstrate That the OCC's Regulation Is Invalid.

DFS asks this Court to take the extraordinary step of invalidating the OCC's regulation under *Cuomo*.  As DFS recognizes, however, "the OCC amended its regulation" after *Cuomo* to take into account the Supreme Court's decision.  (Opp'n at 28.)  That amended regulation, adopted through notice-and-comment rulemaking, warrants *Chevron* deference.  As *Cuomo* held, because "[t]here is necessarily some ambiguity as to the meaning of the statutory term 'visitorial powers,'" the OCC "can give authoritative meaning to the statute within the bounds of that uncertainty."  557 U.S. at 525.  The cases cited by DFS do not support its claim that the OCC's regulation is "not entitled to deference because it purports to . . . define the preemptive scope of a statute."  (Opp'n at 29 n.12.)  Unlike here, the agencies in those cases sought to deem specific

state laws preempted, not to define an ambiguous term in a federal statute the agencies were charged with administering.  *Cf. Wyeth*, 555 U.S. at 577 ("[A]gencies have no special authority to pronounce on pre-emption absent delegation by Congress.").[6]

Under *Chevron*, courts "may not disturb an agency rule unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'"  *Mayo Found. for Med. Educ. & Research* v. *United States*, 562 U.S. 44, 53 (2011); *see also Clarke* v. *Sec. Indus. Ass'n*, 479 U.S. 388, 403-04 (1987) (OCC's construction of NBA entitled to "great weight").  The OCC's regulation reinterpreting the term "visitorial powers" in light of *Cuomo* easily clears that bar. *Cuomo* vacated an injunction only insofar as it prohibited "the *Attorney General* from bringing *judicial* enforcement actions" under generally applicable state antidiscrimination-in-lending laws.  557 U.S. at 536 (emphasis added).  By contrast, the Supreme Court *affirmed* the injunction insofar as it barred the NYAG's "issuance of [a] subpoena on his own authority under New York Executive Law," because this was "*not* the exercise of the *power of law enforcement 'vested in the courts of justice*' which 12 U.S.C. § 484(a) exempts from the ban on exercise of supervisory power."  *Id.* (emphasis added).  In amending its regulation, the OCC carefully tracked *Cuomo*'s holding by excluding from the definition of visitorial powers lawsuits "in a court of appropriate jurisdiction brought by a state attorney general (or other chief law enforcement officer) to enforce an applicable law."  12 C.F.R. § 7.4000(b); *see also Cuomo*, 557 U.S. at 527, 530, 536.

"A regulation is presumptively valid, and one who attacks it has the burden of showing its invalidity."  *N.Y. Foreign Freight Forwarders & Brokers Ass'n* v. *Fed. Maritime Comm'n*,

---

[6] Nor does the OCC's regulation lose its entitlement to deference simply because it was amended in light of *Cuomo*.  (Opp'n at 29 n.12.)  Unlike in *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), on which DFS relies, the OCC does not ask the Court simply to defer to its reading of a judicial decision.  Rather, the OCC promulgated an amended regulation interpreting an NBA provision following *Cuomo*.  An agency's revised interpretation of an undefined and ambiguous statutory term does not lose its entitlement to deference just because a judicial decision prompted the revision.

337 F.2d 289, 295 (2d Cir. 1964).  DFS fails to meet that burden.  In arguing that the OCC acted

"[i]n apparent defiance to *Cuomo*'s clear directive" (Opp'n at 28), DFS essentially takes the

position that *Cuomo* stands for the proposition that *any* state enforcement of *any* state law or

requirement in *any* forum—whether by a state attorney general or a state banking regulator,

whether in a court or an administrative proceeding, and whether under a generally applicable law

or a state banking law, regulation or order—is not visitorial.  According to DFS, visitorial

powers instead are narrowly limited to bank examinations, inspection of bank books and records,

and supervision of a bank's internal organization or the adequacy of its capital structure.  (*See id*.

at 29-30.)  DFS's cramped view of visitorial powers is inconsistent with *Cuomo*, which

explained "the difference between visitation and law enforcement" as follows:

> If a State chooses to pursue enforcement of its laws *in court*, then it is not
> exercising its power of visitation and will be treated like a litigant.  An *attorney
> general* acting as a *civil litigant* must *file a lawsuit*, survive a motion to dismiss,
> endure the rules of procedure and discovery, and risk sanctions if his claim is
> frivolous or his discovery tactics abusive . . . . *A visitor, by contrast*, may inspect
> books and records at any time for any or no reason.

557 U.S. at 531 (emphasis added).  The OCC's amended regulation—not DFS's sweeping

interpretation of *Cuomo*—is consistent with that distinction.  Moreover, DFS seeks here to

pursue penalties based not on discovery in litigation, but on its previous supervisory inspections

of BTMU's books and records, a clear exercise of visitorial powers under *Cuomo*.

### 3.    DFS's Efforts To Portray Itself as a Law Enforcement Officer and To Seek Post-Conversion Penalties in an Administrative Proceeding Do Not Withstand Scrutiny.

DFS contends that it has "broad law enforcement authority" under New York law,

repeatedly suggesting that it is a "prosecutor."  (Opp'n at 30; *see id*. at 21-22.)  DFS is incorrect:

DFS is a regulatory agency that is not vested with any law-enforcement powers outside of a

supervisory context.  (BTMU Opening Br. at 12-13.)  In arguing otherwise, DFS principally

relies on the Financial Services Law's description of the reasons for DFS's creation, which include "provid[ing] for the enforcement of the insurance, banking and financial services laws." (Opp'n at 30 (citing N.Y. Fin. Serv. L. § 102(c).)  But that provision merely outlines general policy goals; it does not set forth particular grants of authority.  The provisions of New York law that specifically establish DFS's power do not provide DFS with the law-enforcement authority it claims to possess.  (*See id.* at 5, 30, 32.)  To the contrary, those provisions establish a regulatory scheme in which DFS may investigate and impose penalties through an administrative proceeding on the institutions it regulates, but must refer the matter to the NYAG or another prosecutor to commence any proceeding in court.  *See*, *e.g.*, N.Y. Fin. Serv. L. §§ 403, 408, 409(a) (permitting DFS to establish financial frauds and consumer protection unit but providing that DFS can impose penalties only administratively or report violations to NYAG or district attorney to prosecute in court); N.Y. Banking L. §§ 44, 21(3) (permitting DFS to impose penalties administratively for violations of Banking Law but authorizing only NYAG to enforce penalties in court).[7]  By consistently limiting DFS's authority to impose penalties to an administrative proceeding, the Legislature has underscored DFS's role as a regulator with supervisory authority only over the entities it licenses.

In support of Count VII of its counterclaims, which seeks a declaration that it can proceed administratively, DFS knocks down a straw man by suggesting that BTMU has raised a due-process challenge to DFS's "authority to pursue enforcement actions in an administrative proceeding." (Opp'n at 31.)  BTMU does not argue on this motion that such an administrative proceeding fails to "provide[] banks with sufficient due process." (*Id.* at 32.)  Rather, BTMU

---

[7] Where the Legislature has seen fit to empower DFS to sue in court, it has done so expressly: Section 309 of the Financial Services Law expressly authorizes DFS to seek an injunction in court, and Section 109 of the Insurance Law explicitly authorizes DFS to bring an action in court to recover unpaid penalties imposed under the Insurance Law through DFS's administrative process.

notes that the Legislature's decision to limit DFS's ability to seek penalties to an internal administrative proceeding and to require DFS to refer unpaid penalties to the NYAG underscores DFS's role as a banking regulator with supervisory authority, not New York's chief law enforcement officer.  None of the inapposite due process cases cited by DFS addresses whether administrative proceedings by state banking regulators are visitorial.  And DFS does not dispute that an internal administrative proceeding conducted by DFS lacks all the judicial process and procedural safeguards that *Cuomo* found significant in determining whether an action is a preempted exercise of visitorial powers.  (BTMU Opening Br. at 15-17.)

## III.    DFS Fails To Defend Its Claims Under New York Law.

### A.    DFS Fails To Show That It Is Authorized To Assert Counts I–VI in Court.

DFS admits that it has never before attempted to sue for penalties under the Banking Law in court.  (Opp'n at 34.)  DFS also does not dispute that it lacks express statutory authority to pursue such penalties in this or any court.  Instead, citing *Community Board 7 of Borough of Manhattan* v. *Schaffer*, 84 N.Y.2d 148 (1994), DFS asks the Court to infer that it has the power to sue for penalties in court by "implication" from DFS's other "powers and responsibilities," relying again on New York statutes' general descriptions of DFS's purpose.  (Opp'n at 33.) Under *Schaffer*, however, such an inference is appropriate *only* if "there is no clear legislative intent negating" it.  84 N.Y.2d at 156.  Here, such a "clear legislative intent" exists.  In 2017, the Legislature *rejected* a bill proposed by Governor Cuomo that would have authorized DFS to sue in court to recover penalties imposed administratively under Section 44.  (BTMU Opening Br. at 25-27.)  In opposing the proposed legislation, the NYAG wrote that DFS lacks the "authority to bring civil actions in court to enforce orders and recover penalties" and instead must "report violations of civil penalties imposed under the financial services law" to state law-enforcement authorities.  *See* Letter from Eric T. Schneiderman to Andrew M. Cuomo 2 (Feb. 14, 2017)

(Pepperman Decl. Ex. A).  That legislative history negates any inference that the Legislature intended to confer on DFS the power to recover penalties in court.  *See Schaffer*, 84 N.Y.2d at 158 (municipal community board lacked implied capacity to sue in part because municipality had rejected proposal to amend board's charter to provide such authority expressly).

**B.      DFS Effectively Concedes Its Failure To State a Claim Under Sections 44(3) and 44(4) of the Banking Law and 3 N.Y.C.R.R. § 116.2.**

DFS all but ignores BTMU's independently dispositive arguments that DFS fails to state a claim under Sections 44(3) and 44(4) of the Banking Law and 3 N.Y.C.R.R. § 116.2.  (BTMU Opening Br. at 28-30.)  In a single paragraph on the last page of its brief, DFS baldly asserts that it "has sufficiently alleged facts to support the plausibility of its counterclaims," indiscriminately "block citing" 50 paragraphs of its counterclaims.  (Opp'n at 35 (citing Countercls. ¶¶ 64-114).) DFS does not point to a single allegation—and there is none—that pleads the missing elements of DFS's Section 44(3) and 44(4) claims, namely, that BTMU incurred *any* losses in connection with the alleged violations.  DFS also says nothing in response to BTMU's argument that DFS's failure to plead an OFAC sanctions violation is fatal to its claims under 3 N.Y.C.R.R. § 116.2. DFS concedes that argument by not addressing it in its opposition brief.  *See Felske* v. *Hirschmann*, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them."); *Guzman* v. *Macy's Retail Holdings, Inc.*, 2010 WL 1222044, at *8 (S.D.N.Y. Mar. 29, 2010) ("Plaintiff does not address this argument in her opposition brief, and therefore has waived this claim.").

## CONCLUSION

For the foregoing reasons, as well as those stated in BTMU's opening memorandum, DFS's counterclaims are preempted by federal law and fail to state a claim under New York law. The Court should dismiss the counterclaims in their entirety with prejudice.

-20-

Dated:  New York, New York
        June 13, 2018

                                  Respectfully submitted,


                                  By: /s/ Richard C. Pepperman II
                                  Richard C. Pepperman II
                                  Beth D. Newton
                                  SULLIVAN & CROMWELL LLP
                                  125 Broad Street
                                  New York, New York 10004-2498
                                  (212) 558-4000
                                  peppermanr@sullcrom.com
                                  newtonb@sullcrom.com

                                  Robert A. Long, Jr. (*pro hac vice*)
                                  Henry B. Liu (*pro hac vice*)
                                  Jonathan Y. Mincer (*pro hac vice*)
                                  COVINGTON & BURLING LLP
                                  One CityCenter
                                  850 Tenth Street, NW
                                  Washington, D.C. 20001-4956
                                  (202) 662-6000
                                  rlong@cov.com
                                  hliu@cov.com
                                  jmincer@cov.com

                                  *Attorneys for Plaintiff The Bank of Tokyo-*
                                  *Mitsubishi UFJ, Ltd.*
                                  *(now known as MUFG Bank, Ltd.)*